**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|                                                                |   :
| TOUCHSTONE STRATEGIC TRUST,                                    |   :      Index No.
| TOUCHSTONE VARIABLE SERIES TRUST,                              |   :
| THE WESTERN AND SOUTHERN LIFE                                  |   :      **COMPLAINT**
| INSURANCE COMPANY, WESTERN-SOUTHERN                            |   :
| LIFE ASSURANCE COMPANY, WESTERN &                              |   :
| SOUTHERN FINANCIAL GROUP, INC., and                            |   :      **DEMAND FOR JURY TRIAL**
| INTEGRITY LIFE INSURANCE COMPANY,                              |   :

                                    Plaintiffs,

            -against-

GENERAL ELECTRIC COMPANY, JEFFREY R.
IMMELT, JEFFREY S. BORNSTEIN, JAMIE S.
MILLER, and KEITH S. SHERIN,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# **TABLE OF CONTENTS**

**Page**

NATURE OF ACTION ............................................................................................1

PARTIES ............................................................................................................8

JURISDICTION AND VENUE ..............................................................................11

SUBSTANTIVE ALLEGATIONS .........................................................................12

I.      Background ...........................................................................................12

II.     Defendants' LTC scheme ........................................................................14

        A.      The Genworth IPO ...................................................................14

        B.      Defendants assured investors that they had exited the insurance business............16

        C.      Industry experience demonstrated that GE's LTC exposure was not "stable"......21

        D.      GE failed to disclose its LTC liabilities in its disclosure of "Contractual Obligations" ...........................................................................24

        E.      GE's insurance reserve disclosures were misleading and incomplete.................29

        F.      Defendants did not have a reasonable basis to conclude LTC reserves were adequate ...............................................................................33

        G.      GE's belated disclosure of its true LTC exposure ................................39

        H.      Additional allegations of scienter relating to Defendants' LTC scheme..............40

III.    Defendants' scheme to mislead investors as to the strength of GE's Power segment.......45

        A.      Defendants manipulated LTSAs to artificially inflate GE Power Contract Assets and reported revenue .......................................................................47

                1.      Defendants were aware, or reckless in not knowing, that LTSAs revenue were overstated because utilization rates had fallen dramatically ............50

                2.      Defendants renegotiated or otherwise manipulated LTSAs in order to generate phantom income to meet Defendants' growth targets................51

3. Defendants' LTSA scheme begins to unravel ...........................................53

4. GE's restatement confirms that it inappropriately inflated Contract Assets and revenue associated with GE Power LTSAs .......................................56

5. Additional scienter allegations concerning Defendants' LTSA scheme ...58

B. Defendants touted the Alstom acquisition despite knowing that GE grossly overpaid for the troubled company and, as a result, belatedly took a $22 billion charge .........................................................................................................................61

1. Defendants overstated the expected future economic benefits associated with the Alstom acquisition ......................................................................65

2. GE's belated goodwill impairment charges................................................68

3. Additional allegations of scienter concerning the Alstom acquisition ......71

IV. Defendants' materially false or misleading statements and omissions of material facts...73

A. Defendants misled Plaintiffs about GE's LTC exposures ....................................73

1. Statements or omissions regarding GE's "insurance liabilities" and "contractual obligations" ...........................................................................73

2. Statements or omissions regarding GE Capital's insurance exposures and risks ................................................................................................................76

3. Statements or omissions regarding GE's insurance reserves....................79

4. GE violated GAAP by failing to disclosure material contingencies related to its LTC exposure....................................................................................83

5. GE violated GAAP by failing to disclose uncertainties relating to its calculation of LTC exposure.....................................................................85

6. GE violated GAAP by failing to disclose information regarding the basis for its LTC reserve estimates ......................................................................86

7. GE violated Item 303(a)(1)-(3) by failing to disclose known trends, demands, commitments, and uncertainties ..............................................87

8.     Omissions regarding the critical accounting estimates Defendants used to calculate GE's LTC reserves ...................................................................90

B.     Defendants misled Plaintiffs about the strength of GE's Power segment ...........92

1.     Statements or omissions relating to GE's Power segment, including GE's LTSAs, Contract Assets, and industrial CFOA ........................................92

2.     Statements or omissions regarding factoring...........................................100

3.     Statements or omissions regarding the Alstom acquisition ....................101

4.     GE violated Item 303(a)(1)-(3) by failing to disclose known trends, demands, commitments, and uncertainties concerning the Power segment .......................................................................................106

5.     GE's accounting for its Contract Assets and the Alstom transaction violated GAAP...........................................................................................107

C.     SOX Certifications and representations regarding GE's compliance with GAAP...................................................................................................108

D.     Statements or omissions regarding GE's internal controls over financial reporting ...............................................................................................109

V.     Loss causation/economic loss .................................................................................109

A.     April 21, 2017: financial results for 1Q 2017 ....................................................111

B.     July 21, 2017: financial results for 2Q 2017.......................................................113

C.     October 20, 2017: financial results for 3Q 2017.................................................114

D.     November 13-14, 2017: investor update and Goldman Sachs conference ..........119

E.     January 16, 2018: GE's "Insurance Update" ......................................................124

F.     January 24, 2018: disclosure of  4Q 2017 financial results and SEC investigations into GE's LTC reserves and revenue recognition practices related to LTSAs ....129

G.     October 30, 2018: disclosure of $22 billion impairment loss primarily attributable

to the Alstom acquisition and investigations by the SEC and DOJ relating to the impairment charge ............................................................................................................131

VI.    Plaintiffs purchase GE stock in reliance on Defendants' materially false and misleading statements.................................................................................................................132

VII.   No safe harbor...........................................................................................................133

CAUSES OF ACTION .............................................................................................................134

PRAYER FOR RELIEF ............................................................................................................141

JURY TRIAL DEMANDED......................................................................................................142

Plaintiffs Touchstone Strategic Trust, Touchstone Variable Series Trust, The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Western & Southern Financial Group, Inc., and Integrity Life Insurance Company (collectively "Plaintiffs") for their Complaint against Defendants General Electric Company ("GE" or the "Company"), Jeffrey R. Immelt, Jeffrey S. Bornstein, Jamie S. Miller, and Keith S. Sherin (Immelt, Bornstein, Miller, and Sherin are collectively referred to as the "Individual Defendants") hereby allege upon knowledge as to themselves and their own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      GE, once a symbol of American ingenuity and a bellwether of the U.S. economy, has lost over $100 billion in market capitalization since it made the first in a series of disclosures exposing a massive accounting fraud committed during the tenure of Jeffrey Immelt as Chief Executive Officer ("CEO"). To date, GE has taken more than $36 billion in charges related to the fraudulent scheme and has committed to additional capital contributions of $15 billion to be made in subsequent periods.

2.      Plaintiffs purchased approximately 5,320,806 million shares of GE's common stock at artificially inflated prices for an aggregate purchase amount of approximately $120 million. Plaintiffs have lost approximately half of their investment after Defendants' fraud was revealed. A table, identifying each purchase and, to the extent purchased shares were sold, the sale, of GE common stock by Plaintiffs is attached hereto as Exhibit A.

3.      On June 12, 2017, GE announced that John Flannery ("Flannery") would succeed Immelt as GE's CEO effective August 1, 2017. What followed was a dismantling and unraveling of a multi-year scheme of fraud and deception that Immelt and his senior management team,

including his Chief Financial Officer ("CFO"), Jeffrey Bornstein, used to prop up GE's reported financial results since at least 2014. The massive scope of this fraud was revealed to the market piecemeal in a series of disclosures made from late 2017 to late 2018.[1]

4.      Immelt's tenure has been described as "success theatre" because GE's public statements often did not reflect GE's dire position. As reported in a December 2018 article in the Wall Street Journal (the "December 2018 WSJ Report") that was the result of interviews with numerous former GE executives, employees, and directors, Immelt "projected a sunny vision for the company's future that didn't always match reality. . . . That often left Immelt, in the words of one GE insider, trying to market himself out of a math problem."[2] Making matters more acute, sources told the Wall Street Journal that Immelt was obsessed with his legacy and desperate to crawl from the shadow of Jack Welch, his successful predecessor who publicly admitted that his choice of Immelt as successor was a mistake.

5.      Successive failures in GE's financial segment, GE Capital, brought GE to the brink of a collapse. Only a government bailout prevented a total collapse. Immelt and his management team vowed to drastically reduce its reliance upon GE Capital and refocus its strategic plan on its industrial segment, including GE Power. Defendants encountered multiple problems executing this strategy including GE's inability to (i) shed itself of its enormous exposure to toxic long-term-care ("LTC") policies, and (ii) generate growth in GE's Power segment. Defendants attempted to market their way out of these problems with repeated assurances that it had exited the insurance business and retained only "stable" runoff business

---

[1] In October 2018, GE announced that Lawrence Culp was replacing Flannery as CEO.

[2] *GE Powered the American Century—Then it Burned Out*, Wall St. J.  (Dec. 14, 2018), https://www.wsj.com/articles/ge-powered-the-american-centurythen-it-burned-out-11544796010.

and by misleading investors as to the value of assets acquired in GE's acquisition of the French power company, Alstom SA.

6.     _Defendants misled investors as to the extent of GE's exposure to LTC insurance and reinsurance_. From 1990 until 2003, GE Capital underwrote and reinsured billions of dollars in LTC policies covering the cost of home care, assisted living care, adult care, and general living aid expenses not covered by health insurance. Insurance regulations, Generally Accepted Accounting Principles ("GAAP"), and Statutory Accounting Principles ("SAP") require GE Capital to hold sufficient cash reserves and book-related liabilities for anticipated claims. Cash reserves are calculated utilizing assumptions based upon mortality, morbidity, lapse rates, claims experience, and health care costs.

7.     In 2003, GE announced that it intended to exit the insurance business through a spin-off that led to the creation of Genworth Financial, Inc. GE stated that the Genworth transaction would divest it of "most" of its insurance operations. When the Genworth transaction was announced in November 2003, Immelt stated on a conference call that GE was retaining only a "very stable" block of policies that were "pric[ed] diligently" and provided "safe earnings." However, GE did not make a strategic decision to retain its LTC block. According to a Bloomberg report published in 2018, the bankers that structured the spin-off, Goldman Sachs and Morgan Stanley, advised GE that it could not divest itself of its LTC liabilities in the Genworth transaction because they were too risky.[3] GE never disclosed this fact.

8.     In fact, after the Genworth transaction, GE made a number of statements that led investors to conclude that GE's insurance exposures were reduced to an immaterial amount. In

---

[3] _See GE's Surprise $15 Billion Shortfall Was 14 Years in Making_, Bloomberg (Jan. 29, 2018), http://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-14-years-in-the-making.

its Form 10-K for 2006, GE stated "we substantially completed our planned exit of the insurance businesses through the sale of the property and casualty insurance and reinsurance businesses and the European life and health operations of GE Insurance Solutions Corporation." In GE's Form 10-K for 2012, Defendants removed any quantification of LTC exposures from required management discussion and analysis ("MD&A"). This omission was carried forward until 2018. GE also did not disclose the amount that it was recording as a reserve for LTC exposures in its financials, instead lumping all of its insurance reserves in a line item it described as relating to life insurance and annuities. In reality, almost the entire reserve related to LTC, but investors could not discern this from GE's U.S. Securities and Exchange Commission ("SEC") filings. This omitted information was essential because LTC insurance is far more volatile than traditional life insurance and annuities.

9.      GE did not begin to disclose its true exposure to LTC until July 21, 2017 when GE's CFO, Bornstein, announced that GE experienced adverse claims in its LTC portfolio and that GE would have to reassess the adequacy of its reserves. On October 20, 2017, GE announced it would suspend a $3 billion dividend payment until its reserve review was complete. In January 2018, GE announced that it was increasing LTC reserves by $8.9 billion, almost doubling them, and taking a related $6.2 billion charge to earnings. GE further announced that it expected to make additional capital contributions of $15 billion over the next seven years to address adverse claims experience. On November 30, 2018, the Wall Street Journal reported that former GE employees interviewed by the SEC admitted that the "insurance business failed to internally acknowledge worsening results over the years" and "buried risks that ultimately kept the company from booking bigger reserves."[4] At least one individual left the Company "after

---

[4] *In GE Probe, Ex-Staffers Say Insurance Risks Were Ignored*, Wall St. J. (Nov. 30, 2018), https://www.wsj.com/articles/in-ge-probe-ex-staffers-say-insurance-risks-were-ignored-1543580971.

growing concerned that senior executives in the division were changing numbers and their methodology without providing supporting evidence." *Id.*

10.     *GE misled led investors as to the health of its Power segment*. GE's plan to decrease reliance on GE Capital was largely dependent upon growing GE Power. Defendants assured the market that they would be able to achieve the required growth through strategic acquisitions and growing GE Power's "service" contracts.

11.     The performance of GE's industrial segment was impressive through year end 2016. However, in April 2017, GE made the first in a series of announcements cautioning the market that the expected cash flow from this unit was unlikely to meet previously provided guidance due, in large part, to lower than expected cash payments relating to "Contract Assets." In April 2018, GE announced that it was restating its 2016 and 2017 financial statements by $8.7 billion to adjust its accounting for long-term service agreements ("LTSAs"), decreasing industrial profits by 17%. LTSAs are contracts that GE enters into with clients under which GE agrees to maintain industrial equipment or facilities, often oil and gas run turbines.

12.     What has recently come to light is that GE's inflation of Contract Assets was part of a broader scheme to mislead investors about the progress that Defendants were making in their strategic plan to "pivot" away from GE Capital to its industrial core, primarily GE Power. In 2014, Immelt was eager to acquire a major power business. As reported in the December 2018 WSJ Report, he aggressively pursued Alstom despite the fact that the GE merger team had conducted due diligence on Alstom in 2012 and determined that the company was not an attractive acquisition target because it was in much worse financial condition than the public knew and had far too many employees who would be difficult to lay off due to the French regulatory landscape.

13.     Immelt was so eager to acquire Alstom that he bid far and above what the GE merger team thought the company was worth. When the Alstom deal was announced in April 2014, GE issued a press release stating that Alstom was expected to add $.08-$.10 of earnings in 2016 and quoted Immelt as saying Alstom was "expected to provide an excellent return on capital." There was no mention in the press release of the fact that GE concluded in 2012 that Alstom was too troubled financially to be an attractive target and that Immelt had agreed to pay a price that vastly exceeded what his own team thought was a reasonable price.

14.     After the Alstom deal was announced, Defendants set unreasonable growth targets for GE Power. On a conference call in January 2015, Bornstein admitted that orders for gas turbines, a major revenue driver for GE Power, were falling. But he assured investors that GE would be able to nevertheless meet growth targets because it could "grow services," meaning it could generate revenue by providing services to GE Power customers.

15.     Bornstein failed to disclose that these service revenues were phantom revenue. In an article dated February 22, 2018 titled *How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE*, The Wall Street Journal reported that GE was merely "pulling forward" future sales citing interviews with former executives who admitted that GE was agreeing to provide turbine upgrades that "meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that future sales were being pulled forward." He also did not disclose that LTSA revenues were booked using historical average usage rates for GE's clients—a fact Defendants recently admitted in a class action litigation involving Defendants—instead of the actual utilization rates GE was observing. Defendants knew those rates were dramatically declining due to global trends in energy usage, energy efficiency, and competition from renewable energy providers.

16.     In interviews referenced in the December 2018 WSJ Report, GE executives admitted that these tactics were "aggressive" and that "profits were mostly on paper. Rarely was a new dollar of profit flowing in the door." When GE Power employees expressed their concerns regarding the manipulation of LTSA revenues, Steve Bolze, head of GE Power, and Paul McElhinney, the head of the unit responsible for LTSAs, told them to continue their "aggressive" manipulation of LTSAs. According to the report, McElhinney told GE Power employees, "'***Get on board***,' . . . '***We have to make the numbers***.'"

17.      As noted, GE ultimately took a charge of $8.7 billion to correct for its improper manipulation of LTSA related "Contract Assets." While GE attempted to chalk it up to a change in accounting rules at the time, none of GE's peers took a charge of a similar magnitude and public reports all point towards one conclusion: Defendants, desperate to generate growth in GE Power to reassure investors that their strategic "pivot" was proceeding as planned, consciously manipulated LTSA related Contract Assets and related revenues to mislead investors.

18.     GE's $8.7 billion charge relating to LTSAs was dwarfed by the charge that was required to clean up the Alstom scheme. On October 2018, GE announced that it was replacing Flannery with Lawrence Culp and that it expected to take a large goodwill impairment charge relating primarily to the Alstom acquisition. On October 30, 2018, GE confirmed that it was taking a goodwill impairment charge of approximately $22 billion relating to the Alstom acquisition. In other words, GE previously overstated the future expected economic benefit of the Alstom acquisition on its balance sheet by $22 billion. This was particularly shocking because GE paid only approximately $10 billion for Alstom. At the same time, GE announced that the U.S. Department of Justice ("DOJ") had opened a criminal investigation into Defendants' accounting for the GE acquisition and their manipulation of LTSAs and that the

SEC had expanded its investigation to cover the Alstom acquisition as well as LTC and LTSA reporting.

*      *      *

19.     Defendants' misrepresentations and omissions hid the true nature of GE's exposure to toxic LTC policies and structural weaknesses in GE's Power segment. Defendants' omissions and misrepresentations are actionable under the Securities Exchange Act of 1934 ("Exchange Act"), the Ohio Securities Act, and under the common law.

**PARTIES**

20.     Plaintiff Touchstone Strategic Trust is an open-end, managerial investment company, and is a registered Massachusetts business trust, with its principal place of business located in Cincinnati, Ohio. GE shares were purchased for inclusion in funds that were each a series of the Touchstone Strategic Trust including the Touchstone Focus Fund and Touchstone Value Fund. Collectively Touchstone Strategic Trust funds purchased 2,255,283 shares of GE common stock on the dates identified in Exhibit A.

21.     Plaintiff Touchstone Variable Series Trust is an open-end, managerial investment company, and is a registered Massachusetts business trust, with its principal place of business located in Cincinnati, Ohio. GE shares were purchased for inclusion in funds that were each a series of the Touchstone Variable Series Trust including the Touchstone Focused Fund, Touchstone Balance Fund, and the Touchstone Common Stock Fund. Collectively Touchstone Variable Series Trust funds purchased 294,535 shares of GE common stock on the dates identified in Exhibit A.

22.     Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of

business in Cincinnati, Ohio. The Western and Southern Life Insurance Company purchased approximately 1,630,462 shares of GE common stock on the dates identified in Exhibit A.

23.     Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. Western-Southern Life Assurance Company purchased approximately 778,287 shares of GE common stock on the date identified in Exhibit A.

24.     Plaintiff Western & Southern Financial Group, Inc. is an Ohio company with its principal place of business in Cincinnati, Ohio. It is the ultimate parent of Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, and Integrity Life Insurance Company. Western & Southern Financial Group, Inc. purchased approximately 317,774 shares of GE common stock on the dates identified in Exhibit A.

25.     Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. Integrity Life Insurance Company purchased approximately 44,465 shares of GE common stock on the dates identified in Exhibit A.

26.     Defendant GE is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. GE holds itself out as a global digital industrial company with products and services ranging from aircraft engines, power generation, and oil and gas production equipment to medical imaging, financing, and industrial products.

27.     Defendant Immelt served as the Chairman of GE's Board from September 7, 2001 to October 2, 2017, when he was replaced by Flannery. Flannery assumed this position three months ahead of schedule because Immelt resigned earlier than expected. Immelt also served as GE's CEO from September 2001 through July 31, 2017, and was a member of GE Capital's

Board from 1997 through 2015. Immelt was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conference and earnings calls described herein until his departure. Immelt also signed the 10-Ks and 10-Qs that GE filed with the SEC during the relevant period, including the 10-Ks from 2013 through 2016, and the 10-Qs from 2014 through 2017.

28.     Defendant Bornstein was appointed Senior Vice President and CFO of GE, effective July 1, 2013, replacing Defendant Sherin, and served in that role until October 31, 2017. Bornstein also served as a member of GE Capital's Board from 2006 through 2015. GE's Board appointed Bornstein as Vice Chairman of GE, effective June 12, 2017. But shortly thereafter, on October 10, 2017, GE announced that Bornstein's term as Vice Chairman would abruptly conclude at the end of the year. Bornstein was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conferences and earnings calls described herein until his sudden, early departure on October 31, 2017. Bornstein also signed the 10-Ks and 10-Qs that GE filed with the SEC during the relevant period, including the 10-Ks from 2013 through 2016, and the 10-Qs from 2014 through 2017.

29.     Defendant Miller has served as GE's CFO since November 1, 2017. Miller joined GE in 2008 as Vice President, Controller, and Chief Accounting Officer ("CAO"). She became GE's Senior Vice President and Chief Information Officer in 2013, and became President and CEO of GE Transportation in 2015. Miller was a direct and substantial participant in the fraud, including through her making of the false or misleading statements and omissions alleged herein. Miller also signed the 10-Ks and 10-Qs that GE filed with the SEC during the relevant period, including the 10-K for 2017, and the 10-Qs for 2018.

30.     Defendant Sherin served as CFO of GE from 1999 until July 2013, when he became GE Capital's Chairman and CEO. Sherin held both positions until he resigned, effective September 1, 2016. Sherin also served as Vice Chairman of GE from 2007 until December 31, 2016. Sherin was a direct and substantial participant in the fraud until he left GE in September 2016, including through his making of the false or misleading statements and omissions alleged herein and participation in the conferences and earnings calls described herein, until he resigned from GE and GE Capital, effective September 1, 2016.

## JURISDICTION AND VENUE

31.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.     This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of Defendants' actions took place within this District. Further, GE's common stock trades on the New York Stock Exchange ("NYSE"), located within this District.

34.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

35.   GE was founded in 1889 by Thomas Alva Edison with backing from J.P. Morgan's Drexel, Morgan & Co and was formally incorporated in 1892. The original entity combined Edison's business interests in several electricity-related companies. In 1896, GE was included as one of the twelve original companies included in the Dow Jones Industrial Average. (In 2018, after Defendants' fraud was revealed, GE was removed from the Dow Jones Industrial Average.)

36.   GE was a pioneer in developing electrical generation equipment, distribution systems, and light bulbs. It soon branched out to manufacture and sell household appliances, including ovens, washer machines and dryers, radios and televisions, curling irons and toothbrushes. In 1932, GE created a finance arm called GE Capital in order to help consumers buy its home appliances.

37.   GE's former CEO, Jack Welch, is credited with building the modern GE. During his twenty-year tenure beginning in 1981, GE expanded into more disparate businesses and GE Capital accounted for more and more of GE's growth. As a recent Wall Street Journal report put it, under Welch, GE "worked more like a collection of businesses under the protection of a giant bank." *See* December 2018 WSJ Report. At one point, GE Capital accounted for half of all GE profits and was one of the biggest banks in the country.

38.   By the end of Welch's tenure, GE was in a variety of different businesses, including power generation, oil and gas, computing, aviation, insurance, healthcare, media,

transportation, lighting, and capital. GE Capital's performance was credited with allowing GE to pay its regular dividend and deliver consistent financial performance despite broadly disparate results in its portfolio businesses.

39.     Immelt was Welch's hand-picked successor. Four days after Immelt took over, the attacks of September 11 took place and GE's insurance business suffered significantly. In the following years, Immelt attempted to exit the insurance business entirely, selling most of GE's insurance lines. As noted below, unbeknownst to investors, Immelt was unable to exit the LTC business due to the excessive risk in that book of business.

40.     The financial crisis brought GE to the brink of collapse and forced GE to cut its dividend for the first time since the Great Depression. The Federal Reserve intervened to save the company.

41.     In the wake of the financial crisis, GE was designated a "Systemically Important Financial Institution" subjecting it to more intrusive oversight from the Federal Reserve. According to a recent report: "Immelt gritted his teeth at the name of Caroline Frawley, head of the Fed teams that patrolled the unit that spun out nearly half of GE's profits. 'That woman,' he said at one point, 'is not going to tell me how to run this company.'" *See* December 2018 WSJ Report. Immelt ultimately determined to rapidly reduce the size of GE Capital in order to "de-SIFI" GE and return to GE's industrial roots. Under Immelt's plan, less than 10% of GE's revenue would come from the financial segment.

42.     GE's financial statements and the statements of the Individual Defendants led investors to conclude that the plan was working and the market value of GE's common stock rose significantly.

13

43.     In reality, the plan was not working. In a series of recent disclosures, GE has admitted that the impressive results it reported during the period in which Plaintiffs purchased their shares were drastically overstated.

44.     After Immelt resigned as CEO of GE in July 2017, GE undertook a review of its business that revealed "deep problems in the company's core power division and legacy insurance business, forcing GE to slash its dividend and profit goals."[5] To date, these problems have resulted in approximately $36 billion of charges to adjust for GE's failure to disclose accurately and completely its exposure to LTC insurance claims and problems in its Power segment. Specifically, these charges were required to address: (i) inadequate loss reserves for its LTC insurance and reinsurance policies; and (ii) the revenue recognition policies relating to its industrial segment and GE's 2014 purchase of the power and grid division of French manufacturer Alstom.

## II.   Defendants' LTC scheme

### A.   The Genworth IPO

45.     From 1990 until 2003, GE Capital reinsured billions of dollars in LTC policies covering the cost of home care, assisted living care, adult care, and general living aid expenses not covered by health insurance. Insurance regulations, GAAP, and SAP require GE Capital to hold sufficient cash reserves and book-related liabilities for anticipated claims. Cash reserves are calculated utilizing assumptions based upon mortality, morbidity, lapse rates, claims experience, and health care costs.

---

[5] *See GE Narrows Focus to Power, Aviation in Latest Revamp*, W.S.J. (June 26, 2018), https://www.wsj.com/articles/ge-to-spin-off-health-care-business-in-latest-revamp-1530005401.

46.     In November 2003, GE announced that it intended to exit the insurance and reinsurance business through a spin-off that led to the creation of Genworth Financial, Inc. GE stated that the Genworth transaction would divest it of "most" of its insurance operations.[6] This was disclosed as part of a larger strategy to exit its low-return businesses and redeploy capital to refocus on higher-growth businesses.

47.     GE spun off most of the life insurance assets, and all of the mortgage insurance assets held by GE Financial Assurance Holdings Inc. ("GEFAH"), which had a book value of approximately $10 billion. GE retained the insurance operations conducted through its principal insurance businesses, GE Insurance Solutions, and its subsidiary Employers Reassurance Corporation ("ERAC"). Among other things, ERAC reinsured LTC policies originally written by Allianz, American United LLC, Berkshire Life, Jackson National Life, John Alden, Lincoln Benefit Life, MassMutual, State Life, Trans America, and others.

48.     As part of the spin-off, GE's Union Fidelity Life Insurance Company ("UFLIC") subsidiary entered into agreements to reinsure portions of Genworth's LTC portfolio. Thus, while GE superficially transferred this block of LTC policies to Genworth in connection with its IPO, Genworth transferred the financial risks of these LTC blocks right back to GE (via UFLIC) through the reinsurance agreements.

49.     Defendants knew that GE retained exposure to over 300,000 LTC policies that exposed GE to a number of risks, none of which were disclosed to investors. In particular, Miller served as a GE controller during the Genworth IPO. As controller, she would have had been

---

[6] *See GE Plans to Pursue Initial Public Offering of Its Principal Life and Mortgage Insurance Operations; Will Hold Investor Meeting and Webcast November 19*, GE Press Release (Nov. 18, 2003), https://www.businesswire.com/news/home/20031118005916/en/GE-Plans-Pursue-Initial-Public-Offering-Principal.

involved in the Genworth IPO and aware of work done to assess what business was included in the IPO and what was left out. Miller, as Controller, would have received materially identifying risk associated with the LTC block.

50.     On November 19, 2003, during a call with investors, Immelt described the business that GE retained "as a piece low return, very stable, runoff block from [its] portfolio." Immelt further claimed that GE strategically retained these assets, that they were "pric[ed] very diligently" and that they supplied "pretty safe earnings." In addition, Immelt stated that GE "maintained strong reserv[es]" against these assets.

51.     GE, however, did not make a strategic decision to retain its LTC block. According to a Bloomberg report published in 2018, the bankers that structured the spin-off, Goldman Sachs and Morgan Stanley, advised GE that it could not divest itself of its LTC liabilities in the Genworth transaction because they were too risky and that the IPO would be difficult to complete if they were included in the spun-off entity.[7]

52.     According to Genworth in its IPO documents, the LTC reinsurance business retroceded to GE in connection with the IPO, was associated with $1.5 billion in reserves. GE, however, did not provide its own investors with any information following the Genworth IPO regarding the size, composition, or quality of this LTC exposure, or the risks associated therewith.

**B.     Defendants assured investors that they had exited the insurance business**

53.     Following the Genworth IPO, GE went to great lengths to assure investors that it was exiting the insurance market and would continue to reduce its remaining insurance exposure.

---

[7] *See GE's Surprise $15 Billion Shortfall Was 14 Years in Making*, Bloomberg (Jan. 29, 2018), http://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-14-years-in-the-making.

For example, during a December 18, 2003 conference call, Immelt stated that GE had "exited, or announced the exit, [of] a substantial portion of our insurance business," and explained that the Genworth IPO "takes the low return insurance business and makes it a much smaller portion of the overall GE portfolio."

54.     Several months later, during an April 8, 2004 conference call, Sherin stated, with respect to GE's remaining exposure, that "[w]e're seeing some good momentum in the life business and long-term care segments." A few months later, on July 9, 2004, Sherin assured investors that "our plan is to sell down [the remaining insurance] position in an orderly manner, but the plan to reduce capital insurance is on track."

55.     By October 8, 2004, when asked during a conference call whether GE's higher-normalized dividend rate that period reflected "the lower capital intensity of the business with insurance kind of shrinking as a percent of the total," Sherin told investors that "we have exited insurance." During the same call, Sherin assured the market that GE had analyzed and had reduced the risks associated with its remaining insurance position:

> The whole focus at our reinsurance business which as I said we call insurance solutions today, has been to re-underwrite the book from top to bottom and Ron Pressman and his team have taken apart every single line of business. . . . [E]very single decision is made based on what we think our return on equity is going to be based on the risk we're taking. They've done a great job of reducing risk by isolating how much exposure we have and aggregating the exposure across the entire underwriting portfolio.

56.     In 2006, GE disclosed that it had sold off the vast majority of its remaining insurance operations to Swiss Re, including: (i) the June 2006 sale of GE Insurance Solutions (f/k/a ERC) for $6.8 billion; and (ii) the December 2006 sale of all of the remaining operations of subsidiary GE Life for $0.9 billion.

57.    Following these dispositions, GE stated in its 10-K for the year ended December

31, 2006:

> In 2006, *we substantially completed our planned exit of the insurance businesses*
> through the sale of the property and casualty insurance and reinsurance businesses
> and the European life and health operations of GE Insurance Solutions Corporation
> (GE Insurance Solutions) and the sale of GE Life, our U.K.-based life insurance
> operation, to Swiss Reinsurance Company (Swiss Re).

58.    On numerous occasions following GE's sale of Insurance Solutions to Swiss Re,

GE emphasized its purported "exit" from insurance, praising the move as "strategically

important" to GE and one that improved GE Capital's risk profile.

59.    For example, during an April 11, 2008 conference call, Immelt told investors that

"what we have done over the last few years is try to derisk financial services by exiting

insurance, reinsurance, mortgage insurance, and we want to continue to do that to get more of a

debt spread and consistent model." During a February 10, 2009 presentation at the Barclays

Capital Industrial Select Conference, Sherin stated more specifically that over "the last several

years, we've exited mortgage insurance, bond insurance, life insurance, long-term care

insurance, reinsurance."

60.    Sherin likewise assured investors on a June 8, 2011 conference call that GE

Capital "sold all the insurance businesses, life insurance, bond insurance, reinsurance" and, after

those dispositions, had "a tremendously more focused portfolio." Sherin repeated this statement

during a January 20, 2012 earnings call, telling investors that while GE previously "had

significant insurance operations," it has since "sold all the insurance businesses."

61.    On May 22, 2013, during an Electrical Products Group Conference, GE announced

it was entering into the second phase of its plan to liquidate GE Capital's "non-core assets," which

included "*continu[ing] to do run-off of non-core assets*." Analysts seized upon these statements

noting that the Company is "committed to continued run-off of its non-core Capital assets."

62.     During the Sanford C. Bernstein Strategic Decisions Conference on May 31, 2013,

Chairman and CEO of GE Capital, Mike Neal ("Neal"), stated that "we have made [GE Capital]

smaller. *We have made it safer*. We have made it more core." Neal further described GE

Capital's remaining portfolio as "*our best stuff*" and claimed that it *"is very safe for us and we err*

*on the side of being safe and being secure*."

63.     On November 15, 2013, GE Capital held an Investor Day Meeting where it

announced further reductions to its asset base and a continued reduction of its non-core portfolios.

For example, during the call, Sherin boasted that "[t]he team has done a fantastic job of reducing

the overall size of GE Capital, and *more importantly, exiting the non-core assets*."  Sherin

added that "we'll still have about $50 billion in non-core assets that Bill is going to show you some

of what we're doing *to continue to run this off, and put proceeds of that back into the core*

*business*." GE Capital Chief Operating Officer Cary further stated, "we entered the crisis with

almost a third of our portfolio activities that today we would define as non-core. *We've really*

*shrunk that dramatically*,  and now over 85% of our book are in things, activities, places, markets,

products that we like a lot, and we think we can -- that we can grow successfully."

64.     Analysts continued to buy into Defendants' representations that GE Capital's

portfolio was becoming safer. For instance, in a November 25, 2013 report, Barclays' analysts

further stated that "the overall GE story is improving and at a faster rate than is generally perceived,

in our view; *it is becoming lower risk and more shareholder friendly*. Portfolio simplification

should continue to be a powerful stock driver. . . . GE has plenty of cash and B/S optionality. . . .

[And] an excellent core portfolio."

65.     During the Company's December 18, 2013 guidance update call, Immelt affirmatively represented that, as part of GE's divestiture of "non-core" assets, it "**sold the reinsurance business**." Yet in making this representation, Immelt failed to disclose that the Company continued to reinsure hundreds of thousands of high-risk LTC insurance policies.

66.     In September 2014, GE again represented to investors that it had divested—and would continue to divest—non-core assets including, specifically, its run-off insurance portfolio. Indeed, on September 8, 2014, GE issued a press release announcing the sale of its Appliances business to Electrolux and noted that GE's "2014 portfolio activity continues the Company's longer-term **redeployment of capital from non-core assets like** media, plastics **and insurance** to higher-growth, higher margin businesses in Oil & Gas, Power, Aviation and Healthcare."

67.     In connection with its December 16, 2014 guidance update call, Defendants specifically stated that they had made GE Capital safer by selling insurance assets. Indeed, in a presentation to investors, GE indicated that it had executed its "risk reduction" plan to "**sell insurance before the storm**." Immelt further boasted that "**we exited insurance in time**." Again, Defendants made no mention of the significant LTC risks that GE continued to reinsure.

68.     Instead, Defendants continued to tout the "strong," "solid," and less-risky nature of GE Capital's remaining assets. During the June 1, 2016 Sanford C. Bernstein Strategic Decisions Conference, Sherin stated:

> So, we are a lot smaller. Assets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity. That's up substantially from where it was when we were designated. **And we are not just smaller; we exited whole pools of risk**.

69.     In fact, during the same Conference, Sherin boldly represented that GE had gotten rid of **all** of its insurance business. In response to an analyst request for Sherin to put GE's transformation over the last year and a half into context from a long-term perspective, Sherin

boasted that "[i]f you look at what the portfolio is today versus take it when Jeff [Immelt] started, *all of the insurance business is gone. That was a huge change in the portfolio*. . . . It's a cleaner more synergistic portfolio. So we feel great about it."

70.     At no point during their discussions about "de-risking" GE Capital did Defendants disclose that GE had still retained a toxic LTC portfolio or had a crippling, multi-billion dollar future liability. To the contrary, Defendants omitted any disclosure regarding these massive liabilities even as: (i) the LTC market continued to crumble; and (ii) GE's LTC exposure became an increasingly large part of GE Capital's remaining asset base.

### C.     Industry experience demonstrated that GE's LTC exposure was not "stable"

71.     The LTC block retained by GE was anything but "stable," which is exactly why GE could not get rid of it in the Genworth transaction. By 2003, it was apparent to industry professionals that the assumptions that were used to price LTC polices were in many cases wrong—GE and its competitors were forced to maintain policies longer than expected due to policyholders living longer, low lapse rates, and increases in healthcare costs.

72.     Insurance companies typically price LTC insurance premiums based on four assumptions: (i) mortality rates (how long individuals who have policies are expected to live, pay premiums, and collect benefits); (ii) lapse rates (how many insureds will stop paying their premiums and let their policies terminate); (iii) morbidity rates (the chance someone will develop a condition requiring LTC); and (iv) interest rates (the rate of interest income earned on reserves held against premiums collected).

73.     Insurers initially assumed that 8% of policyholders would let their policies lapse within one year, with an additional 4% thereafter. In practice, only 4% let their policies lapse in the first year, and just 0.5% thereafter.  In addition, by 2007, insurers had reduced their

assumptions for mortality rates by 10% compared to the assumptions that were used to price LTC policies in 2000, and by 2014 those rates had been reduced by an additional 20%. Likewise, morbidity rates in 2014 were between 15 to 45% higher than they were in 2000. During this same time period, interest rates were 2 to 4%, far lower than the 3 to 8% assumed by insurers.

74.     At the same time GE was touting its safe exit from insurance, its peers were taking drastic steps to address negative market-wide developments in the LTC industry. Due to the rising costs and liabilities associated with providing LTC insurance, most insurers chose to exit the LTC market altogether.  Following a peak of approximately 750,000 new LTC policies issued in 2002, annual individual LTC policy sales declined sharply each year, to a low of roughly 90,000 policies sold in 2016. The number of carriers issuing new policies likewise fell sharply, from over 100 insurers in the early 2000s to, according to the actuarial firm Milliman, 17 by 2016.

75.     When MetLife (another original writer of LTC policies reinsured by GE, via UFLIC) announced its exit from the LTC market 2010, a MetLife spokeswoman stated that "the financial challenges facing the [LTC] insurance industry in the current environment *are well-known*" and "aren't unique to MetLife." Prudential similarly stated that its exit in 2012 "reflect[ed] the challenging economics of the individual [long-term care] market."

76.     As insurers exited the LTC market, adverse claims experience and losses mounted. To account for the dramatic increase in their expected future liabilities to LTC policyholders, many insurance companies sought to increase LTC premiums. All told, between 2009 and 2017, LTC insurers sought premium rate increases. Some of the increases sought have been as high as 130% (Genworth). In approving rate increase requests by Genworth, MetLife, and John Hancock in 2016, the Pennsylvania Insurance Department stated that "[t]he current policies in place are not generating sufficient premium to pay future claims to policyholders.

***This is a common problem for a number of insurers nationwide*** because policyholders are keeping their policies longer than expected and are living longer than projected."

77.     In addition to these premium rate increases, as reflected in the chart below, insurers also recorded large reserve charges to account for their increased future LTC liabilities long before GE announced that it needed to take billions of charges to adjust its LTC reserves:

| Year | Company | Reserve Amount | Explanation |
|------|---------|----------------|-------------|
| July 2006 | GE Capital Life Assurance Company of New York (one of the entities spun off by GE in connection with the Genworth IPO) | $184 million reserve increase (required by NYDFS) | "long-term care business ha[d] sustained continued losses due to the aging of the block and persistency," and that its reserves were based on overly aggressive assumptions |
| February 2012 | Unum | $573.6 million pre-tax charge ($372.8 million after-tax), which resulted in a $425.4 million net loss for 4Q11 | "due largely to . . . its strategic review of the long-term care business," which resulted in "an increase to long-term care policy and claim reserves" |
| November 2012 | Prudential | ***$698 million reserve charge***; resulting in "a pre-tax loss of $685 million from divested businesses, primarily related to long-term care insurance" | "charge related to [its] long term care insurance [portfolio] to reflect updates of actuarial assumptions based on our annual review" |
| November 2014 | Genworth | $531 million reserve increase | "claimants are staying on claim longer than expected and using more of the available benefits" |
| February 2015 | Unum | $698.2 million reserve increase | Resulting from low interest rates |
| February 2015 | Genworth | $700 million reserve increase | Resulting from completion of annual loss recognition testing |
| September 2016 | Genworth | $905 million reserve increase | Resulting from an annual review of assumptions |

| Year | Company | Reserve Amount | Explanation |
|------|---------|----------------|-------------|
| November 2016 | Manulife (John Hancock) | $455 million reserve increase and a charge against earnings of $313 million | Resulting from "updates to policyholder assumptions" and "a downward revision to our ultimate reinvestment rate assumptions" |

### D. GE failed to disclose its LTC liabilities in its disclosure of "Contractual Obligations"

78.     Recognizing that GE Capital's rising LTC risks and liabilities threatened to derail their narrative that GE Capital had become less risky, Defendants took increased steps to conceal them from investors' view, including, as described below, *intentionally removing* any disclosure from its annual SEC filings concerning the extent of its LTC liabilities.

79.     Under Item 303(a)(5) of Regulation S-K, GE was required to include in its Form 10-K a tabular breakdown of its "Contractual Obligations." Item 303(a)(5) provides:

> In a tabular format, provide the information specified in this paragraph (a)(5) as of the latest fiscal year end balance sheet date with respect to the registrant's known contractual obligations specified in the table that follows this paragraph (a)(5)(i). The registrant shall provide amounts, aggregated by type of contractual obligation. The registrant may disaggregate the specified categories of contractual obligations using other categories suitable to its business, but *the presentation must include all of the obligations of the registrant that fall within the specified categories*. A presentation covering at least the periods specified shall be included. The tabular presentation may be accompanied by footnotes to describe provisions that create, increase or accelerate obligations, or other pertinent data to the extent necessary for an understanding of the timing and amount of the registrant's specified contractual obligations.

17 C.F.R. § 229.303(a)(5).

80.     Prior to GE's annual statement for 2012, GE included future claims payments on its run-off LTC portfolio within its "Insurance Liabilities" line item. For example, in its 10-K for the year-ended December 31, 2008, GE stated that its Insurance Liabilities "[i]ncluded guaranteed investment contracts, structured settlements and single premium immediate annuities

based on scheduled payouts, as well as those contracts with reasonably determinable cash flows

such as deferred annuities, universal life, term life, long-term care, whole life and other life

insurance contracts." As reflected below, this line item totaled $22 billion as of December 31,

2008:

**Contractual Obligations**

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2008, follow.

| (In billions) | Total | | 2009 | | 2010-2011 | | 2012-2013 | | 2014 and thereafter |
|---|---|---|---|---|---|---|---|---|---|
| Borrowings (Note 18) | $ 523.8 | $ | 193.7 | $ | 115.6 | $ | 79.8 | $ | 134.7 |
| Interest on borrowings | 142.0 | | 20.0 | | 29.0 | | 18.0 | | 75.0 |
| Operating lease obligations (Note 5) | 6.6 | | 1.3 | | 2.2 | | 1.6 | | 1.5 |
| Purchase obligations[(a)(b)] | 63.0 | | 40.0 | | 16.0 | | 6.0 | | 1.0 |
| Insurance liabilities (Note 19)[(c)] | 22.0 | | 3.0 | | 5.0 | | 3.0 | | 11.0 |
| Other liabilities[(d)] | 97.0 | | 33.0 | | 8.0 | | 4.0 | | 52.0 |
| Contractual obligations of discontinued operations[(e)] | 1.0 | | 1.0 | | – | | – | | – |

(a) Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b) Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 31 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(c) Included guaranteed investment contracts, structured settlements and single premium immediate annuities based on scheduled payouts, as well as those contracts with reasonably determinable cash flows such as deferred annuities, universal life, term life, long-term care, whole life and other life insurance contracts.

(d) Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. See Notes 21 and 29 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report for further information on certain of these items.

(e) Included payments for other liabilities.

    81.    By 2011, GE's Disclosed Insurance Liabilities had increased to $23.7 billion. The

table included in GE's 10-K for 2011 noted that it "[i]ncluded contracts with reasonably

determinable cash flows such as structured settlements, certain property and casualty contracts,

and guaranteed investment contracts." The table made no reference to whether or not the table

included LTC liabilities.

**Contractual Obligations**

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2011, follow.

| (In billions) | Total | | 2012 | | 2013-2014 | | 2015-2016 | | 2017 and thereafter |
|---|---|---|---|---|---|---|---|---|---|
| Borrowings and bank deposits (Note 10) | $ | 453.4 | $ | 173.8 | $ | 104.5 | $ | 52.6 | $ | 122.5 |
| Interest on borrowings and bank deposits | | 116.1 | | 12.2 | | 17.5 | | 12.8 | | 73.6 |
| Purchase obligations(a)(b) | | 57.3 | | 32.5 | | 15.1 | | 4.7 | | 5.0 |
| Insurance liabilities (Note 11)(c) | | 23.7 | | 2.9 | | 3.6 | | 2.5 | | 14.7 |
| Operating lease obligations (Note 19) | | 4.5 | | 1.0 | | 1.4 | | 0.9 | | 1.2 |
| Other liabilities(d) | | 73.6 | | 23.5 | | 12.5 | | 8.0 | | 29.6 |
| Contractual obligations of discontinued operations(e) | | 1.4 | | 1.4 | | – | | – | | – |

(a)     Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, contractual commitments related to factoring agreements, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b)     Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 25 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(c)     Included contracts with reasonably determinable cash flows such as structured settlements, certain property and casualty contracts, and guaranteed investment contracts.

(d)     Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. For further information on certain of these items, see Notes 14 and 22 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(e)     Included payments for other liabilities.

82.     In its 2012 10-K filed on February 26, 2013, GE reported total Insurance Liabilities of $14 billion.

**Contractual Obligations**

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2012, follow.

| (In billions) | Total | | 2013 | | 2014-2015 | | 2016-2017 | | 2018 and thereafter |
|---|---|---|---|---|---|---|---|---|---|
| **Payments due by period** | | | | | | | | | |
| Borrowings and bank deposits (Note 10) | $ | 414.1 | $ | 139.2 | $ | 103.2 | $ | 60.9 | $ | 110.8 |
| Interest on borrowings and bank deposits | | 92.8 | | 9.7 | | 14.2 | | 10.1 | | 58.8 |
| Purchase obligations(a)(b) | | 65.8 | | 33.8 | | 13.5 | | 5.8 | | 12.7 |
| Insurance liabilities (Note 11)(c) | | 14.0 | | 1.6 | | 2.9 | | 2.0 | | 7.5 |
| Operating lease obligations (Note 19) | | 4.1 | | 0.9 | | 1.3 | | 0.9 | | 1.0 |
| Other liabilities(d) | | 83.7 | | 19.3 | | 10.0 | | 8.3 | | 46.1 |
| Contractual obligations of discontinued operations(e) | | 1.9 | | 1.9 | | – | | – | | – |

(a)     Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, contractual commitments related to factoring agreements, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b)     Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 25 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(c)     Included contracts with reasonably determinable cash flows such as structured settlements, guaranteed investment contracts, and certain property and casualty contracts, and excluded long-term care, variable annuity and other life insurance contracts.

(d)     Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. For further information on certain of these items, see Notes 14 and 22 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(e)     Included payments for other liabilities.

83.     In a footnote to the table, GE noted this figure "excluded long-term care, variable annuity and other life insurance contracts." GE did not explain why it excluded LTC liabilities or quantify the impact of excluding such liabilities.

84.     In GE's Form 10-Ks for 2013-2016, GE reported annual reductions in its Insurance Liabilities. Indeed, by 2016, GE had reported just $11.1 billion in Insurance Liabilities, a 21% reduction from the $14.0 billion figure it reported in its Form 10-K for 2012, and a 53% reduction from the $23.7 billion in Disclosed Insurance Liabilities it reported in the 10-K for 2011.

85.     Defendants had no basis (apart from concealing the true extent of GE's insurance liabilities from investors) to exclude GE's LTC liabilities from its Insurance Liabilities. GE effectively conceded that the omitted LTC liabilities were material and should have been included in its Insurance Liabilities when GE filed its 2017 10-K—after GE had belatedly revealed the true extent of its LTC exposure—and included in its Insurance Liabilities "all contracts associated with [its] run-off insurance operations," including LTC liabilities. Once

27

these liabilities were added back into this line item, its disclosed Insurance Liabilities more than

tripled, increasing from $11.1 billion in 2016 to $38.0 billion in 2017:

**CONTRACTUAL OBLIGATIONS**

As defined by reporting regulations, our contractual obligations for estimated future payments as of December 31, 2017, follow.

| | | | Payments due by period | | |
|---|---|---|---|---|---|
| (In billions) | | Total | 2018 | 2019-2020 | 2021-2022 | 2023 and thereafter |
| Borrowings (Note 10) | $ | 134.6 $ | 24.7 $ | 27.7 $ | 18.2 $ | 64.0 |
| Interest on borrowings | | 40.8 | 3.7 | 6.0 | 4.7 | 26.4 |
| Purchase obligations(a)(b) | | 63.3 | 22.1 | 19.2 | 12.5 | 9.5 |
| Insurance liabilities (Note 11)(c) | | 38.0 | 2.5 | 4.1 | 4.0 | 27.4 |
| Operating lease obligations (Note 25) | | 5.3 | 1.1 | 1.7 | 1.2 | 1.3 |
| Other liabilities(d) | | 71.0 | 15.3 | 5.5 | 5.5 | 44.7 |
| Contractual obligations of discontinued operations(e) | | 1.6 | 1.1 | 0.1 | 0.2 | 0.2 |

(a)  Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b)  Excluded funding commitments entered into in the ordinary course of business. See Notes 19 and 21 to the consolidated financial statements for further information on these commitments and other guarantees.

(c)  Included all contracts associated with our run-off insurance operations and represents the present value of future policy benefit and claim reserves.

(d)  Included an estimate of future expected funding requirements related to our postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: derivatives, deferred revenue and other sundry items. See Notes 12, 13 and 19 to the consolidated financial statements for further information on certain of these items.

(e)  Included payments for other liabilities.

86.     Defendants' deliberate omission of GE's LTC insurance liabilities misled

investors into believing that the Company's insurance liabilities were declining from 2013-2016

when, in truth (as Defendants later revealed), they were increasing alarmingly:



87.     By removing GE's LTC insurance liabilities from its disclosures, Defendants falsely conveyed to investors that GE's LTC business had been run off to the point that it was no longer a material exposure.  In addition, erasing these liabilities from investors' view allowed GE to: (i) report decreasing insurance liabilities; and (ii) avoid recording the massive reserve charges that other insurers were announcing prior to 2016.  In truth, as investors belatedly learned, GE remained exposed to billions of dollars in LTC liabilities throughout the relevant period, and its total insurance liabilities had dramatically increased—not decreased—during this time period.

**E.      GE's insurance reserve disclosures were misleading and incomplete**

88.     GE was required to hold two different reserves against its LTC insurance exposures: "Benefit Reserves" and "Claims Reserves."  "Benefit Reserves" are established for policies at the time they are issued and reserves against future claims ***not yet made*** by policyholders. It is calculated as the present value of future benefits to be paid less the present value of future net premiums payable. "Claims Reserves" by contrast, reserve against future payments to be made on claims that have ***already*** been made on or before the end of a particular

reporting period. Claims Reserves are calculated as the present value of the amount needed to provide for the estimated ultimate cost of settling such claims. When an insured event occurs, Claims Reserves are incurred and Benefit Reserves are released.

89.     GE did not expressly disclose Benefit Reserves or Claims Reserves in its SEC filings. Instead, GE disclosed to investors only a line item titled "Life insurance benefits," which it described as "obligations to annuitants and policyholders in our run-off insurance operations." GE subsequently disclosed that that its "Life insurance benefits" figures reflected the aggregated amount of GE's Benefit Reserves relating to *all* of its insurance policies, including its LTC insurance policies even though LTC insurance is plainly distinct from life insurance in terms of expected premium receipts, claims payments liabilities, and other risk characteristics.

90.     As reflected in GE's 2017 10-K, the "Life insurance benefits" line item actually consisted of: (i) LTC reserves (41% and 54% of the total in 2016 and 2017, respectively); (ii) reserves for "[s]tructured settlement annuities with life contingencies and other contracts" (49% and 31% of the total in 2016 and 2017, respectively); and (iii) "[s]hadow adjustments," which reflect "unrealized gains on specific investment securities" that would result in a premium deficiency if realized (10% and 15% of the total in 2016 and 2017, respectively).

91.     GE's inclusion of LTC reserves in an entry titled "Life insurance benefits" was not a truthful statement since the characteristics and risks associated with LTC (a type of health insurance with periodic incurred benefit payments structure) is separate and distinct from those of pure life insurance (pure mortality products often paying a single face amount), versus even of annuities (pure survival products). Investors were misled because GE's reserve disclosure failed to communicate the correct characteristics of the risks associated with GE's LTC portfolio, a

particularly important communication in light of the negative conditions within the LTC

insurance marketplace during the time period the statements were made.

92.     In addition, prior to mid-2017, GE did not separately disclose its Claims Reserves

to investors. Instead, GE subsumed those reserves in an "Other" line item that also included non-

reserve items like "claims adjustment expenses." As investors would later learn, over **70%** of

GE's Claims Reserves were actually reserves held against its undisclosed LTC insurance

liabilities. Indeed, GE's 10-Q for the three months ended September 30, 2017 (the "3Q17 10-Q")

disclosed that $3.4 billion of its $4.9 billion Claims Reserves was related to LTC insurance

contracts.

93.     Because GE did not separately disclose its LTC reserves to investors, but instead

bundled those LTC reserves within its disclosure of "Life insurance benefits" and "Other"

reserves, investors could not discern the extent that GE had reserved for its exposure to the toxic

LTC insurance market—which constituted the vast majority of its insurance exposure.

94.     Relatedly, Defendants' decision to remove GE's LTC liabilities from its

Disclosed Insurance Liabilities, as discussed above, and bundle GE's LTC Benefit Reserve in its

line item described as "Life insurance benefits" created a deception that its reserves were more

than adequate to satisfy its contractual insurance obligations.

95.     As reflected in the table below, prior to excluding LTC payment obligations from

its Disclosed Insurance Liabilities, GE's Disclosed Insurance Liabilities exceeded its disclosed

"Life insurance benefits"—i.e., its Benefit Reserves. Beginning on February 25, 2013, however,

when GE filed the 2012 10-K that omitted its LTC insurance liabilities, and continuing into later

periods, the trend reversed and GE began representing to investors that its reserves exceeded its

future insurance liabilities. Tellingly, after GE came clean regarding the true extent of its LTC

exposure, the trend reversed once again:



96.     Thus, Defendants' removal of GE's LTC liabilities from its Insurance Liabilities

in its Form 10-Ks, in violation of GAAP and applicable SEC regulations, falsely indicated to

investors that GE had more than adequately reserved for its remaining insurance payment

obligations.

97.     Defendants' deception concealed from investors that GE's insurance reserves

were materially inadequate. While the LTC market continued to deteriorate between 2008 and

2016, GE's reported "Life insurance benefits" figure remained relatively flat, fluctuating by an

average of just 6.2% annually. In 2017, however, after the Company's disclosure of its true LTC

exposure, GE's reported Benefit Reserves skyrocketed by over 63%, from $18.74 billion to

$30.55 billion:

32



98.     GE's LTC reserve figure—which it disclosed for the first time on October 20, 2017

to represent roughly $12 billion or 50% of its insurance reserves—ballooned to over $20 billion

by the end of 2017.  Contractual liabilities against these reserves, which were disclosed to be $11.1

billion at year-end 2016, spiked to $38 billion as of December 31, 2017.

**F.     Defendants did not have a reasonable basis to conclude LTC reserves were adequate**

99.     The Wall Street Journal recently reported that former GE employees told

reporters that GE's "insurance business failed to internally acknowledge worsening results over

the years" and "buried risks that ultimately kept the company from booking bigger reserves." *In

GE Probe, Ex-Staffers Say Insurance Risks Were Ignored*, Wall St. J. (Nov. 30, 2018). These

same individuals were familiar with GE's accounting for, and reporting of, its LTC liabilities and

had been interviewed by the SEC in connection with its investigation of GE's disclosures

concerning its LTC exposure. According to the report, one of the former employees who was

interviewed was hired to "improve the governance of the reserve process at GE . . . but left [in

2016] after growing concerned that senior executives in the division were changing numbers and their methodology without providing supporting evidence." *Id.*

100.     Plaintiffs in *Sjunde AP-Fonden v. General Electric Company*, No. 1:17-cv-08457-JMF interviewed a number of former GE employees who provided information that confirms the accuracy of the Wall Street Journal's report. For example, they relied on statements from an individual who was employed as a senior actuary at ERAC from 2006 to 2012, a senior insurance audit specialist at GE Capital Audit from 2012 to 2014, and a senior vice president at GE Capital Audit from 2014 through January 1, 2017. According to the class plaintiffs, in the summer of 2014, this individual discovered in the course of an audit of ERAC that key assumptions used in LTC modeling were "stale by several years." He also reported that prior and subsequent audits had identified serious issues with the models that were used by GE to set LTC reserves that were elevated in reports required to be provided to Defendants. These issues included use of outdated assumptions and the failure to validate models.

101.     The *Sjunde AP-Fonden* plaintiffs also obtained statements from an individual who worked at GE as an Actuarial Controller ERAC from July 2015 to September 2016. This individual indicated that ERAC management changed LTC reserve assumptions without justification. According to this individual, during loss recognition testing in the spring of 2016 his modeling showed that GE Capital had experienced a "loss recognition event" and would need hundreds of millions of GAAP additional reserves. When his superiors, Clark Ramsey ("Ramsey"), ERAC's chief actuary, and William Steilen, ERAC's CFO, learned of this, they modified the way testing was done and took the position that there was actually a $78 million surplus. This individual was "very uncomfortable" because management was not supporting changes to modeling methodology.

102.    Defendants were aware prior to 2014 that, across the LTC industry, claims were significantly higher than insurers had expected, due to increased longevity, low lapse rates, and increases in healthcare costs.

103.    The industry experience of the LTC insurers that GE reinsured was well-known to GE as reinsurer of these policies. Since at least 2010, many of the direct writers of the LTC policies that GE reinsured through its ERAC and UFLIC subsidiaries had actual-to-expected claims ratios that exceeded 120%, meaning that the dollar value of claims they actually incurred exceeded the dollar value of claims that insurers had expected to incur based on their assumptions regarding lapse, mortality, and morbidity rates.[8]

104.    Analysts have noted that actual-to-expected claims ratios of 116% or greater "paint an alarming picture." As reflected in NAIC's Long-Term Care Insurance Experience Reports for the years 2010-2016, many of the direct writers of the LTC policies that GE reinsured had actual-to-expected claim ratios significantly worse than 116%, presenting a catastrophic miss from a statistical point of view.

105.    Defendants also knew that the LTC market was in serious decline. As Zanin admitted in January 2018, "[v]irtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected."

106.    In addition, GE was a member of the Society of Actuaries Long Term Care Insurance Section ("SOA LTCI"), which, among other things, publishes newsletters three times per year and organizes section meetings, including a three- to four-day annual meeting, to discuss pertinent issues and ongoing research projects in the LTC insurance industry. The newsletter is

---

[8] *See, e.g.*, National Association of Insurance Commissioners, Long-Term Care Insurance Experience Reports for 2017, available at https://naic.org/prod_serv/LTC-LR-18.pdf.

called Long-Term Care News and, as stated in each newsletter, "is free to section members" and "available on the SOA website (www.soa.org)."

107.     Long-Term Care News published articles that chronicled the negative issues facing LTC insurers. For example, the August 2014 issue of Long-Term Care News (Issue 36) featured the article *Mechanics and Basics of Long-Term Care Rate Increases* as its centerpiece. The article described the "misses of the past in terms of pricing assumptions and the need for rate increases" which by then had "been well established." The article discusses how industry-wide mis-estimation of morbidity, persistency, and interest rates, among other things, had resulted in a general need for premium increases, advocating that there ought to be a "shift" in the thinking and regulation "regarding LTC rates and the basis for which a rate increase is determined."

108.     Key GE personnel intimately involved with the Company's LTC portfolio served in SOA LTCI leadership roles and published for the SOA LTCI. For example, Jim Berger, an LTC Valuation Actuary and Economic Capital Actuary with GE during the relevant period, was the "Chairperson" of the SOA LTCI and, in that role, oversaw the SOA LTCI's activities in 2014. David Benz, ERAC's LTC Managing Actuary responsible for locking in the assumptions during the assumption governance phase, published in the Long-Term Care News.

109.     According to Issue 36 of Long-Term Care News, SOA LTCI held its annual meeting in Orlando, Florida in October 2014, and included a "standing room only" general session tackling the "elephant in the room"—whether "the long-term care insurance industry ha[s] a future, given its current challenges, missed assumptions and plummeting sales." The session featured a presentation by Genworth CEO Thomas McElhinney, during which he discussed his belief that "many carriers in the industry waited too long to take action when emerging [claims] experience was incongruent with original assumptions and recommend[ed that] carriers annually

evaluate results against assumptions." The 2014 annual meeting also included a presentation titled *Mitigating Industry Trends in LTC Experience*.

110.     In July 2016, Defendants provided their first indication that GE had any material exposure to LTC liabilities. Specifically, on July 22, 2016, Defendants Immelt and Bornstein participated in a conference call with analysts and investors to discuss its second quarter 2016 results. During the call, Bornstein announced that the "vertical businesses earned $452 million this quarter, down 15% from prior year including higher base earnings offset by lower gains and *higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book*." Bornstein assured investors, however, that "*[p]ortfolio quality remains stable*." Yet despite expressly discussing the topic of LTC insurance and confirming that they were aware of—and had been reviewing—GE's LTC exposure, Defendants provided investors with no meaningful information regarding the extent  of the Company's LTC exposure. To the contrary, Defendants' disclosures falsely suggested to investors that GE's remaining exposures were immaterial and that its LTC portfolio quality remained stable.

111.     In the Company's quarterly report on its 10-Q for the three months ended for the June 30, 2016 (the "2Q16 10-Q") filed shortly thereafter, GE stated, "[w]ithin [GE] Capital, Verticals net earnings decreased by $0.1 billion *due to higher insurance reserve provisions ($0.1 billion)* and lower gains, partially offset by core increases." Given the multi-billion dollar reserve increases that other LTC insurers like Genworth had taken during this time period, *see* ¶ 77, GE's reserve increase of just $100 million signaled to investors that its remaining LTC exposure was small and posed no material future risk to the Company. Indeed, following GE's disclosure of the $100 million reserve increase, analysts at RBC reaffirmed their belief that "GE Capital's balance

sheet and risk profile have been ***dramatically reduced*** over the past year as the company completed sales and spins of +80% of its finance businesses."

112.    In addition, when analysts began to question management regarding the Company's run-off insurance exposure following the Company's announcement of a $100 million reserve increase, Defendants actively misled investors regarding the risks associated with that portfolio. For example, during the February 22, 2017 Barclays Industrial Select Conference, Bornstein was asked if GE would consider "sell[ing] the liability in that insurance, kind of write a check and get rid of it?" In response, rather than disclosing the massive risk the portfolio still carried, Bornstein falsely claimed that the "low interest rate environment" was the primary impediment to selling its remaining insurance liabilities, "I think interest rates are a fundamental challenge in selling long-term liabilities in a low interest rate environment is a challenge."

113.    Richard Laxer, CEO of GE Capital, made similar misstatements during the Company's March 13, 2017, J.P. Morgan Aviation, Transportation & Industrials Conference, telling J.P. Morgan analyst Tusa that it would not be "attractive" for GE to sell its run-off insurance portfolio "given the interest rate environment we are in right now." Laxer went on to state, "we would like to see a few increases before that would be attractive." Tusa cited these representations in a report he issued that day, stating, "[o]n the insurance liabilities assets, GE noted that it's not attractive to exit this business in the current rate environment and would need a couple more increases in rates to start considering a move."

114.    In truth, and in stark contrast to the foregoing statements by Bornstein and Laxer, it was not simply low interest rates that were preventing GE from selling its LTC insurance portfolio. Rather, GE could not sell its LTC portfolio because—as investors would later learn—the "check" that GE would have had to write to "get rid of it" exceeded $20 billion. Indeed, as

discussed herein, GE's Disclosed Insurance Liabilities increased by nearly $27 billion when it began including LTC in its calculation of Insurance Liabilities, and its LTC liabilities were so massive that they led to the Company booking a $9 billion reserve charge in 2017 and agreeing to contribute an additional $15 billion in capital to its insurance subsidiaries over the next seven years.

### G.   GE's belated disclosure of its true LTC exposure

115.   It was not until July 21, 2017—just one fiscal quarter after Bornstein and Laxer falsely represented to investors that low interest rates were the primary reason why the Company was retaining its run-off insurance business—that GE announced that, in truth, it was suffering from "***adverse claim experience in a portion of our long-term care portfolio***," and that this negative LTC claims experience was severe enough to require the Company to reassess the adequacy of its insurance reserves. However, after years of being told that GE Capital's risk had been reduced and that the insurance business had been successfully exited, coupled with the complete removal of GE's LTC liabilities from its Disclosed Insurance Liabilities, the market did not and could not fully appreciate what was still to come.

116.   Three months later, on October 20, 2017, the Company revealed that ***roughly 50%*** of its total insurance reserves—or ***over $12 billion***—related to GE's LTC exposure, and further announced that it was suspending GE Capital's $3 billion dividend payment to GE until its reserve analysis was completed. Less than a month later, Miller admitted that even though its reserve testing was not yet complete, GE expected its forthcoming LTC reserve charge to eclipse the size of GE Capital's $3 billion dividend payment.

117.   Finally, GE shocked analysts and investors alike on January 16, 2018, when it recorded a ***$9 billion*** charge to earnings related to an increase to the Company's LTC Benefit

Reserves. The Company further disclosed that, due to an increase in its future LTC liabilities, GE Capital expected to contribute *$15 billion* in capital to its insurance subsidiaries over the next seven years.

### H.     Additional allegations of scienter relating to Defendants' LTC scheme

118.     Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over GE's and the Individual Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth above, and in Section IV were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above Defendants' scienter is further evidenced by the following facts:

119.     *First*, Defendants deliberately removed GE's enormous LTC liabilities from its public filings beginning with its Form 10-K for 2012 without any explanation to investors. *See* Section II.A. By excluding LTC liabilities and failing to offer an explanation, GE falsely represented in SEC filings that it had no material LTC exposure (i.e., payment obligations). The timing of Defendants' decision to exclude this information is highly suspicious as it coincided with Defendants public statements concerning GE's renewed focus on its core industrial businesses and the desire to downsize GE Capital and exit insurance entirely. Indeed, the Company had included LTC liabilities in its MD&A and disclosure of Contractual Obligations in prior Form 10-Ks and, after GE finally revealed the extent of its LTC exposure in the 2017 10-K, it reverted back to this prior practice. Then and only then did GE report that its insurance liabilities had skyrocketed to $38 billion.

120.    Moreover, it is implausible that Defendants were unaware of the nature and extent of GE's increasing LTC liabilities, as: (i) GE reviewed and quantified these liabilities before intentionally removing them from GE's MD&A and disclosure of Contractual Obligations; (ii) Flannery has admitted that GE reviewed its LTC insurance exposure by no later than 2015 as part of the GE Capital Exit Plan; and (iii) at least as of July 2016, Bornstein spoke directly on the topic of LTC insurance. Further, it is implausible that over *$20 billion* in previously unknown insurance liabilities materialized overnight, or even in the year since GE's prior annual review.

121.    *Second*, Defendants were required to quantify GE's LTC liabilities, future payment obligations, and reserves every year as part of GE's annual reserve deficiency testing, and deliberately chose not to disclose them. As Zanin stated on January 16, 2018, "[e]ach year, we perform an annual premium deficiency test, which, under GAAP, test[s] to ensure the sufficiency of our current reserves plus future premiums to pay future claims across all insurance books. In all prior years, these test[s] resulted in a positive margin, which, under GAAP, requires that original assumptions above the book remain locked." Yet, despite doing so, Defendants intentionally (and inexplicably) excluded GE's LTC payment obligations from GE's Disclosed Insurance Liabilities and failed to increase GE's LTC reserves in accordance with those obligations.

122.    *Third*, Defendants knew GE's LTC liabilities comprised nearly half of the Company's Benefit Reserves. When GE finally began breaking out its LTC reserves in 2017, it was revealed that nearly *50%* ($9 billion of its $19.2 billion) of its "Life insurance benefits" (or Benefit Reserves) and nearly *70%* ($3.4 billion of its $4.9 billion) of its "Claims Reserves" were attributable to its LTC insurance exposure. This information was readily available to Defendants, as Bornstein confirmed in October 2017 when he revealed that "the long-term care book at GE

41

Capital's legacy insurance business [] represents $12 billion or roughly 50% of our insurance reserves." Given the size of GE's LTC reserves and their material contribution to GE's total insurance reserves, it is implausible that Defendants were unaware of the nature and extent of the Company's LTC-related liabilities and risks.

123.    *Fourth*, Defendants repeatedly assured investors that GE was eliminating its LTC business and had minimal remaining exposure to insurance, including LTC.  Prior to 2014 and thereafter, by Defendants' own admission, they were hyper focused on GE's exit from the LTC business and made numerous false or misleading statements to investors to minimize the extent of GE's remaining LTC insurance exposure. *See* Section IV.A. In that regard, the Individual Defendants controlled the contents of their statements on behalf of the Company. These and related statements strongly and plausibly suggest that each of the Individual Defendants had detailed knowledge of or access to the material facts and information misrepresented or concealed by Defendants.

124.    *Fifth*, the magnitude of the required increase in GE's LTC reserves and the Company's significant overstatement of prior earnings supports an inference of scienter. On January 16, 2018, Defendants revealed that GE's belated reserve testing related to its LTC portfolio showed that the Company was materially under-reserved and disclosed that it would take an "after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017" on an approximately $9 billion pre-tax charge, and that GE would need to make additional "statutory reserve contributions of ~$15 billion over seven years."  GE's LTC reserve charge erased GE's entire earnings reported from all other segments for fiscal 2017, and almost all of the profits previously reported by GE Capital's "Verticals" segment over the four years prior. Given the sheer size of

the LTC reserve charge, it is implausible that Defendants were unaware of GE's LTC liability or that GE had materially understated that LTC reserve.

125.    *Sixth*, the Individual Defendants held high-level positions and had access to material, adverse, nonpublic information concerning GE's LTC portfolio, underlying policies, and exposure including: (i) the assumptions underlying the over 300,000 LTC policies the Company had been unable to unload to Genworth, Swiss Re, or any other entity; (ii) the claims experiences of the insurance provides whom GE reinsured since the inception of the LTC policies, many of which date back decades; (iii) the analyses and results of GE's periodic loss recognition, deficiency, and statutory cash-flow testing to assess the adequacy of the Company's Benefit Reserves, which, among other things, shows whether an entity has sufficient reserves to cover expected future payment obligations; (iv) GE's estimates on their current and required LTC reserves; and (v) the analyses and reports, including model validation, of the Company's internal actuaries, auditors, and other employees focused on risk. As GE's CEO, CFOs, and CAO, Immelt, Bornstein, Sherin (who also served as GE Capital's Chairman and CEO from July 2013 until September 2016), and Miller controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE's LTC liabilities, and the impact of those liabilities on the Company's operations.

126.    *Seventh*, from 2013-2017, as GE's CEO and CFOs, Immelt, Sherin, and Bornstein signed GE's SOX certifications in connection with GE's 10-Qs and 10-Ks filed with the SEC (the "SOX Certifications"). As signatories of both: (i) the SOX Certifications representing that "[t]he information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit

to state a material fact necessary to make the statements made . . . not misleading," these Defendants each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and its impact on the Company's financial performance and condition. As GE's CEO and CFOs, these Defendants' knowledge or recklessness is imputed to the Company.

127. *Eighth*, the timing and circumstances of resignations of high-ranking executives, including Immelt, Bornstein, Sherin, and Laxer during or shortly after the revelation of the alleged fraud is highly suspicious. Just weeks before GE surprised investors when it began to disclose adverse material facts concerning the Company's LTC reserves and exposure, GE announced that Immelt would "resign" as CEO of GE, effective July 31, 2017, and that the Board of Directors had voted to appoint Flannery as CEO, effective August 1, 2017. In August 2017, just after GE revealed that it was "assess[ing] the adequacy of our premium reserves" and would "update" investors the following quarter, GE announced that Sherin would also "resign" from his position as CEO of GE Capital, effective September 1, 2017, and would similarly exit his positions as Vice Chairman and Executive Officer of GE.

128. Then, shortly before the October 20, 2017 announcement that the $12 to $14 billion Industrial CFOA figure would be slashed to $7 billion, Bornstein unexpectedly departed GE, despite having been named to the important post of "Vice Chairman" just a short time earlier in June 2017. Indeed, at a June 12, 2017 GE "CEO Succession Investor Meeting," Immelt stressed the importance of Bornstein's role going forward. Immelt stated that "one of the things [he] feel[s] best about is the ***Flannery-Bornstein partnership***, which [he] view[s] as being ***critical*** to the company." Flannery added—in response to a question from a Morgan Stanley analyst about "the John [Flannery] and Jeff Bornstein partnership"—that Flannery "is excited to have Jeff [Bornstein]

44

as a partner. And I think that's what you should expect. Bornstein, for his part, stated, "I've known John [Flannery] for the better part of 23 years" and "I couldn't be more excited about this. I think that we're excited to get John up to speed and really tackle some of what's possible for this company." Less than four months later, the "partnership" GE had trumpeted to investors as being critical to the Company was abruptly terminated. On October 6, 2017, GE announced that Bornstein would leave the company and forfeit 80% of the lucrative award package he had just received after being named Vice Chairman. Shortly thereafter, GE slashed its dividend and, in early 2018, the apparent reason for the dissolution of the Flannery-Bornstein partnership came to light. The Company announced two separate SEC investigations into GE's practices related to LTC insurance and accounting for Contract Assets and LTSAs (discussed below), all of which occurred under Bornstein's watch. And in December 2017, in the middle of GE's belated "deeper dive" into the adequacy of its LTC reserves, Laxer, who had just become GE Capital's CEO a year earlier, abruptly "resigned" from GE.

129.    *Finally*, the SEC investigation into the same misconduct alleged herein supports an inference of scienter. GE disclosed on January 24, 2018 that it had "been notified by the SEC that they are investigating the process leading to the [LTC] insurance reserve increase and the fourth quarter charge, as well as GE's revenue recognition and controls for long term-service agreements."

## III.    Defendants' scheme to mislead investors as to the strength of GE's Power segment

130.    In December 2018, the Wall Street Journal published an exhaustively researched article that traced the historic collapse of GE and, in particular, the collapse of GE Power. The article was "based on scores of interviews with dozens of people directly involved in these events. They include current and former board members, senior executives and employees at GE

45

headquarters and in its various business units, as well as bankers and advisers employed by the company, investors in its stock, customers for its products and corporate analysts." *See* December 2018 WSJ Report.

131.    The December 2018 WSJ Report reported that prior to GE's acquisition of Alstom, which was agreed to in 2014, Immelt was "[i]ncreasingly . . . worried about his legacy." According to the report: "Whittling away at [GE] Capital wasn't enough. Immelt, trapped in Welch's long shadow, craved a bold move to shock his company out of the doldrums that had plagued his tenure. It was time for GE to be reinvented again."

132.    Immelt determined to "pivot" almost completely away from GE Capital by selling its assets, reducing GE Capital's contribution to GE's earnings to 10% and allowing GE to escape the SIFI designation that brought so much unwanted oversight. According to the December 2018 WSJ Report,

> It struck some within Capital as an overcorrection to both the markets and skeptical regulators at the Fed. Some worried how the company would manage once most of GE Capital was gone. "What are we going to do about the cash?" the second Capital executive asked after Sherin broke the news. "We'll work it out," Sherin said . . . .

133.    Unbeknownst to investors, Defendants tried to "work it out" by engaging in various practices designed to artificially prop up the appearance of Industrials' financial strength, including the strength of GE Power. As set forth in more detail below, Defendants scheme included (A) artificially inflating GE Power and Contract Assets and revenues; and (B) recording an artificially inflated book value in connection with its acquisition of Alstom. The revelation of these schemes, and resulting charges, was followed by dramatic declines in GE's share price and resulted in an expanded criminal probe by the DOJ.

### A. Defendants manipulated LTSAs to artificially inflate GE Power Contract Assets and reported revenue

134.    GE builds large-scale power generation facilities, including the equipment and services necessary to maintain these facilities over extended time frames. The agreements themselves are termed LTSAs, and such agreements can include monitoring, maintenance, service, and spare parts for a gas turbine installed in a customer's power plant. An LTSA's typical duration is between 5 and 25 years. The profits that GE expects to earn over the lifetime of the agreements that govern these projects are booked as Contract Assets on GE's balance sheet. As discussed below, GE utilized the long-term nature of the LTSAs to manipulate such agreements in order to artificially inflate its Contract Assets, which in turn inflated its reported revenues and profits.

135.    According to GE's 2017 10-K, it recognizes revenue on its LTSAs as it performs under the agreements "based upon costs incurred at the estimated margin rate of the contract." According to the Company, "[r]evenue recognition on [LTSAs] requires estimates of both customer payments expected to be received over the contract term as well as the costs to perform required maintenance services." GE determines the total revenues it expects to generate and the total costs it expects to incur from an LTSA, then uses those figures to distribute revenues and profits over the life of the LTSA. However, GE's LTSA customers do not pay GE according to the same timeline that GE uses to recognize revenues. Rather, LTSA customers generally pay GE "based on the utilization of the asset (per hour usage for example) or upon the occurrence of a major event within the contract such as an overhaul."

136.    Because GE recognizes revenues as it performs under the LTSAs but does not bill customers until certain utilization milestones or major events are achieved, GE frequently recognizes LTSA revenues *before* it actually bills, or receives payment from, its LTSA customers.

137.    To account for this timing discrepancy, GE reports revenues that have been recognized, but not yet billed, on LTSAs as a sub-category of assets identified as Contract Assets in its financial statements. As GE explained in its quarterly filings, "[c]ontract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs." 1Q16 10-Q at Note 8.

138.    GE reported rapidly growing Contract Assets. Between 2012 and 2015, GE's disclosed Contract Assets were as follows:

| ($bn) | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Contract Assets | $9.443 | $12.522 | $16.960 | $21.156 |

139.    The growth of Contract Assets continued in 2016 and 2017.  In 2016, GE expanded its disclosure of Contract Assets, disclosing for the first time the proportion of its Contract Assets that were comprised of LTSAs and beginning in 2017, GE further disclosed the proportion of the LTSAs attributed to GE Power:

| ($bn) | 2015 | 2016 | 2017 |
|---|---|---|---|
| Contract Assets | $21.156 | $25.162 | $28.861 |
| GE LTSAs | $10.346[9] | $12.752 | $15.157 |
| GE Power LTSAs | Not reported | $6.595 | $7.439 |

140.    The table above shows 55% and 65% of the increases in GE's Contract Assets in 2016 and 2017, respectively, were due to LTSAs.

---

[9] This figure was subsequently disclosed in the 2016 10-K.

141.     Because GE calculates LTSA revenues and Contract Assets using long-term assumptions regarding, among other things, utilization rates, instances arise where those assumptions, and thus GE's estimated revenues, change over the life of an LTSA. From 2015-2017, such changes were reflected in GE's financial statements through an accounting mechanism known as a "cumulative catch-up adjustment." A cumulative catch-up adjustment was a way for GE to record revenues attributable to changes in the profit margins that GE expected to earn on its LTSAs. Cumulative catch-up adjustments could be either positive or negative. A positive cumulative catch-up may occur when a reporting company determines that it has been underestimating its margin on its LTSAs, and adjusts its expected profits upward, resulting in an increase in revenues. By contrast, a negative cumulative catch-up adjustment may occur when a reporting company adjusts its expected profits downward, resulting in a reversal of revenues, or loss recognition.

142.     GE's adjustments were referred to as "cumulative" because, as discussed in ¶ 191, if GE changed its expected profit margin in the third year of a 10-year LTSA, GE would record, in a single period, all three years of increased (or decreased) expected profits that resulted from this change.

143.     The GE Power segment reported total revenues of $20.6 billion, $21.5 billion, and $26.8 billion in 2014, 2015, and 2016, respectively. During the same years, Power reported impressive profits of $5.4 billion (which GE subsequently revised downward in its 2015 10-K), $4.5 billion, and $5.0 billion, respectively. According to GE's SEC filings, cumulative catch-up payments account for an increasing percentage of GE Industrial's profits:

| ($bn) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Cumulative catch-up adjustments | $0.4 | $0.3 | $1.0 | $1.4 | $2.2 | $2.1 |

| GE Industrials Profit | $15.486 | $16.220 | $17.764 | $17.966 | $17.598 | $14.740 |
|---|---|---|---|---|---|---|
| Percent | 2.6% | 1.9% | 5.6% | 7.8% | 12.5% | 14.3% |

144.    According to a November 1, 2017 article in The Wall Street Journal entitled *GE Shows How 'Black Box' Assets Boost Profits*, LTSA increases boosted GE's earnings for the third quarter of 2017 by $649 million on a pre-tax basis and by $1.93 billion for the first nine months of 2017, "equal[ing] to 44% and 51% of pretax earnings from continuing operations for each period, respectively."

145.    Unbeknownst to investors, this growth in Contract Assets, and related increase in revenues, from 2014-2017 was an illusion created by Defendants' manipulation of LTSAs and failure to appropriately adjust for known trends in the energy markets.

### 1. Defendants were aware, or reckless in not knowing, that LTSAs revenues were overstated because utilization rates had fallen dramatically

146.    GE failed to account for reduced demand for services that was caused by decreased use by GE's customers of power generation equipment. Utilization of traditional power sources began to decline in or around 2008 during the worldwide financial crisis. Plants were used with less frequency, generating less wear-and-tear that would normally have required GE services (and produced GE services revenues). According to a report called *2017 Power and Utilities Industry Trends*, published by PricewaterhouseCooper, "[e]nd-use electricity consumption declined in 22 out of 28 E.U. countries between 2005 and 2014," and "the electricity sales growth rate since 2002 has hovered around 1 percent or less per year, and demand has declined in five of those years."

147.     The December 2018 WSJ Report reported that GE executives were aware that market trends were impeding GE's ability to grow revenues in connection with its LTSAs noting: "Global investment in new gas-fired power plants was slowing. Energy efficiency was on the rise. That meant future revenue from the highly profitable service contracts GE had signed was likely to fall, or at least to grow less quickly." Despite this awareness, Defendants have admitted in court papers filed in the *Sjunde AP-Fonden* action that GE continued to book Contract Assets using "historical averages" rather than what GE was actually observing. Memorandum of Law in Support of Defendants' Motion to Dismiss the Third Amended Compl. at 22, *Sjunde AP-Fonden v. General Electric Co.*, No.17-cv-08457-JMF (S.D.N.Y Sept. 12, 2018), ECF No. 174. Prior to 2018, Defendants never advised investors of this very material fact. Instead, GE reported increases in its Contract Assets by 124% between 2012 and 2016, driven in large part by growth in LTSA Contract Assets without disclosing that this growth was achieved in large part because GE did not timely write-down the reduced revenue expected from LTSA agreements due to decreased utilization.

### 2.     Defendants renegotiated or otherwise manipulated LTSAs in order to generate phantom income to meet Defendants' growth targets

148.     GE consciously renegotiated LTSAs in order to make up for shortcomings in sales. In a conference call held on January 23, 2015, Bornstein reported that orders for gas turbines, a major source of GE revenues, had declined in the fourth quarter of 2014, relative to the fourth quarter of 2013. Bornstein projected that GE would "grow services" to offset lost revenue and expected to see a "flat gas turbine market." This statement was misleading because Bornstein failed to disclose that GE intended to "grow services" by generating phantom income from GE's LTSA Contract Assets.

149.     According to the December 2018 WSJ Report, during a meeting in the summer of 2015 held at the GE Management Development Institute in Crotonville, NY, GE executives met to discuss the Company's "Growth Playbook." Immelt sat behind a desk while Steve Bolze, head of GE Power, cued up PowerPoint slides. The purpose of the meeting was to "hammer out targets for sales and profit, setting the underlying assumptions for the financial estimates it would give investors." When Bolze cued up a slide that proposed target growth for GE Power of 5% it was obvious that "was a rosy assumption that cried out for interrogation, the very point of the formal review" and that GE "Power had been struggling to meet targets, and its sales hadn't grown that quickly in years."

150.     Immelt simply "gave the desk in front of him a confident slap. 'Great, next page,' he said." It was no accident that the management team failed to question the growth target. According to the December 2018 WSJ Report, Immelt "discouraged dissent by applauding optimistic news . . . he projected a sunny vision for the company's future that didn't always match reality." That often left Immelt, "in the words of one GE insider, trying to market himself out of a math problem."

151.     In order to meet this unreasonable growth target "they stretched." According to the December 2018 WSJ Report,

- "GE teams started offering discounted turbine upgrades to customers in exchange for extending the length of contracts to as far out as 2050."
- "Executives scoured existing contracts for ways to change underlying assumptions, such as the frequency of overhauls, to boost" reported Contract Assets.
- GE Power "gave customers discounts on their service contracts, lowering their overall value, in exchange for renegotiations that let the company bill the customers sooner."

152.     These tactics created the illusion of growth when, in reality, GE was merely "pulling forward" future sales. In an article dated February 21, 2018 titled *How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE*, The Wall Street Journal reported that "[a]ccording to

former executives, the [turbine] upgrades meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that future sales were being pulled forward."

153.    According to the December 2018 WSJ Report, GE executives admitted that these tactics were "aggressive" and that "profits were mostly on paper. Rarely was a new dollar of profit flowing in the door." GE Power employees told Bolze and the head of the unit responsible for administering LTSAs, Paul McElhinney, that "[Defendants'] expectations about the sales growth and profit they should be able to hit didn't reflect the dim reality of the market." They were told to nevertheless continue their "aggressive" manipulation of LTSAs. According to the report: "'Steve's our guy,' McElhinney said in one meeting. If Bolze was elevated to CEO, those behind him in Power would rise too. '***Get on board***,' he said. '***We have to make the numbers***.'"

### 3.    Defendants' LTSA scheme begins to unravel

154.    GE's LTSA scheme created a serious cash flow problem for the Company. Much of the revenue that GE was booking as a result of these adjustments would not translate into cash for the year, and likely would never turn into cash because, as described above, GE had been artificially inflating its Contract Asset values. The Company's reported Contract Assets swelled, but so did the gap between GE's earnings and its Industrial Cash Flow from Operating Activities, or CFOA. For example, while GE reported steadily increasing Industrials revenues in 2015, 2016, and 2017 ($108.796 billion, $113.156 billion, and $116.157 billion, respectively), Industrial CFOA declined sharply over the same period-from $12.238 billion in 2015, to $11.610 billion in 2016, to just $9.698 billion in 2017. As The Wall Street Journal noted in an October 30, 2017 article titled *GE's Numbers Game: Pick from Four Earnings Figures*, "[t]ypically, big gaps between earnings, which are calculated on an accrual basis, and cash flow, which is money going into and out of a company, are a red flag for investors."

155.    With fewer LTSAs to factor and its inability to continue relying on cumulative

catch-up revenues, GE's charade was up and the catch flow issues that were created by its LTSA

scheme began to materialize. On April 21, 2017, while GE reported profits that were in line with

expectations, GE reported—as Immelt admitted in a conference call held that day—that

"***Industrial CFOA was a negative $1.6 billion.***" Bornstein elaborated, stating, "our industrial

CFOA was at $1.6 billion usage of cash, ***about $1 billion below our expectations***" due in large

part to $1.4 billion in negative cash flows from GE's LTSAs. GE's 1Q17 earnings press release

explained that Industrial CFOA for 1Q17 was a mere $370 million (*i.e.*, before deducting CFOA

attributable to GE Capital dividends in the amount of $2 billion) and had ***declined year-over-year***

***95%*** from $7.902 billion in 1Q16.  The market reacted swiftly to this shocking news, as GE's stock

price fell 2.4% on heavy trading volume despite the otherwise favorable report on earnings—as

distinguished from cash flow.

156.    Immelt and Bornstein played off the tremendous Industrial CFOA shortfall as a

temporary phenomenon. Immelt stated on GE's April 21, 2017 earnings call that GE's

disappointing Industrial CFOA was just a "slow start" and that—despite starting out $1.6 billion

in the hole after first quarter 2017 results—Industrial CFOA would improve so dramatically during

the remainder of the year that full year 2017 guidance of $12 to $14 billion would still be achieved.

Immelt stated, "[d]espite a ***slow start***, we plan to hit $12 billion to $14 billion of Industrial CFOA

for the year."

157.    On GE's July 21, 2017 earnings call, Bornstein stated that GE was "trending to the

bottom end of the $12 billion to $14 billion range on CFOA," but affirmed that "[d]ividend remains

[GE's] priority," and then went on to represent that Power would be up in the second half of 2017,

stating, "then when you think about total year, we still think about the Power business being up mid single-digits on revenue and up roughly high to low double-digits on earnings."

158.    Several months later, on October 20, 2017, GE announced that Industrial CFOA for 2017 would be **slashed almost in half** from the $12 billion figure Immelt and Bornstein had assured the market could be achieved. On an October 20, 2017 earnings call, GE's new CFO Miller (Bornstein had departed abruptly, as explained more fully below), stated that:

> On cash flow, we now expect industrial cash flow for the year to be **about $7 billion**. . . . This is well below the $12 billion estimate we provided at second quarter earnings, and it's principally driven by three businesses. **Power is the biggest driver** on lower volume, higher inventory and the timing of payments on long-term equipment contracts.

159.    On this news of a gargantuan slash to Industrial CFOA (as well as the simultaneous announcement that "upstreaming" of dividends from GE Capital to GE would be suspended pending a review of LTC insurance reserves, as discussed above), analysts began to focus on the daunting possibility that GE would cut its dividend. Of course, while the market did not know it, the dividend cut was inevitable due to the concealed fraud. The 50% dividend cut was ultimately announced not long thereafter, GE's stock price sank precipitously as news of the cut was released, and disclosure of an SEC investigation into GE's accounting for its LTSAs followed.

160.    Industrials cash flow continued downward in 2018 due to the fact that the fraud at GE Power could no longer be sustained. Indeed, in its April 20, 2018 earnings call, GE reported that "total Industrial free cash flow was negative $2 billion in the [first] quarter [of 2018]." GE reported on July 20, 2018 that Power's revenues declined 19% year-over-year, while quarterly profits plummeted by 58% year-over-year.  Overall, GE's reported EPS declined by 33%, from $0.12 in the second quarter of 2017 to $0.08 in the second quarter of 2018.

### 4.    GE's restatement confirms that it inappropriately inflated Contract Assets and revenue associated with GE Power LTSAs

161.    In May 2014, the Financial Accounting Standards Board announced disclosed amendments to the then-current revenue recognition standards through ASC 606, which, among other things, prohibited companies like GE from recognizing cumulative catch-up adjustments on its LTSAs. In 2017, in light of this looming accounting change, GE made additional disclosures about its accounting for Contract Assets and LTSAs. Defendants still did not reveal the true enormity of its accounting manipulation. For example, during the February 22, 2017 Barclays Industrial Select Conference, Bornstein stated:

> The other is in our long-term service contract accounting. We have an enormous portfolio, many times bigger than anybody else in the space, both in power—principally in power systems and aviation. And the rules around it are changing. And it's complex, but there are several things that we do today that we account for on a cum[ulative]-catch basis. And I'll explain that in a moment that now we'll be accounted for on a prospective basis.
>
> **So, for instance, if you have a contract with a customer today and you modify it**, you add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions, and you reprice it.  **A lot of these things are priced on a per-utilization per-hour basis, if you will.**  In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes, what's the margin rate for the contract now. **If the margin rate went down, you go back to day one, and you'll book a loss for restating time zero to the current date on the lower margin rate.**  If the margin rate is higher, you do the opposite.  You get a cum[ulative]-catch gain, and you restate the margin rate of contract. **So things like modifications, termination clauses, et cetera, upgrades; all of that will be accounted for prospectively, as opposed to retrospectively.**

162.    On April 13, 2018, in response to ASC 606's revenue recognition amendments becoming effective, GE filed an 8-K with the SEC restating its financials and quantifying the impact that such adjustments had on its financial performance in prior periods.

163.    The Company now disclosed that it was effectively writing down the value of its LTSA Contract Assets by *$8.7 billion*. This disclosure confirms the stunning extent to which GE

relied upon its manipulation of LTSAs to generate phantom profits. With this disclosure, GE effectively admitted, among other things, that: (i) it had previously booked over $8.7 billion in revenues due to LTSA adjustments that have not yet turned into cash for the Company; (ii) more than half (57%) of GE's reported LTSA Contract Assets as of year-end 2017 were the product of cumulative catch-up adjustments that were the result of changes to LTSAs intended to generate phantom revenues; and (iii) its LTSA Contract Assets are actually worth 57% less than previously reported.

164.   While several of GE's competitors issued restatements following the enactment of ASC 606's revenue recognition amendments, none were even remotely close to the size of GE's adjustments. For example, as reported by The Financial Times in an April 19, 2018 article titled *General Electric sets out on road to regaining investors' trust*:

> The revisions resulting from ASC 606 have been much greater for GE than for some of its peers. Boeing revised its 2017 operating earnings of $10.3bn up by $66m. Lockheed Martin shaved just $8m from reported 2017 operating profits of about $5.12bn. United Technologies said in February that it expected the new standard to have "an immaterial impact" on net income this year. For Microsoft, reported operating income for 2016-17 was revised up from $22.3bn to $29bn.
>
> For GE, by contrast, the new standard meant revising 2017 profits from industrial operations down by 17 per cent, from $14.7bn to $12.2bn, mostly because of a changed view of long-term contracts for servicing equipment such as aero engines and turbines for power plants. As originally reported, those profits fell 16 per cent from 2016. Under the new standard, they were down 23 per cent.

165.   In addition, The Financial Times article included the below chart, which confirms that nearly every one of GE's divisions had used the prior accounting standard to improve the appearance of their financial performance in 2017:



New accounting standard changes the view of how GE's divisions did in 2017

(Per cent)

Source: Company reports
© FT

166.    In response to GE's restatement, The Financial Times quotes J.P. Morgan analyst

Tusa as stating that ASC 606 has "la[id] bare the truth of the actual economics" of GE's LTSAs.

167.    Defendants' artificial inflation of GE's LTSA Contract Assets from 2013-2017:

(i) gave investors a false picture of the profitability of GE's closely-watched Power segment; (ii)

violated GAAP; (iii) rendered misleading GE's statements, which are discussed below, about

how it accounted for Contract Assets; and (iv) purportedly enabled GE to meet its short-term

earnings targets. The artificial inflation of GE's LTSA Contract Assets ultimately led to an $8.7

billion write-down of those assets as of year-end 2017.

### 5.    Additional scienter allegations concerning Defendants' LTSA scheme

168.    Defendants' scienter is further evidenced by the following facts:

169.    *First*, GE repeatedly touted GE Power's purported financial strength and growth to

investors, including its contribution of significant revenues and profits to GE's bottom line. GE

Power was identified as one of GE's "core segment[s]" and GE repeatedly touted Power as a primary driver of GE's growth prospects and value, directing investors' attention to Power's purported ability to, among other things, contribute significant earnings to GE.  Indeed, in January 2017, Bornstein flouted "double-digit earnings growth in Power" for 2017, noting GE's focus to deliver services growth with Power. All told, the Power segment generated revenues of $20.6 billion, $21.5 billion, and $26.8 billion in 2014, 2015, and 2016, respectively. During the same years, Power reported profits of $5.4 billion (which GE subsequently revised downward in its 2015 10-K), $4.5 billion, and $5.0 billion, respectively. In short, Power's performance was of paramount importance to GE (and investors).

170.     *Second*, the dramatic impact that GE Power's LTSAs had on reported Contract Assets and earnings from 2014-2017 is strong evidence of scienter. As discussed above, LTSAs comprised almost half of GE's entire reported Contract Assets. For example, in 2015, LTSAs accounted for $10.346 billion of GE's $21.156 billion in Contract Assets, and in 2016, LTSAs accounted for $12.752 billion of GE's $25.162 billion in Contract Assets. In addition, cumulative catch-up adjustments on those LTSAs had a material impact on GE's reported earnings, improving GE's reported EPS by 13% and 44% in 2016 and 2017, respectively, and accounting for a staggering 80% of GE's reported EPS in the first quarter of 2017.

171.     *Third*, Defendants GE, Immelt, Bornstein, Miller, and Sherin were hyper- focused on GE Power and the impact of new accounting rules announced in May 2014 on GE's revenue recognition practices for LTSAs. In addition, Bloomberg reported that "there are monthly meetings with the CFO and the audit committee—doing 'deep dives' on different technical topics and on matters that are unique to certain segments."

172.    *Fourth*, Immelt, Sherin, Bornstein, and Miller held high-level positions, controlled the contents of GE's public statements, and had access to material, adverse, nonpublic information concerning GE Power's operations, including with respect to Contract Assets and underlying LTSAs. Because of their high-level positions, each of Immelt, Sherin, Bornstein, and Miller was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information concerning the Company, Immelt, Sherin, Bornstein, and Miller knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete. As the Company's senior-most executives, Immelt, Sherin, Bornstein, and Miller were responsible for the accuracy of GE's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

173.    *Fifth*, as GE's CEO, CFOs, and CAO, Immelt, Sherin, Bornstein, and Miller controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE Power's Contract Assets, and the impact of those purported assets on the Company's operations. The fact that Defendants Immelt, Bornstein, Miller, and Sherin had access to this information shows that they knew, or were reckless in not knowing, that statements concerning GE's Contract Assets were materially false or misleading. Indeed, GE repeatedly told investors that the Company "routinely review[ed] estimate[s]" on LTSAs to "adjust for changes in outlook," such that it is implausible Defendants did not know its revenue recognition and profitability estimates on LTSAs lacked a reasonable basis in fact.

174.     *Sixth*, GE has admitted that the Company did not have adequate internal controls over revenue recognition and profit estimation practices for Contract Assets, including LTSAs. As noted above, the alleged fraud includes numerous false or misleading reported financial results and figures, and violations of accounting and disclosures regulations. And, as GE's CEO and CFOs, Immelt, Sherin, and Bornstein signed GE's SOX Certifications. As such, these Defendants each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTSAs (and Contract Assets, generally) and the impact of GE's revenue recognition and profit estimation practices, and artificial triggering of cumulative catch-up adjustments, on the Company's financial performance and condition. As GE's CEO and CFOs, these Defendants' knowledge or recklessness is imputed to the Company.

175.     *Seventh*, during an earnings conference call held before the market opened on January 24, 2018, GE disclosed that it has "been notified by the SEC that they're investigating . . . GE's revenue recognition and controls for long term-service agreements." Further, GE disclosed more recently in its Form 10-Q for the period ended September 30, 2018, that "In late November 2017, staff of the Boston office of the [SEC] notified us that they are conducting an investigation of GE's revenue recognition practices and internal controls over financial reporting related to long-term service agreements."

**B.      Defendants touted the Alstom acquisition despite knowing that GE grossly overpaid for the troubled company and, as a result, belatedly took a $22 billion charge**

176.     As noted above, in the years after the financial crisis, Immelt became exceedingly concerned about his legacy and determined to reinvent GE by pivoting away from GE Capital and towards GE's industrial segments, including Power.

177.     According to the December 2018 WSJ Report, in late 2013 or early 2014, GE's merger teams were told "[h]eadquarters wants your biggest targets." This led to a meeting between Immelt and Patrick Kron, then CEO of Alstom. As the report noted, "In Immelt, Kron found a man spoiling for a big deal."

178.     The December 2018 WSJ Report further disclosed, for the first time publicly, that in 2012, GE did due diligence on Alstom and decided not to acquire the company because "Alstom was in greater need of cash than the market understood, had too many employees and French law made it too difficult to lay off workers and sell assets." Those problems still existed in 2014, but Immelt was determined to do a deal as part of the so called "GE Pivot." According to the report, "GE directors and advisers were wary. Immelt's determination to complete a blockbuster reflected his customary optimism, a trait that had led him to overpay in the past, and one the succession team warned the board about before it picked him as CEO."

179.     GE's initial bid for Alstom was €30 per share, a price "the power division's deal team already believed was too high." December 2018 WSJ Article. To the chagrin of the GE deal team, Immelt personally met with Kron in April 2014 and agreed to up GE's bid to €34, or approximately $47 per share. *Id.*

180.     On April 30, 2014, GE issued a press release regarding its agreement with Alstom:

> PARIS, FRANCE, April 30, 2014 – GE (NYSE: GE) and Alstom announced here today that GE has submitted a binding offer to acquire the Thermal, Renewables ("Power") and Grid businesses of Alstom (ALO.PA) consisting of $13.5 billion (€9.9 billion) enterprise value and $3.4 billion (€2.5 billion) of net cash, totaling $16.9 billion (€12.35 billion). . . .
>
> The deal is expected to close in 2015.

**Transaction details**

The all-cash transaction is valued at 7.9 times pro forma earnings before interest, taxes, depreciation and amortization (EBITDA) of Alstom's Thermal, Renewables, and Grid business units. GE expects the acquisition to be accretive to earnings in the first year; it is expected to add $.08-$.10 of earnings in 2016; and approximately 75% of operating earnings is expected to come from GE Industrial by 2016.

**Creating investor value**

Jeff Immelt, GE Chairman and CEO, said, "This is a strategic transaction that furthers GE's portfolio strategy. Power & Water is one of our higher growth and margin industrial segments and is core to the future of GE. Alstom, like GE, is a company built on engineering, innovation and technology. We respect and value the deep industry and technology expertise of Alstom employees and expect them to add to our proven track record of developing talent and leadership in France and globally."

Immelt continued, "Alstom not only advances our strategic priorities and industrial growth, but is also expected to provide an excellent return on capital. Alstom's businesses are very complementary in technology, operations, and geography to our power and grid businesses. We expect a collaborative and prompt integration that will yield efficiencies in supply chain, service infrastructure, commercial reach, and new product development. We expect these actions will generate more than $1.2B in annual cost synergies by year five and the transaction will be immediately accretive for GE shareholders."

Immelt concluded, "GE has an excellent track record of creating shareholder value from investments in Europe. In France, this includes our longstanding CFM aircraft engine joint venture with Snecma (Safran); our acquisition of Thomson-CGR, a healthcare center of excellence for GE; and our 1999 acquisition of Alstom's gas turbine business in Belfort, which today is GE's technology center of excellence for 50 Hz gas turbines. Across Europe, we have built strong global competitors from European champions in Oil & Gas, Aviation and Healthcare."

181.    These statements were misleading and incomplete because Defendants failed to disclose that the price GE agreed to pay was far above what GE's own deal team thought Alstom was worth and that just, two years prior, GE determined that Alstom was not an attractive acquisition target because "Alstom was in greater need of cash than the market understood, had too many employees and French law made it too difficult to lay off workers and sell assets."

182.     After the Alstom acquisition was announced, U.S. and European regulators demanded that GE agree to remove valuable Alstom assets from the transaction, including an Alstom program to build a gas turbine that could compete with GE's and an Alstom unit that serviced turbines. According to the December 2018 WSJ Report:

> A band of skeptics inside GE Power were hopeful the deal would collapse. When advisers determined that the concessions to get the deal approved might have grown costly enough to trigger a provision allowing GE to back out, some in the Power business quietly celebrated, confiding in one another that they assumed management would abandon the deal.

> But Immelt and his circle of closest advisers wanted it done. That included Steve Bolze, the man who ran it and hoped someday to run all of General Electric.

183.     On November 2, 2015, GE announced that it had completed its acquisition of Alstom, noting in a press release:

> PARIS, FRANCE – November 2, 2015 – GE [NYSE:GE] announced today that it has completed the acquisition of Alstom's power and grid businesses. The completion of the transaction follows the regulatory approval of the deal in over 20 countries and regions including the EU, U.S., China, India, Japan and Brazil. It is GE's largest-ever industrial acquisition.

> GE reached an agreement with Alstom in 2014 to purchase Alstom's power and grid businesses for €12.35 billion. Adjusting for the joint ventures announced in June 2014 (renewables, grid, and nuclear), changes in the deal structure, price adjustments for remedies, net cash at close, and including the effects of currency, the purchase price is €9.7B (approximately $10.6B). This includes working capital usage of approximately €0.6B in the month of October. GE expects the deal to generate $0.05-0.08 of earnings per share in 2016 and $0.15-0.20 of earnings per share by 2018. GE is targeting $3.0 billion in cost synergies in year five and strong deal returns. The overall economics and strategic rationale remain the same as GE announced in April 2014.

> "The completion of the Alstom power and grid acquisition is another significant step in GE's transformation," said Jeff Immelt, chairman and CEO, GE. "The complementary technology, global capability, installed base, and talent of Alstom will further our core industrial growth. We are open for business and ready to deliver one of the most comprehensive technology offerings in the energy sector for our customers."

184.    These statements were misleading and incomplete because they failed to disclose

that even prior to the mandated divestures, the GE Power team who performed due diligence on

Alstom considered the consideration GE paid excessive and the "overall economics" were now

worse for GE after costly concessions mandated by regulators.

### 1. Defendants overstated the expected future economic benefits associated with the Alstom acquisition

185.    GAAP rules define goodwill as "an asset representing the future economic

benefits arising from other assets acquired in a business combination that are not individually

identified and separately recognized." SFAS 141. When an asset is acquired, the goodwill is

typically the purchase price less the fair value of the asset after deducting for the asset required.

The amount of goodwill recorded must fairly reflect the expected future economic benefit of the

asset and needs to be tested annually for impairment.

186.    In GE's Form 10-K for 2015, filed on February 26, 2016, GE stated that it had

preliminarily valued the Alstom assets at $13.7 billion, net of cash acquired. This resulted in a

purchase price allocation of $13.5 billion in goodwill and $4 billion of amortizable intangible

assets.

187.    Specifically, GE's Form 10-K for 2015 stated:

On November 2, 2015, we acquired the Thermal, Renewables and Grid businesses
from Alstom. The purchase price was €9,200 million ($10,135 million), net of cash
acquired of approximately €1,600 million ($1,765 million). As further discussed
below and elsewhere in this report, the acquired Alstom businesses had a significant
impact on our industrial businesses, directly affecting accounting and reporting
related to three of our operating segments, as well as the creation of several new,
jointly-owned entities. Given the timing and complexity of the acquisition, the
presentation of these businesses in our financial statements, including the allocation
of the purchase price, is preliminary and likely to change in future reporting periods.
We will complete our post-closing procedures and purchase price allocation no later
than the fourth quarter of 2016. . . .

The financial impact of acquired businesses on individual segments will be affected by a number of variables, including operating performance, purchase accounting effects and expected synergies. In addition, due to the amount of time that elapsed between signing and closing, the commercial operations of the businesses were negatively affected primarily as a result of uncertainty among Alstom customers regarding the execution of the transaction. This affected the overall valuation of the acquired businesses at the time of close and, accordingly, is reflected in the amounts assigned to the assets and liabilities recorded in purchase accounting. The fair value of the acquired businesses, including a preliminary valuation of non-controlling interest, at the time of close was approximately $13,700 million, net of cash acquired. The preliminary purchase price allocation resulted in approximately $13,500 million of goodwill and $4,065 million of amortizable intangible assets. The preliminary fair value of the associated non-controlling interest is approximately $3,600 million, which consists of approximately $2,900 million for Alstom's redeemable non-controlling interest in the three joint ventures (presented separately from total equity in the consolidated balance sheet) and $700 million for all other non-controlling interest.

In order to obtain approval by the European Commission and the Department of Justice, GE pledged to sell certain of Alstom's gas-turbine assets and its Power Systems Manufacturing subsidiary to Ansaldo Energia SpA (Ansaldo) after the close of the transaction for approximately €120 million. The purchase price will be paid by Ansaldo over a period of five years. The transaction closed on February 25, 2016.

This statement was misleading and incomplete because Defendants did not disclose that the GE employees on the deal team for Alstom, who were the most knowledgeable as to the value of Alstom, believed GE paid far too much for Alstom and that many were of the view that GE should have exited the transaction when concessions made by regulators materially altered the deal.

188.    In GE's Form 10-K for 2016, filed on February 24, 2017, GE disclosed that it in its final purchase price allocation, it had recorded $17.3 billion in goodwill relating to the Alstom transaction. Although it is unusual to record a goodwill charge exceeding the purchase price for an asset, Defendants claimed it was justified "by estimated GE-specific synergies." Specifically, in Note 8 to the financial statements published in GE's Form 10-K for 2016, GE stated:

ALSTOM ACQUISITION ACCOUNTING UPDATE

66

The total consideration for the acquired businesses, at the time of close in November 2015 included our purchase price of $10,124 million (net of cash acquired) and a preliminary valuation of noncontrolling interests, of approximately $3,600 million for a total of approximately $13,700 million. In the fourth quarter of 2015, the preliminary allocation of purchase price resulted in goodwill, intangible assets and unfavorable customer contract liabilities of approximately $13,500 million, $5,200 million, and $1,100 million respectively. The amount of goodwill recognized compared with identifiable intangible assets is affected by estimated GE-specific synergies, which are not permitted to be included in the measurement of identifiable intangibles. Such synergies include additional revenue from cross-selling complementary product lines. The preliminary fair value of the associated noncontrolling interests consisted of approximately $2,900 million for Alstom's redeemable noncontrolling interests in the three joint ventures (presented separately from total equity in the consolidated statement of financial position) and $700 million for all other noncontrolling interests.

Through the fourth quarter of 2016, we adjusted the preliminary allocation of purchase price, which has now resulted in goodwill, intangible assets, and unfavorable customer contract liabilities, of $17,304 million, $4,370 million, and $2,720 million, respectively as of the acquisition date. These adjustments, which are necessary to reflect acquired assets and liabilities of the acquired businesses at fair value, reflected revisions in 2016, primarily related to cash flow and other valuation assumptions for customer contracts, increases to legal reserves, and other fair value adjustments related to acquired assets and liabilities. The approximate amounts of significant purchase accounting adjustments recorded since the date of acquisition include a reduction in the book value of assets sold to Ansaldo of $405 million, adjustments to the fair value of derivative contracts of $335 million, decreases in inventory balances of $130 million, increases to legal reserves of $990 million, a reduction in the book value of aged accounts receivable of $175 million and other project related costs such as warranty provisions and liquidating damages of $665 million. In addition, the fair value of all other noncontrolling interests decreased by $55 million.

This statement was misleading and incomplete because Defendants did not disclose that the GE employees on the deal team for Alstom, who were the most knowledgeable as to the value of Alstom, believed GE paid far too much for Alstom and that many were of the view that GE should have exited the transaction when concessions made by regulators materially altered the deal.

## 2.    GE's belated goodwill impairment charges

189.    Under GAAP rules, the amount of goodwill must be tested annually to determine whether the recorded value on the balance sheet is fair and whether the anticipated benefits from the business are still justified. GE described its testing process in its Form 10-K for 2016, noting:

> We test goodwill for impairment annually in the third quarter of each year using data as of July 1 of that year. The impairment test consists of two steps: in step one, the carrying value of the reporting unit is compared with its fair value; in step two, which is applied when the carrying value is more than its fair value, the amount of goodwill impairment, if any, is derived by deducting the fair value of the reporting unit's assets and liabilities from the fair value of its equity, and comparing that amount with the carrying amount of goodwill. We determined fair values for each of the reporting units using the market approach, when available and appropriate, or the income approach, or a combination of both. We assess the valuation methodology based upon the relevance and availability of the data at the time we perform the valuation. If multiple valuation methodologies are used, the results are weighted appropriately. . . .
>
> During the third quarter of 2016, we performed our annual impairment test of goodwill for all of our reporting units. Based on the results of our step one testing, the fair values of each of the GE reporting units exceeded their carrying values; therefore, the second step of the impairment test was not required to be performed for any of our reporting units and no goodwill impairment was recognized.

GE's Form 10-K for 2015 contained a similar statement.

190.    In its Form 10-K for 2017, filed on February 23, 2018, GE disclosed that it identified impairment to the recorded Alstom goodwill in the third and fourth quarters and had taken a $1.1 billion reduction to goodwill as a result. The primary factors contributing to the further decline in the fair value of the Power Conversion reporting unit in the fourth quarter were increased competition leading to loss and cancellation of orders in the renewables customer segment and further downturn in oil and gas. Specifically, the Form 10-K for 2017 stated:

> During the third quarter of 2017, we performed our annual impairment test of goodwill for all our reporting units. Based on the results of our step one testing, the fair values of each of the GE reporting units exceeded their carrying values except for our Power Conversion reporting unit, within our Power operating segment. The primary factors contributing to a reduction in fair value of this reporting unit were extended downturns in certain of its customer segments, most notably the marine

and oil and gas markets, increased pricing and cost pressures in low margin renewable markets, and the delayed introduction of new technologies and products. Therefore, we performed a step two analysis. As a result of this analysis, we recognized a non-cash goodwill impairment loss of $947 million during the third quarter to write down the carrying values of Power Conversion's goodwill to its implied fair value. Due to the impairment taken in the third quarter, we performed an interim impairment test of our Power Conversion reporting unit in the fourth quarter of 2017, which indicated that its carrying value was greater than its fair value. Therefore, we performed a step two analysis which resulted in the impairment of the remaining reporting unit goodwill. The primary factors contributing to the further decline in the fair value of the Power Conversion reporting unit in the fourth quarter were increased competition leading to loss and cancellation of orders in the renewables customer segment and further downturn in oil and gas. In addition, Power Conversion reached an agreement to sell its low voltage motors business, which decreased the fair value of the remaining Power Conversion reporting unit. As a result, we recognized an additional non-cash impairment loss of $217 million during the fourth quarter. The total impairment loss of $1,164 million of the Power Conversion goodwill was recorded on the Statement of Earnings (Loss) to Other costs and expenses. After the impairment loss, there is no goodwill in our Power Conversion reporting unit.

191. On October 1, 2018, GE announced that Flannery was being replaced by Lawrence Culp as CEO and that the Company expected to take a large goodwill impairment charge noting:

> GE expects to take a non-cash goodwill impairment charge related to the GE Power business. GE Power's current goodwill balance is approximately $23 billion and the goodwill impairment charge is likely to constitute substantially all of this balance. The impairment charge is not yet finalized and remains subject to review. The Company will provide additional commentary when it reports third quarter results.

GE failed to disclose that the DOJ and the SEC were investigating this impairment charge or that the Company knew from the start that it had grossly overpaid for the Alstom assets.

192. On October 30, 2018, GE disclosed in its Form 10-Q for the third quarter 2018 that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition.

> The value of these unrecognized intangible assets is driven by high customer retention rates in our Power business, our contractual backlog, the value of

internally created technology, and the GE trade name. The combination of these unrecognized intangibles, adjustments to the carrying value of other assets and liabilities, and reduced reporting unit fair values calculated in step one, resulted in an implied fair value of goodwill substantially below the carrying value of goodwill for the Power Generation and Grid Solutions reporting units. Therefore, in the third quarter, we recorded our best estimate of a non-cash impairment loss of $21,973 million. The impairment loss included $827 million of goodwill recorded at Corporate associated with our Digital acquisitions that was previously allocated to our Power Generation and Grid Solutions reporting units. We recorded the estimated impairment losses in the caption "Goodwill impairment" in our consolidated Statement of Earnings (Loss). As a result of ongoing updates to our long-range forecast and the complexity of valuing intangible assets in the second step of the impairment test, the Company has not yet completed its analysis. We will recognize any differences to this estimate in the fourth quarter when we finalize the step two impairment test. After the impairment loss, there is no remaining goodwill associated with our Power Generation reporting unit and $1,653 million related to our Grid Solutions reporting unit at September 30, 2018.

193.    GE further announced in the third quarter Form 10-Q that the SEC and the DOJ

were investigating the Alstom impairment charge:

Following our announcement on October 1, 2018 about the expected non-cash goodwill impairment charge related to GE's Power business, as discussed further in Note 8 to the consolidated financial statements, the SEC expanded the scope of its investigation to include that charge as well. We are providing documents and other information requested by the SEC staff, and we are cooperating with the ongoing investigation. Staff from the DOJ are also investigating these matters, and we are providing them with requested documents and information as well.

194.    On GE's October 30, 2018 conference call, Miller stated:

Based on our best estimate, we booked a charge of $22 billion, $19 billion related to our Power Gen reporting unit and $3 billion related to Grid. Most of the $22 billion charge is related to the Alstom acquisition, which occurred in the fourth quarter of 2015. We will true this up in the fourth quarter as it gets finalized.

Also, the SEC expanded the scope of its ongoing investigation to include the goodwill charge. The Department of Justice is also investigating this charge, and the other areas that we have previously reported are part of the SEC's investigation. We are cooperating with the SEC and DOJ as they continue their work on these matters.

195.    GE's stock price fell sharply on this announcement.

### 3.    Additional allegations of scienter concerning the Alstom acquisition

196.    *First*, the magnitude of the required charge to goodwill supports an inference of scienter. On October 1, 2018, Defendants revealed that GE was required to reduce goodwill associated with the Alstom acquisition by approximately $22 billion—more than twice what GE paid for Alstom. This was in addition to the $1.1 billion charge recorded in fiscal year 2017. Market forces cannot explain why GE would have to take such a huge write down three years after the closing of the Alstom acquisition.

197.    *Second*, GE repeatedly touted GE Power's purported financial strength and growth to investors, including the contribution of the Alstom business to the revenues and profits of GE. Defendants also repeatedly touted the Alstom acquisition as the cornerstone of its strategy to pivot toward GE's Industrial Segments.

198.    *Third*, Defendants GE, Immelt, Bornstein, Miller, and Sherin were hyper-focused on the Alstom acquisition. Immelt in particular viewed it as the key to his legacy as GE CEO.

199.    *Fourth*, Immelt, Sherin, Bornstein, and Miller held high-level positions, controlled the contents of GE's public statements, and had access to material, adverse, nonpublic information concerning the Alstom acquisition. Because of their high-level positions, each of Immelt, Sherin, Bornstein, and Miller was provided with, or had access to, the GE merger team's conclusions regarding the true value of Alstom and the amount by which GE was overpaying for the troubled company. Defendants were also aware that GE had conducted due diligence of Alstom in 2012, but concluded that the company was in dire need for cash and had far too many employees. Defendants knew that these problems still existed in 2014, but consciously decided to dramatically overpay without informing investors of GE's true view of Alstom. Because of their positions and access to material non-public information concerning the Company, Immelt, Sherin, Bornstein,

and Miller knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete. As the Company's senior-most executives, Immelt, Sherin, Bornstein, and Miller were responsible for the accuracy of GE's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

200.    *Fifth*, as GE's CEO, CFOs, and CAO, Immelt, Sherin, Bornstein, and Miller controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE Power's proposed acquisitions, and the impact of acquisitions on the Company's operations. The fact that Defendants Immelt, Bornstein, Miller, and Sherin had access to this information shows that they knew, or were reckless in not knowing, that statements concerning the Alstom acquisition were materially false or misleading. Indeed, GE repeatedly told investors that the Company tested impairment at the time of the Alstom acquisition and annually such that it is implausible Defendants did not know its recorded goodwill for the Alstom acquisition lacked a reasonable basis in fact.

201.    *Sixth*, on October 30, 2018, GE announced that the SEC had expanded its probe to include the Alstom goodwill charge and the DOJ was similarly conducting a criminal investigation with respect to the charge.

IV.    **Defendants' materially false or misleading statements and omissions of material facts**

   A.    **Defendants misled Plaintiffs about GE's LTC exposures**

      1.    **Statements or omissions regarding GE's "insurance liabilities" and "contractual obligations"**

202.    Each of GE's SEC filings listed below contain a disclosure titled "Contractual Obligations," which included, among other things, GE's Disclosed Insurance Liabilities. GE reported the below amounts as its "Insurance Liabilities."

| SEC Filing | Disclosed Insurance Liabilities ($ bn) |
|---|---|
| 2013 10-K (dated 2/27/14) | $13.5 |
| 2014 10-K (dated 2/27/15) | $12.6 |
| 5/8/15 8-K (dated 5/8/15) | $12.6 |
| 8/7/15 8-K (dated 8/7/15) | $12.6 |
| 2015 10-K (dated 2/26/16) | $11.5 |
| 2016 10-K (dated 2/24/17) | $11.1 |

203.    The "Insurance liabilities" disclosed in the MD&A section of GE's SEC filings were materially false or misleading and/or omitted material facts when they were reported because GE did not quantify its LTC insurance liabilities for these years and led investors to believe it had exited the insurance business and only retained stable run-off exposure. *See* Section II. Defendants did not want investors to know about the LTC liabilities and took steps to conceal them from the investors' view. *Id*. They also failed to disclose that GE was using outdated assumptions to estimate future liabilities and that management was making changes to reserve setting methodologies without supporting such changes. *Id*.

204.    By removing the LTC liabilities from the MD&A section of GE's Form 10-K, Defendants materially understated GE's total insurance liabilities. This misled investors into

believing that GE's future LTC liabilities were immaterial. Defendants' omission of GE's LTC liabilities falsely indicated that GE's insurance obligations were declining, even though the LTC market was cratering, creating a deception that GE did not retain material LTC exposure. This omission also indicated that GE's reserve exceeded its liabilities when GE had dramatically under-reserved for its LTC exposures.

205.    GE was required under Item 303(a)(5) of Regulation S-K to include in its MD&A section of its Form 10-K a breakdown of all of its known material contractual obligations in a tabular format. *See* ¶ 79.  While GE could disaggregate specified categories of its contractual obligations, the "presentation must include all of the obligations of the registrant that fall within the specified categories." *Id*.

206.    The SEC stated in its Release No. 33-9144, dated September 17, 2010 that "[t]he purpose of the contractual obligations table is to provide aggregated information about contractual obligations and contingent liabilities and commitments in a single location so as to improve transparency of a registrant's short-term and long-term liquidity and capital resources needs . . . ." The SEC also stated that "registrants should prepare the disclosure consistent with that objective," and that "[u]ncertainties about what to include . . . should be resolved consistent with the purpose of the disclosure." The SEC's release further stated that companies "should highlight any changes in presentation that are made, ***so that investors are able to use the information to make comparisons from period to period***." Finally, where a contractual obligations disclosure is linked to a financial statement disclosure, the SEC advised companies to provide sufficient information to allow investors to "tie" the information in the contractual obligations disclosure to the financial statement disclosure.

207.     As discussed above, prior to GE's annual statement for 2012, GE had included future claims payments on its run-off LTC portfolio within its "Insurance Liabilities" line item, specifically referred to LTC, and admitted that its LTC contracts had reasonably determinable cash flows. *See* ¶ 80.

208.     However, in GE's 2011 10-K, GE Disclosed Insurance Liabilities of $23.7 billion without any reference to whether or not the table included LTC liabilities. *See* ¶ 81.

209.     Then, in its 2012 10-K filed on February 26, 2013 GE reported Insurance Liabilities of $14 billion and stated in a footnote that this figure excluded LTC. *See* ¶ 82. GE did not explain why it excluded LTC liabilities or quantify the impact.

210.     Over these several years referenced in the table in ¶ 86, GE did not disclose the LTC liabilities, and instead reported annual reductions in its Insurance Liabilities. However, in realty, GE's LTC insurance liabilities were increasing at an alarming rate.

211.     Defendants failed to disclose GE's billions of dollars in LTC liabilities, which violated Item 303(a), including its requirement that the tabular breakdown of liabilities with "all of the obligations of the registrant that fall within the specified categories." Defendants further did not disclose that GE was using outdated assumptions to estimate future liabilities and that management was making changes to reserve setting methodologies without supporting such changes. *See* Section II.F.

212.     GE's exclusion of LTC liabilities from its SEC filings was materially false or misleading and/or incomplete because GE did not inform investors of meaningful required disclosures of material insurance liabilities that were required under Item 303(a)(5). Defendants provided no substantive explanation for its decision to omit its multi-billion dollar LTC exposure. These misleading and incomplete statements prevented investors from knowing the

true extent of GE's LTC liabilities, and thus, investors were unable to compare the amount of

LTC liabilities reported from year to year and to assess the adequacy of the insurance reserves

recorded in GE's financial statements. Defendants falsely conveyed to investors that GE's LTC

business had been run off to the point where there was no longer material exposure requiring

disclosure under the 10-K. These disclosures omitted material facts about GE's inquiry into its

Insurance Liabilities for its 10-K reporting and its knowledge about the true extent of its LTC

exposure, which investors would expect Defendants to disclose to the SEC. Defendants'

omission of GE's LTC liabilities falsely indicated that GE's insurance obligations were

declining, even though the LTC market was cratering, creating a deception that GE did not retain

material LTC exposure.

> ### 2.      Statements or omissions regarding GE Capital's insurance exposures and risks

213.     On December 16, 2014, GE held its annual guidance and update call with analysts

and investors. GE also disseminated a presentation in connection with the call titled *The Pivot*,

which was presented during the call by Immelt, on behalf of the Company. In the presentation,

GE indicated that the Company had achieved its "risk reduction" goal to "***[s]ell insurance before

the storm***." During the call, Immelt further stated that "***we exited insurance in time***."

214.     The foregoing statements in the above paragraph were materially false or

misleading and/or omitted material facts when made. Specifically, it was false or misleading for

GE and Immelt to represent that GE had reduced GE Capital's risks by "sell[ing]" and "exit[ing]

insurance" without disclosing that the Company remained exposed to billions of dollars in high-

risk LTC reinsurance liabilities.  Immelt's and GE's statements misled investors to believe that

GE had reduced—and was continuing to reduce—its insurance exposure at a time when GE's

LTC liabilities were materially increasing. It was similarly materially false or misleading to

suggest that GE had reduced its insurance exposure "in time" and "before the storm" without also disclosing that it remained exposed to "the storm" due to this multi-billion dollar LTC liability.

215.     On June 1, 2016, GE presented at the Sanford C. Bernstein Strategic Decisions Conference during which Sherin stated the following about GE Capital:

> So, we are a lot smaller. Assets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity. That's up substantially from where it was when we were designated. And we are not just smaller; *we exited whole pools of risk*.

216.     Sherin went on to state, in response to an analyst request to put GE's transformation over the last year and a half into context from a long-term perspective, that "*[i]f you look at what the portfolio is today versus take it when Jeff started, all of the insurance business is gone.  That was a huge change in the portfolio*. . . . It's a cleaner more synergistic portfolio. So we feel great about it."

217.     The foregoing statements in ¶¶ 215-16 were materially false or misleading and/or omitted material facts when made. Specifically, it was materially false or misleading for Sherin to state that GE had "exited whole pools of risk" and that "all of the insurance business is gone" without disclosing to investors that the Company remained exposed to billions of dollars in high-risk LTC reinsurance liabilities. Sherin's statements misled investors to believe that GE had reduced its insurance exposures at a time when GE's LTC liabilities were materially increasing.

218.     On February 22, 2017, Bornstein participated in the Barclays Industrial Select Conference on behalf of GE. During the conference, Bornstein stated that "we have the stub insurance piece, which has got virtually no returns associated with it," which prompted an analyst to ask whether GE would "sell the liability in that insurance kind of write a check and get rid of it." Bornstein responded by falsely claiming that the "low interest rate environment" was the primary impediment to selling its remaining insurance liabilities and stated, "I think interest

rates are a fundamental challenge in selling long-term liabilities in a low interest rate environment is a challenge."

219.    Similarly, on March 13, 2017, GE participated in the J.P. Morgan Aviation, Transportation & Industrials Conference during which Laxer, in response to an analyst's questions, created the false or misleading belief that the interest rate environment made selling GE's LTC portfolio unattractive at that time—when in fact it was the adverse claims experience and other risks attendant to GE's LTC portfolio that made the book so risky and unattractive that GE could not sell it. Specifically, when asked "what's the plan" for GE's remaining insurance liabilities, Laxer stated:

> Those are long-dated assets **and given the interest rate environment we are in right now, it's not attractive to do something**.  We always look at it, but just given where rates are at this point, it's not an attractive exit.

220.    When pressed as to, "[w]hat sort of bogey level would you think you have to see in terms of the rate environment to consider that transaction," Laxer stated, "**I think there's a lot of factors there. So it's hard to give you a specific number, but we would like to see a few increases before that would be attractive**."

221.    The foregoing statements in ¶¶ 218-220 were materially false or misleading and/or omitted material facts when made. Specifically, it was materially false or misleading for Bornstein and Laxer to indicate to investors that the interest rate environment was the primary impediment to GE liquidating its remaining LTC insurance exposure without disclosing that GE had been unable to liquidate its multi-billion dollar LTC portfolio due to its low quality, its "adverse claims experience," and GE's failure to adequately reserve for its future LTC liabilities, of which they were aware.

222.    On April 10, 2015, the Company hosted a call with analysts and investors to discuss the GE Capital Exit Plan announced earlier that day, during which Sherin stated that "[a]s you all know, we have done a lot over the last six years to shrink GE Capital while also ***making it much safer***."

223.    The foregoing statements were materially false or misleading and/or omitted material facts when made. Specifically, it was false or misleading for Neal to represent to investors that GE Capital's portfolio was "very safe," "safer," and "our best stuff," and for Sherin to represent that Defendants had made GE Capital "much safer" without disclosing that GE remained exposed to billions of dollars in high-risk LTC reinsurance liabilities. Neal's statements misled investors to believe that GE had reduced—and was continuing to reduce—GE Capital's risk exposures at a time when its insurance liabilities were materially increasing due to its LTC exposure. Neal's statements further misled investors into believing that GE Capital had only retained the portfolios it knew best and desired to keep when, in fact, Neal and Defendants knew GE had been forced to retain the LTC portfolio due to its substantial (and increasing) risks and liabilities.

### 3.    Statements or omissions regarding GE's insurance reserves

224.    In each of GE's 10-Ks and 10-Qs, and in an earnings press release published each quarter, GE reported as a line item to its financial statements, "Investment contracts, insurance liabilities and insurance annuity benefits," both for GE and GE Capital.  GE reported the following figures during the relevant period for these line items:

| Source | GE Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) | GE Capital Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) |
|---|---|---|
| 2013 10-K (2/27/14) | $26.544 | $26.979 |
| 4/17/14 8-K | $27.0 | $27.6 |
| 1Q14 10-Q (5/12/14) | $27.019 | $27.604 |
| 7/18/14 8-K | $27.4 | $27.9 |
| 2Q14 10-Q (7/31/14) | $27.365 | $27.908 |
| 10/17/14 8-K | $27.5 | $28.0 |
| 3Q14 10-Q (11/4/14) | $27.491 | $27.991 |
| 1/23/15 8-K | $27.6 | $28.0 |
| 2014 10-K (2/27/15) | $27.578 | $28.027 |
| 1Q15 10-Q (5/4/15) | $27.622 | $28.222 |
| 5/8/15 8-K | $27.578 | $28.027 |
| 7/17/15 8-K | $26.8 | $27.4 |
| 2Q15 10-Q (7/30/15) | $26.835 | $27.389 |

| Source | GE Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) | GE Capital Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) |
|---|---|---|
| 8/7/15 8-K | $27.578 | $28.027 |
| 10/16/15 8-K | $26.1 | $26.6 |
| 3Q15 10-Q (11/2/15) | $26.135 | $26.646 |
| 1/22/16 8-K | $25.7 | $26.2 |
| 2015 10-K (2/26/16) | $25.692 | $26.155 |
| 4/22/16 8-K | $26.3 | $27.0 |
| 1Q16 10-Q (5/4/16) | $26.318 | $26.955 |
| 7/22/16 8-K | $27.1 | $27.6 |
| 2Q16 10-Q (8/1/16) | $27.056 | $27.619 |
| 10/21/16 8-K | $27.1 | $27.6 |
| 3Q16 10-Q (11/2/16) | $27.126 | $27.642 |
| 3Q16 10-QA (11/9/16) | $27.126 | $27.642 |
| 1/20/17 8-K | $26.1 | $26.5 |
| 2016 10-K (2/24/17) | $26.086 | $26.546 |
| 4/21/17 8-K | $26.3 | $26.9 |
| 1Q17 10-Q (5/5/17) | $26.301 | $26.880 |

225.    Note 11 to the financial statements as a whole, and specifically to the balance sheet entry for the line items, "Investment contracts, insurance liabilities and insurance annuity benefits," both for GE and GE Capital, in each of GE's 10-Ks for the fiscal years 2012 through 2016, included line items for "Life insurance benefits" and "Other." GE reported the following figures (in $bn) during the relevant period for these line items:

| Note 11 for 10-K | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **"Life insurance benefits" ($bn)** | $20.427 | $18.959 | $20.688 | $19.978 | $18.741 |
| **"Other" ($bn)** | $3.304 | $3.405 | $3.369 | $3.223 | $4.992 |

226.    Each of the foregoing figures in ¶¶ 224-25 were materially false or misleading and/or omitted facts when made because the statements omitted facts about Defendants' inquiry into its reserves or knowledge concerning its reserves or the extent of its LTC liability. Plaintiffs expected that Defendants would make an inquiry into its numbers and information backing its reported figures and that these figures were based on accurate and reliable testing, inputs, and assumptions as they were reported to the SEC. Plaintiffs further expected that Defendants would align or incorporate the information it had in its possession either into the statements or in some meaningful way in its disclosures, particularly when it related to billions of dollars.

227.    Indeed, Defendants were aware that their LTC reserve statements were untrue because they attempted to bury and remove any related LTC liability from their disclosures. Defendants possessed the assumptions underlying GE's LTC reserves, in addition to GE's periodic loss recognition, deficiency, cash-flow testing. In addition, Defendants had access to

adverse facts regarding the accuracy, veracity, and reliability of GE's periodic LTC reserve testing. Section II.F.

228.    As discussed above, GE did not expressly disclose Benefit Reserves or Claim Reserves in its SEC filings. *See* ¶¶ 224-25. GE's line item titled "Life insurance benefits" was actually reflected in its "Benefit Reserves," of which approximately 50% was associated with high-risk LTC insurance policies ***and none of which*** was for life insurance policies. The remainder of this reserve was associated with structured settlement annuities and "shadow adjustments." *See* Section II.H. GE's inclusion of LTC reserves in an entry called "Life insurance benefits" was not a truthful statement and was misleading because there is a materially different risk profile of life insurance policies compared to LTC policies. Specifically, investors were misled because GE's reserve disclosure failed to communicate the correct characteristics of the risks associated with GE's LTC portfolio, which was material given the negative conditions within the LTC insurance marketplace. *See* Section II.C.

229.    GE's line item titled "Other" actually constituted its Claims Reserves, the vast majority of which (as much as 70%) was held against GE's toxic LTC contracts. *See* II. E. Given the specific and known risks associated with LTC reserves, it was materially misleading to refer to the LTC Claims Reserves as an "Other" category. Investors were not able to discern the extent that GE had reserved for its exposure to the LTC insurance market, which was the vast majority of its insurance exposure.

230.    Defendants knew this was materially false or misleading and/or omitted material facts because they decided to remove GE's LTC liabilities from its Disclosed Insurance Liabilities and bundle GE's LTC Benefit Reserve in its line item "Life insurance benefits." *See* Section II.E. This was misleading because nothing in the disclosures revealed that half of GE's

"Life insurance benefits" were LTC reserves. This was also misleading because it created the

deception that GE's reserves were more than adequate to satisfy its contractual insurance

obligations. *Id.* Defendants further did not disclose that GE was using outdated assumptions to

estimate future liabilities and that management was making changes to reserve setting

methodologies without supporting such changes. *See* Section II.F.

231.    Finally, in GE's 2Q16 10-Q, GE stated "[w]ithin [GE] Capital, Verticals net

earnings decreased by $0.1 billion due to higher insurance reserve provisions ($0.1 billion) and

lower gains, partially offset by core increases." This was false and or misleading and/or omitted

material facts because given the multi-billion dollar reserve increases that other LTC insurers like

Genworth had taken during this time period, *see* ¶ 77, GE's reserve increase of just $100 million

signaled to investors that its remaining LTC exposure was small and posed no material future

risk to the Company. Indeed, following GE's disclosure of the $100 million reserve increase,

analysts at RBC reaffirmed their belief that "GE Capital's balance sheet and risk profile have

been ***dramatically reduced*** over the past year as the company completed sales and spins of +80%

of its finance businesses."

### 4.    GE violated GAAP by failing to disclose material contingencies related to its LTC exposure

232.    GE's financial statements published in its Form 10-Ks and Form 10-Qs identified

above in ¶¶ 224-25 were false and misleading because they violated GAAP by failing to disclose

material contingencies.

233.    Within GAAP, ASC 450 governs the disclosure and accrual of contingencies for

all companies, including public companies in their SEC filings.  ASC 450 defines a "contingency"

as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible

gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

234.     Where a loss contingency is both probable (more likely than not) and estimable, GAAP requires the loss to be recorded. In a situation where the loss contingency is not both probable and estimable, GAAP nonetheless requires companies to make disclosures about such contingency. Specifically, where a material loss is "reasonably possible"—i.e., more likely than remote but less likely than probable—and the amount of the loss is reasonably estimable, ASC 450 requires companies to disclose the nature of the contingency and provide its estimate of the amount or range of loss. If the loss is reasonably possible but not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

235.     GE's financial statements violated ASC 450 by, *inter alia*, failing to disclose to investors ***any*** meaningful information regarding the nature and extent of its LTC exposure, or the future uncertainties and potential losses that could arise from that exposure. Indeed, GE's financial statements did not disclose its potential LTC-related liabilities or losses, and did not provide investors with any estimate of the amount or range of charges that could result from such exposure. GE also did not disclose trends known to it, including that: (i) negative issues in the LTC market were causing other insurers to materially increase their reserves, and (ii) GE's reserves were based on assumptions that did not account for negative events in the LTC market. Instead, as discussed herein, GE deliberately excluded any estimate of future LTC-related payments from its disclosure of future insurance liabilities, even though such liabilities should have been disclosed under GAAP because they were reasonably possible and potentially material.

**5.    GE violated GAAP by failing to disclose uncertainties relating to its calculation of LTC exposure**

236.    GE's financial statements published in its Form 10-Ks and Form 10-Qs identified above in ¶¶ 224-25 were false and misleading because they violated GAAP by failing to disclose uncertainties relating to its calculation of LTC exposure.

237.    ASC 275 requires companies to disclose in their financial statements the "risks and uncertainties" existing as of the date of the financial statements, including, *inter alia*, those arising out of the "use of estimates in the preparation of financial statements."

238.    Specifically, ASC 275 requires companies to include a "discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued . . . it is reasonably possible that the estimate will change in the near term and the effect of the change will be material." The required disclosure "shall indicate the nature of the uncertainty and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term." Further, "[i]f the estimate involves a loss contingency covered by [ASC 450], the disclosure also shall indicate an estimate of the possible loss or range of loss, or a statement that such an estimate cannot be made." ASC 275-10-50-15 notes that "examples of assets and liabilities . . . that may be based on estimates that are particularly sensitive to change in the near term" include amounts reported for "long-term obligations" and "long-term contracts," as well as "[c]ontingent liabilities for obligations of other entities."

239.    GE's 2012 10-K and SEC filings failed to provide sufficient information to investors regarding the basis for its estimated LTC reserves. Among other things, GE failed to provide any meaningful disclosure regarding the qualitative or quantitative impact that changes to critical LTC reserve assumptions—like mortality rate, morbidity rate, and lapse rate—would have on GE's reserve calculation. Nor did GE provide investors with any discussion of how GE's

reported reserves would change if it were calculated using *current* assumptions rather than

"assumptions at the time the policies were issued or acquired." Further, GE failed to provide any

meaningful disclosure regarding its estimated future payment obligations under its LTC policies,

notwithstanding that it was required to calculate such amounts in order to evaluate the adequacy

of its reserves. GE also did not disclose trends known to it, including that: (i) negative issues in

the LTC market were causing other insurers to materially increase their reserves, and (ii) GE's

reserves were based on assumptions that did not account for negative events in the LTC market.

Rather than disclose those future payment obligations, as discussed above, GE deliberately

omitted LTC liabilities from the quantification of its Disclosed Insurance Liabilities.

### 6.   GE violated GAAP by failing to disclose information regarding the basis for its LTC reserve estimates

240.   GE's financial statements published in its Form 10-Ks and Form 10-Qs identified

above in ¶¶ 224-25 were false and misleading because they violated GAAP by failing to disclose

information regarding its basis for its LTC reserve estimates.

241.   With respect to long-duration insurance contracts, ASC 944-40-50-6 requires

insurance entities to "disclose in their financial statements the methods and assumptions used in

estimating the liability for future policy benefits."

242.   As discussed herein, GE failed to make any meaningful disclosure regarding the

methods and assumptions used to calculate its LTC Benefit Reserves until the third quarter of

2017.  Unlike these more fulsome disclosures, and unlike the disclosures of other companies with

significant LTC exposures, GE merely stated in its 2012 10-K and 10-Ks for several years that

"[l]iabilities for traditional long-duration insurance contracts represent the present value of such

benefits less the present value of future net premiums based on mortality, morbidity, interest and

other assumptions at the time the policies were issued or acquired." These omissions were

misleading because they failed to disclosure the true extent of the LTC exposure GE faced, even though GE would have had to make this determination to calculate its reserves.

### 7.    GE violated Item 303(a)(1)-(3) by failing to disclose known trends, demands, commitments, and uncertainties

243.    GE's annual and quarterly reports identified above in ¶¶ 224-25 were false and misleading because they failed to disclose known trends, demands, commitments and uncertainties.

244.    GE's annual and quarterly reports filed with the SEC were subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Item 303(a)(1)-(3) generally requires companies to disclose in the MD&A section of its annual SEC filings any known trends, demands, commitments, events, or uncertainties that are reasonably likely to have a material impact on the company's financial condition.

245.    With respect to liquidity, Item 303(a)(1) requires issues to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

246.    With respect to capital resources, Item 303(a)(2) requires companies to, among other things:

   a. "Describe the registrant's material commitments for capital expenditures as of the end of the latest fiscal period, and indicate the general purpose of such commitments and the anticipated source of funds needed to fulfill such commitments."; and
   b. Describe any known material trends, favorable or unfavorable, in the registrant's capital resources.  Indicate any expected material changes in the mix and relative cost of such resources. The discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements."

247.    Finally, with respect to results of operations, Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

248.    On May 18, 1989, the SEC issued an interpretive release concerning registrants' disclosure obligations under to Item 303 (the "1989 Release"). The 1989 Release stated:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)   Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)   If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

249.    The purpose of the MD&A discussion, according to the SEC, is to provide investors information "necessary to an understanding of a [company's] financial condition, changes in financial condition and results of operations." In particular, there are three principal objectives of the MD&A: (i) "to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance."

250.    With respect to results of operations, Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will

have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

251.     The negative developments in the LTC insurance industry, which led other companies with LTC exposure (like Genworth, Unum, MetLife, and others) to increase reserves, raise premiums and—in many cases—exit the industry altogether, *see* ¶ 77, was a trend that was reasonably likely to—and did—have a material impact on GE's financial results, capital position, and liquidity. The negative trends with GE's own reinsurance portfolio, including, among other things, the widening gap between its actual claims and expected claims, the increasing future liabilities, and growing insufficiency of its LTC reserves, likewise were trends that were reasonably likely to impact the Company's financial results, capital position and liquidity. Further, GE's portfolio of 300,000 high-risk LTC insurance policies and the increasing liabilities GE was subject to under those policies, represented a demand, commitment, and/or uncertainty that was reasonably likely to have a material impact on GE's financial results, capital position, or liquidity during the relevant period.

252.     As discussed in ¶ 77, negative trends in the LTC industry led GE's competitors to record billions in reserve charges. GE, however, did not disclose trends known to it, including that: (i) negative issues in the LTC market were causing other insurers to materially increase their reserves, and (ii) GE's reserves were based on assumptions that did not account for negative events in the LTC market. During this same time period, GE's own exposure to the LTC industry caused its insurance liabilities to dramatically increase (an increase that was not disclosed to investors) and eventually caused GE to belatedly record a *$9 billion* charge to earnings at the end of fiscal year 2017. GE's LTC exposure will also require it to contribute *$15 billion* in capital to ERAC and UFLIC over seven years.

253.    In light of the above, GE was required under Item 303 to disclose on February 27, 2014 and thereafter, *inter alia*, the negative trends occurring in the LTC market, the expected impact of those trends—and of GE's increasing LTC insurance liabilities (and any potential uncertainties related to those liabilities)—on GE's financial results, capital position, and liquidity. More specifically, GE was required—but failed—to disclose information to investors concerning the existence and extent of this demand, commitment, and/or uncertainty.

254.    In light of the above, Item 303 required GE to disclose in its 10-Ks and 10-Qs, among other things, material facts concerning the negative trends that were ongoing in the LTC insurance market generally and within its own LTC portfolio, the extent of GE's (increasing) exposure to the LTC market, and manner and extent to which those trends were expected to negatively impact GE's liquidity, capital position, and financial results. GE violated Item 303 on February 27, 2014 and thereafter by failing to provide investors with any meaningful disclosures concerning the negative developments in the LTC industry, the nature or extent of GE's LTC exposure, or the risks or uncertainties created by such exposure. Indeed, rather than make these required disclosures, as discussed herein, Defendants deliberately excluded GE's LTC exposure from its Disclosed Insurance Liabilities even though they were aware of the "well-known" financial challenges that faced the LTC industry during this period.

### 8.    Omissions regarding the critical accounting estimates Defendants used to calculate GE's LTC reserves

255.    GE's financial statements published in its Form 10-Ks and Form 10-Qs identified above in ¶¶ 224-25 were false and misleading because they failed to disclose critical accounting estimates Defendants used to calculate GE's LTC reserves.

256.    In SEC Release 33-8350, dated December 29, 2003, the SEC stated that "management's most important responsibilities include communicating with investors in a clear

and straightforward manner" and that MD&A disclosures are "a critical component of that communication." The SEC stated that one of the three principal objectives of MD&A disclosures is "to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance."

257.    The SEC further stated in the release that companies should provide disclosures about critical accounting estimates where: (i) "the nature of the estimates or assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change;" and (ii) "the impact of the estimates and assumptions on financial condition or operating performance is material." The disclosures, according to the release, "should provide greater insight into the quality and variability of information regarding financial condition and operating performance" by disclosing how the Company "arrived at the estimate, how accurate the estimate/assumption has been in the past, how much the estimate/assumption has changed in the past, and whether the estimate/assumption is reasonably likely to change in the future." Further, the release stated that "[q]uantitative disclosure should be considered and may be required to the extent material if quantitative information is reasonably available."

258.    GE's 2013 10-K and latter Forms 10-K and 10-Q failed to provide sufficient information to investors regarding the critical accounting estimates that it was using to calculate its LTC reserves. Specifically, GE failed to provide any meaningful disclosure regarding the qualitative or quantitative impact that changes to critical LTC reserve assumptions—like mortality rate, morbidity rate, and lapse rate—would have on GE's reserve calculation. Nor did GE provide investors with any discussion of how GE's reported reserves would change if it were calculated

using *current* assumptions rather than "assumptions at the time the policies were issued or acquired." Further, GE failed to provide any meaningful disclosure regarding its estimated future payment obligations under its LTC policies, notwithstanding that it was required to calculate such amounts in order to evaluate the adequacy of its reserves. Rather than disclose those future payment obligations, as discussed above, GE deliberately omitted LTC liabilities from the quantification of its Disclosed Insurance Liabilities in the MD&A section during the relevant period.

259.    Instead, with respect to its "[l]iabilities for traditional long-duration insurance contracts," which would include LTC policies, GE merely stated the following regarding its critical accounting estimates in its 2013 10-K and 10-Ks during the relevant period, "[l]iabilities for traditional long- duration insurance contracts represent the present value of such benefits less the present value of future net premiums based on mortality, morbidity, interest and other assumptions at the time the policies were issued or acquired."

260.    In stark contrast to GE's prior SEC filings, and as discussed further in Section II.E. GE's 2017 10-K—which it filed after belatedly disclosing its true LTC exposure— contained the level of detail regarding the critical accounting estimates that GE used to calculate its LTC reserves that GE was required to—but did not—provide to investors during the previous years.

**B.    Defendants misled Plaintiffs about the strength of GE's Power segment**

    **1.    Statements or omissions relating to GE's Power segment, including GE's LTSAs, Contract Assets, and industrial CFOA**

261.    GE's reported Contract Assets reported in its Form 10-Ks for 2013-2016 and its Form 10-Qs filed in 2016-2017 were materially false and incomplete. In sum, the recorded Contract Assets were based on inflated estimates of the profitability of GE's LTSAs that were

based on models and inputs designed to manufacture and manage earnings through practices such as: (i) disregarding the deteriorating power industry and ignoring or manipulating critical, adverse real-time utilization data that GE maintained with respect to customers' assets on which GE provided services; (ii) relying on historical data which underestimated costs, leading to the unsustainable and undisclosed practices that underlay GE's cumulative catch-ups to increase short term profits; (iii) renegotiating LTSAs solely to trigger positive (and avoid negative) cumulative catch-up adjustments in order to allow GE to recognize a short-term gain at the long-term expense of GE, including by forfeiting revenues and profits on GE-provided services, labor, technology updates, and products (i.e., de-scoping); (iv) extending customers' payment terms and, as a result, harming GE's ability to collect on receivables; and (v) shifting costs associated with services rendered to a later period in order to recognize higher profits in the current period, with the hope that GE could make up the difference (i.e., realize cost savings) at a later point. *See* Section III.A.

262.     The practices summarized above rendered the following metrics materially false or misleading when made for the reasons set forth in ¶ 261:

|  | Contract Assets ($bn) | GE Industrials Profits ($bn) | Cumulative Catch-up ($bn) | EPS | Source |
|---|---|---|---|---|---|
| **2013** | | | | | |
| **Annual** | $12.522 | $16.220 | $0.3 | $1.47 | 2013 10-K |
| **2014** | | | | | |
| **Q1** | - - | $3.279 | - - | $0.29 | 1Q14 10-Q |
| **Q2** | - - | $4.166 | - - | $0.35 | 2Q14 10-Q |
| **Q3** | - - | $4.331 | - - | $0.34 | 3Q14 10-Q |
| **Q4** | - - | $5.988 | - - | $0.52 | 1/23/15 8-K |
| **Annual** | $13.990 | $17.764 | $1.0 | $1.51 | 2014 10-K |
| **2015** | | | | | |
| **Q1** | - - | $3.56 | - - | ($1.13) | 1Q15 10-Q and 10-QA |
| **Q2** | - - | $4.356 | - - | $0.24 | 2Q15 10-Q |

| Q3 | - - | $4.530 | - - | $0.28 | 3Q15 10-Q |
|---|---|---|---|---|---|
| Q4 | $21.9 | $5.522 | - - | $0.26 | 1/22/16 8-K |
| Annual | $21.156 | $17.966 | $1.4 | $0.17 | 2015 10-K |
| **2016** | | | | | |
| Q1 | $21.654 | $3.314 | - - | $0.02 | 1Q16 10-Q |
| Q2 | $23.458 | $4.122 | - - | $0.36 | 2Q16 10-Q |
| Q3 | $24.354 | $4.320 | - - | $0.23 | 3Q16 10-Q and 10-QA |
| Q4 | $25.2 | $5.842 | - - | $0.39 | 1/20/17 8-K |
| Annual | $25.162 | $17.598 | $2.2 | $1.00 | 2016 10-K |
| **2017** | | | | | |
| Q1 | $27.382 | $3.622 | - - | $0.10 | 1Q17 10-Q |
| Q2 | $28.924 | $3.947 | - - | $0.15 | 2Q17 10-Q |
| Q3 | $29.809 | $3.630 | - - | $0.22 | 3Q17 10-Q |
| Q4 | $28.9 | $3.542 | - - | $(1.15) | 1/24/18 8-K |
| Annual | $28.861 | $14.740 | $2.1 | $(0.68) | 2017 10-K |

263.    The 2013 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate and cost changes. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook. We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings*, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions that affect a product services agreement's total estimated profitability result in an adjustment of earnings; such adjustments increased earnings by $0.3 billion, $0.4 billion and $0.4 billion in 2013, 2012 and 2011, respectively. We provide for probable losses when they become evident*.

264.    The 2014 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates

of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

*We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings*, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.0 billion, $0.3 billion and $0.4 billion in 2014, 2013 and 2012, respectively*. We provide for probable losses when they become evident.

265.    The 2015 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

*We also regularly assess customer credit risk inherent in the carrying amounts of receivables* and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.4 billion, $1.0 billion and $0.3 billion in 2015, 2014 and 2013, respectively*. We provide for probable losses when they become evident

266.    The 2016 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

**We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings**, *including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination.* **We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $2.2 billion, $1.4 billion and** *$1.0 billion in 2016, 2015 and 2014, respectively.* **We provide for probable losses when they become evident.**

267.   The foregoing statements in ¶¶ 263-66 were materially false or misleading and/or omitted material facts when made for the reasons identified in ¶ 261, and because contrary to GE's statements that the Company "routinely review[ed] estimates" under LTSAs and "regularly revise[d] them to adjust for changes in the outlook," including "customers' utilization of assets" and "cost trends." GE recently admitted that it relied on historical average utilization rates rather than making adjustments for changes in outlook. *See* Section III.A. Defendants further disregarded or manipulated these critical inputs to inflate revenues, profits, and asset values, and to create the appearance of profitability. *Id*.

268.   Further, these statements were materially false or misleading and/or omitted material facts when made because the statements misled investors about GE's ability to generate and sustain revenues and profit from GE's Contract Assets and LTSAs.

269.   As discussed above, and in Section III.A, Defendants knew these statements were materially false or misleading and/or omitted material facts when made because during a 2015

summer meeting with GE executives to "hammer out targets for sales and profit, setting the underlying assumptions for the financial estimates it would give investors," Bolze showed the executives a presentation with a slide that proposed target growth for GE Power of 5%. Bolze stated in reference to that slide that it obvious that it "was a rosy assumption that cried out for interrogation, the very point of the formal review" and that GE "Power had been struggling to meet targets, and its sales hadn't grown that quickly in years."

270.    In a conference call held on January 23, 2015, Bornstein reported that orders for gas turbines, a major source of GE revenues, had declined in the fourth quarter of 2014, relative to the fourth quarter of 2013. Bornstein projected that GE would "grow services" to offset lost revenue and expected to see a "flat gas turbine market." This statement was false or misleading and/or omitted material facts when made because Bornstein failed to disclose that GE intended to "grow services" by generating phantom income from GE's LTSA Contract Assets.

271.    On February 22, 2017, during the Barclays Industrial Select Conference, Bornstein detailed GE's reliance on cumulative catch-up adjustments on its LTSAs:

> The other is in our long-term service contract accounting. We have an enormous portfolio, many times bigger than anybody else in the space, both in power—principally in Power Systems and Aviation. And the rules around it are changing. And it's complex, but there are several things that we do today that we account for on a cum[ulative]-catch basis. And I'll explain that in a moment that now we'll be accounted for on a prospective basis.
>
> ***So, for instance, if you have a contract with a customer today and you modify it, you add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions, and you reprice it. A lot of these things are priced on a per-utilization per-hour basis, if you will. In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes, what's the margin rate for the contract now. If the margin rate went down, you go back to day one, and you'll book a loss for restating time zero to the current date on the lower margin rate. If the margin rate is higher, you do the opposite. You get a cum[ulative]-catch gain, and you restate the margin rate of contract. So for things like modifications, termination clauses, et cetera, upgrades; all of that will be***

***accounted for prospectively, as opposed to retrospectively. Things like productivity will continue to act like they do today, which is a cum[ulative]-catch.***

So, we'll go through some of those details in the K. Our best estimate today, our expectation is that 2018 impact of all that is, we think, is going to be about a $0.05 EPS decline. After 2018, that will get smaller and start to approach zero. And at some point a few years after that, it will actually be accretive to what otherwise we would have—in the old accounting model—reported as earnings. So there's no cash associated with any of this accounting change. It doesn't change anything about the economics of these contracts in any way. It's just a point of where you're recognizing revenue and where you're recognizing cost.

272.    The foregoing statements were materially false or misleading when made because they did not disclose that GE had been generating billions of dollars in cumulative catch-up adjustments through fraudulent, unsustainable, and unsound business practices, as described in Section III.A. Moreover, as GE later admitted on April 13, 2018, (i) it had previously booked over $8.7 billion in revenues due to LTSA adjustments that have not yet turned into cash for the Company; (ii) more than half (57%) of GE's reported LTSA Contract Assets as of year-end 2017 were the product of cumulative catch-up adjustments that were the result of changes to LTSAs intended to generate phantom revenues; and (iii) its LTSA Contract Assets are actually worth 57% less than previously reported.

273.    During the 1Q17 earnings call on April 21, 2017, an analyst from Credit Suisse asked questions about GE's Industrial CFOAs and Contract Assets. In response, Bornstein assured investors that "the contract drag on cash flow" for 2017 would be the same as in 2016, and ***that GE was "not pulling future profit forward" on the contracts***, stating:

***[W]e expect the contract drag on cash flow for the year to be roughly the same***, 2016 versus 2017. . . . I think you got a number of phenomenon going on. We're investing like crazy in productivity and cost-out. When we get lower cost, the cost to execute against our contracts improves. And when they improve, the accounting has to account for that and where it changes our view on the ultimate profitability of these contracts. That's one method, and we're hugely focused on that. ***And I think you want us focused on that. That's all future cash, future economics, et***

98

*cetera, on a go-forward basis. We're not pulling future profit for it. That is not what we're doing*. We're just restating where we are in the contract from inception to-date. The second part is where the long-term service agreements that protect our installed base. *Our penetration continues to improve*.

274.    The foregoing statements were materially false or misleading and/or omitted material facts when made because in direct response to an analyst's question, Bornstein claimed that GE was "not pulling future profit for it." In fact, that was exactly what it was doing through its use of cumulative catch-up adjustments, backed by the undisclosed, unsustainable, and unsound business practices described in Section III.A.

275.    One analyst pressed Defendants for more clarity on GE's "noncash earnings from contract assets." In response, Bornstein explained what supposedly drove the increase in Contract Assets for the quarter:

> CSA contracts in the quarter were up $1.4 billion year-over-year. $800 million of that increase was associated with contract updates. Okay? And that's versus $500 million a year ago. So it's higher by $266 million year-over-year. *Of the about* $300 million, it's up year-over-year, a little more than half of that is in Power *and most of that is associated with updates of part costs when we change standards every year. So, for the contracts that were under review in the first quarter, if we change the standard on the part costs and deliver against that contract in the future, we did that update*. And then there's a small update for escalation that's mostly around our Aviation business. We update once a year on escalation within the service contracts. That part of long-term contracts that are revenues versus billing, so outside of contract updates, was $600 million in the first quarter and that's really where we've incurred shop visits, outages. We've incurred costs against those service contracts ahead of actually billing the hours or the events associated with it. So, that's mostly timing. *And some of that will come back over the course of the year because, we actually bill against the utilization or bill against an outage or a shop visit. So, I would say that's mostly timing*. That's the $1.4 billion increase that you see in contracts year-over-year.

276.    The foregoing statements were materially false or misleading and/or omitted material facts when made because Bornstein claimed that the adjustments were attributed to "updates of part costs," when in fact the adjustments were due to the undisclosed, unsustainable business practices described in Section III.A.

## 2.   Statements or omissions regarding factoring

277.   The 2016 10-K stated as follows with respect to GE's factoring of receivables:

In order to manage credit exposure, the Company sells additional current receivables to third parties outside the Receivables Facility described in Note 22. In connection with certain of these sales, we provide servicing activities and limited recourse to the purchasers. At December 31, 2016 and 2015, GE serviced $2,962 million and $2,167 million, respectively, of these receivables that remain outstanding. Of these balances, $458 million and $378 million at December 31, 2016 and 2015, respectively, were current receivables serviced by GE Capital that GE sold directly to third-parties. At December 31, 2016 and 2015, our maximum exposure to loss under the limited recourse arrangements is $215 million and $154 million, respectively.

278.   The foregoing statement that factoring was used solely to "manage credit exposure" was materially false or misleading and/or omitted material facts when made because, as described above in ¶ 261, and as GE would later reveal, it also used factoring "[i]n order to manage short-term liquidity," including in an effort to mask the liquidity issues caused by GE's reliance on manipulating LTSAs and abusing cumulative catch-up adjustments to inflate revenues by over $8.7 billion.

279.   During a January 20, 2017 conference call associated with GE's 4Q16 and 2016 year-end results, analysts were provided an opportunity to ask questions following the Company's prepared remarks. Here, analysts displayed their skepticism about GE's reported Contract Assets due to the fact that there was an increasing gap between Industrial CFOA and Contract Assets. Steven Winoker, an analyst from Sanford C. Bernstein & Co., asked the following with regard to GE Power's cash flow, to which Bornstein specifically denied that factoring from GE Capital played a notable role in Power's performance:

### STEVEN WINOKER—SANFORD C. BERNSTEIN & CO.—ANALYST

Thanks, good morning. Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial?

And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving.

### JEFF BORNSTEIN—GENERAL ELECTRIC COMPANY—SVP & CFO

Okay, there's a lot in that. So let me start with the fourth quarter, Steve.

We improved working capital in fourth quarter about $5.2 billion which the best we can tell is the strongest working capital quarter the Company has ever had. And I want to just give you some of the pieces on that.

* * *

So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million.

So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. **So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring.**

280.    The foregoing statement that GE was not relying on factoring to generate CFOA was materially false or misleading and/or omitted material facts when made because, in fact, GE was heavily reliant on factoring to monetize its Contract Assets and to generate CFOA to meet targets and pay its dividends, as discussed in Section IV.B. Defendants used factoring to manage its liquidity and inflate GE's financial results.

### 3.    Statements or omissions regarding the Alstom acquisition

281.    On April 30, 2014 GE issued a press release stating that it submitted a binding offer to acquire Alstom's Thermal, Renewables and Grid businesses of Alstom for a total of

$16.9 billion (€12.35 billion). GE's press release also stated, among other things, that "[Alstom] is also expected to provide an excelled return on capital," "We expect a collaborative and prompt integration that will yield efficiencies in supply chain, service infrastructure, commercial reach, and new product development," and "We expect these actions will generate more than $1.2B in annual cost synergies by year five and transaction will be immediately accretive for GE shareholders." *See* ¶ 180.

282.     These statements were misleading and incomplete because Defendants knew and did not disclose that the price GE had agreed to pay was far above what GE's own deal team thought Alstom was worth. GE knew that even its initial bid for Alstom at €30 per share was too high based on the deal team's analysis, and agreed to pay even more than €30 per share. *See* Section III.B. Further, the due diligence that Defendants conducted in 2012 revealed that "Alstom was in greater need of cash than the market understood, had too many employees and French law made it too difficult to lay off workers and sell assets." *See* Section III.B. This was the reason GE did not acquire the company in 2012. Defendants knew of the due diligence its own employees conducted when it made the statements concerning the Alstom acquisition on April 30, 2014 yet did not disclose those facts.

283.     After the announcement of the Alstom transaction, U.S. and European regulators demanded that GE agree to remove valuable assets from the transaction including an Alstom program to build a gas turbine. GE's own GE Power group assumed that management would then abandon the deal. *See* Section III.B

284.     On November 2, 2015, GE issued a press release announcing that it completed the Alstom acquisition and that the completion of the transaction "follows the regulatory approval of the deal in over 20 countries and regions including the EU, U.S., China, India, Japan and Brazil,"

and that "[t]he overall economics and strategic rationale remain the same as GE announced in

April 2014."

285.    These statements were misleading and incomplete because the "overall

economics" of the deal had not remained the same, which GE knew because it negotiated the

deal and was aware of valuable assets that were removed from the transaction. *See* Section III.B.

GE failed to disclose that even prior to the mandated divestures, the GE Power team who

performed due diligence on Alstom considered the consideration GE paid excessive and that "the

overall economics" were now worse for GE after the costly concessions mandated by regulators.

*Id.* Further, in 2012, GE did not originally pursue an acquisition of Alstom because "Alstom was

in greater need of cash than the market understood, had too many employees and French law

made it too difficult to lay off workers and sell assets." *See* Section III.B. GE did not inform

investors of these facts and that it was acting against the recommendations of its own due

diligence team.

286.    In GE's Form 10-K for 2015, filed on February 26, 2016, GE stated that it had

preliminarily valued the Alstom assets at $13.7 billion, net of cash acquired. This resulted in a

purchase price allocation of $13.5 billion in goodwill and $4 billion of amortizable intangible

assets. Specifically, GEs Form 10-K for 2015 stated:

> The fair value of the acquired businesses, including a preliminary valuation of non-
> controlling interest, at the time of close was approximately $13,700 million, net of
> cash acquired. The preliminary purchase price allocation resulted in approximately
> $13,500 million of goodwill and $4,065 million of amortizable intangible assets.
> The preliminary fair value of the associated non-controlling interest is
> approximately $3,600 million, which consists of approximately $2,900 million for
> Alstom's redeemable non-controlling interest in the three joint ventures (presented
> separately from total equity in the consolidated balance sheet) and $700 million for
> all other non-controlling interest. . . .

This statement was misleading and incomplete because Defendants did not disclose that the GE employees on the deal team for Alstom, who were the most knowledgeable as to the value of Alstom, believed GE paid far too much for Alstom and that many were of the view that GE should have exited the transaction when concessions made by regulators materially altered the deal. *See* Section III.B. The reported goodwill also failed to reflect what Defendants reasonably believed the future economic benefits associated with the Alstom assets would be as is required under GAAP. *Id.*

287.     In GE's Form 10-K for 2016, filed on February 24, 2017, GE disclosed that in its final purchase price allocation, it had recorded $17.3 billion in goodwill relating to the Alstom transaction. Although it is unusual to record a goodwill charge exceeding the purchase price for an asset, Defendants claimed it was justified "by estimated GE-specific synergies." Specifically, in Note 8 to the financial statements published in GE's Form 10-K for 2016, GE stated:

ALSTOM ACQUISITION ACCOUNTING UPDATE

The total consideration for the acquired businesses, at the time of close in November 2015 included our purchase price of $10,124 million (net of cash acquired) and a preliminary valuation of noncontrolling interests, of approximately $3,600 million for a total of approximately $13,700 million. In the fourth quarter of 2015, the preliminary allocation of purchase price resulted in goodwill, intangible assets and unfavorable customer contract liabilities of approximately $13,500 million, $5,200 million, and $1,100 million respectively. The amount of goodwill recognized compared with identifiable intangible assets is affected by estimated GE-specific synergies, which are not permitted to be included in the measurement of identifiable intangibles. Such synergies include additional revenue from cross-selling complementary product lines. The preliminary fair value of the associated noncontrolling interests consisted of approximately $2,900 million for Alstom's redeemable noncontrolling interests in the three joint ventures (presented separately from total equity in the consolidated statement of financial position) and $700 million for all other noncontrolling interests.

Through the fourth quarter of 2016, we adjusted the preliminary allocation of purchase price, which has now resulted in goodwill, intangible assets, and unfavorable customer contract liabilities, of $17,304 million, $4,370 million, and $2,720 million, respectively as of the acquisition date. These adjustments, which

are necessary to reflect acquired assets and liabilities of the acquired businesses at fair value, reflected revisions in 2016, primarily related to cash flow and other valuation assumptions for customer contracts, increases to legal reserves, and other fair value adjustments related to acquired assets and liabilities. The approximate amounts of significant purchase accounting adjustments recorded since the date of acquisition include a reduction in the book value of assets sold to Ansaldo of $405 million, adjustments to the fair value of derivative contracts of $335 million, decreases in inventory balances of $130 million, increases to legal reserves of $990 million, a reduction in the book value of aged accounts receivable of $175 million and other project related costs such as warranty provisions and liquidating damages of $665 million. In addition, the fair value of all other noncontrolling interests decreased by $55 million.

This statement was misleading and incomplete because Defendants did not have a reasonable basis to conclude that the Alstom acquisition supported $17 billion of goodwill based on "estimated GE-specific synergies." *See* Section III.B. In fact, Defendants knew, but failed to disclose that the GE employees on the deal team for Alstom, who were the most knowledgeable as to the value of Alstom, believed GE paid far too much for Alstom and that many were of the view that GE should have exited the transaction when concessions made by regulators materially altered the deal. *Id.* The reported goodwill also failed to reflect what Defendants reasonably believed the future economic benefits associated with the Alstom assets would be as is required under GAAP. *Id.*

288.    On October 1, 2018, GE issued a press release announcing that Flannery was being replaced by Lawrence Culp as CEO and that the Company. Although this announcement stated that "GE expect[ed] to take a non-cash goodwill impairment charge related to the GE Power business," the press release failed to disclose that this charge related almost entirely to its acquisition of Alstom or that the DOJ and the SEC were investigating this impairment charge. It was further misleading because it did not disclose that the Company knew from the start that it had grossly overpaid for the Alstom assets.

     **4.**      **GE violated Item 303(a)(1)-(3) by failing to disclose known trends, demands, commitments, and uncertainties concerning the Power segment**

289.    As discussed above, GE's annual and quarterly reports filed with the SEC are subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K, 17 C.F.R. § 229.303. *See* Section III.A.

290.    GE violated its Item 303 disclosure obligations by providing investors with no (or misleading) information to assess the many assumptions embedded in GE's Contract Assets, including whether estimated levels of profitability could realistically be achieved. For example, GE did not disclose that: (i) it was renegotiating LTSAs to its detriment, by eliminating some lower margin revenues, in order to trigger cumulative catch-ups; (ii) it had extended out the contract terms which gave customers additional time to make payment; (iii) its estimates relied on historical, rather than reasonably dependable current estimates; (iv) it was renegotiating its LTSAs for the sole purpose of padding its earnings by booking cumulative catch-up revenue adjustments. Such information should have been included in GE's Form 10-Ks for 2013-2016 and Form 10-Qs filed from 2014-2017.

291.    Defendants also did not disclose and chose to conceal that GE Power's LTSA revenues and Contract Assets were highly susceptible to, and had been negatively impacted by, increased reliance on renewable energy sources, lower customer utilization rates, and declining margins on its LTSAs and equipment sales. Further, Defendants did not disclose information that was likely to have a material impact on GE Power's profitability, and thus, GE's results, liquidity, and/or capital position such as (i) the deteriorating power industry, (ii) customers' migration to sustainable energy sources and resulting decreased asset usage, and (iii) GE's subsequent reliance on and use of unsustainable manipulations and factoring of LTSAs.

292.     In addition, Defendants failed to disclose known trends, demands, commitments,

and uncertainties concerning the Alstom transaction. Defendants knew, but failed to disclose that

the GE employees on the deal team for Alstom, who were the most knowledgeable as to the

value of Alstom, believed GE paid far too much for Alstom and that many were of the view that

GE should have exited the transaction when concessions made by regulators materially altered

the deal. *See* Section III.B. Despite knowing that the mandated divestures materially altered the

economics of the transaction, GE stated the "overall economics" of the deal had remained the

same. *See id.* Defendants further failed to disclose that in 2012 GE performed due diligence on

Asltom but did not pursue an acquisition of Alstom because "Alstom was in greater need of cash

than the market understood, had too many employees and French law made it too difficult to lay

off workers and sell assets." *See id.* Defendants further failed to disclose they did not have a

reasonable basis to conclude the goodwill reported in connection with the Alstom transaction

reflected the expected future economic benefit of the transaction. *See id.* These disclosures

should have been made in GE's press releases concerning the Alstom transactions (*see id.*) and

GE's Form 10-Ks for 2014-2017 and Form 10-Qs filed from the second quarter of 2014 through

at least the second quarter of 2018.

### 5.     GE's accounting for its Contract Assets and the Alstom transaction violated GAAP

293.     GE's financial statements published with its Form 10-Ks for 2013-2016 and Form

10-Qs filed from 2014-2017 were false and misleading because GE failed to perform a

reasonably dependable analyses of both the revenue and related costs associated with GE

Power's LTSAs, which is required under GAAP. *See* ASC 605-35 (Revenue Recognition,

Construction-Type, and Production- Type Contracts). GAAP requires an ongoing review of the

contract to ensure revenue and cost estimates continue to remain reasonable. As set forth above

in Section III.A, GE not only failed to conduct a meaningful review, it consciously inflated the amount of its Contract Assets in violation of GAAP.

294.     GE's accounting for its Alstom acquisition similarly violated GAAP. Under SFAS 141 and SFAS 142, the amount of goodwill recorded must fairly reflect the expected future economic benefit of the asset and needs to be tested annually for impairment. As set forth above in Section III.B, Defendants knew that GE grossly overpaid for Alstom, but did not insure that an appropriate impairment to goodwill was taken in a timely manner.

### C.     SOX Certifications and representations regarding GE's compliance with GAAP

295.     GE's 10-Ks filed on February 26, 2013 and throughout the relevant period that represented that "[o]ur financial statements are prepared in conformity with [GAAP]."

296.     GE's 10-Ks and 10-Qs contained certifications from GE's CEO and CFO stating that: (i) GE's filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;" (ii) GE's "financial statements, and other financial information . . . fairly present in all material respects the financial condition, results of operations and cash flows of [GE] as of, and for, the periods presented;" and (iii) "[t]he information contained in the report fairly presents, in all material respects, the financial condition and results of operations of [GE]." Immelt and Sherin issued the foregoing certifications in connection with the 2012 10-K and the 1Q13 10-Q. Immelt and Bornstein issued the foregoing representations in GE's 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and its quarterly reports filed on 10-Qs covering each of the periods from 2Q13 through 1Q17.

297.     The foregoing statements were materially false or misleading and/or omitted material facts when made because GE's financial statements did not comply with GAAP and did

not, in all material respects, fairly present the financial position of the Company during the periods reported. GE violated GAAP by, among other things, failing to adequately disclose its material LTC risks and exposure or the material uncertainties surrounding the portfolio, failing to hold sufficient reserve against its LTC liabilities, overstating its earnings and Contract Asset values, and timely take impairment to goodwill recorded in the Alstom transaction in violation of GAAP. As such, Defendants that issued SOX Certifications had no reasonable basis to assert that GE's financial statements complied with GAAP.

**D.    Statements or omissions regarding GE's internal controls over financial reporting**

298.    In GE's 2012 10-K, and 10-Ks and 10-Qs during the relevant period, GE's CEO and CFO certified that they evaluated GE's disclosure controls and procedures and internal controls over financial reporting and concluded that both GE's disclosure controls and internal controls over financial reporting were effective. Immelt and Sherin issued the foregoing certifications in connection with the 2012 10-K and the 1Q13 10-Q. Immelt and Bornstein issued the foregoing certifications in GE's 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and its quarterly reports filed on 10-Qs covering each of the periods from 2Q13 through 1Q17.

299.    The foregoing statements were materially false or misleading and/or omitted material facts when made because its disclosures, controls, procedures, and internal controls over financial reporting, including with respect to its insurance reserves, earnings and Contract Asset values, and accounting for the Alstom transaction were inadequate.

**V.    Loss causation/economic loss**

300.    Plaintiffs were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the relevant period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts relating to GE's: (i)

exposure to enormous, undisclosed and under-reserved-for LTC liabilities, (ii) reported revenue, which was inflated by GE's manipulation of LTSAs and Contract Assets, and related failure to account for reduced utilization rates and other negative developments in the power market when determining LTSA revenues and profits; and (iii) acquisition of Alstom when GE knew, or were reckless in not knowing, the price GE was paying was excessive and would not lead to the future economic benefits it claimed based on the concessions it made for the transaction to close.

301.    As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of GE's common stock was artificially inflated when Plaintiffs made the purchases identified in Exhibit A.

302.    Plaintiffs unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased GE stock at artificially inflated prices or continued to hold GE stock.

303.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between April 21, 2017 and October 30, 2018. During this corrective disclosure period, GE's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited GE's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 30, 2018 that the full truth was known to the market such that there was no longer any artificial inflation in GE's stock price attributable to the fraud described herein.

304.    The declines in GE's stock price during the corrective disclosure period, including, *inter alia*, the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

305.     Plaintiffs suffered economic losses as the price of GE's stock fell in response to partial corrective disclosures and/or the materializations of concealed risks. The price declines on the partial corrective disclosure dates in GE stock were a direct result of the materially false or misleading statements and omissions. It was foreseeable that such disclosures would cause GE's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs.

306.     The following partial corrective disclosures caused GE's stock price to decline, thereby damaging investors, and are representative, not exclusive, of the partial corrective disclosures and/or materializations of concealed risks that led to Plaintiffs' damages for which relief is sought in this case.

### A.     April 21, 2017: financial results for 1Q 2017

307.     On Friday, April 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, entitled "GE 1Q 2017 Earnings." Among other things, the press release reported that "Industrial operating cash flows[] were ***negative*** $1.6 billion driven primarily by an increase in working capital and ***timing of billings on our long-term equipment and service contracts***."

308.     Also on Friday, April 21, 2017, before the market opened, GE held an earnings conference call to discuss its 1Q 2017 results with analysts and investors. During the call, Immelt reiterated the results reported in the April 21 press release, stating, "***Industrial CFOA was a negative $1.6 billion***."  Bornstein elaborated on Immelt's comments, stating, "our industrial CFOA was at $1.6 billion usage of cash, ***about $1 billion below our expectations***." According to Bornstein, the largest contributor to this negative CFOA was cash outflows on GE's Contract

Assets ($1.9 billion) and, more specifically, GE's LTSA Contract Assets ($1.4 billion).

As Bornstein explained:

Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our billion revenue recognition milestones differ. This will catch-up throughout the year as we execute against the contracts. *The remaining $1.4 billion is our long-term service agreements*. There were two pieces to this. $600 million is related to service contracts where we've incurred costs and booked the revenue, but haven't yet billed the customer. We expect this to partly come back over the year as we see higher asset utilization in Power and Aviation. And we've seen these similar trends in the prior years. The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power and Aviation.

309. Defendants' April 21, 2017 disclosure corrected and/or reflected the materialization of risks concealed by the material misstatements and omissions alleged herein. On this news, GE's stock price declined from a close of $30.27 on April 20, 2017 to $29.55 on April 21, 2017, a drop of $0.72 per share, or 2.4%, on heavy volume of 72,351,400 shares.

310. Analysts were surprised by the revelation of negative Industrial CFOA cash flow and expressly stated that investors were reacting to this disappointing information, despite otherwise favorable earnings results reported by GE. For example, an April 21, 2017 Morningstar analyst report stated, "[s]hares of . . . General Electric slumped April 21 as *investors reacted to negative industrial cash flow in the first quarter*, which largely overshadowed [other more favorable results]." An April 21, 2017 Morgan Stanley report similarly noted, "we continue to be disappointed by weak cash generation, with $1.6bn of negative CFOA . . . *the contract asset headwind clearly drops a flag on the quality of the quarter*." An April 23, 2017 RBC analyst report entitled *Cash Flow Shortfall Gives Investors a Reason Not to Like 1Q17 Beat* expressly stated under "Key points" that:

   a. "GE's 1Q17 earnings call *was hijacked* by its disappointing cash flows from operating activities (CFOA)"; and

112

b.   "the 1Q [2017 CFOA] shortfall and back-end-weighted ramp arguably
drove most of the -2.4% stock reaction."

**B.      July 21, 2017: financial results for 2Q 2017**

311.    On Friday, July 21, 2017, before the market opened, GE issued a press release and
filed it on an 8-K with the SEC, entitled "GE 2Q 2017 Earnings" that summarized earnings for the
second quarter ended June 30, 2017.

312.    During a July 21, 2017 earnings conference call held before the market opened,
Bornstein updated investors on the $12 to $14 billion CFOA guidance for 2017 that the Company
had reiterated during the earnings call held in April 2017 (discussed above) by stating:

For the year, we are ***trending to the bottom end*** of the $12 billion to $14 billion
range on CFOA, driven by pressure, principally in Power and Oil & Gas.

313.    In addition, Bornstein provided results for GE Capital and stated, "[w]e recently
have had ***adverse claims experience in a portion of our long-term care portfolio,*** and we will
assess the adequacy of our premium reserves. We will update you in the fourth quarter."

314.    Defendants' July 21, 2017 disclosures corrected and/or reflected the materialization
of risks concealed by the material misstatements and omissions alleged herein.

315.    As investors absorbed this news, GE's stock price fell $0.78 from a close of $26.69
on Thursday, July 20, 2017 to close at $25.91 on Friday, July 21, 2017, a drop of 2.92% on
unusually large volume of over 90 million shares. On the next following trading day, Monday,
July 24, 2017, the share price decline continued as the market continued to digest this news, and
GE shares dropped to close at $25.43 on July 24, 2017, on heavy volume of over 56 million shares,
a two-day drop of $1.26 per share, or nearly 5%.

316.    Analysts noted the importance of the surprising news that Industrial CFOA was
being forecasted to come in at the low end of the $12 to $14 billion range. For example, RBC

issued a report on July 23, 2017 stating, "[o]n [the] last earnings call [on July 21, 2017] . . . GE 'ripped the band-aid' by cutting its 2017 EPS and Industrial CFOA guidance ranges to their respective low ends" and "Importantly, the company now expects full-year Industrial CFOA to come in at the low-end of its $12-$14 billion guidance range "

317.    Analysts were similarly surprised about the adverse claims experience in the LTC book of business. For example, a J.P. Morgan analyst report dated July 24, 2017 noted that, although the magnitude of the LTC reserve issue had not been revealed, the mere existence of the issue presented a risk to GE Capital being able to sustain the dividends it had been "upstreaming" to its parent company, GE, which, in turn, presented a risk to GE's ability to continue to pay dividends to GE shareholders. The J.P. Morgan report states:

> [T]he comment [on the 2Q17 earnings call] that [GE] will be evaluating Insurance for losses is a stark reminder that GECS is not just GECAS.  Indeed, GECAS is $40B of assets out of a total $153B.  In fact, Insurance is almost the same size at ~$36B, with roughly breakeven earnings contribution, ***and now prone to "adverse claims" in long term care***, which according to our JPM Insurance analysts has in recent years been measured in "the billions" for others.  This is a TBD, and we now see some risk to vertical earnings in 2H, ***as well as risk to potential for meaningful up streamed dividends in the years ahead***.

**C.    October 20, 2017: financial results for 3Q 2017**

318.    On October 20, 2017, before the market opened, GE filed an 8-K with the SEC attaching a "GE 3Q 2017 Earnings" summary.  The summary reported GE's CFOA for the quarter (as discussed further below) and stated that although GE Capital had paid $4 billion in dividends to GE through September 30, 2017, GE  was "deferring decision on additional dividends until Insurance reserve review [related to LTC insurance] is completed."

319.    On October 20, 2017, before the market opened, GE held an earnings conference call to discuss its results for the third quarter ended September 30, 2017. On the call, Bornstein stated:

Our reported CFOA was $500 million in the quarter.  That represents GE cash flow
. . . .  Next on GE Capital, there you [do see] we did not receive a dividend in the
quarter. As you know, we're in the process of performing an actuarial analysis of
claims reserves in our insurance business. Until that review has been completed,
***we have deferred the decision to pay GE Capital dividends to GE***.

Our industrial CFOA was $1.7 billion in the quarter, adjusted for $1.3 billion of US
pension plan funding and deal taxes. This is down $1.2 billion from prior year.
With BHGE on a dividend basis and excluding Oil and Gas CFOA, our Industrial
CFOA was $2.1 billion.

*       *       *

Contract assets were a use of $800 million in the quarter. . . . $500 million is from
our long-term service agreements due to better cost performance in parts life,
primarily in Power and Transportation.

320.    On the call, Miller further stated:

On cash flow, we now expect Industrial cash flow for the year to be about $7 billion
. . . . This is well below the $12 billion estimate we provided at second-quarter
earnings, and it's principally driven by three businesses.  Power is the biggest driver
on lower volume, higher inventory, and the timing of payments on long-term
equipment contracts. Oil and Gas is about $1 billion off; about half of that being
driven by lower volume in Collections in the first half, and the rest driven by our
methodology change to show them on the dividend basis for the second half of the
year. And Renewables is also about $500 million off on lower-than-expected
volume impacting inventory and progress collections.

321.    On the call, Flannery added:

As Jamie [Miller] mentioned, cash will be approximately $7 billion for the year.
Power alone will be lower than expected by $3 billion on lower earnings and higher
inventory. . . .

We expect substantially higher cash generation in 2018 driven by lower structural
headwinds, things like tax and restructuring charges; the rigorous cost-out plan; and
a substantial improvement in working capital. That said, ***obviously, $7 billion of
cash is significantly lower than guidance***, and this performance is simply not
acceptable.

322.    On the call, Bornstein further stated:

GE Capital ended the quarter with $155 billion of assets, including $33 billion of
liquidity, down $6 billion from the second quarter. As I mentioned on our last
earnings call, ***we have recently observed elevated claims experience*** for a portion

115

of the long-term care book at GE Capital's legacy insurance business, *which represents $12 billion or roughly 50% of our insurance reserves.*

As a result, we began a *comprehensive review in the third quarter of premium deficiency assumptions* that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. *Until the review has been completed, we've deferred the decision to pay approximately $3 billion of additional GE Capital dividends.* Year to date, GE Capital has paid $4 billion of dividends to GE.

323.    During the call, Flannery also announced that the Company had "identified $20-billion plus of assets that we will exit in the next 1 to 2 years."

324.    In reaction to GE's disclosures regarding LTC insurance reserves and Industrial CFOA, which corrected and/or reflected the materialization of risks concealed and the material misstatements and omission alleged herein, there was an immediate price decline in GE's stock, which opened on the NYSE trading on October 20, 2017 down more than 5.6% from the closing price of $23.58 on the previous day, October 19, 2017. While the price rebounded temporarily by the close of trading on Friday, October 20, 2017, by the close of the market on the next trading day (Monday, October 23, 2017)—after investors had sufficient time to absorb the impact of this news and after several analysts (including J.P. Morgan, Morgan Stanley and UBS AG) downgraded GE's stock in light of the disclosures—the stock closed at $22.32 on October 23, 2017, down $1.26, or 5.34%, from the close on Thursday, October 19, 2017 on extremely high volume of 187,340,900 shares traded. As the market continued to absorb this news, GE's stock price continued its slide over the next few trading days, falling to $21.89 on October 24, 2017, and then to $21.50 on October 25, 2017 and then to $21.32 on October 26, 2017.  Thus, over the course of this five-day period while the market digested the information disclosed on October 20, 2017, GE's stock price sank from a close of $23.58 on October 19, 2017 to a close of $21.32 on October 26, 2017, a cumulative drop of $2.26, or almost 10%.

116

325.    As discussed below, the changed views of analysts from the time the information

was initially disclosed on October 20, 2017 to the next trading day (October 23, 2017) demonstrate

that the market continued to digest the information after the initial disclosure on October 20, 2017.

326.    For example, on October 20, 2017, when GE held its conference call, Morningstar

opined that the GE's dividend was "at risk" based on the October 20, 2017 disclosures. But, by

Monday, October 23, 2017, after further digesting the information disclosed on October 20, 2017,

Morningstar then informed investors that the risk of a dividend cut was more likely. Specifically,

in an analyst report on Friday, October 20, 2017, Morningstar wrote, "[w]e plan to cut our fair

value estimate by as much as 10% following General Electric's third-quarter earnings report,

which revealed deeper challenges in the power segment than we had anticipated." The report

specifically pointed to GE "halv[ing] management's original 2017 target of $12 billion-$14 billion

in industrial cash from operations," and further wrote:

> More concerning is the suspension of GE Capital dividends, ***pending actuarial
> analysis of claims reserves in a long-term care insurance business***. Absent
> these dividends to the parent, and with Flannery positioning 2018 as a trough or
> "reset" year, ***we think it would be irrational for GE to maintain its current
> dividend***. ***Flannery did not explicitly confirm a cut*** but hinted that GE would be
> managed for total shareholder return going forward.

327.    Thus, as the title of the report stated, Morningstar was initially of the view that the

"Dividend [Was] *at Risk*." But, by the next trading day, Monday, October 23, 2017, Morningstar

actually acted on its plan to lower estimates for GE by 10% (lowering its price target for the stock

from $32 to $29) and stated:

> We're lowering our fair value estimate to $29 from $32 ***on weaker-than-
> expected industrial cash flow generation***. GE's dismal third quarter revealed
> both financial and behavioral factors that also lead us to believe ***the risk of a
> dividend cut has increased***. Originally, we had four conditions that caused us to
> believe GE would be able to maintain its $8 billion dividend. ***Two of those
> conditions broke down in the third quarter***. Management indicated that

117

industrial cash from operations would reach only $7 billion in 2017, *far short of the original $12 billion-$14 billion prior management targeted*. Subtracting capital expenditures from this new figure would leave only about $4 billion in industrial free cash flow, and that is before the $1.8 billion of pension contributions that GE is expected to make this year. Second, we had anticipated an additional $3 billion-$4 billion in GE Capital dividends to help bridge the gap if industrial free cash flow came in light. However, *management revealed the suspension of GE Capital dividends pending review of reserves needed to support a long-term care insurance business*. In our view, these were the two most important conditions needed to sustain the current dividend.

328. An RBC analyst report dated October 23, 2017 offered the following explanation for why the stock rebounded on Friday, October 20, 2017, despite the negative news:

New CEO John Flannery's much-anticipated inaugural earnings call set off a rollercoaster day for GE stock. We believe that his brutal honesty about prior mismanagement and commitment to rethinking the entire business model resonated well with investors. The turning point that sparked the stock rally from down -6% Friday morning, in our view, was during Q&A when management crisply explained how the ~$7 bil 2017 CFOA level was not the "new normal". . . .

Biggest surprise: Despite guidance cuts, GE's stock ends the day up 1%. Given the magnitude of the guidance cuts, the urgent question we fielded on Oct-20 was *why the stock rallied from -6% at the open to up 1% at the close*. Our take is that this rally was driven by two factors: (1) The bridge of cash usage items that will not repeat in 2018, demonstrating how $7 bil is not the "new normal", eased some shock over the CFOA guidance cut. (2) John Flannery's brutal honesty about GE's prior failings, along with a heartfelt "falling on his sword" by outgoing CFO Jeff Bornstein. These factors helped investors conclude that a bottom could be at hand.

329. The RBC report then, like the October 23, 2017 Morningstar report, went on to state, "[w]e expect GE to cut its dividend ahead of the Nov-13 analyst meeting," and went on to:

(i) discuss what was learned from the earnings call; (ii) stress both CFOA and LTC concerns; and (iii) actually *lower its price target* for GE's stock, stating:

The deterioration of GE's cash generation and sustainability of its dividend remains one of the biggest topics of debate facing the company today. To address this, new CEO John Flannery was unequivocal about his focus and commitment to improving cash flows at the company. That said, *GE was forced to once again*

***cut its 2017 Industrial CFOA target, moving from ~$12 billion down to ~$7 billion***, implying a -40% decrease.  In addition, the company had originally planned to orchestrate $6-$7 billion of total GE Capital (GECC) dividend back to the parent for the full- year. However, though it has only generated $4 billion YTD, ***management is deferring any decisions on additional GECC dividends until it completes an actuarial review of the claims reserves in its insurance business*** to gauge the level of cash outlays that may become necessary.

330.    Another area of the report states:

GE is currently in the midst of reviewing the adequacy of its reserves on its long-term care reinsurance business within GE Capital, which is expected to conclude in 4Q17. ***Given that this review may determine that roughly half of GE Capital's reserves are insufficiently funded and that additional contributions must be committed***, management has opted to defer any decision on transferring further dividends from GE Capital to the Industrial parent in 2H17. Year-to-date, the company has generated $4 billion of GE Capital dividends, vs. the prior target of $6-7 billion for the year, ***which may no longer be feasible*** depending on the conclusion of the insurance reserve assessment.

331.    In an October 23, 2017 analyst report, Deutsche Bank AG ("Deutsche Bank") similarly pointed to the surprising disclosures regarding GE's likely LTC charges in issuing a "sell" recommendation to investors, stating, *inter alia*:

The fact that GE owes such a large bill for legacy insurance likely surprised a lot investors considering GE supposedly exited Genworth, ERC and GE's other insurance businesses many years ago.  In fact, of GE Capital's [approximately] $155bn of assets at 3Q17, roughly $27bn are reportedly tied to insurance . . . Why is GE still taking charges for its discontinued operations . . . .

**D.    November 13-14, 2017: investor update and Goldman Sachs conference**

332.    On Monday, November 13, 2017, before the market opened, GE released to the market the long-awaited "GE Investor Update" from its CEO, Flannery. Flannery had been conducting a 100-days' long "deep dive" into all of GE's businesses and had earlier promised investors that he would update them on GE's plans for the future in November 2017, including an update on the LTC insurance issue.

333.    In the written "GE Investor Update," GE announced that it was cutting its dividend by 50% from the then-current level of $0.96 per share to $0.48 per share. The "GE Investor Update" stated that this reduction meant that the all-important dividend yield was be reduced from approximately 4.7% to approximately 2.3%. The "GE Investor Update" further stated that there would be a "[p]otential 4Q [2017] insurance reserve adjustment," but did not specify the amount, and further disclosed that while GE Capital had paid GE $4 billion in dividends thus far through the year, the decision on whether GE Capital would pay any further dividends to GE in 2017 was "deferred" and that GE was "[n]ot planning for dividend from GE Capital in 2018."

334.    This announcement was a highly significant event as the dividend cut was only the second dividend cut GE had made since the Great Depression (the other one was during the financial crisis in 2008), and was attributable to GE's disappointing CFOA and forthcoming LTC reserve charge.

335.    Beginning at 9 a.m. New York time, and continuing after the market had opened, GE held an "Investor Update" conference call with analysts and investors to discuss the written update further. During the call, CEO Flannery stated:

> You saw this morning that we announced the reduction in our dividend. It's in the context really of focusing on managing the company for total shareholder return. *I'd just start by saying we understand this is an extremely painful action for our shareholders, our owners. We're reducing the dividend by 50% to $0.48 a share*. Not a decision we took lightly. It was after extreme deliberation and consideration what the alternatives were.
>
> *            *            *
>
> With respect to the dividend, again, I just want to reiterate, *we understand how important the dividend is to our shareholders*, especially the people who use it for current income.  We've gone through exhaustive analysis of this, but I want to start, first and foremost, with a full recognition of the gravity of this decision and the effect it has on many people. That said, the reduction of this dividend to $0.48 is a product, really, of where we are as a company right now. So we had a $0.96 dividend established. We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend, that we'd end up in

2018 with a payout ratio that was quite comparable to what you'd see from our peers. The reality is that hasn't unfolded that way. The cash profile has not unfolded that way, ***and we've been paying a dividend in excess of our free cash flow for a number of years now***.

336.     GE then went on to discuss reasons why its dividend was being cut—Industrial CFOA shortfalls and the lack of an upstream dividend from GE Capital to GE for the remainder of 2017 and 2018 as a consequence of the LTC insurance issues. Defendant Flannery reiterated the Company's CFOA forecast reduction, in the following question and answer exchange during the call:

> **Unidentified Participant:**
>
> [S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe.  Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the gate. . . .
> When did you make the decision? . . .
>
> **John L. Flannery—General Electric Company—Chairman & CEO:**
>
> So I think ***there's been major change in our cash flow forecast***. So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA.  And the day I started, there was a guide to the low end of that range. . . .
>
> So we're now at a $7 billion number. . . . [F]undamentally, that ***dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow*** in the next couple of years. . . . ***So the single biggest delta, I think is obvious, which is what happened in the Power business***.

337.     On the call, regarding GE's review of its LTC insurance reserves, Miller updated investors as follows:

> One area, I'll just pause and talk about for a minute, is GE Capital. And as many of you know, ***we're in the middle of an ongoing reserve review at our insurance businesses there***. This process is ongoing. It involves multiple third parties and it's not done at this point. And I don't have a number for you today. We're on track to conclude that in December. ***And we mentioned to you before that we're not taking a second half [2017] GE Capital dividend of about $3 billion. And***

***as we go through this process, at this point, I do expect the charge to be more than that***. But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.

*     *     *

Probably the last thing I would just mention on this page is that we're not planning a GE Capital dividend [to be paid to GE] <u>for 2018</u>.

338.    On November 14, 2017, Miller appeared at a Goldman Sachs conference beginning at 9:30 a.m. New York time (i.e., after the market had opened), during which one analyst noted that in "[y]esterday's presentation, GE Capital was noticeably absent in the discussion there."

339.    Miller reiterated, "you saw that we cut the dividend yesterday by 50%" and provided further information. In response to an analyst's question, Miller further elaborated on the information provided in the November 13, 2017 presentation the day before, stating:

> And then the second piece to your question was really around the insurance review we have ongoing. Many of you may know, we're in the middle of a review of our insurance reserves. This is a book of largely reinsured long-term care businesses back from more than a decade ago. That review is ongoing, we're right in the middle of it. It involves multiple third parties. It's not done so we don't have any answers to it today. It's on track for completion in December. So when we know what that is, we'll announce it. We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year. At this point in the process, ***I'd tell you that I expect that charge to be more than that***, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point. But look, when we know and when we understand this better, we will announce it and be sure everybody knows.

340.    The enormous 50% dividend slash was more than analysts had been anticipating. For example, after the October 20, 2017 disclosures (discussed above), in an October 23, 2017 analyst report, Morgan Stanley had forecasted a "higher probability of a dividend cut to [approximately] $0.70 . . . ." Thus, the unanticipated halving of the dividend to a substantially lower $0.48 per share, and the need for charges exceeding $3 billion for LTC reserves, caught analysts and the market off guard and sent the stock price reeling. This news, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading

122

statements and omissions alleged here, caused GE's stock price to drop from a close of $20.49 on Friday, November 10, 2017 to close of $19.02 on Monday, November 13, 2017, a drop of over 7%, on heavy volume of over 261 million shares. The share price decline continued on the next trading day as the market continued to digest the shocking news about GE's massive dividend cut and need for larger-than-previously-disclosed LTC insurance reserves. On Tuesday, November 14, 2017, GE's stock fell an additional $1.12 per share, or 5.8%, to close at $17.90 on even heavier volume of 312,556,800 shares. The stunning news released by GE on November 13, 2017 and further discussed by GE at the November 14, 2017 Goldman Sachs conference resulted in a two-day share price free fall of more than 12.5%.

341.    As analysts explained, the dividend cut was particularly distressing news to GE's "retail investors" who placed great emphasis on GE's attractive dividend yield. In a November 14, 2017 Deutsche Bank report, under the heading *Negative surprises*, Deutsche Bank wrote, "[t]he dividend cut to 48 cents *was steeper than we expected*." The Deutsche Bank report goes on to note that "retail investors," who own approximately 40% of GE's shares, were particularly apt to punish the stock because such investors had been heavily reliant on GE's (formerly) attractive dividend yield. The Deutsche Bank report states:

> Yesterday, GE's analyst meeting *surprised* on several fronts.
>
> **Steep dividend cut**
> For the third time in its history, GE cut its dividend. Only this time, the cut wasn't predominantly driven by macro forces as was the case in the past (ie, Great Depression, Great Recession) but instead was heavily attributable to circumstances that were created by GE itself—namely excessive earnings ramp/targets matched with a dividend payout ratio of 45-50%.
>
> The cut to 48 cents from 96 cents came in lower than consensus expectations of ~60 cents, in our opinion. . . .
>
> *With >40% of GE's common equity owned by retail investors, we believe substantial near term selling pressure on GE could further ensue as retail*

*investors who previously counted on the GE dividend look elsewhere*.

342.    In a November 14, 2017 analyst report, Citigroup Global Markets, Inc. lowered its price target from $27 to $25 and wrote that "*[p]ower is a mess* right now. GE Capital will likely take *a big insurance charge*, and Cash/EPS could flat-line close to $1" and further that "the long term care reserve in GE Capital *will be bigger than we thought*."

**E.    January 16, 2018: GE's "Insurance Update"**

343.    On Tuesday, January 16, 2018, before the market opened, GE issued a press release announcing the results of its reserve testing related to its LTC portfolio and disclosed the shocking news that it will take an "after tax GAAP charge of $6.2 billion for the fourth quarter of 2017" ($8.9 billion pre-tax) and that "GE Capital expects to make statutory reserve contributions of ~ $15 billion over seven years."

344.    On January 16, 2018, before the market opened, GE also filed an 8-K with the SEC, which stated:

> On January 16, 2018, GE provided an update on the previously reported review of premium deficiency assumptions related to GE Capital's run-off insurance business (North American Life and Health ("NALH")). With the completion of that review, and of NALH's annual premium deficiency test, *GE recorded an increase in future policy benefit reserves of $8.9 billion* and $0.6 billion of related intangible asset write-off for the fourth quarter of 2017. *This will result in a $6.2 billion charge* ($7.5 billion upon remeasurement under tax reform) on an after-tax GAAP basis *to GE's earnings in the fourth quarter of 2017*.
>
> As a regulated insurance business, NALH is subject to a statutory accounting framework for setting reserves that requires the modification of certain assumptions to reflect moderately adverse conditions and other differences from the reserve calculation under GAAP. Under that framework, we estimate that *GE Capital will need to contribute approximately $15 billion of capital to NALH over the next seven years*. GE Capital plans to make a first capital contribution of approximately $3 billion in the first quarter of 2018 and expects to make further contributions of approximately $2 billion per year in each of the six following years, subject to ongoing monitoring by NALH's primary regulator, the Kansas Insurance Department. GE Capital plans to fund the capital contributions with its excess

liquidity and other GE Capital portfolio actions and ***does not expect to make a common share dividend distribution to GE for the foreseeable future***.

345.    On January 16, 2018, before the market opened, GE held an "Insurance Update

Call" as a follow-up to the press release. During the call, Flannery stated:

> We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate. And you will see that reflected in our fourth quarter financials. GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion.

> Needless to say, at a time when we are moving forward as a company, I'm ***deeply disappointed at the magnitude of the charge*** in this legacy portfolio.

> *              *              *

>   Clearly, in hindsight, we underappreciated the risk in this book.

346.    In contrast to Defendants' repeated proclamations that GE had "exited" the

insurance business and that "all of the insurance business is gone," Flannery acknowledged on

January 16, 2018 that GE had only "exit[ed] ***the majority*** of our insurance businesses in the 2004

to 2006 timeframe." He also conceded that, notwithstanding GE's lack of disclosures to investors

regarding its LTC liabilities, GE had been focused internally on its LTC portfolio throughout the

relevant period. Flannery noted that executives "reviewed" GE's LTC exposure "[i]n 2015, as

part of the GE Capital exit process" and further stated that GE's LTC book "has gone through a

standard evaluation process and testing every year as is the standard in the industry."

347.    During the January 16, 2018 conference call, Zanin noted that GE's experience was

no different than those of other LTC insurers (many of which had increased their reserves long

before GE), stating that "the entire industry has experienced greater claims than originally

anticipated where more people go on claim and for longer than expected."

348.    In response to this disturbing news, which corrected and/or reflected the

materialization of risks concealed by the materially false or misleading statements and omissions

alleged here, GE's share price sank from a close of $18.76 on Friday, January 12, 2018 to $18.21 on Tuesday, January 16, 2018 (the next trading day), a drop of approximately 3% on heavy trading volume of 205,657,000 shares. As investors continued to digest the news, the price drop continued the following trading day when on January 17, 2018, GE's stock fell to $17.35 from the January 16 close of $18.21, a drop of an additional 4.7% on heavy trading volume of 185,781,800 shares. The share price decline continued for the next two days, closing at $16.77 on January 18, 2018 and then at $16.26 on January 19, 2018. Thus, as the market continued to digest the news, GE's stock price declined over this four-day period from a close of $18.76 on Friday, January 12, 2018 to close at $16.26 on January 19, 2018, a cumulative drop of $2.50 per share or more than 13%.

349.    Analysts were incredulous about the enormity of the LTC reserve charge. During the January 16 call, analyst Jeffrey Todd Sprague, Founder and Managing Partner at Vertical Research Partners, LLC, remarked that "[i]t is hard to imagine a $15 billion problem materialized in the course of a year, like there was not enough rigor behind this process."

350.    Numerous analysts also remarked that the LTC reserve charge was greater than what the market had expected. In an analyst report dated January 16, 2018, entitled *Insurance woes hit GE hard*, Deutsche Bank stated its surprise regarding GE's enormous charge to earnings related to LTC insurance especially since LTC reserve issues had been revealed to the market by other companies with LTC exposure (but not by GE) at least as early as 2014:

> This morning, GE announced that it would take $6.2bn of 4Q17 after-tax charges to shore up reserves for GE Capital's long term care reinsurance book ($7.5bn at 21% US tax rate), or ***more than twice the original estimate last year of ~$3bn***, which we had presumed was a pretax number—this was not publicly specified. The charges come well after Genworth first flagged long term care issues in late 2014. The company also called out a considerable cash funding requirement of $15bn over the next 7 years. . . .

Overall, the charges and scope of the problem are ***significantly worse than we had anticipated***.

351.    In an analyst report dated January 16, 2018, entitled, *GE—Insurance Reserve Much*

*Worse Than Anticipated; $15 Bil of Contributions Over 7 Years*, RBC wrote:

> Our view: Although we had been previously warned that Sector Perform-rated GE's insurance portfolio reserve charge would be substantial, ***the initial amount announced on Jan-16 was far more severe than the market had been anticipating***, and exceeded expectations in early November of a +$3 billion charge. Specifically, GE now expects to record a $6.2 billion after-tax GAAP initial charge in 4Q17 and confer over $15 billion of total statutory capital contributions (cash) over the next seven years based on a "comprehensive bottom- up rebuild" of all claim curves and assumptions.
>
> *      *      *
>
> Long-awaited insurance portfolio reserve charge was ***higher than expected***; $6.2 billion after-tax charge in 4Q17 and $15 billion of contributions over seven years. On Jan-16, GE finally announced the results of its comprehensive review of GE Capital's run-off insurance portfolio. Specifically, management sized the pre-tax GAAP charge at $9.5 billion (or $6.2 billion after-tax), to be booked in 4Q17, and estimates a total statutory capital contribution of $15 billion over the next seven years. Recall that GE had previously estimated that the charge would be over +$3 billion and that it would announce these results in Dec-2017; clearly, ***the severity of the reserve shortfall was more dire than anticipated*** Management stated that these new charges are based on a "comprehensive bottom-up rebuild" of all claim curves, projections, and assumptions, which ***suggests to us that the prior standards for the actuarial reviews had been inadequate***.

352.    In an analyst report dated January 16, 2018, entitled *GE Capital Charge*

*Problematic on Many Levels*, Cowen wrote:

> GE Capital's Woes A Problematic Development—GE announced a $6.2B after-tax charge ($9.5B pretax) related to its review of the insurance portfolio (i.e. GE North American Life & Health; "NALH") it divested over 10 years ago. ***The $6.2B is 2x+ larger than GE had originally guided*** GE Capital plans to make $15B
> of "statutory reserve contributions" (i.e., cash contributions) over the next seven years, with $3B to be paid in Q1:18 and $2B/year to be paid over 2019-2024.

353.    The negative coverage continued the next day as analysts continued to digest the

completely unanticipated news GE revealed the day before. On January 17, 2018, Deutsche Bank

reemphasized the dire effect of the failure to properly reserve in the LTC business, stating:

GE needs cash. Separating out Aviation and Healthcare (relatively robust cash generators) could strand substantial liabilities with the Power business that could face years of long term fundamental pressures. Power itself requires substantial cash to fund its downsizing and new product development. Moreover, *GE Capital now requires cash to pay the $15bn of Insurance reserve funding (over 7 years), which would end up $9bn short once the $28bn of cash available pays off ~$25bn of run-off debt over the next 3 years (excluding the contribution from annual Capital earnings*, which may also shrink as EPS and the Industrial Finance books are meaningfully taken down).

354.    Similarly, in a January 17, 2018 analyst report, J.P. Morgan analyst Tusa continued to digest the implications the January 16, 2018 disclosures would have for GE's future earnings and wrote, "[y]esterday's charge from GE was **materially larger than expected**, and the implications of dealing with it are dilutive to earnings, FCF [free cash flow] and ultimately value." (emphasis in original). Tusa went on to note that the charge was so large that it implicates the financial strength of "the consolidated company now, and is not a ring fenced [GE Capital] issue."

355.    In fact, in a January 16, 2018 article titled *GE Capital Drags Down its Parent and CEO*, reporters at The New York Times noted that Flannery himself admitted, "I share your **surprise and disappointment** of this coming out of a legacy business."

356.    The market continued to digest this news on January 18, 2018. For example, a January 18, 2018 article in The Economist titled, *After a huge loss on old reinsurance contracts, GE contemplates a break-up*, stated, "[t]hat in the 12 years since [the Genworth and Swiss Re deals], the firm appears to have done little about this residual portfolio seems **an odd omission**. **The risk, after all, was well known.** Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble."

F.       **January 24, 2018: disclosure of 4Q 2017 financial results and SEC investigations into GE's LTC reserves and revenue recognition practices related to LTSAs**

357.     On January 24, 2018, before the market opened, GE issued a press release, filed with the SEC on an 8-K, announcing its 4Q 2017 results.  The press release stated that GE suffered a net loss of $9.8 billion for 4Q 2017, which included a $6.2 billion after-tax charge to increase LTC insurance reserves and substantial profit shortfalls in its Power unit.  The press release further stated:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions. . . . Power was down significantly and we expect market challenges to continue."

358.     The press release further stated, "GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity.  On a reported basis, the Verticals generated a loss of $(7.6) billion, ***which is down from last year driven by the effects of the charges in the Insurance business***" and that:

> GE announced last week that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), resulted in an ***after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017***, and GE Capital expects to make statutory reserve contributions of approximately ***$15 billion over 7 years***.

359.     Also on January 24, 2018, during an earnings conference call held before the market opened, GE disclosed that it has "been ***notified by the SEC that they are investigating*** the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements."

360.     In response to these disclosures regarding the SEC investigations, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, GE's stock price declined from a close of $16.89 on

January 23, 2018 to $16.44 on January 24, 2018, a 2.66% decrease on heavy volume of over 167 million shares. The share decline continued the next day as the price continued to drop to close at $16.18 on January 25, 2018, again on heavy volume of over 95 million shares. Thus, as the market continued to digest the news over this two-day period, GE's stock price declined from a close of $16.89 on January 23, 2018 to a close of $16.18 on January 25, 2018, a cumulative drop of $0.71 or more than 4%.

361.     Analysts cited the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, in an RBC analyst report dated January 25, 2018, RBC lowered its price target for GE's stock and wrote that any positive developments in GE's financial results:

> [W]ere quickly made irrelevant when management unexpectedly disclosed during the earnings call that the SEC had opened two separate investigations: one into GE's insurance reserve charge and the other into its contract asset accounting practices. ***The stock reaction to this negative news was swift, reversing a +4% relief rally into a 2%-3% decline***. While it is difficult to handicap the risks associated with these SEC reviews in their early stages, this overhang will likely continue to dog GE over the near-term and present any bottom-fishing investors with a reason to stay on the sidelines. We are lowering our 2019 EPS by -4c and our price target to $17.
>
> **Biggest surprise: Discloses two separate SEC investigations**. GE's stock sell-off on Jan-24 was seemingly prompted by the unsettling revelation of two SEC investigations. Recall that it announced on Jan-16 that GE Capital's insurance reserves were found to be inadequate, requiring $15 bil of capital contributions over the next seven years. This development apparently elicited the interest of the SEC, which may be looking into how a liability of this magnitude had been permitted to languish unnoticed for so long. Separately, GE revealed that the SEC had opened an investigation into its contract asset accounting practices in late-2017.

362.     Market commentators also pointed to the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, a January 25, 2018 CBS MarketWatch article entitled, *GE stock swings lower after disclosure of SEC investigation*, states:

> General Electric Co's stock was soaring after the company reported fourth-quarter results, then the industrial conglomerate's bombshell about a government accounting probe triggered a sharp pullback that erased all the gains.

*    *    *

The stock . . . had traded up as much as 5.8% in premarket trade, after GE reported fourth-quarter results, and after the start of the post-earnings conference call.

*    *    *

But after the SEC probe [was announced on the earnings call], the stock took a sharp dive. It tumbled 2.7% in active trade Wednesday, enough to pace the Dow Jones Industrial Average[] . . . decliners. Volume spike to 167 million shares, making the stock the most actively traded on major U.S. exchanges.

363.    The declines in GE's stock following the revelations during the corrective disclosure period (April 21, 2017 through January 24, 2018) and the resulting losses suffered by Plaintiffs were proximately caused by the misstatements and omissions of material fact alleged herein.

**G.    October 30, 2018: disclosure of $22 billion impairment loss primarily attributable to the Alstom acquisition and investigations by the SEC and DOJ relating to the impairment charge**

364.    The declines in GE's stock following GE's disclosure that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition and the resulting losses suffered by Plaintiffs were proximately caused by the misstatements and omissions of material fact alleged herein.

365.    On October 30, 2018 GE disclosed in its Form 10-Q for the third quarter of 2018 that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition.

The value of these unrecognized intangible assets is driven by high customer retention rates in our Power business, our contractual backlog, the value of internally created technology, and the GE trade name. The combination of these unrecognized intangibles, adjustments to the carrying value of other assets and liabilities, and reduced reporting unit fair values calculated in step one, resulted in an implied fair value of goodwill substantially below the carrying value of goodwill for the Power Generation and Grid Solutions reporting units. Therefore, in the third

quarter, we recorded our best estimate of a non-cash impairment loss of $21,973 million. The impairment loss included $827 million of goodwill recorded at Corporate associated with our Digital acquisitions that was previously allocated to our Power Generation and Grid Solutions reporting units. We recorded the estimated impairment losses in the caption "Goodwill impairment" in our consolidated Statement of Earnings (Loss). As a result of ongoing updates to our long-range forecast and the complexity of valuing intangible assets in the second step of the impairment test, the Company has not yet completed its analysis. We will recognize any differences to this estimate in the fourth quarter when we finalize the step two impairment test. After the impairment loss, there is no remaining goodwill associated with our Power Generation reporting unit and $1,653 million related to our Grid Solutions reporting unit at September 30, 2018.

366.    This Form 10-Q also disclosed that the SEC and DOJ were investigating Alstom with respect to the impairment charge:

> Following our announcement on October 1, 2018 about the expected non-cash goodwill impairment charge related to GE's Power business, as discussed further in Note 8 to the consolidated financial statements, the SEC expanded the scope of its investigation to include that charge as well. We are providing documents and other information requested by the SEC staff, and we are cooperating with the ongoing investigation. Staff from the DOJ are also investigating these matters, and we are providing them with requested documents and information as well.

367.    GE's stock price fell sharply on this announcement from a closing price of $11.16 on October 29, 2018 to close at $10.18 on October 30, 2018, on trading of almost 345 million shares.

## VI.    Plaintiffs purchase GE stock in reliance on Defendants' materially false and misleading Statements

368.    Plaintiffs purchased GE common stock on the dates identified in Exhibit A for an aggregate price of more than approximately $120 million. *See* Exhibit A. Plaintiffs relied upon the misleading statements and/or omissions described in this Complaint when making the purchases identified in Exhibit A.

369.    In accordance with Plaintiffs' due diligence process in the purchase of equity securities, Plaintiffs' investment advisors reviewed and relied upon GE's most recently available financial statements and SEC filings on Forms 10-K and 10-Q prior to purchase.

370.    Plaintiffs' investment advisors further monitored GE's earnings releases and conference calls and relied upon statements made in such releases and conferences calls when making the purchases identified in Exhibit A.

371.    In addition, Plaintiffs reviewed statements from GE employees and executives disseminated to the media concerning, among other things, Defendants' financials, revenues, profits and losses, GE's exit from the insurance business, methods for accounting in financial statements, financial controls, and related topics during the relevant period.

372.    Plaintiffs would not have made the purchases identified in Exhibit A if Defendants had disclosed information that they had a duty to disclose. For example, Plaintiffs would not have purchased the GE Stock if they had known of: (i) GE's exposure to enormous and under-reserved-for LTC liabilities; (ii) GE's manipulation of LTSAs and contract assets to inflate its revenue; and (iii) acquisition of Alstom when GE knew the price it was paying was excessive and against the advice of its due diligence team, and would not lead to the future economic benefits it claimed based on the concessions it made for the transaction to close.

VII.    **No safe harbor**

373.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements,

there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

374.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized, and/or approved by Defendants who knew that those statements were false when made.

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
### **(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

375.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.

376.    Plaintiffs assert this Cause of Action pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants.

377.    During the Relevant Period, Defendants disseminated or approved the false statements set forth above, which they knew were, or deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

378.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.    employed devices, schemes and artifices to defraud;

b.     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

d.     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of GE common stock during the relevant period.

379.     During the relevant period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of GE common stock to trade above its true value; and (iii) cause Plaintiffs to purchase or otherwise acquire GE common stock at artificially inflated prices that did not reflect the stock's true value during the relevant period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

380.     While in possession of materially adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for GE common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

381.    Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding GE's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

382.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of GE common stock during the relevant period.  Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of materially adverse information that was known to or recklessly disregarded by Defendants but not disclosed by them, Plaintiffs purchased or otherwise acquired GE common stock during the relevant period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of GE common stock substantially declined, causing losses to Plaintiffs. These declines and the preceding disclosures are set forth above in Section V.

383.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were not aware of their falsity and believed them to be true. Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GE common stock. Had Plaintiffs known the relevant truth regarding GE's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants,

Plaintiffs would not have purchased or otherwise acquired GE common stock at artificially-inflated prices, or at all.

384.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common stock during the relevant period.

**SECOND CAUSE OF ACTION**
**(Violation of Section 20(a) of the Exchange Act against the Individual Defendants)**

385.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

386.    Prior to and during the relevant period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning GE, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

387.    In their respective roles, the Individual Defendants had regular access to non-public information about GE's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of GE's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

388.    Each of the Individual Defendants was a controlling person of GE within the meaning of Section 20(a), as alleged herein. By virtue of their high-level positions, and their participation in or awareness of the Company's day-to-day operations and finances,  and/or

knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiffs allege were materially false or misleading.

389.   Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of GE common stock during the relevant period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) as set forth above in Section IV. The scheme: (i) deceived the investing public regarding GE's operations and the true value of GE's common stock; and (ii) caused Plaintiffs to purchase GE common stock at artificially inflated prices, which plummeted in value as the truth concerning the magnitude of GE's LTC exposure and the manipulation of costs and profitability of GE's LTSAs were revealed.

390.   The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiffs allege were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected. In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

391.     As set forth above, Defendants violated Section 10(b) and Rule 10b-5, by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a). As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiffs suffered damages in connection with their transactions in GE's common stock during the relevant period.

### THIRD CAUSE OF ACTION
### (Rescission pursuant to O.R.C. § 1707.43)

392.     Plaintiffs reallege each allegation above as if fully set forth herein.

393.     This claim is brought under Ohio Securities Act, O.R.C. § 1707.43, against Defendant GE.

394.     GE violated O.R.C. § 1707.44(J) because it knowingly made or caused to be made, with purpose to deceive, materially misleading false statements and omissions concerning the overall financial condition of GE, including materially false and misleading statements concerning GE's insurance liabilities and contractual obligations, GE's LTC liabilities and insurance reserves and exposure, GE Power's Contract Assets and reported revenue, and GE's Alstom acquisition, among other things. These misstatements artificially inflated the value of GE's common stock.

395.     Plaintiffs' purchases had a nexus to Ohio. All of the Plaintiffs have their principal places of business in Ohio and, as a result, suffered their losses in Ohio. Moreover, with the exception of purchases of shares included in the Touchstone Value Fund all of Plaintiffs purchases were made by an investment advisor located in Ohio. GE was aware that its false statements were disseminated into Ohio and were being relied upon by Ohio investors.

396.    GE participated in, or aided, the sales to Plaintiffs. GE is the issuer of the securities purchased by Plaintiffs and caused them to be listed for sale on the New York Stock Exchange. GE issued false financial statements, Forms 10-K, Forms 10-Q and press releases that it knew, or should have known through the exercise of reasonable due diligence, were false or misleading and affected the value of GE's common stock. GE's officers similarly made false statements concerning facts that affected the value of GE's common stock attributable to GE that GE knew, or should have known through the exercise of reasonable due diligence, were false or misleading.

397.    Plaintiffs are entitled to void and rescind their purchase of GE common stock under O.R.C. § 1707.43 and recover the full amount of consideration paid for the common stock and all taxable court costs.

**FOURTH CAUSE OF ACTION**
**(Common law fraud)**

398.    Plaintiffs reallege each allegation above as if fully set forth herein.

399.    This claim is for common law fraud against Defendants.

400.    The material misrepresentations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

401.    Defendants knew their misrepresentations and omissions were false and misleading at the time they were made. Defendants made the false and misleading statements and omissions with the intent to defraud investors in GE, like Plaintiffs. Indeed, the Defendants made fraudulent misrepresentations and omissions directly to Plaintiffs' through financial statements and earnings announcements, and through statements made by GE employees and executives disseminated to the media concerning, among other things, Defendants' financials,

revenues, profits and losses, GE's exit from the insurance business, methods for accounting in financial statements, financial controls and related topics during the relevant period.

402.    Plaintiffs justifiably relied on Defendants' false and misleading representations and omissions.

403.    Had Plaintiffs known the relevant true facts regarding, among other things, GE's financial results, operations, business, and prospects, which were misrepresented and/or concealed by Defendants, Plaintiffs would not have purchased or otherwise acquired GE common stock at artificially-inflated prices.

404.    As a result of Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered damages according to proof. Defendants are liable to Plaintiffs for common law fraud.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

A.      Compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

B.      Extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

C.      Costs and expenses incurred in this Action, including reasonable counsel fees and expert fees;

D.      Prejudgment interest at the maximum legal rate;

E.      Treble and punitive damages; and

F.      Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  February 27, 2019

Respectfully submitted,

/s/ *Steven S. Fitzgerald*

William A. Maher
Steven S. Fitzgerald
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
wmaher@wmd-law.com
sfitzgerald@wmd-law.com
rhallinan@wmd-law.com

*Attorneys for Plaintiffs*