**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TOUCHSTONE STRATEGIC TRUST, TOUCHSTONE VARIABLE SERIES TRUST, THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, WESTERN-SOUTHERN LIFE ASSURANCE COMPANY, WESTERN & SOUTHERN FINANCIAL GROUP, INC., and INTEGRITY LIFE INSURANCE COMPANY,

Plaintiffs,

-against-

GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE S. MILLER, and KEITH S. SHERIN,

Defendants.

Case No. 1:19-cv-01876-JMF

Hon. Jesse M. Furman

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ....................................................................................1

PARTIES ....................................................................................................10

JURISDICTION AND VENUE ..........................................................................13

SUBSTANTIVE ALLEGATIONS ........................................................................14

I. Background ..............................................................................................14

II. Defendants' scheme to inflate Power service revenues and related cash flow from operations. ....................................................................................................18

A. Defendants' manipulation of revenues relating to Power's LTSAs ....................19

B. Defendants' use of factoring to inflate "Industrial CFOA" ..................................26

C. Defendants' false or misleading statements relating to Power service profit and revenues .............................................................................................30

D. Defendants' false or misleading statements concerning GE's use of factoring and its deferred monetization practices ..........................................................41

E. Additional scienter allegations concerning Defendants' LTSA scheme ...............47

III. Defendants misled investors with an "artificial" valuation of Alstom to justify GE's acquisition of the troubled company and recorded the assets acquired at inflated values ..........................................................................................49

A. GE prepares a bid for Alstom based on an "artificial" enterprise valuation.............................................................................................50

B. Defendants misleadingly tout the Alstom transaction from the date the deal was announced until deal closing....................................................................53

C. Material misstatements or omissions in GE's SEC filings relating to the Alstom acquisition and recorded goodwill ..................................................................58

D. GE announces a belated $22 billion impairment charge relating to Alstom .........63

E. Additional scienter allegations regarding the Alstom misrepresentations and omissions....69

IV. GE's misrepresentations and omissions concerning its LTC exposure....70

A. Defendants announce that GE is "exiting" the insurance business....71

B. Industry experience demonstrated that the retained block of LTC policies were not "stable"....75

C. Defendants did not have a reasonable basis to conclude LTC reserves were adequate....78

D. GE's belated disclosure of its true LTC exposure....83

E. GE's material misrepresentations and omissions concerning its LTC exposure....85

F. Additional allegations of scienter relating to Defendants' LTC scheme....90

V. Loss causation/economic loss....93

A. April 21, 2017: financial results for 1Q 2017....95

B. July 21, 2017: financial results for 2Q 2017....96

C. October 20, 2017: financial results for 3Q 2017....98

D. November 13-14, 2017: investor update and Goldman Sachs conference....103

E. January 16, 2018: GE's "Insurance Update"....108

F. January 24, 2018: disclosure of 4Q 2017 financial results and SEC investigations into GE's LTC reserves and revenue recognition practices related to LTSAs....113

G. October 30, 2018: disclosure of $22 billion impairment loss primarily attributable to the Alstom acquisition and investigations by the SEC and DOJ relating to the impairment charge....115

VI. Plaintiffs purchase GE stock in reliance on Defendants' materially false and misleading statements....116

VII. No safe harbor....117

CAUSES OF ACTION ........................................................................................................ 118

PRAYER FOR RELIEF ..................................................................................................... 125

JURY TRIAL DEMANDED .............................................................................................. 125

Plaintiffs Touchstone Strategic Trust, Touchstone Variable Series Trust, The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Western & Southern Financial Group, Inc., and Integrity Life Insurance Company (collectively "Plaintiffs") for their Complaint against Defendants General Electric Company ("GE" or the "Company"), Jeffrey R. Immelt, Jeffrey S. Bornstein, and Keith S. Sherin, hereby allege upon knowledge as to themselves and their own conduct, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. GE, once a symbol of American ingenuity and a bellwether of the U.S. economy, has lost over $100 billion in market capitalization since it made the first in a series of disclosures exposing a massive accounting fraud committed during the tenure of Jeffrey Immelt as Chief Executive Officer ("CEO"). To date, GE has taken more than $36 billion in charges related to the fraudulent scheme and has committed to additional capital contributions of $15 billion to be made in subsequent periods.

2. Plaintiffs purchased approximately 5,320,806 million shares of GE's common stock at artificially inflated prices for an aggregate purchase amount of approximately $120 million. Plaintiffs have lost approximately 50% of the value of their shares as the truth concerning GE's financial condition emerged from 2017-2018. A table, identifying each purchase and, to the extent purchased shares were sold, the sale, of GE common stock by Plaintiffs is attached hereto as Exhibit A.

3. On June 12, 2017, GE announced that John Flannery ("Flannery") would succeed Immelt as GE's CEO effective August 1, 2017. What followed was a dismantling and unraveling of a multi-year scheme of fraud and deception that Immelt and his senior management team,

including his Chief Financial Officer ("CFO"), Jeffrey Bornstein, used to prop up GE's reported financial results since at least 2014. The massive scope of this fraud was revealed to the market piecemeal in a series of disclosures made from late 2017 to late 2018. Flannery was ultimately replaced by GE's current CEO, Larry Culp.

4. The historic collapse of GE, including the accounting and financial reporting scandals discussed in more detail later in this complaint, has been chronicled in a series of articles published in the Wall Street Journal and an exhaustively researched and recently published book by Journal reporters Thomas Gryta and Ted Mann, titled *Lights Out, Pride Delusion, and the Fall of General Electric* ("*Lights Out*").[1] More details concerning how Defendants misled investors were made public in connection with GE's $200 million settlement with the United States Securities and Exchange Commission (the "SEC") announced on December 9, 2020. The SEC issued a cease and desist order (the "SEC Order") containing factual findings based on the SEC's review of internal GE documents and interviews of current or former GE employees. What has emerged from these accounts is a shocking, multi-year, concerted effort to mislead investors which effectively destroyed a storied American institution. After conducting a detailed review of the many facets of Defendants' scheme, Flannery is quoted as saying, "It was like they drove off a cliff . . . and there were no skid marks." *Lights Out*, p.5-6.

5. Faced with the mountain of evidence that GE had dramatically misrepresented its true financial position during Immelt's tenure, Flannery described it as "success theatre," and adopted "no more success theatre" as a "mantra" when he took over as CEO. *Lights Out*, p.4. As reported in a December 2018 article in the Wall Street Journal (the "December 2018 WSJ Report") that was the result of interviews with numerous former GE executives, employees, and

[1] *Lights Out* was published in 2020 by Houghton Mifflin Harcourt.

directors, Immelt "projected a sunny vision for the company's future that didn't always match reality. . . . That often left Immelt, in the words of one GE insider, trying to market himself out of a math problem."[2] Making matters more acute, sources told the authors of *Lights Out* and the December 2018 WSJ Report that Immelt was obsessed with his legacy and desperate to crawl from the shadow of Jack Welch, his legendary predecessor who publicly admitted that his choice of Immelt as successor was a mistake.

6. Successive failures in GE's financial segment, known as "GE Capital," brought GE to the brink of a collapse during the financial crisis of 2008 that only a government bailout prevented. Immelt and his management team vowed to drastically reduce its reliance upon GE Capital and refocus its strategic plan on its industrial segment, including GE Power. When that plan soured due to a fundamental shift in the power generation industry, Defendants misled investors in multiple ways including by (i) creating the illusion that GE Power was performing better than it was by manipulating recognition of revenue associated with its service business and related cash flow from operations; (ii) disseminating false and misleading statements concerning GE's acquisition of Alstom SA and recording the assets acquired at inflated values; and (iii) failing to disclose known trends and uncertainties concerning GE's enormous exposure to toxic long-term-care ("LTC") policies and falsely representing that GE implemented internal controls adequate to monitor that exposure.

7. *Defendants misled led investors as to the health of its Power segment*. GE's plan to decrease reliance on GE Capital was largely dependent upon growing its power division, known as "GE Power." Defendants assured the market that they would be able to achieve the

[2] *GE Powered the American Century—Then it Burned Out*, Wall St. J. (Dec. 14, 2018), https://www.wsj.com/articles/ge-powered-the-american-centurythen-it-burned-out-11544796010.

required growth through strategic acquisitions and growing GE Power's "service" contracts known as long term service agreements ("LTSAs").

8. The reported performance of GE's industrial segment, and GE Power in particular, was impressive through 2017. What has recently come to light is that GE created the illusion that GE Power was increasing its revenues and profitability despite decreasing demand for industrial equipment and power generation capacity by manipulating its reporting of revenues associated with its LTSAs. LTSAs are contracts that GE enters into with clients under which GE agrees to maintain industrial equipment or facilities, often oil and gas run turbines. GE reported its future expected income under its LTSAs as "Contract Assets" and would recognize revenue in the period where GE incurred the cost of providing the service.

9. GE manipulated the amount of contract assets in a variety of ways described below in Section II. One method, that was the subject of detailed factual findings by the SEC, involved a concerted effort by GE Power to identify reductions to estimates of GE's cost to perform LTSAs. This allowed GE Power to meet publicly reported growth estimates because it enabled GE to report revenue in the period the cost reduction was identified despite the fact that no money was actually earned. As described in *Lights Out*, "[b]y tweaking its estimate of the future cost of fulfilling those contracts, [GE] could report boosts to its profit as needed. Flannery shook his head; he couldn't believe that a major GE division had dug itself such a deep hole." *Lights Out*, p.7. This scheme was executed at the behest of Immelt and Bornstein specifically to meet management's guidance provided to Wall Street. It materially inflated GE Power's reported revenues and profit from 2014-2017.

10. In an article dated February 22, 2018 titled *How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE*, The Wall Street Journal reported that GE was merely "pulling

forward" future sales citing interviews with former executives who admitted that GE was agreeing to provide turbine upgrades that "meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that future sales were being pulled forward."

11. In interviews referenced in the December 2018 WSJ Report, GE executives admitted that these tactics were "aggressive" and that "profits were mostly on paper. Rarely was a new dollar of profit flowing in the door." When GE Power employees expressed their concerns regarding the manipulation of LTSA revenues, Steve Bolze, head of GE Power, and Paul McElhinney, the head of the unit responsible for LTSAs, told them to continue their "aggressive" manipulation of LTSAs. According to the report, McElhinney told GE Power employees, "'***Get on board,*' . . . '*We have to make the numbers.***'"

12. GE's practice of pulling forward future earnings related to LTSAs may have been discovered even sooner were it not for GE's use of factoring to create the impression that a figure GE reported as "Industrial CFOA" or "Industrial Cash Flow From Operations" was consistent with reported revenues. As set forth in detail in the SEC Order, in 2015 GE determined that it would significantly expand its sale of GE Power receivables associated with its LTSAs. While it previously only sold receivables relating to customer obligations coming due within two years, GE began to factor receivables coming due within five years, a practice referred to internally as "deferred monetization." This practice was not disclosed to investors and was affirmatively misrepresented in GE's SEC filings, which suggested that it factored only "current receivables" in order to manage "credit exposure." GE's deferred monetization practices materially impacted reported Industrial CFOA in 2016 and 2017.

13. *Defendants misleadingly touted the Alstom transaction and recorded the acquired Alstom assets at an inflated value*. In late 2013, Immelt was eager to acquire a major power

business to convince the market that GE was committed to its "pivot" away from GE Capital and return to GE's industrial roots. As reported in *Lights Out* and the December 2018 WSJ Report, he aggressively pursued Alstom despite the fact that the GE merger team had conducted due diligence on Alstom in 2012 and determined that the company was not an attractive acquisition target because it was in much worse financial condition than the public knew and had far too many employees who would be difficult to lay off due to the French regulatory landscape.

14. Immelt agreed to acquire Alstom at a price that, contrary to GE's disclosures, was not based on the actual fair value of Alstom's power business. According to a source quoted in *Lights Out*, GE based the entire deal on an "artificial" enterprise valuation, which was calculated as the amount that would provide Alstom's largest shareholder, Bouygues SA, a return on its investment that it deemed sufficient. *Lights Out*, p.196. This was an economically irrational and reckless act because Alstom was in financial distress—if it did not do a deal it was going bankrupt or would need a government bailout. Bouygues would be lucky not to lose everything; it was not entitled to a return on investment. The publicly touted "enterprise value" also failed to consider the actual fair value of the company, which is the only accurate way to calculate a fair value. The deal team within GE Power responsible for due diligence on the Alstom acquisition believed Immelt had agreed to pay too high a price. They were also concerned because Alstom provided unusually limited information during due diligence relating to the transaction.

15. Defendants' public announcements relating to the Alstom transaction made no mention of these exceedingly material facts. When the Alstom deal was announced in April 2014, GE issued a press release reporting GE's supposed fair value calculation without disclosing that it was not in fact the fair value, but instead an "artificial" valuation that was backed into by GE based on economically irrational considerations. In the months leading up to

the closing of the transaction, regulators demanded concessions that made a very bad deal for GE much worse. Market conditions also further deteriorated. The GE Power deal team wanted to terminate the deal. In Immelt's memoir, published in February 2021, Immelt admits that when there was still time to back out of the Alstom acquisition the head of GE Power, Steve Bolze, told Immelt GE should not acquire Alstom for the price Immelt agreed to pay, but Immelt insisted that they proceed.

16. Despite knowing that GE grossly overpaid for Alstom, GE recorded and carried the Alstom assets on GE's books and records at a value vastly exceeding what GE had paid, purportedly due to "synergies" that could be realized. But the goodwill reported by GE was inaccurate from the start because it was based on the same phony enterprise value discussed above. On October 1, 2018, GE announced that it was replacing Flannery with Lawrence Culp and that it expected to take a large goodwill impairment charge relating to the Power segment. On October 30, 2018, GE confirmed that it was taking a goodwill impairment charge of approximately $22 billion and disclosed that most of the charge related to the Alstom acquisition. In other words, GE previously overstated the future expected economic benefit of the Alstom acquisition on its balance sheet by $22 billion. This was particularly shocking because GE paid only approximately $10 billion for Alstom. At the same time, GE announced that the U.S. Department of Justice ("DOJ") had opened a criminal investigation into GE's acquisition of Alstom and that the SEC had expanded its investigation to cover the Alstom acquisition. When the SEC announced its settlement with GE it described its investigation as "ongoing" presumably because the settlement announced in December 2020 addressed only GE's manipulation of LTSAs revenues and related cash flows and its failure to disclose its enormous LTC exposure.

17. *Defendants misled investors as to the extent of GE's exposure to LTC reinsurance*. From 1990 until 2003, GE Capital underwrote and reinsured billions of dollars in LTC policies covering the cost of home care, assisted living care, adult care, and general living aid expenses not covered by health insurance. In 2003, GE announced that it intended to exit the insurance business through a spin-off that led to the creation of Genworth Financial, Inc. GE stated that the Genworth transaction would divest it of "most" of its insurance operations. When the Genworth transaction was announced in November 2003, Immelt stated on a conference call that GE was retaining only a "very stable" block of policies that were "pric[ed] diligently" and provided "safe earnings."

18. According to a Bloomberg report published in 2018, the bankers that structured the spin-off, Goldman Sachs and Morgan Stanley, advised GE that it could not divest itself of its LTC liabilities in the Genworth transaction because they were too risky.[3] GE never disclosed this fact. In fact, after the Genworth transaction, GE made a number of statements that led investors to conclude that GE's insurance exposures were reduced to an immaterial amount and failed to disclose known trends and uncertainties concerning GE's massive exposure to LTC policies.

19. A division within GE Capital known as the North American Life and Health ("NALH") was tasked with overseeing GE Capital's run off insurance and reinsurance operations. The SEC found that in 2015 this unit began manipulating assumptions used to model future LTC liabilities to ensure that GE would be able to meet earnings projections provided by Immelt and Bornstein for its so-called "Verticals" segments, which was the part of GE Capital that GE intended to retain going forward despite its pivot away from reliance on GE Capital. In

[3] *See GE's Surprise $15 Billion Shortfall Was 14 Years in Making*, Bloomberg (Jan. 29, 2018), http://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-14-years-in-the-making.

fact, prior to 2015, NALH was aware that GE's reserves relied on outdated assumptions because it was aware of negative loss experience impacting LTC generally and information provided by the insurance companies that were ceding LTC losses to GE Capital through its reinsurance contracts. Executives at GE Capital doubled down on this fraudulent manipulation in 2016 because Verticals results would have been a "train wreck" if GE had taken charges to earnings to address increasing losses in the LTC portfolio. And while the SEC found that senior management of GE was not notified of the NALH's manipulation of loss recognition models until 2Q 2017, that was only because they did not implement adequate internal controls despite providing affirmative representations that they had.

20. GE did not begin to disclose its true exposure to LTC until July 21, 2017 when GE's CFO, Bornstein, announced that GE experienced adverse claims in its LTC portfolio and that GE would have to reassess the adequacy of its reserves. On October 20, 2017, GE announced it would suspend a $3 billion dividend payment until its reserve review was complete. In January 2018, GE announced that it was increasing LTC reserves by $8.9 billion, almost doubling them, and taking a related $6.2 billion charge to earnings. GE further announced that it expected to make additional capital contributions of $15 billion over the next seven years to address adverse claims experience. On November 30, 2018, the Wall Street Journal reported that former GE employees interviewed by the SEC admitted that the "insurance business failed to internally acknowledge worsening results over the years" and "buried risks that ultimately kept the company from booking bigger reserves."[4] At least one individual left the Company "after growing concerned that senior executives in the division were changing numbers and their methodology without providing supporting evidence." *Id.*

---

[4] *In GE Probe, Ex-Staffers Say Insurance Risks Were Ignored*, Wall St. J. (Nov. 30, 2018), https://www.wsj.com/articles/in-ge-probe-ex-staffers-say-insurance-risks-were-ignored-1543580971.

* * *

21. Flannery's reported belief that Defendants' schemes had the combined effect of driving GE "off a cliff" without leaving "skid marks" reflected the reality that all the time this "success theatre" was playing out, GE was sending cash that it did not have out the door in the form of dividends and stock repurchases. The impact on GE was staggering. As the details concerning the financial impact of Immelt's "success theatre" were unraveled from 2017-2018, GE's stock lost approximately 75% of its market value. GE, one of the original companies included in the Dow Jones Industrial Average more than 100 years ago, was removed from the bellwether industrial index.

22. Defendants' misrepresentations and omissions hid the structural weaknesses in GE's Power segment and its exposure to toxic LTC policies and are actionable under the Securities Exchange Act of 1934 ("Exchange Act"), the Ohio Securities Act, and under the common law.

## PARTIES

23. Plaintiff Touchstone Strategic Trust is an open-end, managerial investment company, and is a registered Massachusetts business trust, with its principal place of business located in Cincinnati, Ohio. GE shares were purchased for inclusion in funds that were each a series of the Touchstone Strategic Trust including the Touchstone Focus Fund and Touchstone Value Fund. Collectively Touchstone Strategic Trust funds purchased 2,255,283 shares of GE common stock on the dates identified in Exhibit A.

24. Plaintiff Touchstone Variable Series Trust is an open-end, managerial investment company, and is a registered Massachusetts business trust, with its principal place of business located in Cincinnati, Ohio. GE shares were purchased for inclusion in funds that were each a

series of the Touchstone Variable Series Trust including the Touchstone Focused Fund, Touchstone Balance Fund, and the Touchstone Common Stock Fund. Collectively Touchstone Variable Series Trust funds purchased 294,535 shares of GE common stock on the dates identified in Exhibit A.

25. Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. The Western and Southern Life Insurance Company purchased approximately 1,630,462 shares of GE common stock on the dates identified in Exhibit A.

26. Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. Western-Southern Life Assurance Company purchased approximately 778,287 shares of GE common stock on the date identified in Exhibit A.

27. Plaintiff Western & Southern Financial Group, Inc. is an Ohio company with its principal place of business in Cincinnati, Ohio. It is the ultimate parent of Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, and Integrity Life Insurance Company. Western & Southern Financial Group, Inc. purchased approximately 317,774 shares of GE common stock on the dates identified in Exhibit A.

28. Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. Integrity Life Insurance Company purchased approximately 44,465 shares of GE common stock on the dates identified in Exhibit A.

29. Defendant GE is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. GE holds itself out as a global digital industrial

company with products and services ranging from aircraft engines, power generation, and oil and gas production equipment to medical imaging, financing, and industrial products.

30. Defendant Immelt served as the Chairman of GE's Board from September 7, 2001 to October 2, 2017, when he was replaced by Flannery. Flannery assumed this position three months ahead of schedule because Immelt resigned earlier than expected. Immelt also served as GE's CEO from September 2001 through July 31, 2017, and was a member of GE Capital's Board from 1997 through 2015. Immelt was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conference and earnings calls described herein until his departure. Immelt also signed the 10-Ks and 10-Qs that GE filed with the SEC during the relevant period, including the 10-Ks from 2013 through 2016, and the 10-Qs from 2014 through 2017.

31. Defendant Bornstein was appointed Senior Vice President and CFO of GE, effective July 1, 2013, replacing Defendant Sherin, and served in that role until October 31, 2017. Bornstein also served as a member of GE Capital's Board from 2006 through 2015. GE's Board appointed Bornstein as Vice Chairman of GE, effective June 12, 2017. But shortly thereafter, on October 10, 2017, GE announced that Bornstein's term as Vice Chairman would abruptly conclude at the end of the year. Bornstein was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conferences and earnings calls described herein until his sudden, early departure on October 31, 2017. Bornstein also signed the 10-Ks and 10-Qs that GE filed with the SEC during the relevant period, including the 10-Ks from 2013 through 2016, and the 10-Qs from 2014 through 2017.

32. Defendant Sherin served as CFO of GE from 1999 until July 2013, when he became GE Capital's Chairman and CEO. Sherin held both positions until he resigned, effective September 1, 2016. Sherin also served as Vice Chairman of GE from 2007 until December 31, 2016. Sherin was a direct and substantial participant in the fraud until he left GE in September 2016.

## JURISDICTION AND VENUE

33. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

34. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

35. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of Defendants' actions took place within this District. Further, GE's common stock trades on the New York Stock Exchange ("NYSE"), located within this District.

36. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

### I. Background

37. GE was founded in 1889 by Thomas Alva Edison with backing from J.P. Morgan's Drexel, Morgan & Co and was formally incorporated in 1892. The original entity combined Edison's business interests in several electricity-related companies. In 1896, GE was included as one of the twelve original companies included in the Dow Jones Industrial Average. (In 2018, after Defendants' fraud was revealed, GE was removed from the Dow Jones Industrial Average.)

38. GE was a pioneer in developing electrical generation equipment, distribution systems, and light bulbs. It soon branched out to manufacture and sell household appliances, including ovens, washer machines and dryers, radios and televisions, curling irons and electronic toothbrushes. In 1932, GE created a finance arm called GE Capital in order to help consumers buy its home appliances.

39. GE's former CEO, Jack Welch, is credited with building the modern GE. During his twenty-year tenure beginning in 1981, GE expanded into more disparate businesses and GE Capital accounted for more and more of GE's growth. As a Wall Street Journal report put it, under Welch, GE "worked more like a collection of businesses under the protection of a giant bank." *See* December 2018 WSJ Report. At one point, GE Capital accounted for half of all GE profits and was one of the biggest banks in the country.

40. By the end of Welch's tenure, GE was in a variety of different businesses, including power generation, oil and gas, computing, aviation, insurance, healthcare, media, transportation, lighting, and capital. GE Capital's performance was credited with allowing GE to

pay its regular dividend and deliver consistent financial performance despite broadly disparate results in its portfolio businesses.

41. Immelt was Welch's hand-picked successor. Four days after Immelt took over, the attacks of September 11 took place and GE's insurance business suffered significantly.

42. The financial crisis brought GE to the brink of collapse and forced GE to cut its dividend for the first time since the Great Depression. The Federal Reserve intervened to save the company.

43. In the wake of the financial crisis, GE was designated a "Systemically Important Financial Institution" subjecting it to more intrusive oversight from the Federal Reserve. According to a recent report: "Immelt gritted his teeth at the name of Caroline Frawley, head of the Fed teams that patrolled the unit that spun out nearly half of GE's profits. 'That woman,' he said at one point, 'is not going to tell me how to run this company.'" *See* December 2018 WSJ Report. Immelt ultimately determined to rapidly reduce the size of GE Capital in order to "de-SIFI" GE and return to GE's industrial roots. Under Immelt's plan, less than 10% of GE's revenue would come from the financial segment.

44. GE's financial statements and the statements of Immelt, Bornstein, and Sherin led investors to conclude Immelt's "pivot" away from GE Capital and return to GE's industrial roots was working and the market value of GE's common stock rose significantly.

45. In reality, the plan was not working. In a series of recent disclosures from April 2017-Ocotber 2018, GE incrementally revealed that the impressive results it reported during the period in which Plaintiffs purchased their shares were drastically overstated.

46. After Immelt resigned as CEO of GE in July 2017, GE, under its new CEO Flannery, undertook a review of its business that revealed "deep problems in the company's core

power division and legacy insurance business, forcing GE to slash its dividend and profit goals."[5]

47. To date, the issues unearthed in connection with this belated review has resulted in $36 billion in accounting charges and a $200 million settlement with the SEC. The SEC settlement addressed GE's failure to properly disclose its manipulation of LTSA revenues, its use of factoring, and its enormous exposure to LTC policies. The SEC described its investigation of GE as "ongoing" when its settlement with GE was announced and did not address the Alstom acquisition. GE also previously announced an investigation by the DOJ concerning the Alstom acquisition and there has not been a public announcement from the DOJ concerning any resolution of that investigation.

48. The SEC issued a cease and desist order containing detailed findings of fact concerning GE's manipulation of LTSA revenue, use of factoring to create the illusion that GE's Power unit was maintaining impressive cash flow from operating activities, and its failure to disclose the extent of its exposure to LTC reinsurance policies. These findings were based on an extensive investigation that included a review of GE internal documents. As noted in the SEC's press release announcing the SEC Order: "The SEC's order finds that GE violated the antifraud, reporting, disclosure controls, and accounting controls provisions of the securities laws."

49. GE's collapse has also been the subject of exhaustively researched articles published in the Wall Street Journal and now a book titled *Lights Out, Pride, Delusion, and the Fall of General Electric*, by Thomas Gryta and Ted Mann, journalists at the Wall Street Journal. In their note on sourcing of *Lights Out*, the authors stated:

---

[5] *See GE Narrows Focus to Power, Aviation in Latest Revamp*, W.S.J. (June 26, 2018), https://www.wsj.com/articles/ge-to-spin-off-health-care-business-in-latest-revamp-1530005401.

> This book is the result of six years of combined reporting on General Electric, its business, its promises, and its people. In the course of our reporting on GE for the *Wall Street Journal* and this book, we have conducted hundreds of interviews with scores of people involved with the company—executives, members of the board of directors, bankers, lawyers, consultants, investors, and employees. We have spoken to some of the most prominent names in this narrative; we have also received valuable insights from people who are . . . those workers deep in the rank and file of the corporation whose names are not known to the general public but whose perspectives on the company have been instrumental in helping us learn about what GE did well, what it got wrong, and how those in the middle of the organization first spotted the signs of trouble. . . . Where we have relied on background interviews in this book, we have operated as we would at the *Journal*. Details provided anonymously have been cross-checked against public records and interviews with other reliable sources and across multiple conversations.

*Lights Out*, p.327-28.

50. In December 2018, the Wall Street Journal published an exhaustively researched article by the same authors that traced the historic collapse of GE and, in particular, the collapse of GE Power. The article was "based on scores of interviews with dozens of people directly involved in" the events described including "current and former board members, senior executives and employees at GE headquarters and in its various business units, as well as bankers and advisers employed by the company, investors in its stock, customers for its products and corporate analysts." *See* December 2018 WSJ Report.

51. The detailed accounts of the collapse of GE relied upon in this complaint corroborate each other and have brought into focus multiple fraudulent schemes, discussed more fully in the sections that follow, that brought an American institution to the brink of total collapse and have cost investors billions of dollars.

**II. Defendants' scheme to inflate Power service revenues and related cash flow from operations**

52. GE Power manufactures gas turbines for large-scale power generation facilities. It earns revenues by selling the turbines and entering into servicing agreements, referred to as LTSAs, with its plant operator customers.

53. GE's LTSAs were typically multi-year agreements with durations often ranging from 15 to 30 years. The profits that GE expects to earn over the lifetime of the agreements that govern these projects are booked as Contract Assets on GE's balance sheet.

54. GE recognized revenue associated with its LTSAs based on its determination of expected total revenues and costs associated with each LTSA. Revenues were recognized before GE actually billed its client for work performed under the LTSAs. Clients were billed when events or milestones set forth in the LTSAs occurred, but GE recognized the revenue when it incurred costs relating to the performance of services. As the SEC Order explains, GE carried a deferred balance reflecting the difference between revenues actually recognized and amounts billed:

> GE Power had a $5 billion "deferred balance" of unbilled revenue reported in GE's financial statements as a part of the "contract assets" on its balance sheet, because under GE's accounting method, the company recognized revenue from service agreements when it incurred costs, typically-earlier in time than when it billed under the agreements. Were a customer to stop using a turbine, use it less, or exercise its termination rights under a service agreement, GE Power Services faced the potential that it would be unable to collect the "deferred balance" related to that contract.

SEC Order ¶ 5.

55. As set forth in more detail below, when it became increasingly apparent that the market for GE Power's equipment was rapidly decreasing, Immelt and Bornstein reassured investors that any decreases in the equipment sector would be offset by revenues from its

services business. But this was not true. Defendants created the illusion that profit and revenue from GE Power's LTSAs was offsetting decreased demand for equipment by engaging in a concerted, and undisclosed, effort to adjust cost estimates and make other adjustments to LTSAs that resulted in pulling forward revenues from future periods. As GE became more dependent on such adjustments to create the illusion of profit growth, Defendants began to factor GE Power's longer term LTSA's booked revenues, later referred to by GE as "long-term customer receivables," using an undisclosed practice referred to internally as "deferred monetization." This factoring created the illusion that GE's reported cash flow from operating activities was consistent with the inflated LTSA revenues reported by GE. This created a further, and unsustainable, drag on future earnings that was not disclosed to investors.

**A. Defendants' manipulation of revenues relating to Power's LTSAs**

56. The centerpiece of the turnaround of GE was a return to its industrial roots. Immelt determined to "pivot" almost completely away from GE Capital by selling its assets, reducing GE Capital's contribution to GE's earnings to 10% and allowing GE to escape the SIFI designation that brought so much unwanted oversight. According to the December 2018 WSJ Report,

> It struck some within Capital as an overcorrection to both the markets and skeptical regulators at the Fed. Some worried how the company would manage once most of GE Capital was gone. "What are we going to do about the cash?" the second Capital executive asked after Sherin broke the news. "We'll work it out," Sherin said . . . .

57. The expansion of income from LTSAs was crucial to this pivot. GE, Immelt, Bornstein, and Power executives were aware that demand for Power's services and equipment were decreasing. The SEC Order revealed that "[i]n internal planning documents in 2014 and 2015, GE described its power markets as 'flat' and a 'challenging environment' and noted increasing price pressure and excess industry capacity."

58. In earnings releases and earnings calls for 2Q and 3Q 2014 GE disclosed that equipment orders (*e.g.*, turbines) for the Power segment had decreased. But each time Immelt and/or Bornstein emphasized that increases in servicing orders offset such decreases. Similarly, in a conference call held on January 23, 2015, Bornstein reported that orders for gas turbines had declined in the fourth quarter of 2014, relative to the fourth quarter of 2013. Bornstein projected that GE would "grow services" to offset lost revenue and expected to see a "flat gas turbine market."

59. Unbeknownst to investors, GE did not "grow services" to offset lost revenue. It manipulated its reported LTSA revenues to create the illusion that GE Power was performing better than it actually was. As the SEC found:

> Internal risk assessments for the GE Power Services business completed in 2014 and 2015 noted that it was subject to the same challenges facing all divisions within GE Power. Indeed, GE Power Services acknowledged internally that it had increased risk that its service agreements would need to be renegotiated due to lower than anticipated power consumption and increasing competition from other companies that offered servicing and repair of the power turbines after GE Power had sold them to customers. The business also faced the prospect that customers would exercise termination clauses in the service agreements if they did not receive price and terms concessions from GE Power, which created further risk to GE Power Services.

SEC Order ¶ 4.

60. The SEC Order describes in detail one method by which GE manipulated its recognition of LTSA revenues to offset decreasing demand and difficult market conditions for the Power business. Because GE recognized LTSA revenues based on estimated future payments less cost of performance, GE was able to record an increase in revenues by reducing its estimate of costs. As explained in the SEC Order:

> The difference between the old and new estimates of revenue earned to date was recognized as revenue and earnings in the period in which the margin estimate was changed. Projected cost reductions over the life of the service agreement increased

> the contract profit margin and resulted in an increase to revenue and earnings in the current period.

SEC Order ¶ 7.

61. The SEC Order is consistent with the December 2018 WSJ Report, which disclosed that GE Power executives and employees embarked on a mission to "scour[] existing contracts for ways to change underlying assumptions" in order to meet the 5% growth target for GE Power set by GE management. In order to meet this unreasonable growth target "they stretched." This included adjustments to cost assumptions. For example, they changed assumptions concerning the frequency of overhauls and negotiated changes with clients that reduced GE's costs. These adjustments would decrease short term costs and, thus, increase the amount of revenue that was recognized upfront. But the increase in revenue was only an illusion because the amount that GE expected to receive over the life of the LTSA did not change.

62. As detailed in *Lights Out*, "much of the company's research and innovation was aimed at improving the long term profitability of [LTSAs]." A software product touted by GE called "Predix" was used to justify more cost adjustments to LTSAs because it purportedly reduced GE's cost of performance. "As always, GE sought to ensure that the cost of fulfilling its contract promises would decline over time, and that meant more profit." *Lights Out*, p.248.

63. GE would offer existing clients a turbine upgrade to replace older machinery with more efficient machinery in exchange for extending the length of service contracts. *Lights Out*, p.248. This allowed GE to record increased revenue because it reduced the cost of performance and extended the expected life of the LTSA. Yet no money was coming in the door and, in fact, future profits were hurt because the upgrades merely pulled future earnings forward. These tactics created the illusion of growth when, in reality, GE was merely "pulling forward" future sales. In an article dated February 21, 2018 titled *How Jeffrey Immelt's 'Success Theater'*

*Masked the Rot at GE*, the Wall Street Journal reported that GE provided discounted turbines to customers and, as a result, "future sales were being pulled forward."

64. As noted in *Lights Out*: "These reviews produced profits that GE could use to hit targets for Wall Street, but they were really future profits, produced by accounting adjustments alone." *Lights Out*, p.248-49. The SEC similarly found that the adjustments to cost estimates were undertaken to meet internal operating profit targets. *See* SEC Order ¶ 6 ("GE Power Services endeavored to meet internal operating profit targets set by GE, in part, through reducing its costs and correspondingly reducing estimates of costs required to perform its obligations under service agreements."). The SEC further found that "[w]ithout GE Power Services' reductions in cost estimates, GE would have missed the forecast it provided to investors for its non-GAAP industrial operating profit metric in 2016." *Id.*

65. The revenue targets referenced in the SEC Order and *Lights Out* were delivered in presentations provided by Immelt and Bornstein. Specifically:

a. During GE's earnings call on July 18, 2014, Immelt and Bornstein delivered a presentation that reported management's target for organic (*i.e.*, unrelated to acquisitions) revenue growth for the industrial segment of 4-7% and reported that segment saw organic revenue growth of 6% for the first half of 2014 and 5% in 2Q 2014.

b. During GE's earnings call on October 17, 2014, Immelt and Bornstein delivered a presentation that reported management's target for organic revenue growth for the industrial segment of 4-7% and reported that segment saw organic revenue growth of 5% for the during the first three quarters of 2014 and 4% in 3Q 2014.

c. In a presentation delivered by Immelt and Bornstein in December 2014, GE management provided EPS guidance. Immelt stated that they expected EPS of 1.70-1.80, with 1.10-1.20 attributable to GE's industrial segments and approximately 0.60 attributable to GE Capital. Immelt indicated that management maintained a long term target of 5% annual revenue growth for the industrial segment with 2015 organic revenue growth for the industrial segment expected to be 2-5% and operating profit margin of 17%. He further advised investors that GE was adjusting its target for GE Capital's contribution to EPS to less than 25% with the industrial segment contributing the remainder. Management intended to reduce GE Capital's share through continued divestures and estimated that GE Capital would contribute approximately 0.40 by 2016. That reduction would be offset by revenue growth in the industrial segment.

d. In April 2015, GE announced in its earnings release for 1Q 2015 that management was raising its guidance for the industrial segment's contribution to EPS in 2015. The revised guidance was 1.13-1.20.

e. In a presentation delivered at the Electrical Products Group Conference on May 20, 2015, Immelt provided EPS guidance through 2018, estimating that EPS would grow to $2 per share. Immelt reiterated that management expected to achieve this target despite reducing GE Capital's footprint by growing industrial segment revenues. Again, this was based on the previously communicated 5% expected growth rate for Power and the industrial segment.

66. The table below demonstrates the impact of the manipulation of GE's LTSAs revenues. The manipulation created the illusion that GE was able to offset declines in equipment

orders and revenues in 2014 and 2015 with revenues from LTSAs. And the cost cutting scheme was necessary to meet the unreasonable 5% growth estimate for 2016 and 2017 that Immelt provided to investors.




SEC Order ¶ 6.

67. According to the SEC Order, "[e]xecutives at GE Power informed GE management [*e.g.*, Immelt and Bornstein] that a significant portion of GE Power's segment profits was the result of reductions in cost estimates and that these changes were critical to meeting financial targets." Immelt and Bornstein understood that the increased revenue that resulted from the adjustment to cost estimates increased the deferred balance that GE carried for contract assets because it did not result in increased cash flow. "Nonetheless," according to the SEC,

> GE executives directed GE Power Services executives to both increase earnings and keep the deferred balance from growing further. This was described internally by one GE Power executive as putting GE Power Services between "a rock [and] a hard place" since the business lacked opportunities to increase earnings without increasing the deferred balance.

SEC Order ¶ 8.

68. According to the December 2018 WSJ Report, and confirmed in *Lights Out*, GE executives admitted that these tactics were "aggressive" and that "profits were mostly on paper. Rarely was a new dollar of profit flowing in the door." GE Power employees told Bolze and the head of the unit responsible for administering LTSAs, Paul McElhinney, that "[Defendants'] expectations about the sales growth and profit they should be able to hit didn't reflect the dim reality of the market." They were told to nevertheless continue their "aggressive" manipulation of LTSAs. According to the report: "'Steve's our guy,' McElhinney said in one meeting. If Bolze was elevated to CEO, those behind him in Power would rise too. '***Get on board***,' he said. '***We have to make the numbers***.'"

69. GE further manipulated its LTSA revenues by disregarding actual utilization rates when projecting LTSA revenues. Despite the awareness that demand for Power services was rapidly decreasing, Defendants have admitted in court papers filed in the *Sjunde AP-Fonden* action that GE continued to book Contract Assets using "historical averages" rather than what GE was actually observing. Memorandum of Law in Support of Defendants' Motion to Dismiss the Third Amended Compl. at 22, *Sjunde AP-Fonden v. General Electric Co.*, No.17-cv-08457-JMF (S.D.N.Y Sept. 12, 2018), ECF No. 174. Prior to 2018, Defendants never advised investors of this very material fact.

70. *Lights Out* described Flannery's discovery of the manipulation of Power LTSA revenues and profit when he took over as CEO in 2017:

> [A]s Flannery paged through the financials, he realized that GE power had somehow run out of cash. This discovery wasn't just shocking—it was unthinkable. GE's largest industrial business was stretched thin. Its profits, on close examination, seemed to exist mostly in paper. Years of pro forma adjustments had given the appearance of a business that was turning decent profits selling power turbines and the services that kept them running, but in fact there was relatively little actual money coming in the door from customers.

*Lights Out*, p.5.

**B. Defendants' use of factoring to inflate "Industrial CFOA"**

71. The cash flow generated by GE's industrial segment was a key metric used by investors to assess GE's performance particularly after GE's intention to pivot away from GE Capital was announced. GE reported to investors "Industrial Cash Flow from Operations," sometimes referred to as "Industrial CFOA" or "Industrial Cash Flow."

72. According to the SEC Order: "GE was aware of investor and analyst concerns that its cash collections were not keeping pace with revenue and that its unbilled revenue was growing in its industrial business. Executives at GE Power and GE Power Services cited analyst reports when they discussed internally the need to show improved cash performance." SEC Order ¶ 9.

73. As further described in *Lights Out*:

> There was no actual new cash coming in. Such gaps between reported income and cash flow usually close pretty quickly, because they represent a simple timing issue—a bill wasn't paid, or cycles didn't match up to quarters. When such gaps are frequent and not closed quickly, it can be a red flag to investors. They see a telltale sign of aggressive accounting, if not fraud, when a company records a lot of profits but no cash to back them up. Anyone can run up a credit card, but someone has to pay that bill eventually. While contract accounting is complicated, investors still expect to see real money coming in the door.
>
> Doing its part to meet GE's earning targets, the Power team was finding just these kinds of paper profits in the vast portfolios of service contracts it maintained on gas and steam turbines around the world. But they were also digging a future hole—pulling forward the value of those long-term assets, and very optimistic terms.
>
> To pad the hole, GE now began selling its receivables—bills its customers owed over time—to GE Capital in order to generate short-term cash flow, making it appear that those newfound profits were matched by cash flowing in the door. But a future invoice can be sold only once. GE power was making its numbers in a way that would make future growth more difficult.

*Lights Out*, p.249.

74. The SEC Order disclosed that beginning in 2016, GE expanded its use of factoring by engaging in a practice referred to as "deferred monetization" without disclosing this fact to investors. Deferred monetization was different than what GE had done in prior years because it previously only sold receivables coming due in one year or less. Under the new practice, GE sold receivables coming due within five years. In addition, "in order to engage in deferred monetization, GE renegotiated a number of service agreements and provided pricing and/or other concessions to entice customers to agree to the changes to the agreements that were required to permit factoring to GE Capital." SEC Order ¶ 11.

75. As was the case with the manipulation of LTSA revenues through cost-cutting, "GE's new deferred monetization practice pulled forward future years' cash collections into the present year, decreasing cash flows in later periods." SEC Order ¶ 12. The practice was also quite costly because it depended upon providing discounts to customers and resulted in a finance charge. *Id.*

76. Immelt and Bornstein knew of the deferred monetization practice when it was instituted. As noted in the SEC Order: "GE's senior executives, and those at GE Power and GE Power Services not only agreed to engage in the practice, but expanded it in part to meet internal cash flow targets set by GE's leadership." SEC Order ¶ 12. The practice was referred to internally as a "'drug' because the company needed to continue to do more deferred monetization to achieve equivalent effects period after period." *Id.* There was only a finite number of LTSAs that could be factored and "[b]y May 2017, GE Power Services and GE Power executives referred to deferred monetization in internal documents as 'not sustainable' and questioned whether the GE Power Services business model was economically viable." *Id.*

77. The statements of former employees described in the *Sjunde AP-Fonden* class complaint corroborate the SEC's finding that Immelt, Bornstein and other members of GE senior management, and executives in the Power division, knew about the use of factoring to inflate Industrial Cash Flow from Operations. The statements of these former employees were relied upon by the Court in denying in part the Defendants' motion to dismiss the class plaintiffs' claims relating to GE's misrepresentations or omissions concerning factoring. As set forth in the *Sjunde AP-Fonden* class complaint:

a. According to an individual who worked in GE's Power division from 2004 through August 2017 and served on the "Enterprise Risk Team, which was tasked with identifying and examining GE's risk exposure":

- "factoring was widespread within the Power (and Renewable) Divisions." This individual "specifically recalled GE was factoring 'everything' in Renewable and his counterparts in Power were doing the same." He further "recalled that he would send factoring proposals up the management chain each quarter and approvals would come back down through the chain."
- "GE Power's reliance on factoring to generate CFOA was well known within GE. . . . [A]t an internal meeting in or around June 2017, ***Bornstein acknowledged GE's reliance on factoring, noting that the Company was 'in too deep' to depart from the practice***."

b. According to an individual who served as a "Risk Finance Leader at GE Power Services in Europe" from 2015 through 2018:

- GE's factoring of its LTSAs was "recorded in weekly, monthly, and quarterly reports . . . . The quarterly reports outlined the total amount of cash that GE had

generated through monetization, broken down by region." This former employee "understood that the quarterly reports, which were in the form of a Power Point presentation, were ultimately used for GE's quarterly Blueprint Review for discussion with GE Power's global leadership, including Paul McElhinney (President and CEO of GE Power Services from May 2014 through December 2017) and Donovan."

- "[B]eginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs, which would help to conceal that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment." This individual "was directly involved with his U.S. counterparts during the first through third quarters of 2016 in working to find ways for GE Power to generate CFOA."
- "Estela Delgadillo, GE's Global Cash Leader for GE Power who reported directly to Donovan—the CFO of Power Generation Services during the Class Period—hired Kevin Weber in early 2016 specifically to lead the global monetization effort."

78. The impact on GE's reported Industrial Cash Flow from Operations was immediate and dramatic. The practice allowed GE to increase Industrial Cash Flow from Operations by more than $1.4 billion in 2016 and $500 million in the first three quarters of 2017. As the table below demonstrates, cash obtained through deferred monetization significantly increased Industrial Cash Flow from Operations in virtually every quarter:




SEC Order ¶ 13.

79. If it were not for deferred monetization, GE would not have achieved management's guidance for 2016 Industrial Cash Flow From Operations. SEC Order ¶ 14.

80. GE stopped its deferred monetization practices at the end of 2017. GE's deferred monetization practice came at a steep cost to future cash flow from operating activities. GE disclosed in its Form 10-K for 2019 that the factoring of "long-term customer receivables" associated with the Power segment's LTSAs reduced GE's CFOA for 2019 by $585 million, and for 2018 by $878 million. The practice reduced CFOA for 2020 and subsequent periods by over $800 million. GE did not disclose the impact of its factoring of long-term customer receivables prior to GE's Form 10-K for 2019.

**C. Defendants' false or misleading statements relating to Power service profit and revenues**

81. GE's quarterly reports filed on SEC Form 10-Q for the first three quarters of 2014, 2015, 2016 and 2017, and its annual statements filed on Form 10-K for 2014, 2015 and

2016 failed to disclose material information required to be disclosed under Item 303 of Regulation S-K, 17 C.F.R. § 229.303 relating to its recognition (and manipulation) of revenue associated with its LTSAs as described above in Section II.A. Item 303(a)(1)-(3) generally requires companies to disclose in the MD&A section of their annual SEC filings any known trends, demands, commitments, events, or uncertainties that are reasonably likely to have a material impact on the company's financial condition. Item 303 requires issuers to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." It further requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

82. The purpose of the MD&A discussion, according to the SEC, is to provide investors information "necessary to an understanding of a [company's] financial condition, changes in financial condition and results of operations." In particular, there are three principal objectives of the MD&A:

> (i) to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

83. GE violated its Item 303 disclosure obligations because it did not disclose to investors that a substantial portion of its reported LTSA revenue growth, and Power segment profit, was the result of adjusting cost estimates relating to GE Power LTSAs. As discussed above in Section II.A, Defendants were aware that demand for GE Power services was

decreasing and that the growth in profit and revenue reported was in large part due to adjustments that were identified as part of a concerted plan to "scour" existing contracts in order to identify accounting adjustments that could create the illusion that GE was meeting its growth and earnings targets. Defendants were further aware that these adjustments were not sustainable because there was a finite number of LTSAs and adjustments that could be made. This information was material because the increased service revenues created the illusion that GE was able to grow its Power services business, and earn increased profit, when, in reality, it was merely recognizing an accounting gain and pulling revenue forward. As a result, GE's quarterly reports filed on SEC Form 10-Q for the first three quarters of 2014, 2015, 2016 and 2017, and its annual statements filed on Form 10-K for 2014, 2015 and 2016 failed to disclose material information required to be disclosed under Item 303.

84. GE's annual reports for 2014-2016 filed with the SEC on Form 10-K also contained false and misleading statements relating to the Power segment's profits and revenues:

a. In GE's Form 10-K for 2014, GE reported that the Power "[s]egment profit [was] up $0.4 billion (7%)" compared to 2013 and noted "[t]he increase in profit was mainly due to the higher volume at PGP [Power Generation Products] and Renewables, and higher productivity reflecting a 10% reduction in SG&A [i.e., selling, general and administrative] cost, partially offset by negative business mix with equipment revenue up 20% and lower prices." This statement was false or misleading because the growth in profit was attributable to reductions in cost estimates and LTSA manipulation practices described above in Section II.A, not higher volume in Power Generation Products and Renewables or higher productivity leading to lower general overhead costs. The manipulation of LTSA revenues described above in Section II.A

contributed $600 million or more to 2014 profits. Without such profits, the Power segment's profits would have declined from 2013 to 2014.

b. In GE's Form 10-K for 2014, GE reported that the Power "[s]egment revenues [were] up $2.8 billion (11%)" compared to 2013 and noted "[t]he increase in revenues was driven by higher volume, primarily higher equipment sales at PGP and Renewables, partially offset by lower prices at PGP and Renewables and the impact of a stronger U.S. dollar." This statement was false or misleading because the increase in revenues due in large part to the inflation of LTSA revenues described in Section II.A.

c. In GE's Form 10-K for 2015, GE reported that the Power segment's profit had not changed from 2014 to 2015 noting that "[p]rofit was flat as higher volume, the effects of deflation, higher prices, and favorable business mix were offset by lower productivity, including an increase in SG&A cost, the impact of a stronger U.S. dollar, and the effects of the Alstom acquisition." This statement was false or misleading because the only reason that GE Power was able to achieve the same level of profit in 2015 was because it manipulated LTSA revenues through the cost cutting scheme described above in Section II.A.

d. In GE's Form 10-K for 2015, GE reported that the Power "[s]egment revenues [were] up $0.9 billion (4%)" compared to 2014 and noted "[t]he increase in revenues was mainly driven by higher volume, primarily at Power Services, as well as the effects of the Alstom acquisition, partially offset by the impact of a stronger U.S. dollar." This statement was false or misleading because it failed to disclose that the revenue growth at Power services was largely attributable to the LTSA revenue manipulation practices described in Section II.A.

e. In GE's Form 10-K for 2016, GE disclosed that the Power segment's profits for 2016 were "up $0.5 billion (11%)" compared to 2015 and noted that "[t]he increase in profit was mainly driven by the effects of the Alstom acquisition, as well as material deflation, partially offset by lower cost productivity and an unfavorable business mix, driven by HA-Turbine shipments in the current year." The statement was false and misleading because the increase in profit was attributable entirely to the cost estimate adjustments described above in Section II.A.

85. GE management made a number of statements during earnings calls or presentations to investors that were false or misleading because they created the false impression that the Power segment's LTSA revenues were growing organically and would offset a lack of growth in equipment sales when, in reality, a significant portion of the LTSA revenue growth was the result of the manipulation described above in Section II.A:

a. During GE's earnings call on July 18, 2014, Immelt stated: "This was the strongest service performance in several years with growth of 14%. . . . Power Gen Services grew by 13%." Summarizing the performance of the Power segment, Bornstein added: "Revenue in the quarter was higher by 10% to $6.3 billion. Growth was driven by equipment up 20% and services up 2%." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 2% and that service orders for the Power segment increased by 12%, offsetting a decline in orders for equipment. It further disclosed that profits for the Power segment increased 4% for the quarter.

b. During GE's earnings call on October 17, 2014, Immelt stated: "We are winning in the market. Orders were robust in the quarter, growing 22%; and this was driven by

31% equipment orders growth and 10% growth in services. . . . Power Gen Services grew by 10% despite some sluggish end-use markets." Summarizing the performance of the Power segment, Bornstein added: "Revenue of $6.4 billion in the quarter was down 2%, with equipment down 8% and services up 6%." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 6%. The presentation indicated that service orders for the Power segment increased by 10%. It further disclosed that profits for the Power segment declined 8% for the quarter.

c. During GE's earnings call on January 23, 2015, Immelt stated: "We are executing a valuable pivot at GE, one that improves our business mix while delivering EPS growth and expanding returns. Now for orders, total orders grew by 3%, which is pretty good in the environment. As I said earlier, organically, this is 5% in total, with 3% in equipment and 8% growth in services. Orders grew by 7% for the year. We had strength in services, which was up 6% in the quarter and 10% for the year. . . . PowerGen services grew revenue by 14%." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 7%. It further disclosed that profits for the Power segment increased 13% for the quarter.

d. During GE's earnings call on April 17, 2015, Bornstein stated: "Service revenues were higher by 7% driven by higher upgrades including AGP upgrades, 21 versus 17 a year ago." In the PowerPoint presentation provided in connection with the earnings call, management reiterated that the Power segment's service revenues increased by 7%.

e. During a May 20, 2015 investor conference, Immelt touted the growth of services revenue from 2013-2014. The PowerPoint presentation used during that presentation included a bar graph showing an increase in service revenues from 2013-2014 and predicting continued growth in such revenues. It attributed the "services expansion" to its ability to "combine[] data & physics." Immelt discuss this slide at length during the presentation claiming that GE Power's unique capabilities presented "tremendous opportunities for incremental service revenue growth." In addition to creating the false impression that GE Power was experiencing organic service revenue growth, Immelt's statements and the presentation delivered during the May 20, 2015 investor conference were false or misleading because they suggested that the growth in Power services was due to GE's unique capabilities when that was not true. It was dependent upon unsustainable adjustments to cost estimates that resulted in accounting gains.

f. During GE's earnings call on July 17, 2015, Bornstein stated "Service revenues were up 6% with PGS up 9% on higher installations, strong upgrades including AGP sales of 26 versus 19 last year." Management disclosed in a PowerPoint presentation that the Power segment's service revenues increased by 6% and orders increased by 17%. It further disclosed that profits for the Power segment increased 8% for the quarter. When asked about the Power services business, Immelt attributed the growth in the Power services business to "excellent work on the AGPs" and because "the overall mix in usage around gas turbines is high as there's incremental shift from coal." In addition to creating the false impression that GE Power was experiencing organic service revenue growth, Bornstein's and Immelt's statements were false or misleading because they suggested that the growth in Power services was due to

upgrades to equipment when a significant portion of the growth was attributable to unsustainable cost adjustments that resulted in illusory accounting gains.

g. During GE's earnings call on October 16, 2015, Immelt stated: "Service grew by 6% organically, and our progress was broad-based. PowerGen services grew by 10%." Bornstein stated: "Service orders grew 8% to $3.4 billion, driven by strength in PGS, up 10%. We continue to see success in our upgrade campaigns including AGPs, Dry Low Nox, and OP Flex, all of which enhance the performance of our machines. In the quarter we booked 22 AGPs, up four from the third quarter of last year. . . . Service revenues were strong, up 9%; led by PGS, up 13%, driven principally by upgrade sales." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 9%. It further disclosed that profits for the Power segment increased 7% for the quarter. In addition to creating the false impression that GE Power was experiencing organic service revenue growth, Bornstein's and Immelt's statements were false or misleading because they suggested that the growth in Power services was due to unique service initiatives when a significant portion of the growth was attributable to unsustainable cost adjustments that resulted in accounting gains.

h. During GE's earnings call on January 22, 2016, Bornstein stated: "Service revenues were up 1%, driven by Power Services up 8%. AGPs were 35 in the quarter versus 24 a year ago, bringing total shipments to 104 for the year." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 8%. In addition to creating the false impression that GE Power was experiencing organic service revenue growth,

Bornstein's statement was false or misleading because it suggested that the growth in Power services was due to turbine upgrades when a significant portion of the growth was attributable to unsustainable cost adjustments that resulted in accounting gains.

i. During GE's earnings call on April 22, 2016, Immelt stated: "Service continued to be quite robust. Power Services grew by 17% ex-Alstom . . . . Service margins expanded by 190 basis points, as we continue to see benefits from our efforts in analytics." In the PowerPoint presentation provided in connection with the earnings call, management disclosed that the Power segment's service revenues increased by 7%. In addition to creating the false impression that GE Power was experiencing organic service revenue growth, Immelt's statement was false or misleading because it suggested that the growth in Power services profit margins was due to improved analytics rather than the cost adjustment practices discussed above in Section II.A.

86. Similarly, during GE's earnings call on April 21, 2017, Bornstein stated: "Power earned just under $800 million operating profit, up 39%. Performance was principally driven by cost productivity and equipment volume, offset partly by mix of equipment versus service." Addressing contract assets and impact on cash flows for the quarter specifically, Bornstein stated:

> Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our $1 billion revenue recognition milestones differ. This will catch up throughout the year as we execute against the contract. The remaining $1.4 billion is our long-term service agreements. There were 2 pieces to this. $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer. We expect this to partly come back over the year as we see higher asset utilization in Power and Aviation. And we've seen these similar trends in the prior years. The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power and Aviation. Versus expectations, the $300 million of lower cash on contract assets is driven by $200 million of long-term equipment contracts that

> we expect to come back throughout the year, and the $100 million is from services contract adjustments I just walked through, which will come back over the remaining life of those contracts as we build the utilization. In total, we're about $1 billion off our first quarter plan, but we'll recover the vast majority over the second to the fourth quarter.

In the PowerPoint presentation provided in connection with the earnings call, management described Power's performance as a "strong earnings quarter." These statements were false and misleading because they portrayed "contract adjustments driven by better cost performance" as creating a short term timing issue and that GE would "recover the vast majority over the second to the fourth quarter." They also failed to disclose the dramatic impact of contract adjustments on GE Power's reported profit.

87. During the October 20, 2017 earnings call, Bornstein stated:

> Contract assets were a use of $800 million in the quarter. Of the $800 million, $300 million was from our equipment contracts, given the timing of our revenue recognition milestones which will catch up as we execute against these contracts. The remaining $500 million is from our long-term service agreements due to better cost performance and parts life, primarily in power and transportation. . . .
>
> Service revenues of $4.3 billion were down 4%, with energy connections up 6%, and power down 5%. Power services were down on lower AGPs, down 54%, at 13 versus 28 units last year, and outages were down 18%. Our CSA [cum catch] adjustments in the quarter were $323 million, down from last year's $366 million.

This statement was false or misleading because Bornstein failed to disclose the extent to which Power had previously relied on the cost adjustments described above in Section II.A to inflate Power segment revenues and profit.

88. The press releases that GE released with every earnings report for 2014-2016 and the first three quarters of 2017 were similarly false and misleading because they reported Power revenue and profit figures, and contrasted service orders with equipment orders, without

disclosing that Power revenue and profit was heavily influenced by the manipulation of LTSA revenues described above in Section II.A.

89. These statements had the desired effect. Wall Street analysts' coverage amplified management's theme that lack of growth in GE Power's equipment sector was being offset by growth of Power services. For example, on July 21, 2014, analysts at Barclays wrote: "Results were roughly in-line driven by strong revenue growth (+10% y/y and 7% above our expectations) . . . . Equipment orders . . . were disappointing but were more than offset by service orders (+12% y/y)." The same report noted that Power profits exceeded expectations. In a report dated April 19, 2015, analysts from RBC noted: "Order growth in 1Q15 was driven almost entirely by Services, up 3% organically and offsetting flat organic revenues in Equipment." In a report dated April 26, 2016, Barclays analysts observed the "[h]eadline results in Power were fairly weak" due to weakness in equipment orders, but "[s]ervice revenues were stronger in the quarter (+5%), driven by Power Services +7%."

90. This was a theme that analysts had been repeating for some time. In an April 17, 2014 report Hilliard Lyons analysts wrote: "we feel GE has successfully built its model of obtaining service agreements on its large installed base of equipment, generating high margin service revenue which has helped support industrial results in a difficult environment and contributed positively to margins."

91. As the SEC found: "In a November 2017 investor conference, GE explained to investors ***for the first time*** that changes in service agreement cost estimates were offsetting lower transactional volume during the 2014 through 2016 time frame." SEC Order ¶ 19 (emphasis added). The referenced statement was from the new head of GE Power, Russell Stokes, who stated during an investor conference on November 13, 2017:

> So what happened? The chart here we get into from 2014 to 2016, our gas equipment business margins were declining . . . Inside of the service business, we had been doing well around the upgrades for those AGPs I mentioned a moment ago. CSA [contractual service agreement] productivity have been doing really well. ***And it was offsetting, though, the fact that we were starting to see lower services transactional volume over the '14 to '16 time frame****. . . .*
>
> On culture. John talked about it, I don't really think it's much different, but for Power specifically, it's what I talked about. This idea of growth orientation tied to income, making sure that the teams have as much of an appreciation for how we generate cash. The inventory buildup that we've had right now, given some of our estimates over the market, is going, for me, is just not excusable and we're going to fix it. . . .
>
> We will have lower CSA or contractual asset gains. And I'd say really part of this is focusing the organization on actions that generate a cash return today.

**D. Defendants' false or misleading statements concerning GE's use of factoring and its deferred monetization practices**

92. GE's quarterly reports filed on SEC Form 10-Q for the first three quarters of 2016 and 2017, and its annual statement filed on Form 10-K for 2016 failed to disclose material information required to be disclosed under Item 303 of Regulation S-K, 17 C.F.R. § 229.303 relating to its factoring, and related "deferred monetization" practices, described above in Section II.B. This was a trend or event that was 'reasonably likely to result' in a change in liquidity or that management would have "reasonably expect[ed]" to have "a material . . . impact on net sales or revenues or income from continuing operations." Item 303(a)(1), (a)(3). This practice materially impacted future revenue because GE Power traded future revenue for cash.

93. GE's filings with the SEC also contained false and misleading statements relating to factoring and "deferred monetization" practices described above in Section II.B:

a. In GE's Form 10-Q for 1Q 2016, GE stated:

> GE sells customer receivables to GE Capital in part to fund the growth of our industrial businesses. These transactions can result in cash generation or cash use. During any given period, GE receives cash from the sale of receivables to GE Capital. It also foregoes collection of cash on receivables sold. The incremental

amount of cash received from sales of receivables in excess of the cash GE would have otherwise collected had those receivables not been sold, represents the cash generated or used in the period relating to this activity. The effect of cash generated in GE CFOA from selling these receivables to GE Capital decreased GE's CFOA by $1.1 billion and $1.8 billion for the three months ended March 31, 2016 and 2015, respectively.

This statement was false or misleading because, as described above in Section II.B, GE implemented its deferred monetization practice to mask Power's manipulation of LTSA revenues and create the illusion that its increase in reported revenue was consistent with its cash flow from operations. This practice did not "fund the growth" of GE's industrial business—it prevented revenue growth by pulling forward future revenues. This statement further created the impression that only amounts already invoiced to clients were factored because the normal understanding of the term "customer receivable" is something that has been invoiced to a client. GE was factoring amounts that had not yet been invoiced. In addition, this statement failed to disclose that without deferred monetization, the negative impact of selling receivables would have had an even greater negative impact on GE CFOA because deferred monetization increased GE CFOA by approximately $222 million in 1Q 2016.

b. In GE's Form 10-K for 2016, GE stated:

In order to manage credit exposure, GE sells current receivables to GE Capital and other third parties in part to fund the growth of our industrial businesses. These transactions can result in cash generation or cash use. During any given period, GE receives cash from the sale of receivables to GE Capital and other third parties. GE also leverages GE Capital for its expertise in receivables collection services and sales of receivables to GE Capital are made on an arm's length basis. The incremental amount of cash received from sales of receivables represents the cash generated or used in the period relating to this activity. The incremental cash generated in GE CFOA from current receivables sold to GE Capital, including current receivables subsequently sold to third parties, increased GE's CFOA by $2.1 billion, $2.1 billion and $1.6 billion in 2016, 2015 and 2014, respectively.

This statement was false or misleading because GE indicated that it engaged in

factoring "to manage credit exposure" when, as discussed in Section II.B, in reality, GE had implemented its deferred monetization practice to mask Power's manipulation of LTSA revenues and create the illusion that its increase in reported revenue was consistent with its cash flow from operations. It further suggested that GE was factoring only "current receivables" when it was factoring assets that included future revenues expected to be invoiced to clients in two or more years. In addition, this statement failed to disclose that without deferred monetization, GE's Industrial CFOA would have been $1.4 billion less than what GE reported.

c. In GE's Form 10-Q for 1Q, 2Q, and 3Q 2017 GE stated: "In order to manage credit exposure, GE sells current receivables to GE Capital and other third parties in part to fund the growth of our industrial businesses." This statement was false or misleading because GE indicated that it engaged in factoring "to manage credit exposure" when, as discussed in Section II.B, in reality, GE had implemented its deferred monetization practice to mask Power's manipulation of LTSA revenues and create the illusion that its increase in reported revenue was consistent with its Industrial Cash Flow from Operations. It further suggested that GE was factoring only "current receivables" when it was factoring assets that included future revenues expected to be invoiced to clients in two or more years.

94. GE management made multiple statements during earnings calls, in presentations to investors, or press releases filed with the SEC on Form 8-K, that were false or misleading because they created the false impression that Industrial CFOA was commensurate with reported

Power revenues when, in reality, GE was utilizing the deferred monetization practices to create that illusion:

a. During an investor conference on December 16, 2015, GE management provided its earnings outlook for 2016 in a presentation delivered by Immelt. Management's target for Industrial Cash Flow from Operations for 2016 was $12-$14 billion (CFOA after deducting GE Capital dividend). This statement was false and misleading because it failed to disclose the fact that this target was based on the new, undisclosed practice of deferred monetization discussed above in Section II.B.

b. During GE's earnings call on April 22, 2016, Bornstein stated:

> Industrial CFOA was $400 million, down 60%. There were two big drivers of the year-over-year decline. First, Alstom used about $400 million cash in the quarter, and this is primarily timing. Consistent with what we said previously, we expect Alstom to be breakeven to slightly positive on CFOA for the year. Second, as you are aware, we have a very second half loaded volume profile, driven by Power. As a result, we began level-loading the factories, which has resulted in higher inventory in the quarter.

In the PowerPoint presentation that Immelt and Bornstein used during their presentation to investors, and the earnings press release issued by GE for 1Q 2016, GE disclosed that Industrial CFOA was $400 million for 1Q 2016, down from $900 million in 1Q 2015. Bornstein's statement, the presentation, and press release were false and misleading because $220 million of the Industrial CFOA for 1Q 2016 was attributable to the newly adopted and undisclosed practice of deferred monetization.

c. During GE's earnings call on January 20, 2017, Immelt stated: "For cash industrial CFOA was $8.2 billion in the quarter, the biggest cash quarter in our history. We had significant growth in CFOA . . . ." Bornstein added:

> Industrial CFOA was $11.6 billion, down 5% excluding deal taxes and pension contributions. We generated $8.2 billion of industrial CFOA in the fourth quarter

> which was up 34% versus last year. This was driven primarily by $5 billion of working capital with improvement across all buckets including receivables, inventory, accounts payable and progress collections. . . .
>
> So we came in at $11.6 billion of industrial CFOA. We were shooting to be something closer to $12 billion of CFOA in the latest update we gave you.
>
> When you subtract CapEx you get industrial free cash flow we ended up at $8.9 billion. That was actually right in the middle of the range we gave you coming into the year on industrial free cash flow. But the $400 million light is really all about inventory and it's essentially the $1 billion roughly, the $1 billion sales miss left more in inventory than we expected.

In the PowerPoint presentation and press release issued by GE in connection with the earnings call, GE reiterated these Industrial CFOA results. These statements were false or misleading because the only reason that GE had the "biggest cash quarter in [its] history" was because of the new and undisclosed deferred monetization practices described above in Section II.B. In addition, the reason that Industrial CFOA was just $400 million less than management's previously announced guidance was not due to mere inventory issues. They would have missed by a much wider margin if not for the deferred monetization practices.

d. During GE's earnings call on April 21, 2017, Immelt stated:

> Our cash performance was worse than we expected to start the year with CFOA of $400 million and negative industrial CFOA. We had several one-timers and grew working capital on the first quarter, which we expect to turn around in the second quarter and be on plan for the year. . . . There's no change to our 2017 framework of total CFOA of $18 billion to $21 billion and industrial CFOA of $12 billion to $14 billion.

Bornstein added:

> In the first half of 2016, we delivered $400 million of CFOA. For 2017, we expect significantly stronger cash performance in the second quarter with sequential improvement throughout the year. Our total year plan is $12 billion to $14 billion. That's driven by an increase in net income plus depreciation. And we expect to see a benefit from working capital similar to last year's benefit. Contract assets will be similar impact as 2016. And other cash flows will be lower cash usage this year,

largely driven by the absence of onetime LTIP payment in 2016. So with that, I'll move on to consolidated results.

These statements were misleading because Immelt and Bornstein created the impression that the cash flow issues were the result of one time phenomena and that Industrial CFOA would rebound based on "an increase in net income." Indeed, in an analyst report dated April 23, 2017, RBC Capital Markets analysts noted:

[W]e also wonder whether the breadth of detail provided on the call and in Q&A ultimately made the mostly transitory issue a bigger focus than it needed to be. The bottom line is that GE reaffirmed its full-year target of $12- $14 billion in Industrial CFOA, reflecting its confidence that the 1Q cash shortfalls will be recouped/remedied in the coming quarters.

e. During GE's earnings call on July 21, 2017, Immelt stated:

For cash, CFOA was $3.5 billion in the quarter: $2 billion from capital and $1.5 billion from Industrial CFOA, in line with expectations. . . . The second-half CFOA profile will be a lot like last year. We expect higher earnings. We expect to reduce working capital by about $4 billion in the second half. Last year this was actually more; it was about $5 billion. Contract assets will grow at about the same level, and we will benefit from timing of other items. We ended the quarter with $14 billion of cash on the balance sheet, in line with expectations. And we should be within the $12 billion to $14 billion goal for Industrial CFOA.

The PowerPoint presentation and press release related to the earnings call reported the same Industrial CFOA figures. These statements were false or misleading because they created the impression that organic revenue growth was driving increases in Industrial CFOA when GE's undisclosed deferred monetization processes were a significant driver of Industrial CFOA.

f. During the October 20, 2017 earnings call, Bornstein stated:

Versus our expectations, our CFOA in the quarter was negatively impacted by two things: lower-than-expected power earnings, and underperformance in working capital. Working capital was a usage in the quarter of $1.3 billion, principally driven by inventory receivables. This is worse than expectations, primarily driven by lower-than-anticipated power volume, which resulted in lower earnings and higher inventory on hand.

This statement was false or misleading because it failed to disclose that Industrial CFOA would have been approximately $139 million less without the undisclosed deferred monetization practices and that Industrial CFOA for future periods would be materially impacted by the cost of pulling forward cash through deferred monetization practices.

**E. Additional scienter allegations concerning Defendants' LTSA scheme**

95. In addition to the facts set forth above, Defendants' scienter is further evidenced by the following facts:

96. *First*, the dramatic impact that GE Power's LTSAs had on reported Contract Assets and earnings from 2014-2017 is strong evidence of scienter. As discussed above, LTSAs comprised almost half of GE's entire reported Contract Assets. For example, in 2015, LTSAs accounted for $10.346 billion of GE's $21.156 billion in Contract Assets, and in 2016, LTSAs accounted for $12.752 billion of GE's $25.162 billion in Contract Assets. In addition, so called cumulative catch-up adjustments on those LTSAs that were made when contracts were adjusted or re-negotiated had a material impact on GE's reported earnings, improving GE's reported EPS by 13% and 44% in 2016 and 2017, respectively, and accounting for a staggering 80% of GE's reported EPS in the first quarter of 2017.

97. *Second*, in May 2014, the Financial Accounting Standards Board announced amendments to the then-current revenue recognition standards through ASC 606, which, among other things, prohibited companies like GE from recognizing revenue through so called "cumulative catch-up adjustments" when they adjusted or re-negotiated LTSAs. On April 13, 2018, in response to ASC 606's revenue recognition amendments becoming effective, GE filed a Form 8-K with the SEC restating its financials and quantifying the impact that such adjustments

had on its financial performance in prior periods. GE now disclosed that it was effectively writing down the value of its LTSA Contract Assets by ***$8.7 billion***. With this disclosure, GE effectively admitted, among other things, that: (i) it had previously booked over $8.7 billion in revenues due to LTSA adjustments that have not yet turned into cash for the Company; (ii) more than half (57%) of GE's reported LTSA Contract Assets as of year-end 2017 were the product of cumulative catch-up adjustments that were the result of changes to LTSAs; and (iii) its LTSA Contract Assets are actually worth 57% less than previously reported. While several of GE's competitors issued restatements following the enactment of ASC 606's revenue recognition amendments, none were even remotely close to the size of GE's adjustments. As reported by The Financial Times in an April 19, 2018 article titled *General Electric sets out on road to regaining investors' trust*:

> The revisions resulting from ASC 606 have been much greater for GE than for some of its peers. Boeing revised its 2017 operating earnings of $10.3bn up by $66m. Lockheed Martin shaved just $8m from reported 2017 operating profits of about $5.12bn. United Technologies said in February that it expected the new standard to have "an immaterial impact" on net income this year. For Microsoft, reported operating income for 2016-17 was revised up from $22.3bn to $29bn.
>
> For GE, by contrast, the new standard meant revising 2017 profits from industrial operations down by 17 per cent, from $14.7bn to $12.2bn, mostly because of a changed view of long-term contracts for servicing equipment such as aero engines and turbines for power plants. As originally reported, those profits fell 16 per cent from 2016. Under the new standard, they were down 23 per cent.

98. *Third*, Defendants GE, Immelt, and Bornstein were hyper- focused on GE Power and the impact of new accounting rules announced in May 2014 on GE's revenue recognition practices for LTSAs.

99. *Fourth*, Immelt, Bornstein, and Bolze held high-level positions, controlled the contents of GE's public statements, and had access to material, adverse, nonpublic information concerning GE Power's operations, including with respect to recognition of revenue relating to

LTSAs and adjustments to cost estimates to increase reported revenues. Because of their high-level positions Immelt and Bornstein were provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

100. *Fifth*, as GE's CEO and CFO Immelt and Bornstein controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE Power and the impact of Power's Contract Assets, and related recognition of revenue, on GE's operations. The fact that Defendants Immelt and Bornstein had access to this information shows that they knew, or were reckless in not knowing, that statements concerning GE Power services revenue, profit and growth were materially false or misleading.

## III. Defendants misled investors with an "artificial" valuation of Alstom to justify GE's acquisition of the troubled company and recorded the assets acquired at inflated values

101. The December 2018 WSJ Report reported that as his tenure as CEO wore on Immelt was "[i]ncreasingly . . . worried about his legacy." According to the report: "Whittling away at [GE] Capital wasn't enough. Immelt, trapped in Welch's long shadow, craved a bold move to shock his company out of the doldrums that had plagued his tenure. It was time for GE to be reinvented again." This intense desire ultimately led to the disastrous acquisition of Alstom.

102. In 2013, Immelt became frustrated because there was a perception that GE management may not be willing or able to become primarily an industrial company. Immelt wanted to make a big splash by acquiring a large industrial company to regain credibility in the market. Immelt was determined to do a deal as part of the so called "GE Pivot."

103. The company ultimately acquired was Alstom. It was the biggest acquisition in the history of GE. *Lights Out* contains a detailed description of GE's Alstom acquisition based

on interviews with numerous GE employees including "a member of the business development team at GE's" Power business. The business development team was the deal team that worked "as mergers and acquisitions bankers embedded inside the company." *Lights Out*, p.155. This individual is referred to by the pseudonym Adam Smith in *Lights Out*, "to protect this individual's identity." Because the name Adam Smith is used by the authors of *Lights Out*, it will be used here when referencing statements attributed to him in the book with the understanding that it is a pseudonym for a confidential source.

**A. GE prepares a bid for Alstom based on an "artificial" enterprise valuation**

104. According to Smith, in the Fall of 2012, the deal team concluded that Alstom was covering up a cash crisis. As described in *Lights Out*, Alstom

> had quietly sold €350 million in new shares to private investors, just months after buying back its own stock and reporting earnings that had shown no sign that the company would need to raise money. To Smith, the sale was a clear sign of a cash crunch that one of GE's biggest rivals in the power business clearly didn't want anyone to know about.

*Lights Out*, p.155.

105. Smith concluded that "[b]uying Alstom to restructure its operations and fold it into GE's own Power unit would make sense—but only if it could be had for the right price. Any bid needed to be carefully and precisely calculated; overpaying for a limping business could hamper a buyer for years." Smith expected that Alstom investors would soon discover the cash crunch he identified and that Alstom's stock price would plummet, creating an opportunity to "swoop in with a lowball offer." But a significant decline did not materialize. "Smith and his colleagues sent their pitch to the business development team for the entire corporation at GE headquarters in Fairfield. But corporate filed the report away for the time being. Something was obviously wrong with Alstom." *Lights Out*, p.156.

106. According to the December 2018 WSJ Report, in late 2013, GE's merger teams were told "[h]eadquarters wants your biggest targets." *See Lights Out*, p.158-161. In response to this call, Smith and "the Power team immediately thought of" Alstom "not that they thought much of the property." *Lights Out*, p.161. Nevertheless, if "they could snap it up at a buyer's price" a deal could make sense as "there could be much value for GE's vaunted cost-cutting machine to reap from a declining French conglomerate with assets strewn across three continents." *Id*.

107. According to multiple members of the deal team, during the due diligence phase of the transaction GE was "evaluating Alstom with unusually little insight into the inner workings of the French company." *Lights Out*, p.195. The deal team could glean from public press reports that Alstom's "business prospects had been dim of late," including power plant orders, and that it faced potential criminal liability relating to a bribery probe commenced by the United States Department of Justice. *Id.* Yet "GE's access to Alstom's systems internal records, which would have shed light on the value of its backlog [of power plant orders] and the extent of its exposure to criminal liability, had been limited" during due diligence. *Id.*

108. The lack of information did not turn out to be an impediment to bidding because Defendants did not base their bid on the actual enterprise value of Alstom. According to a GE executive interviewed by the authors of *Lights Out*, Immelt and Bolze decided that any bid for Alstom would need to be high enough to provide Alstom's majority shareholder, Bouygues SA, enough return on its equity to secure its agreement. This executive was quoted as saying: "'[t]he valuation was artificial'" and that "'[i]t was fixed based on Bouygues.'" *Lights Out*, p.196.

109. When Smith heard that GE executives, including Immelt and Bolze, had determined that it would calculate the enterprise value of Alstom at a level high enough to ensure Bouygues was satisfied, he

> was listening to the logic of the deal collapse. Alstom had been worth examining because it was financially imperiled; the value of pursuing it in the first place had been to capture its assets at a bargain, strip what GE wanted, and then sell the rest, like an old car, for the parts. Now the company was talking about making sure Bouygues saw a return on its investment in a company that, absent a buyer, seemed to be headed for bankruptcy or a possible government bailout. Going into the deal with that kind of logic, Smith thought, GE would be seriously overpaying on almost any price it offered.

*Lights Out*, p.195.

110. Using the "backward logic" that the enterprise value should be calculated as the price that would provide Bouygues with a satisfactory return on its investment, GE calculated an enterprise valuation "that fluctuated from €30 euro a share to as high as €34" and assumed more than half of the value was due to "cost synergies." *Lights Out*, p.195-96. GE competitors such as Honeywell did not permit their acquisitions team to factor in potential cost-cutting synergies into calculation of enterprise value. This supposed enterprise valuation resulted in a valuation inflated by at least 50% at the outset and, as discussed below in Section III.B, the situation only got worse as assets were removed from the deal and GE agreed to upward price adjustments.

111. As was reported in the December 2018 WSJ Article:

> At the time of GE's 2014 shareholder meeting in April, Alstom executives flew to a hotel near the venue in Chicago to talk. To the dismay of some involved, GE's bid crept upward, from the €30 a share that the power division's deal team already believed was too high, to roughly €34, or almost $47. Immelt and Kron met one-on-one, and the deal team realized the game was over. The principals had shaken hands.

112. The GE deal term had become increasingly concerned because they "felt that Alstom's murky backlog of power orders had not been reviewed comprehensively enough to

make a proper estimate of its flaws and liabilities." *Lights Out*, p.199. Nevertheless, during a private meeting with Kron, Immelt "agreed to sweeten the pot by roughly $1 billion" and the two "shook hands" on a deal that valued the Alstom power assets that GE would acquire at $13.5 billion. *Id.*

**B. Defendants misleadingly tout the Alstom transaction from the date the deal was announced until deal closing**

113. On April 30, 2014, GE issued a press release regarding its agreement with Alstom:

> PARIS, FRANCE, April 30, 2014 – GE (NYSE: GE) and Alstom announced here today that GE has submitted a binding offer to acquire the Thermal, Renewables ("Power") and Grid businesses of Alstom (ALO.PA) consisting of $13.5 billion (€9.9 billion) enterprise value and $3.4 billion (€2.5 billion) of net cash, totaling $16.9 billion (€12.35 billion). . . .
>
> **Transaction details**
>
> The all-cash transaction is valued at 7.9 times pro forma earnings before interest, taxes, depreciation and amortization (EBITDA) of Alstom's Thermal, Renewables, and Grid business units. GE expects the acquisition to be accretive to earnings in the first year; it is expected to add $.08-$.10 of earnings in 2016; and approximately 75% of operating earnings is expected to come from GE Industrial by 2016.
>
> **Creating investor value**
>
> Jeff Immelt, GE Chairman and CEO, said, "This is a strategic transaction that furthers GE's portfolio strategy. Power & Water is one of our higher growth and margin industrial segments and is core to the future of GE. Alstom, like GE, is a company built on engineering, innovation and technology. We respect and value the deep industry and technology expertise of Alstom employees and expect them to add to our proven track record of developing talent and leadership in France and globally."
>
> Immelt continued, "Alstom not only advances our strategic priorities and industrial growth, but is also expected to provide an excellent return on capital. . . .

These statements were false and misleading because the reported enterprise value was not the fair value of the assets being acquired (less debt). It was the amount that GE needed to pay to

ensure that Bouygues would receive a return on investment sufficient to secure its agreement to sell. GE Power's deal team concluded that GE had agreed to pay far too much in an effort to appease Bouygues for no good reason because Alstom was on the brink of failure and had no bargaining leverage. GE and the Defendants knew, or were reckless in not knowing, that the true enterprise value for the Alstom assets being acquired was much lower than $13.5 billion. The press release failed to disclose how the enterprise value was actually calculated, that more than 50% of the enterprise value was dependent upon cost-cutting "synergies," and that the team responsible for analyzing the Alstom acquisition had concluded that GE was vastly overpaying for the unit to satisfy Immelt's desire to complete a bold transaction as part of GE's pivot away from GE Capital.

114. GE's planned acquisition of Alstom encountered resistance from the French government and EU and U.S. regulators. GE was forced to alter the structure of the deal resulting in the creation of three joint ventures that allowed the French government to take a stake to avoid an outright transfer to a foreign entity. EU and U.S. regulators sought concessions to address potential anticompetitive effects of the transaction.

115. Immelt attempted to reassure investors during GE's annual EPG conference on May 20, 2015 stating:

> [W]e like this deal. We are confident it is going to get approved. . . . Now the synergies have only grown. So when we were here a year ago, we talked about $1.2 billion of synergies. Today, we have got a funnel at $3 billion or above, so we've got a deep pool of synergies. This adds up to $0.06 to $0.09 a share in 2016, $0.15 to $0.20 a share by 2018. We've had hundreds of people working on the integration and synergy process, so I would say the one advantage to having time to work on it is this is probably the most studied synergy team and synergy plan in the history of the Company. So we feel really good that we are well-grounded and then I show you the walk from $1.2 billion to $3 billion in terms of where the synergies come from, more in service. We do see bigger potential there. A lot we can do with the manufacturing footprint. SG&A, we will take out 25% plus of the combined SG&A

> and more technical synergies. So we've got, I think, a well-underwritten investment for our investors that is well-positioned in terms of where we are going in the future.

116. During GE's earnings call on July 17, 2015, Immelt disclosed that GE had discussions with EU and U.S. regulators concerning the Alstom transaction to address their concerns. He declined to discuss specifics, but stated, "we proposed a remedy that addressed their concerns while preserving really the strategic and economic rationale that I reviewed with you guys in the past."

117. Although Immelt did not disclose the fact at the time, GE offered to divest itself of assets relating to an Alstom program to build a gas turbine that could compete with GE to Ansaldo Energia of Italy. In addition, GE offered to divest an Alstom Florida based subsidiary, Power Services Manufacturing ("PSM"). According to the account in *Lights Out*, the PSM divestiture was particularly alarming to GE bankers working on the deal and GE executives because PSM was the asset with perhaps the most value to GE. Acquiring PSM meant that GE would acquire one of its primary competitors and could use the entity to service turbines made by manufacturers other than GE. *Lights Out*, p.227.

118. According to the December 2018 WSJ Report:

> A band of skeptics inside GE Power were hopeful the deal would collapse. When advisers determined that the concessions to get the deal approved might have grown costly enough to trigger a provision allowing GE to back out, some in the Power business quietly celebrated, confiding in one another that they assumed management would abandon the deal.
>
> But Immelt and his circle of closest advisers wanted it done. That included Steve Bolze, the man who ran it and hoped someday to run all of General Electric.

119. But even Bolze soured on the Alstom acquisition as it became increasingly apparent that GE was vastly overpaying. As Immelt describes in his memoir, titled *Hot Seat: What I Learned Leading a Great American Company*, published in February 2021, while the deal

was proceeding to close, Bolze increasingly elevated concerns to Immelt regarding "Alstom's diminishing unit sales" and "how the numbers weren't as good as they'd once been." Bolze also expressed to Immelt that he felt as though they "should get [Alstom] for a lower price" to which Immelt insisted on closing the deal, stating "at this point, the best thing we can do is close the deal and start executing. Let me take the blame for how much we paid." p.272-74.

120. As reported in *Lights Out*, the GE Power deal team was "paradoxically delighted" because the cost of the concessions required were likely to result in GE walking away from the deal.

> They weren't the only ones. The company had even gone so far as to hire litigation council, anticipating that they would be in for a massive court fight, whether battling over the regulators' demands or finally backing out of the deal altogether.
>
> Adam Smith grabbed his cell phone and called a superior, one of the company officers at corporate who was overseeing the deal. This could be it, Smith told him. We might be able to pull the plug on this thing.
>
> The other executive was firm: "This is Jeff's deal. We're not backing away."

*Lights Out*, p.230.

121. On September 8, 2015, the United States Department of Justice announced that it had required GE to divest PSM in order to proceed with the Alstom transaction.

122. To make matters worse, on December 22, 2014, Alstom pled guilty to bribery charges and was fined $772 million to resolve a probe by the U.S. DOJ. Alstom was supposed to pay the entire fine rather than obtain funds from GE to pay. In a Wall Street Journal article published on December 22, 2014, Leslie Caldwell, the head of the DOJ's criminal division at the time, was quoted as saying "[t]hat was something we insisted upon." Yet after the settlement it became increasingly clear that Alstom could not pay the entire fine. GE secretly agreed to adjust the acquisition price by hundreds of millions of dollars to pay the fine. As described in *Lights*

*Out*: "The price tweak, framed internally as a 'brand value adjustment,' quietly took care of the problem." p.233.

123. During GE's earning call on October 16, 2015, Immelt stated:

> For Alstom, all the major regulators have now approved GE's purchase of Alstom with remedies. We're comfortable with the outcome, as the economic and strategic impact of the deal remains intact. We will divest to Ansaldo the GT26 new units, and the GT36 technology, and 34 of 720 service contracts in the installed base. We will retain the ability to do service for competitive units through PSM. Financially, we still expect to achieve $3 billion of synergies . . . .

This statement was false and misleading because the concessions GE had agreed to made a bad deal much worse. It was also incomplete because Immelt failed to disclose that the enterprise value upon which the acquisition was based was not the fair value of the Alstom assets acquired, but was instead a price that was offered to ensure Bouygues earned a satisfactory return on investment and deemed grossly excessive by the internal GE Power deal team responsible for the deal. Immelt also failed to disclose that GE had agreed to a purchase price adjustment of hundreds of millions of dollars to pay Alstom's criminal fine.

124. On November 2, 2015, GE announced that it had completed its acquisition of Alstom, noting in a press release:

> PARIS, FRANCE – November 2, 2015 – GE [NYSE:GE] announced today that it has completed the acquisition of Alstom's power and grid businesses. . . .
>
> GE reached an agreement with Alstom in 2014 to purchase Alstom's power and grid businesses for €12.35 billion. Adjusting for the joint ventures announced in June 2014 (renewables, grid, and nuclear), changes in the deal structure, price adjustments for remedies, net cash at close, and including the effects of currency, the purchase price is €9.7B (approximately $10.6B). This includes working capital usage of approximately €0.6B in the month of October. GE expects the deal to generate $0.05-0.08 of earnings per share in 2016 and $0.15-0.20 of earnings per share by 2018. GE is targeting $3.0 billion in cost synergies in year five and strong deal returns. The overall economics and strategic rationale remain the same as GE announced in April 2014. . . .

These statements were materially false and misleading. The "overall economics and strategic rationale" were not the same because GE had agreed to divestures that fundamentally altered the value to GE. In addition, GE had been forced to pay hundreds of millions for Alstom's fine paid to the DOJ. The press release also failed to disclose that GE had structured its bid around an enterprise valuation that was not a fair value and was instead made up to ensure that Bouygues received a return on investment that it deemed satisfactory despite the fact that Alstom was on the brink of bankruptcy or a bailout. The press release also failed to disclose that GE's own deal team believed that GE was vastly overpaying for Alstom and should have walked away from the deal, but that GE was nevertheless proceeding because Immelt insisted they close a bold acquisition in order to execute his pivot and cement his legacy.

### C. Material misstatements or omissions in GE's SEC filings relating to the Alstom acquisition and recorded goodwill

125. In addition to the false or misleading statements described above in paragraphs 113, 115-116, 123-124, GE's annual and quarterly SEC filings contained material misstatements and omissions concerning the goodwill recorded in connection with the Alstom transaction.

126. Generally Accepted Accounting Principles ("GAAP") rules define goodwill as "an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized." SFAS 141. Goodwill is calculated by deducting tangible assets from the enterprise value of the business acquired. The amount of goodwill recorded must fairly reflect the expected future economic benefit of the asset and needs to be tested annually for impairment.

127. In GE's Form 10-K for 2015, filed on February 26, 2016, GE stated that it had preliminarily valued the Alstom assets at $13.7 billion, net of cash acquired. This resulted in a

purchase price allocation of $13.5 billion in goodwill and $4 billion of amortizable intangible assets. Specifically, GE's Form 10-K for 2015 stated:

> On November 2, 2015, we acquired the Thermal, Renewables and Grid businesses from Alstom. The purchase price was €9,200 million ($10,135 million), net of cash acquired of approximately €1,600 million ($1,765 million). As further discussed below and elsewhere in this report, the acquired Alstom businesses had a significant impact on our industrial businesses, directly affecting accounting and reporting related to three of our operating segments, as well as the creation of several new, jointly-owned entities. . . .
>
> The fair value of the acquired businesses, including a preliminary valuation of non-controlling interest, at the time of close was approximately $13,700 million, net of cash acquired. The preliminary purchase price allocation resulted in approximately $13,500 million of goodwill and $4,065 million of amortizable intangible assets. . . .
>
> In order to obtain approval by the European Commission and the Department of Justice, GE pledged to sell certain of Alstom's gas-turbine assets and its Power Systems Manufacturing subsidiary to Ansaldo Energia SpA (Ansaldo) after the close of the transaction for approximately €120 million. The purchase price will be paid by Ansaldo over a period of five years. The transaction closed on February 25, 2016.

This statement was false and misleading because GE did not in fact ascribe a fair value of $13.7 billion. That was an "artificial" enterprise value concocted to ensure that Bouygues would receive a return on investment satisfactory to it. The inflated enterprise value rendered the reported $13.5 billion in goodwill false or misleading because goodwill is calculated as a function of fair value (*i.e.*, enterprise value). These statements also failed to disclose that GE's own deal team believed that GE was vastly overpaying for Alstom and should have walked away from the deal, but that GE was nevertheless proceeding because Immelt insisted they close a bold acquisition in order to execute his pivot and cement his legacy. GE's Form 10-K also failed to disclose that GE was paying hundreds of millions of dollars of Alstom's criminal fine despite assurances that it would not seek to shift that expense to GE.

128. GE's quarterly reports filed with the SEC on Form 10-Q for the first, second, and third quarters of 2016 each contained statements that were false or misleading because they repeated the "artificial" valuation of Alstom that was used to justify GE's acquisition at an inflated price, reported goodwill numbers that were artificially inflated because they were based on that bogus enterprise value, and failed to disclose the view among members of the GE Power deal team that GE had grossly overpaid for Alstom. For example:

a. GE's Form 10-Q for 1Q 2016 stated:

> The fair value of the acquired businesses, including a preliminary valuation of noncontrolling interests, at the time of close was approximately $13,700 million, net of cash acquired. In the fourth quarter of 2015, the preliminary amount of goodwill, intangible assets and unfavorable customer contract liabilities, recognized was approximately $13,500 million, $5,200 million, and $1,100 million respectively. . . .
>
> In the first quarter of 2016, the preliminary amount of goodwill, intangible assets, and unfavorable customer contract liabilities, recognized was adjusted to approximately $14,200 million, $4,500 million, and $1,100 million respectively. The adjustments reflected refinements in estimates in the first quarter of 2016, primarily related to updated revenue and cost assumptions for customer contracts, and other fair value adjustments related to acquired assets and liabilities. . . .

b. GE's Form 10-Q for 2Q 2016 stated:

> Through the second quarter of 2016, we adjusted the preliminary allocation of purchase price which resulted in goodwill, intangible assets, and unfavorable customer contract liabilities, of approximately $14,750 million, $4,500 million, and $1,200 million respectively. These adjustments, which are necessary to reflect acquired assets and liabilities of the acquired businesses at fair value, reflected revisions in estimates in the first and second quarters of 2016, primarily related to updated revenue and cost assumptions for customer contracts, and other fair value adjustments related to acquired assets and liabilities. The approximate amounts of other significant purchase accounting adjustments recorded since the date of acquisition include a reduction in the book value of assets sold to Ansaldo of $400 million, adjustments to the fair value of derivative contracts of $350 million, decreases in inventory balances of $350 million, increase to legal reserves of $300 million, increases to property, plant and equipment of approximately $200 million and a reduction in the book value of aged accounts receivable of approximately $150 million. . . .

c. GE's Form 10-Q for 3Q 2016 stated:

> Through the third quarter of 2016, we adjusted the preliminary allocation of purchase price, which has now resulted in goodwill, intangible assets, and unfavorable customer contract liabilities, of approximately $17,200 million, $4,400 million, and $2,350 million respectively as of the acquisitions date. These adjustments, which are necessary to reflect acquired assets and liabilities of the acquired businesses at fair value, reflected revisions in estimates in the first, second and third quarters of 2016, primarily related to cash flow and other valuation assumptions for customer contracts, increases to legal reserves, and other fair value adjustments related to acquired assets and liabilities. The approximate amounts of significant purchase accounting adjustments recorded since the date of acquisition include a reduction in the book value of assets sold to Ansaldo of $450 million, adjustments to the fair value of derivative contracts of $350 million, decreases in inventory balances of $115 million, increases to legal reserves of $1,000 million, increases to property, plant and equipment of $50 million, a reduction in the book value of aged accounts receivable of $200 million and other project related costs such as warranty provisions and liquidating damages of $625 million. . . .

129. In GE's Form 10-K for 2016, filed on February 24, 2017, GE disclosed that it in its final purchase price allocation, it had recorded $17.3 billion in goodwill relating to the Alstom transaction. Defendants claimed the higher than initially reported goodwill was justified "by estimated GE-specific synergies." Specifically, in Note 8 to the financial statements published in GE's Form 10-K for 2016, GE stated:

> ALSTOM ACQUISITION ACCOUNTING UPDATE
>
> The total consideration for the acquired businesses, at the time of close in November 2015 included our purchase price of $10,124 million (net of cash acquired) and a preliminary valuation of noncontrolling interests, of approximately $3,600 million for a total of approximately $13,700 million. In the fourth quarter of 2015, the preliminary allocation of purchase price resulted in goodwill, intangible assets and unfavorable customer contract liabilities of approximately $13,500 million, $5,200 million, and $1,100 million respectively. The amount of goodwill recognized compared with identifiable intangible assets is affected by estimated GE-specific synergies, which are not permitted to be included in the measurement of identifiable intangibles. Such synergies include additional revenue from cross-selling complementary product lines. . . .
>
> Through the fourth quarter of 2016, we adjusted the preliminary allocation of purchase price, which has now resulted in goodwill, intangible assets, and unfavorable customer contract liabilities, of $17,304 million, $4,370 million, and

> $2,720 million, respectively as of the acquisition date. These adjustments, which are necessary to reflect acquired assets and liabilities of the acquired businesses at fair value, reflected revisions in 2016, primarily related to cash flow and other valuation assumptions for customer contracts, increases to legal reserves, and other fair value adjustments related to acquired assets and liabilities. The approximate amounts of significant purchase accounting adjustments recorded since the date of acquisition include a reduction in the book value of assets sold to Ansaldo of $405 million, adjustments to the fair value of derivative contracts of $335 million, decreases in inventory balances of $130 million, increases to legal reserves of $990 million, a reduction in the book value of aged accounts receivable of $175 million and other project related costs such as warranty provisions and liquidating damages of $665 million. . . .

This statement was false and misleading because the $13.7 billion valuation was "artificial" because it was based on the price that would provide Bouygues a satisfactory return on its investment and not the fair value of the assets acquired. The resulting goodwill was, thus, similarly inflated. These statements also failed to disclose that GE's own deal team believed that GE was vastly overpaying for Alstom and should have walked away from the deal, but that GE was nevertheless proceeding because Immelt insisted they close a bold acquisition in order to execute his pivot and cement his legacy. GE's Form 10-K also failed to disclose that GE paid hundreds of millions of dollars of Alstom's criminal fine despite assurances that it would not seek to shift that expense to GE.

130. GE's quarterly reports filed on SEC Form 10-Q for the second and third quarters of 2014 and first three quarters of 2015, 2016, 2017 and 2018 and its annual statements filed on Form 10-K for 2014, 2015, 2016, 2017 and 2018 failed to disclose material information required to be disclosed under Item 303 of Regulation S-K, 17 C.F.R. § 229.303 relating to the Alstom acquisition. Although discussion of the transaction and the impact on GE appeared in most filings, it did not disclose material details relating to the transaction including: (i) the fact that it was based on an artificially inflated enterprise value; (ii) that GE agreed to upward price adjustments despite the fact that concessions had substantially reduced the value of Alstom

assets to GE; (iii) that GE had agreed to increase the purchase price by hundreds of millions of dollars to ensure Alstom could pay a criminal fine that the U.S. DOJ had insisted should not be paid by GE; and (iv) that the transaction was entered into despite the fact that GE had previously concluded that Alstom was too troubled to acquire and that the GE Power deal team believed GE was vastly overpaying for Alstom.

**D. GE announces a belated $22 billion impairment charge relating to Alstom**

131. Under GAAP rules, the amount of goodwill must be tested annually to determine whether the recorded value on the balance sheet is fair and whether the anticipated benefits from the business are still justified.

132. Shortly after the close of 3Q 2017, GE announced that it would be taking a goodwill impairment charge of $947 million because the fair value of the "power conversion" was less than its carrying value. These statements were false and misleading because they suggested that "primary factors" that led to the impairment were extended market downturns. In reality, the "primary factor" was that Alstom was acquired at a price that exceeded its fair value in an effort to appease Bouygues and satisfy Immelt's desire to close a large acquisition as part of its pivot. These statements were also incomplete because Defendants failed to disclose that the impairment being taken did not address the fact that the goodwill associated with the Alstom acquisition was artificial and that the GE Power deal team had concluded the GE vastly overpaid for the Alstom assets acquired and the deal did not make economic sense for GE. For example:

a. During GE's earnings call on October 20, 2017, Bornstein announced that GE would be taking an impairment charge noting:

> We also had two impairments in the quarter. As you know, during the third quarter, we perform our annual impairment test of goodwill for all reporting units. Based on the results of our testing, the fair values of each of the GE reporting units exceeded their carrying values, except for our power conversion reporting unit

within the power segment. The primary factors contributing to a reduction of fair value of this reporting unit were extended downturns in marine and oil and gas markets, increased pricing pressures in the low-margin renewable market, and delayed introduction of new technologies and products.

As a result of the analysis, we recognized a non-cash goodwill impairment of $947 million in the quarter to write down the carrying values of power conversion's goodwill to its implied fair value.

b. In its Form 10-Q for 3Q of 2017, GE disclosed:

During the third quarter of 2017, we performed our annual impairment test of goodwill for all our reporting units. Based on the results of our step one testing, the fair values of each of the GE reporting units exceeded their carrying values except for our Power Conversion reporting unit, within our Power operating segment. The primary factors contributing to a reduction in fair value of this reporting unit were extended downturns in certain of its customer segments, most notably the marine and oil and gas markets, increased pricing and cost pressures in low margin renewable markets, and the delayed introduction of new technologies and products. Therefore, we performed a step two analysis. As a result of this analysis, we recognized a non-cash goodwill impairment loss of $947 million ($940 million after tax) during the third quarter to write down the carrying values of Power Conversion's goodwill to its implied fair value of $191 million. The impairment loss was recorded on the Statement of Earnings to Other costs and expenses. After the impairment loss, the fair value of our Power Conversion reporting unit was in excess of its carrying value by approximately 2%.

In addition, we identified one reporting unit for which the fair value was not substantially in excess of its carrying value. The Grid Solutions reporting unit within our Power operating segment was formed as a result of the Alstom acquisition in November 2015. Since fair value equaled carrying value at the time of acquisition, this caused the fair value of this reporting unit not to be significantly in excess of its carrying value. In the current annual impairment test, fair value of Grid Solutions was in excess of its carrying value by approximately 3% and, therefore, continues to be not substantially in excess of carrying value. While the goodwill of this reporting unit is not currently impaired, there could be an impairment in the future as a result of changes in certain assumptions. For example, the fair value could be adversely affected and result in an impairment of goodwill if expected synergies of the acquisition with Alstom are not realized or if the reporting unit was not able to execute on customer opportunities, the estimated cash flows are discounted at a higher risk-adjusted rate or market multiples decrease. The goodwill associated with our Grid Solutions reporting unit was $4,418 million, representing approximately 5% of our total goodwill at September 30, 2017.

133. In its Form 10-K for 2017, filed on February 23, 2018, GE disclosed that it identified impairment to the recorded Alstom goodwill in the third and fourth quarters and had taken a $1.1 billion reduction to goodwill as a result. Again, it misleadingly suggested that the primary factors contributing to the further decline in the fair value of the Power Conversion reporting unit in the fourth quarter were increased competition leading to loss and cancellation of orders in the renewables customer segment and further downturn in oil and gas. Specifically, the Form 10-K for 2017 stated:

> During the third quarter of 2017, we performed our annual impairment test of goodwill for all our reporting units. Based on the results of our step one testing, the fair values of each of the GE reporting units exceeded their carrying values except for our Power Conversion reporting unit, within our Power operating segment. The primary factors contributing to a reduction in fair value of this reporting unit were extended downturns in certain of its customer segments, most notably the marine and oil and gas markets, increased pricing and cost pressures in low margin renewable markets, and the delayed introduction of new technologies and products. Therefore, we performed a step two analysis. As a result of this analysis, we recognized a non-cash goodwill impairment loss of $947 million during the third quarter to write down the carrying values of Power Conversion's goodwill to its implied fair value. Due to the impairment taken in the third quarter, we performed an interim impairment test of our Power Conversion reporting unit in the fourth quarter of 2017, which indicated that its carrying value was greater than its fair value. Therefore, we performed a step two analysis which resulted in the impairment of the remaining reporting unit goodwill. The primary factors contributing to the further decline in the fair value of the Power Conversion reporting unit in the fourth quarter were increased competition leading to loss and cancellation of orders in the renewables customer segment and further downturn in oil and gas. In addition, Power Conversion reached an agreement to sell its low voltage motors business, which decreased the fair value of the remaining Power Conversion reporting unit. As a result, we recognized an additional non-cash impairment loss of $217 million during the fourth quarter. The total impairment loss of $1,164 million of the Power Conversion goodwill was recorded on the Statement of Earnings (Loss) to Other costs and expenses. After the impairment loss, there is no goodwill in our Power Conversion reporting unit.

These statements were false and misleading. The "primary factor" that led to the need to take an impairment was that Alstom was acquired at a price that exceeded its fair value in an effort to appease Bouygues and satisfy Immelt's desire to close a large acquisition as part of its pivot.

These statements were incomplete because Defendants failed to disclose that the impairment being taken did not address the fact that the goodwill associated with the Alstom acquisition was artificially high and that the GE Power deal team had concluded that GE vastly overpaid for the Alstom assets acquired.

134. On October 1, 2018, GE announced that Flannery was being replaced by Lawrence Culp as CEO and that the Company expected to take a large goodwill impairment charge noting:

> GE expects to take a non-cash goodwill impairment charge related to the GE Power business. GE Power's current goodwill balance is approximately $23 billion and the goodwill impairment charge is likely to constitute substantially all of this balance. The impairment charge is not yet finalized and remains subject to review. The Company will provide additional commentary when it reports third quarter results.

GE failed to disclose that this impairment charge was almost entirely due to the Alstom acquisition or that the DOJ and the SEC were investigating this impairment charge. GE further failed to disclose that the enterprise value that was used to calculate goodwill was "artificial" and was not the true fair value of Alstom.

135. On October 30, 2018, GE disclosed in its Form 10-Q for the third quarter 2018 that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition.

> Based on the results of our step one testing, the fair values of each of our reporting units exceeded their carrying values except for the Power Generation and Grid Solutions reporting units, within our Power segment. The majority of the goodwill in our Power segment was recognized as a result of the Alstom acquisition at which time approximately $15,800 million of goodwill was attributed to our Power Generation and Grid Solutions reporting units. As previously disclosed, the Power market as well as its operating environment continues to be challenging. Our outlook for Power has continued to deteriorate driven by the significant overcapacity in the industry, lower market penetration, uncertain timing of deal closures due to deal financing, and the complexities of working in emerging markets. In addition, our near-term earnings outlook has been negatively impacted

> by project execution and our own underlying operational challenges. Finally, market factors such as increasing energy efficiency and renewable energy penetration continue to impact our view of long-term demand. These conditions have resulted in downward revisions of our forecasts on current and future projected earnings and cash flows at these businesses.
>
> Therefore, we conducted step two of the goodwill impairment test for the Power Generation and Grid Solutions reporting units. Step two requires that we allocate the fair value of the reporting unit to identifiable assets and liabilities of the reporting unit, including previously unrecognized intangible assets. Any residual fair value after this allocation is compared to the goodwill balance and any excess goodwill is charged to expense.
>
> In performing the second step, we identified significant unrecognized intangible assets primarily related to customer relationships, backlog, technology, and trade name. The value of these unrecognized intangible assets is driven by high customer retention rates in our Power business, our contractual backlog, the value of internally created technology, and the GE trade name. The combination of these unrecognized intangibles, adjustments to the carrying value of other assets and liabilities, and reduced reporting unit fair values calculated in step one, resulted in an implied fair value of goodwill substantially below the carrying value of goodwill for the Power Generation and Grid Solutions reporting units. Therefore, in the third quarter, we recorded our best estimate of a non-cash impairment loss of $21,973 million. The impairment loss included $827 million of goodwill recorded at Corporate associated with our Digital acquisitions that was previously allocated to our Power Generation and Grid Solutions reporting units. We recorded the estimated impairment losses in the caption "Goodwill impairment" in our consolidated Statement of Earnings (Loss). As a result of ongoing updates to our long-range forecast and the complexity of valuing intangible assets in the second step of the impairment test, the Company has not yet completed its analysis. We will recognize any differences to this estimate in the fourth quarter when we finalize the step two impairment test. After the impairment loss, there is no remaining goodwill associated with our Power Generation reporting unit and $1,653 million related to our Grid Solutions reporting unit at September 30, 2018.

136. GE further announced in the third quarter Form 10-Q that the SEC and the DOJ were investigating the Alstom impairment charge:

> Following our announcement on October 1, 2018 about the expected non-cash goodwill impairment charge related to GE's Power business, as discussed further in Note 8 to the consolidated financial statements, the SEC expanded the scope of its investigation to include that charge as well. We are providing documents and other information requested by the SEC staff, and we are cooperating with the ongoing investigation. Staff from the DOJ are also investigating these matters, and we are providing them with requested documents and information as well.

137. On GE's October 30, 2018 conference call, Miller stated:

> Based on our best estimate, we booked a charge of $22 billion, $19 billion related to our Power Gen reporting unit and $3 billion related to Grid. Most of the $22 billion charge is related to the Alstom acquisition, which occurred in the fourth quarter of 2015. We will true this up in the fourth quarter as it gets finalized.
>
> Also, the SEC expanded the scope of its ongoing investigation to include the goodwill charge. The Department of Justice is also investigating this charge, and the other areas that we have previously reported are part of the SEC's investigation. We are cooperating with the SEC and DOJ as they continue their work on these matters.

138. Prior to the write-down, Alstom accounted for more than a third of GE's industrial segment $64 billion book value. The $22 billion write down resulted in a 34% reduction in book value.

139. GE's stock price fell sharply on this announcement.

140. The announcement of the $22 billion Alstom impairment charge was incomplete as it still did not disclose the fact that the Alstom transaction was based on an artificial valuation of Alstom from the start.

141. The announcement was also misleading to the extent it suggested that the charge was the result of recent market disruptions. GE had been aware of the "challenging" market environment caused by "significant overcapacity in the industry" for years. As the SEC found: "In internal planning documents in 2014 and 2015, GE described its power markets as 'flat' and a 'challenging environment' and noted increasing price pressure and excess industry capacity." SEC Order ¶ 3. The SEC further found:

> Internal risk assessments for the GE Power Services business completed in 2014 and 2015 noted that it was subject to the same challenges facing all divisions within GE Power. Indeed, GE Power Services acknowledged internally that it had increased risk that its service agreements would need to be renegotiated due to lower than anticipated power consumption and increasing competition from other companies that offered servicing and repair of the power turbines after GE Power

> had sold them to customers. The business also faced the prospect that customers would exercise termination clauses in the service agreements if they did not receive price and terms concessions from GE Power, which created further risk to GE Power Services.

SEC Order ¶ 4.

142. As set forth above in Section II, because it was aware of decreasing demand for Power equipment and LTSAs, Defendants manipulated Power revenues through manipulation of LTSA revenues and inflated reported cash flows through the use of factoring.

**E. Additional scienter allegations regarding the Alstom misrepresentations and omissions**

143. In addition to the facts set forth above, Defendants' scienter is further evidenced by the following facts:

144. *First*, the magnitude of the required charge to goodwill supports an inference of scienter. On October 1, 2018, Defendants revealed that GE was required to reduce goodwill associated with the Alstom acquisition by approximately $22 billion—more than twice what GE paid for Alstom. This was in addition to the $1.1 billion charge recorded in fiscal year 2017. Market forces cannot explain why GE would have to take such a huge write down three years after the closing of the Alstom acquisition.

145. *Second*, Defendants repeatedly touted GE Power's purported financial strength and growth to investors, including the contribution of the Alstom business to the revenues and profits of GE. Defendants also repeatedly touted the Alstom acquisition as the cornerstone of its strategy to pivot toward GE's Industrial Segments.

146. *Third*, Defendants GE, Immelt, and Bornstein were hyper-focused on the Alstom acquisition. Immelt in particular viewed it as the key to his legacy as GE CEO.

147. *Fourth*, Immelt, Bornstein, and Bolze held high-level positions, controlled the

contents of GE's public statements, and had access to material, adverse, nonpublic information concerning the Alstom acquisition. Because of their high-level positions, Immelt, Bornstein, and Bolze were provided with, or had access to, the GE merger team's conclusions regarding the true value of Alstom and the amount by which GE was overpaying for the troubled company. Defendants were also aware that GE had conducted due diligence of Alstom in 2012, but concluded that the company was in dire need for cash and had far too many employees. Defendants knew that these problems still existed in 2014, but consciously decided to dramatically overpay without informing investors of GE's true view of Alstom. Because of their positions and access to material non-public information concerning Alstom and the proposed combination with GE, Immelt, Bornstein, and Bolze knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete.

148. *Fifth*, as GE's CEO and CFO during the relevant period, Immelt and Bornstein controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE Power's proposed acquisitions, and the impact of acquisitions on the Company's operations. The fact that Defendants Immelt and Bornstein had access to this information shows that they knew, or were reckless in not knowing, that statements concerning the Alstom acquisition were materially false or misleading.

## IV. GE's misrepresentations and omissions concerning its LTC exposure

149. From 1990 until 2003, GE Capital reinsured billions of dollars in LTC policies covering the cost of home care, assisted living care, adult care, and general living aid expenses not covered by health insurance. Insurance regulations, GAAP, and Statutory Accounting Principles ("SAP") require GE Capital to hold sufficient cash reserves and book-related

liabilities for anticipated claims. Cash reserves are calculated utilizing assumptions based upon mortality, morbidity, lapse rates, claims experience, and health care costs.

150. As detailed below, Defendants had led investors to believe that GE had gotten rid of any meaningful exposure to insurance liabilities in the early 2000s. When GE finally announced in 2017 that despite Defendants' prior assurances it faced enormous liabilities on a block of LTC reinsurance policies and needed to boost reserves by billions of dollars and take charges to earnings, even members of GE's Board of Directors "wondered why they had thought that the company was out of the insurance business." *Lights Out*, p.294.

151. As also is set forth more fully below, Defendants' failure to disclose GE's massive exposure to LTC liabilities and related known trends and uncertainties rendered GE's SEC filings materially false and misleading. The business unit responsible for setting LTC reserves and performing testing to identify whether charges to earnings were required to reflect increasing liabilities manipulated its models to ensure that Immelt and Bornstein's publicly announced earnings targets for the Verticals segments were achieved. In addition, Immelt and Bornstein falsely represented that GE had internal controls adequate to ensure that exposures of this type, and related known trends and uncertainties, were identified and properly reported when that was not true.

**A. Defendants announce that GE is "exiting" the insurance business**

152. In November 2003, GE announced that it intended to exit the insurance and reinsurance business through a spin-off that led to the creation of Genworth Financial, Inc. GE stated that the Genworth transaction would divest it of "most" of its insurance operations.[6] This

---

[6] *See GE Plans to Pursue Initial Public Offering of Its Principal Life and Mortgage Insurance Operations; Will Hold Investor Meeting and Webcast November 19*, GE Press Release (Nov. 18, 2003),

was disclosed as part of a larger strategy to exit its low-return businesses and redeploy capital to refocus on higher-growth businesses.

153. GE spun off most of the life insurance assets, and all of the mortgage insurance assets held by GE Financial Assurance Holdings Inc., which had a book value of approximately $10 billion. GE retained the insurance operations conducted through its principal insurance businesses, GE Insurance Solutions, and its subsidiary Employers Reassurance Corporation ("ERAC"). Among other things, ERAC reinsured LTC policies originally written by Allianz, American United LLC, Berkshire Life, Jackson National Life, John Alden, Lincoln Benefit Life, MassMutual, State Life, Trans America, and others.

154. As part of the spin-off, GE's Union Fidelity Life Insurance Company ("UFLIC") subsidiary entered into agreements to reinsure portions of Genworth's LTC portfolio. Thus, while GE superficially transferred this block of LTC policies to Genworth in connection with its IPO, Genworth transferred the financial risks of these LTC blocks right back to GE (via UFLIC) through the reinsurance agreements.

155. On November 19, 2003, during a call with investors, Immelt described the business that GE retained "as a piece low return, very stable, runoff block from [its] portfolio." Immelt further claimed that GE strategically retained these assets, that they were "pric[ed] very diligently" and that they supplied "pretty safe earnings." In addition, Immelt stated that GE "maintained strong reserv[es]" against these assets.

156. According to a Bloomberg report published in 2018, the bankers that structured the spin-off, Goldman Sachs and Morgan Stanley, advised GE that it could not divest itself of its

https://www.businesswire.com/news/home/20031118005916/en/GE-Plans-Pursue-Initial-Public-Offering-Principal.

LTC liabilities in the Genworth transaction because they were too risky and that the IPO would be difficult to complete if they were included in the spun-off entity.[7] Immelt recently admitted in his memoir that retaining the LTC exposure "was necessary to get the Genworth deal done." *Hot Seat*, p.89-90.

157. Following the Genworth IPO, GE assured investors that it was exiting the insurance market and would continue to reduce its remaining insurance exposure. For example, during a December 18, 2003 conference call, Immelt stated that GE had "exited, or announced the exit, [of] a substantial portion of our insurance business," and explained that the Genworth IPO "takes the low return insurance business and makes it a much smaller portion of the overall GE portfolio."

158. In 2006, GE disclosed that it had sold off the vast majority of its remaining insurance operations to Swiss Re, including: (i) the June 2006 sale of GE Insurance Solutions (f/k/a ERC) for $6.8 billion; and (ii) the December 2006 sale of all of the remaining operations of subsidiary GE Life for $0.9 billion.

159. Following these dispositions, GE stated in its 10-K for the year ended December 31, 2006:

> In 2006, ***we substantially completed our planned exit of the insurance businesses*** through the sale of the property and casualty insurance and reinsurance businesses and the European life and health operations of GE Insurance Solutions Corporation (GE Insurance Solutions) and the sale of GE Life, our U.K.-based life insurance operation, to Swiss Reinsurance Company (Swiss Re).

160. During an April 11, 2008 conference call, Immelt told investors that "what we have done over the last few years is try to derisk financial services by exiting insurance,

---

[7] *See GE's Surprise $15 Billion Shortfall Was 14 Years in Making*, Bloomberg (Jan. 29, 2018), http://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-14-years-in-the-making.

reinsurance, mortgage insurance, and we want to continue to do that to get more of a debt spread and consistent model." During a February 10, 2009 presentation at the Barclays Capital Industrial Select Conference, Sherin stated more specifically that over "the last several years, we've exited mortgage insurance, bond insurance, life insurance, long-term care insurance, reinsurance."

161. Sherin likewise assured investors on a June 8, 2011 conference call that GE Capital "sold all the insurance businesses, life insurance, bond insurance, reinsurance" and, after those dispositions, had "a tremendously more focused portfolio." Sherin repeated this statement during a January 20, 2012 earnings call, telling investors that while GE previously "had significant insurance operations," it has since "sold all the insurance businesses."

162. During the Company's December 18, 2013 guidance update call, Immelt affirmatively represented that, as part of GE's divestiture of "non-core" assets, it "***sold the reinsurance business***." Yet in making this representation, Immelt failed to disclose that the Company continued to reinsure hundreds of thousands of high-risk LTC insurance policies.

163. In connection with its December 16, 2014 guidance update call, Defendants specifically stated that they had made GE Capital safer by selling insurance assets. Indeed, in a presentation to investors, GE indicated that it had executed its "risk reduction" plan to "***sell insurance before the storm***." Immelt further boasted that "***we exited insurance in time***." Again, Defendants made no mention of the significant LTC risks that GE continued to reinsure.

164. At no point during their discussions about "de-risking" GE Capital did Defendants disclose that GE had still retained a toxic LTC portfolio or had a crippling, multi-billion dollar future liability. To the contrary, Defendants omitted any disclosure regarding these massive

liabilities even as: (i) the LTC market continued to crumble; and (ii) GE's LTC exposure became an increasingly large part of GE Capital's remaining asset base.

**B. Industry experience demonstrated that the retained block of LTC policies were not "stable"**

165. The LTC block retained by GE was anything but "stable," which is exactly why GE could not get rid of it in the Genworth transaction. By 2003, it was apparent to industry professionals that the assumptions that were used to price LTC polices were in many cases wrong—GE and its competitors were forced to maintain policies longer than expected due to policyholders living longer, low lapse rates, and increases in healthcare costs.

166. Insurance companies typically price LTC insurance premiums based on four assumptions: (i) mortality rates (how long individuals who have policies are expected to live, pay premiums, and collect benefits); (ii) lapse rates (how many insureds will stop paying their premiums and let their policies terminate); (iii) morbidity rates (the chance someone will develop a condition requiring LTC); and (iv) interest rates (the rate of interest income earned on reserves held against premiums collected).

167. Insurers initially assumed that 8% of policyholders would let their policies lapse within one year, with an additional 4% thereafter. In practice, only 4% let their policies lapse in the first year, and just 0.5% thereafter. In addition, by 2007, insurers had reduced their assumptions for mortality rates by 10% compared to the assumptions that were used to price LTC policies in 2000, and by 2014 those rates had been reduced by an additional 20%. Likewise, morbidity rates in 2014 were between 15 to 45% higher than they were in 2000. During this same time period, interest rates were 2 to 4%, far lower than the 3 to 8% assumed by insurers.

168. When MetLife (another original writer of LTC policies reinsured by GE, via UFLIC) announced its exit from the LTC market in 2010, a MetLife spokeswoman stated that

"the financial challenges facing the [LTC] insurance industry in the current environment ***are well-known***" and "aren't unique to MetLife." Prudential similarly stated that its exit in 2012 "reflect[ed] the challenging economics of the individual [long-term care] market."

169. As insurers exited the LTC market, adverse claims experience and losses mounted. To account for the dramatic increase in their expected future liabilities to LTC policyholders, many insurance companies sought to increase LTC premiums. All told, between 2009 and 2017, LTC insurers sought premium rate increases. Some of the increases sought have been as high as 130% (Genworth). In approving rate increase requests by Genworth, MetLife, and John Hancock in 2016, the Pennsylvania Insurance Department stated that "[t]he current policies in place are not generating sufficient premium to pay future claims to policyholders. ***This is a common problem for a number of insurers nationwide*** because policyholders are keeping their policies longer than expected and are living longer than projected."

170. In addition to these premium rate increases, as reflected in the chart below, insurers also recorded large reserve charges to account for their increased future LTC liabilities long before GE announced that it needed to take billions of charges to adjust its LTC reserves:

| Year | Company | Reserve Amount | Explanation |
|---|---|---|---|
| July 2006 | GE Capital Life Assurance Company of New York (one of the entities spun off by GE in connection with the Genworth IPO) | $184 million reserve increase (required by NYDFS) | "long-term care business ha[d] sustained continued losses due to the aging of the block and persistency," and that its reserves were based on overly aggressive assumptions |
| February 2012 | Unum | $573.6 million pre-tax charge ($372.8 million after-tax), which resulted in a $425.4 million net loss for 4Q11 | "due largely to . . . its strategic review of the long-term care business," which resulted in "an increase to long-term care policy and claim reserves" |

| Year | Company | Reserve Amount | Explanation |
|---|---|---|---|
| November 2012 | Prudential | ***$698 million reserve charge***; resulting in "a pre-tax loss of $685 million from divested businesses, primarily related to long-term care insurance" | "charge related to [its] long term care insurance [portfolio] to reflect updates of actuarial assumptions based on our annual review" |
| November 2014 | Genworth | $531 million reserve increase | "claimants are staying on claim longer than expected and using more of the available benefits" |
| February 2015 | Unum | $698.2 million reserve increase | Resulting from low interest rates |
| February 2015 | Genworth | $700 million reserve increase | Resulting from completion of annual loss recognition testing |
| September 2016 | Genworth | $905 million reserve increase | Resulting from an annual review of assumptions |
| November 2016 | Manulife (John Hancock) | $455 million reserve increase and a charge against earnings of $313 million | Resulting from "updates to policyholder assumptions" and "a downward revision to our ultimate reinvestment rate assumptions" |

171. The industry experience of LTC insurers that GE reinsured was well-known to GE as reinsurer of these policies. Since at least 2010, many of the direct writers of the LTC policies that GE reinsured through its ERAC and UFLIC subsidiaries had actual-to-expected claims ratios that exceeded 120%, meaning that the dollar value of claims they actually incurred exceeded the dollar value of claims that insurers had expected to incur based on their assumptions regarding lapse, mortality, and morbidity rates.[8]

[8] *See, e.g.*, National Association of Insurance Commissioners, Long-Term Care Insurance Experience Reports for 2017, available at https://naic.org/prod_serv/LTC-LR-18.pdf.

172. As reflected in NAIC's Long-Term Care Insurance Experience Reports for the years 2010-2016, many of the direct writers of the LTC policies that GE reinsured had actual-to-expected claim ratios significantly worse than 116%, presenting a catastrophic miss from a statistical point of view.

173. Further, a review of the annual insurance filings of GE's ceding insurers demonstrates that they steadily increased loss projections under the LTC policies GE reinsured from 2013-2016. Yet GE did not make an appropriate adjustment to its reserves until 2018. For example, Allianz estimated future claims estimate increased from $1.8 billion to $2.3 billion during this period. Incurred claims also increased significantly and GE was assuming losses of 124%-192% as a ratio of the premium received annually. Filings of other ceding insurers (Lincoln Benefit Life and John Alden) similarly showed increasing loss ratios from 2013-2016. Executives at NALH were aware of these ceding insurers loss experience as they were reported to NALH and incorporated into experience studies. After comparing GE's annual filings with those of GE's ceding insurers, Harry Markopolis, who is famously known as the forensic accountant who blew the whistle on Bernard Madoff's ponzi scheme, noted in a report that GE had committed "a bigger fraud then Enron."

**C. Defendants did not have a reasonable basis to conclude LTC reserves were adequate**

174. North American Life and Health ("NALH") was the unit within GE Capital responsible for monitoring GE's insurance liabilities. According to the SEC, "Executives at NALH and at GE Capital acknowledged internally during 2015 and 2016 that NALH's continuing and expected losses posed a growing risk to GE's financial statements." SEC Order ¶ 23. This would have included Sherin who served as GE Capital's Chairman and CEO from July

2013 until September 2016 and Richard Laxer who became CEO of GE Capital after Sherin stepped down and, prior to that, served in a number of senior positions within GE Capital.

175. In order to assess whether GE's reserves were adequate, NALH conducted a "loss recognition test," or an impairment test, on its LTC portfolio annually. Actuaries would evaluate claims experience and project future liabilities and compare the results to the carried reserve. This involved the preparation of an "experience study" that collected claims information for prior periods, including the prior twelve months. As the SEC Order explained:

> The loss recognition testing resulted in a "margin" calculation. If the margin was positive, there was no change to GE's financial statements. If the margin was negative, GE would have to record an income statement charge in the period in which the loss recognition test was performed of at least the amount of negative margin. A negative margin could also prompt NALH to perform a more detailed review of its reserves, which could lead to recognizing significantly larger losses.

SEC Order ¶ 25.

176. The SEC found that in 2015, NALH preliminary testing revealed that the margin was negative and reserves were inadequate. Rather than take a charge, "NALH changed assumptions used in the testing process" including the morbidity rates. SEC Order ¶ 27. "By using altered assumptions which anticipated lower future claims costs and higher future premiums, NALH produced a positive margin in 2015." *Id.*

177. In early 2016, "NALH executives began briefing GE Capital executives on the possibility of significant losses during the year." SEC Order ¶ 28. The GE Capital executives were determined to avoid any action that could prevent obtaining management's guidance for GE's "Verticals" segment, which was the operations of GE Capital that GE intended to retain going forward. In May 2016, when a GE Capital executive was told there could be an additional $40 million-$130 million in losses associated with LTC, the executive expressed concern that "'could derail Verticals income target for the year.'" SEC Order ¶ 28. Later that same month

"NALH executives advised GE Capital executives of the potential for an additional $200 million in losses, which prompted one GE Capital executive to respond that such a result would be a 'train wreck.''' *Id.* An NALH executive wrote:

> "The essence is that NALH is now a large piece of the GE Capital['s remaining] operations and the NALH poor experience and P&L volatility are likely going to cause issues over time. [We] work the issues as they arise but this business is going to have major challenges due to the nature of the portfolio itself, current market conditions and continued deterioration from long term care business."

*Id.*

178. The SEC found that despite knowing of the adverse loss experience, in the summer of 2016, NALH management "failed to follow up on its lead long-term care actuary's observation that he did not believe certain assumptions about future claims were supportable in light of recent experience." SEC Order ¶ 29. They further declined to adjust assumptions used that they knew were aggressive "because the change would have had too great a negative impact on the margin." *Id.*

179. When the annual loss recognition test was prepared in the third quarter of 2016 it initially showed a negative result which would have required a $178 million charge to earnings even using hyper aggressive assumptions. SEC Order ¶ 30. Rather than accept the results or perform a more detailed review,

> NALH executives employed a new approach, referred to as the "rollforward," which eliminated the loss recognition testing deficiency. The rollforward, which changed the "valuation date" for certain assumptions used in the loss recognition testing, changed the margin from negative $178 million to a positive $86 million, avoiding any losses on GE's financial statements.

SEC Order ¶ 31.

180. This change was flagged as a concern by internal auditors because no rationale was documented. The internal auditors noted that "'[i]t is not a common practice to make such a

change to a vital GAAP metric without a formalized oversight and approval process.'" SEC Order ¶ 33.

181. The SEC concluded that GE lacked sufficient internal accounting controls and disclosure control and procedures noting:

> GE did not design and maintain sufficient internal accounting controls governing: (1) management's process for determining, reporting, and recording its loss recognition testing for its insurance business, and (2) the supporting documentation that must be maintained to evidence management's process in determining its loss recognition testing estimate. . .[;]
>
> GE lacked sufficient disclosure controls and procedures to ensure that known trends and uncertainties regarding its insurance liabilities were accumulated and communicated to the GE executives responsible for the company's disclosure in a timely manner as required by Rule 13a- 15(a). In particular, GE executives were not informed until the second quarter of 2017 of NALH's increasingly optimistic projections of future liabilities despite higher than expected claims. In addition, GE was not informed of GE Capital's and NALH's use of the roll-forward in 2016.

SEC Order ¶¶ 40-41.

182. Former GE employees told a Wall Street Journal reporter that GE's "insurance business failed to internally acknowledge worsening results over the years" and "buried risks that ultimately kept the company from booking bigger reserves." *In GE Probe, Ex-Staffers Say Insurance Risks Were Ignored*, Wall St. J. (Nov. 30, 2018). These same individuals were familiar with GE's accounting for, and reporting of, its LTC liabilities and had been interviewed by the SEC in connection with its investigation of GE's disclosures concerning its LTC exposure. According to the report, one of the former employees who was interviewed was hired to "improve the governance of the reserve process at GE . . . but left [in 2016] after growing concerned that senior executives in the division were changing numbers and their methodology without providing supporting evidence." *Id.*

183. Plaintiffs in *Sjunde AP-Fonden v. General Electric Company*, No. 1:17-cv-08457-JMF interviewed a number of former GE employees who provided information that confirms the accuracy of the Wall Street Journal's report and are consistent with the SEC's findings. For example, they relied on statements from an individual who was employed as a senior actuary at ERAC from 2006 to 2012, a senior insurance audit specialist at GE Capital Audit from 2012 to 2014, and a senior vice president at GE Capital Audit from 2014 through January 1, 2017. According to the class plaintiffs, in the summer of 2014, this individual discovered in the course of an audit of ERAC that key assumptions used in LTC modeling were "stale by several years." He also reported that prior and subsequent audits had identified serious issues with the models that were used by GE to set LTC reserves that were elevated in reports required to be provided to Defendants.

184. The *Sjunde AP-Fonden* plaintiffs also obtained statements from an individual who worked at GE as an Actuarial Controller ERAC from July 2015 to September 2016. This individual indicated that ERAC management changed LTC reserve assumptions without justification. According to this individual, during loss recognition testing in the spring of 2016 his modeling showed that GE Capital had experienced a "loss recognition event" and would need hundreds of millions of GAAP additional reserves. When his superiors, Clark Ramsey ("Ramsey"), ERAC's chief actuary, and William Steilen, ERAC's CFO, learned of this, they modified the way testing was done and took the position that there was actually a $78 million surplus. This individual was "very uncomfortable" because management was not supporting changes to modeling methodology. This statement is consistent with the findings in the SEC Order.

### D. GE's belated disclosure of its true LTC exposure

185. In July 2016, Defendants provided their first indication that GE had any material exposure to LTC liabilities. During GE's earnings call on July 22, 2016, Bornstein announced that the "vertical businesses earned $452 million this quarter, down 15% from prior year including higher base earnings offset by lower gains and ***higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book***." Bornstein assured investors, however, that "***[p]ortfolio quality remains stable***." This statement was materially false and misleading. The portfolio was not stable. NALH and GE Capital executives had affirmatively manipulated assumptions to avoid charges to earnings and knew that reserves were insufficient to meet future liabilities.

186. During an investor conference on February 22, 2017, Bornstein was asked if GE would consider "sell[ing] the liability in that insurance, kind of write a check and get rid of it?" In response, rather than disclosing the massive risk the portfolio still carried, Bornstein falsely claimed that the "low interest rate environment" was the primary impediment to selling its remaining insurance liabilities, "I think interest rates are a fundamental challenge in selling long-term liabilities in a low interest rate environment is a challenge." This statement was materially false and misleading. Low interest rates were not the reason GE could not sell the block. The massive future expected losses were the true reason.

187. Richard Laxer, CEO of GE Capital, made similar misstatements during the March 13, 2017 investor conference stating "we would like to see a few increases before" selling the LTC block "would be attractive." JPMorgan analyst Stephen Tusa cited this representation in a report he issued that day, stating, "[o]n the insurance liabilities assets, GE noted that it's not attractive to exit this business in the current rate environment and would need a couple more

increases in rates to start considering a move." Laxer's statement was materially false and misleading. Low interest rates were not the reason GE could not sell the block. The massive future expected losses were the true reason.

188. It was not until July 21, 2017 that GE announced that it was suffering from "***adverse claim experience in a portion of our long-term care portfolio***," and that this negative LTC claims experience was severe enough to require the Company to reassess the adequacy of its insurance reserves. However, after years of being told that GE Capital's risk had been reduced and that the insurance business had been successfully exited, coupled with the complete removal of GE's LTC liabilities from its Disclosed Insurance Liabilities, the market did not and could not fully appreciate what was still to come.

189. When auditors took a closer look at GE's LTC exposures in 2017 it became apparent that the problem was enormous because NALH had been using outdated assumptions for many years.

190. Three months later, on October 20, 2017, the Company revealed that ***roughly 50%*** of its total insurance reserves—or ***over $12 billion***—related to GE's LTC exposure, and further announced that it was suspending GE Capital's $3 billion dividend payment to GE until its reserve analysis was completed. Less than a month later, Miller admitted that even though its reserve testing was not yet complete, GE expected its forthcoming LTC reserve charge to eclipse the size of GE Capital's $3 billion dividend payment.

191. On January 16, 2018, GE announced that it recorded a ***$9 billion*** charge to earnings related to an increase to the Company's LTC Benefit Reserves. The Company further disclosed that, due to an increase in its future LTC liabilities, GE Capital expected to contribute ***$15 billion*** in capital to its insurance subsidiaries over the next seven years.

**E. GE's material misrepresentations and omissions concerning its LTC exposure**

192. GE's annual and quarterly reports filed with the SEC were subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Item 303(a)(1)-(3) generally requires companies to disclose in the MD&A section of its annual SEC filings any known trends, demands, commitments, events, or uncertainties that are reasonably likely to have a material impact on the company's financial condition.

193. GE's annual reports on Form 10-K and quarterly reports on Form 10-Q for 2014, 2015, and 2016 and its report on Form 10-Q for the 1Q 2017 were false and misleading because they failed to disclose known trends, demands, commitments and uncertainties regarding increasing costs and reasonably likely losses in its insurance business. As noted above in Section IV.C., GE was aware that charges to earnings were necessary due to adverse claims experience and higher than projected future losses. Rather than perform the work that was necessary to calculate the amount of the charge required, NALH and GE Capital executives manipulated the assumptions used in loss recognition testing to create the illusion that no such charge was necessary.

194. The negative developments in the LTC insurance industry, which led other companies with LTC exposure (like Genworth, Unum, MetLife, and others) to increase reserves, raise premiums and—in many cases—exit the industry altogether, *see* ¶¶ 165-173, was also a trend that was reasonably likely to—and did—have a material impact on GE's financial results, capital position, and liquidity. The negative trends with GE's own reinsurance portfolio, including, among other things, the widening gap between its actual claims and expected claims, the increasing future liabilities, and growing insufficiency of its LTC reserves, likewise were trends that were reasonably likely to impact the Company's financial results, capital position and

liquidity. Further, GE's portfolio of 300,000 high-risk LTC insurance policies and the increasing liabilities GE was subject to under those policies, represented a demand, commitment, and/or uncertainty that was reasonably likely to have a material impact on GE's financial results, capital position, or liquidity during the relevant period.

195. As discussed in ¶¶ 165-173, negative trends in the LTC industry led GE's competitors to record billions in reserve charges. GE, however, did not disclose trends known to it, including that: (i) negative issues in the LTC market were causing other insurers to materially increase their reserves, and (ii) GE's reserves were based on assumptions that did not account for negative events in the LTC market. During this same time period, GE's own exposure to the LTC industry caused its insurance liabilities to dramatically increase (an increase that was not disclosed to investors) and eventually caused GE to belatedly record a ***$9 billion*** charge to earnings at the end of fiscal year 2017. GE's LTC exposure will also require it to contribute ***$15 billion*** in capital to ERAC and UFLIC over seven years.

196. In light of the above, GE was required under Item 303 to disclose on February 27, 2014 and thereafter, *inter alia*, the negative trends occurring in the LTC market, the expected impact of those trends—and of GE's increasing LTC insurance liabilities (and any potential uncertainties related to those liabilities)—on GE's financial results, capital position, and liquidity. More specifically, GE was required—but failed—to disclose information to investors concerning the existence and extent of this demand, commitment, and/or uncertainty.

197. GE also falsely asserted in its public filings that it maintained effective internal controls over financial reporting in clear violation of SEC rules.

198. The lack of effective internal controls at GE facilitated its efforts to mislead investors because without those controls it was able to represent that it was exposed to significantly less risk from LTC than was truly inherent in the LTC block GE retained.

199. GE's annual statements on its Form 10-K filed from 2015 acknowledged management's responsibility for internal controls and asserted that its controls were "effective":

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. With our participation, an evaluation of the effectiveness of our internal control over financial reporting was conducted as of December 31, 2015, based on the framework and criteria established in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2015.

Virtually identical statements were made in GE's Form 10-K for 2013, 2014, and 2016. These statements were false and misleading. The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") defines "internal controls" in Chapter 1 of its Framework as follows:

> Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

200. COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's

> philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

201. In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affects the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company. Chapter 2 of the COSO Framework states:

> Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted...Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel. . . . The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.

202. Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures. Management is responsible for performing this assessment in the context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk. Management's conclusion of its assessment of the effectiveness of the Company's internal control must be included in the Company's annual report. Moreover, it was crucial for GE to regularly monitor those controls to verify their operating effectiveness.

203. Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.

204. Immelt and Bornstein were required under Rule 404 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting." Rule 404 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.

205. Additionally, pursuant to Section 302 of the Sarbanes-Oxley Act, certain officers must execute certifications in annual and quarterly reports filed with the SEC, explaining the effectiveness of the company's internal controls, and certifying as to such management's responsibility for establishing and maintaining adequate internal controls.

206. Immelt and Bornstein executed the Rule 404 certifications included in GE's annual reports on Form 10-K for 2013-2016. In connection with the Company's 2013-2016 Form 10-Ks, and the Company's 2014-2016 Form 10-Qs, Immelt and Bornstein executed the applicable Rule 302 certifications.

207. As explained above and in GE's SEC filings, in providing assurances and certifications pursuant to the relevant SOX provisions, Immelt and Bornstein represented to the marketplace that their assessment of internal controls over financial reporting was based upon the framework established by COSO. Also, Immelt and Bornstein represented in the Company's Form 10-K filings that "management has concluded that [GE's] internal control over financial reporting was effective as of" the years ended 2013-2016. These statements were false because, as established in Section IV.C., GE did not have controls adequate to ensure that known trend and uncertainties regarding its LTC exposure were disclosed or to ensure that loss recognition testing relating to its LTC block was performed properly and was not subject to manipulation to

meet performance targets. Moreover Immelt's "success theatre" did not set the appropriate "tone at the top" emphasized by the COSO framework that GE claimed to have adopted.

208. Management's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that GE's financial statements were reliable and in compliance with applicable laws. However, as alleged herein, GE did not properly assess its internal controls over financial reporting, thus it violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and Sarbanes-Oxley Act.

**F. Additional allegations of scienter relating to Defendants' LTC scheme**

209. In addition to the facts set forth above, Defendants' scienter is further evidenced by the following facts:

210. *First*, Defendants knew GE's LTC liabilities comprised nearly half of the Company's Benefit Reserves. When GE finally began breaking out its LTC reserves in 2017, it was revealed that nearly ***50%*** ($9 billion of its $19.2 billion) of its "Life insurance benefits" (or Benefit Reserves) and nearly ***70%*** ($3.4 billion of its $4.9 billion) of its "Claims Reserves" were attributable to its LTC insurance exposure. This information was readily available to Defendants, as Bornstein confirmed in October 2017 when he revealed that "the long-term care book at GE Capital's legacy insurance business [] represents $12 billion or roughly 50% of our insurance reserves." Given the size of GE's LTC reserves and their material contribution to GE's total insurance reserves, it is implausible that Defendants were unaware of the nature and extent of the Company's LTC-related liabilities and risks.

211. *Second*, Defendants repeatedly assured investors that GE was eliminating its LTC business and had minimal remaining exposure to insurance, including LTC. Prior to 2014 and

thereafter, by Defendants' own admission, they were hyper focused on GE's exit from the LTC business and made numerous false or misleading statements to investors to minimize the extent of GE's remaining LTC insurance exposure. In that regard, Immelt, Bornstein, and Sherin controlled the contents of their statements on behalf of the Company.

212. *Third*, the magnitude of the required increase in GE's LTC reserves and the Company's significant overstatement of prior earnings supports an inference of scienter. On January 16, 2018, Defendants revealed that GE's belated reserve testing related to its LTC portfolio showed that the Company was materially under-reserved and disclosed that it would take an "after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017" on an approximately $9 billion pre-tax charge, and that GE would need to make additional "statutory reserve contributions of ~$15 billion over seven years." GE's LTC reserve charge erased GE's entire earnings reported from all other segments for fiscal 2017, and almost all of the profits previously reported by GE Capital's "Verticals" segment over the four years prior. Given the sheer size of the LTC reserve charge, it is implausible that Defendants were unaware of GE's LTC liability or that GE had materially understated that LTC reserve.

213. *Fourth*, Immelt, Bornstein, Sherin, and Laxer, and the NALH and GE Capital executives referenced in the SEC Order held high-level positions and had access to material, adverse, nonpublic information concerning GE's LTC portfolio, underlying policies, and exposure including: (i) the assumptions underlying the over 300,000 LTC policies the Company had been unable to unload to Genworth, Swiss Re, or any other entity; (ii) the claims experiences of the insurance providers whom GE reinsured since the inception of the LTC policies, many of which date back decades; (iii) the analyses and results of GE's periodic loss recognition, deficiency, and statutory cash-flow testing to assess the adequacy of the Company's Benefit Reserves,

which, among other things, shows whether an entity has sufficient reserves to cover expected future payment obligations; (iv) GE's estimates on their current and required LTC reserves; and (v) the analyses and reports, including model validation, of the Company's internal actuaries, auditors, and other employees focused on risk.

214. *Fifth*, the timing and circumstances of resignations of high-ranking executives, including Immelt, Bornstein, Sherin, and Laxer during or shortly after the revelation of the alleged fraud is highly suspicious. Just weeks before GE surprised investors when it began to disclose adverse material facts concerning the Company's LTC reserves and exposure, GE announced that Immelt would "resign" as CEO of GE, effective July 31, 2017, and that the Board of Directors had voted to appoint Flannery as CEO, effective August 1, 2017. In August 2017, just after GE revealed that it was "assess[ing] the adequacy of our premium reserves" and would "update" investors the following quarter, GE announced that Sherin would also "resign" from his position as CEO of GE Capital, effective September 1, 2017, and would similarly exit his positions as Vice Chairman and Executive Officer of GE.

215. Then, shortly before the October 20, 2017 announcement that the $12 to $14 billion Industrial CFOA figure would be slashed to $7 billion, Bornstein unexpectedly departed GE, despite having been named to the important post of "Vice Chairman" just a short time earlier in June 2017. Indeed, at a June 12, 2017 GE "CEO Succession Investor Meeting," Immelt stressed the importance of Bornstein's role going forward. Immelt stated that "one of the things [he] feel[s] best about is the ***Flannery-Bornstein partnership***, which [he] view[s] as being ***critical*** to the company." Flannery added—in response to a question from a Morgan Stanley analyst about "the John [Flannery] and Jeff Bornstein partnership"—that Flannery "is excited to have Jeff [Bornstein] as a partner. And I think that's what you should expect. Bornstein, for his part, stated, "I've

known John [Flannery] for the better part of 23 years" and "I couldn't be more excited about this. I think that we're excited to get John up to speed and really tackle some of what's possible for this company." Less than four months later, the "partnership" GE had trumpeted to investors as being critical to the Company was abruptly terminated. On October 6, 2017, GE announced that Bornstein would leave the company and forfeit 80% of the lucrative award package he had just received after being named Vice Chairman. Shortly thereafter, GE slashed its dividend and, in early 2018, the apparent reason for the dissolution of the Flannery-Bornstein partnership came to light. The Company announced two separate SEC investigations into GE's practices related to LTC insurance and accounting for Contract Assets and LTSAs (discussed below), all of which occurred under Bornstein's watch. And in December 2017, in the middle of GE's belated "deeper dive" into the adequacy of its LTC reserves, Laxer, who had just become GE Capital's CEO a year earlier, abruptly "resigned" from GE.

**V. Loss causation/economic loss**

216. Plaintiffs were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the relevant period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts relating to GE's: (i) reported revenue for the industrial segment and GE Power, which was inflated by GE's manipulation of the recognition of revenues relating to Power LTSAs, and related manipulation of Industrial Cash Flow From Operations through the use of factoring including the "deferred monetization" practices described herein; (ii) acquisition of Alstom when Defendants knew, or were reckless in not knowing, the price GE was paying was excessive and the goodwill recorded for the Alstom assets was inflated; and (iii) exposure to enormous, undisclosed and under-reserved-for LTC liabilities.

217. As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of GE's common stock was artificially inflated when Plaintiffs made the purchases identified in Exhibit A.

218. Plaintiffs unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased GE stock at artificially inflated prices or continued to hold GE stock.

219. The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between April 21, 2017 and October 30, 2018. During this corrective disclosure period, GE's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited GE's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on October 30, 2018 that there was no longer any artificial inflation in GE's stock price attributable to the fraud described herein.

220. The declines in GE's stock price during the corrective disclosure period, including, *inter alia*, the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

221. Plaintiffs suffered economic losses as the price of GE's stock fell in response to partial corrective disclosures and/or the materializations of concealed risks. The price declines on the partial corrective disclosure dates in GE stock were a direct result of the materially false or misleading statements and omissions. It was foreseeable that such disclosures would cause GE's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs.

222. The following partial corrective disclosures caused GE's stock price to decline, thereby damaging investors, and are representative, not exclusive, of the partial corrective disclosures and/or materializations of concealed risks that led to Plaintiffs' damages for which relief is sought in this case.

**A. April 21, 2017: financial results for 1Q 2017**

223. On Friday, April 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, entitled "GE 1Q 2017 Earnings." Among other things, the press release reported that "Industrial operating cash flows[] were ***negative*** $1.6 billion driven primarily by an increase in working capital and ***timing of billings on our long-term equipment and service contracts***."

224. Also on Friday, April 21, 2017, before the market opened, GE held an earnings conference call to discuss its 1Q 2017 results with analysts and investors. During the call, Immelt reiterated the results reported in the April 21 press release, stating, "***Industrial CFOA was a negative $1.6 billion***." Bornstein elaborated on Immelt's comments, stating, "our industrial CFOA was at $1.6 billion usage of cash, ***about $1 billion below our expectations***." According to Bornstein, the largest contributor to this negative CFOA was cash outflows on GE's Contract Assets ($1.9 billion) and, more specifically, GE's LTSA Contract Assets ($1.4 billion).

225. Defendants' April 21, 2017 disclosure corrected and/or reflected the materialization of risks concealed by the material misstatements and omissions alleged herein. On this news, GE's stock price declined from a close of $30.27 on April 20, 2017 to $29.55 on April 21, 2017, a drop of $0.72 per share, or 2.4%, on heavy volume of 72,351,400 shares.

226. Analysts were surprised by the revelation of negative Industrial CFOA cash flow and expressly stated that investors were reacting to this disappointing information, despite

otherwise favorable earnings results reported by GE. For example, an April 21, 2017 Morningstar analyst report stated, "[s]hares of . . . General Electric slumped April 21 as ***investors reacted to negative industrial cash flow in the first quarter***, which largely overshadowed [other more favorable results]." An April 21, 2017 Morgan Stanley report similarly noted, "we continue to be disappointed by weak cash generation, with $1.6bn of negative CFOA . . . ***the contract asset headwind clearly drops a flag on the quality of the quarter***." An April 23, 2017 RBC analyst report entitled *Cash Flow Shortfall Gives Investors a Reason Not to Like 1Q17 Beat* expressly stated under "Key points" that:

a. "GE's 1Q17 earnings call ***was hijacked*** by its disappointing cash flows from operating activities (CFOA)"; and

b. "the 1Q [2017 CFOA] shortfall and back-end-weighted ramp arguably drove most of the -2.4% stock reaction."

**B. July 21, 2017: financial results for 2Q 2017**

227. On Friday, July 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, entitled "GE 2Q 2017 Earnings" that summarized earnings for the second quarter ended June 30, 2017.

228. During a July 21, 2017 earnings conference call held before the market opened, Bornstein updated investors on the $12 to $14 billion CFOA guidance for 2017 that the Company had reiterated during the earnings call held in April 2017 (discussed above) by stating:

> For the year, we are ***trending to the bottom end*** of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas.

229. In addition, Bornstein provided results for GE Capital and stated, "[w]e recently have had ***adverse claims experience in a portion of our long-term care portfolio,*** and we will assess the adequacy of our premium reserves. We will update you in the fourth quarter."

230. Defendants' July 21, 2017 disclosures corrected and/or reflected the materialization of risks concealed by the material misstatements and omissions alleged herein.

231. As investors absorbed this news, GE's stock price fell $0.78 from a close of $26.69 on Thursday, July 20, 2017 to close at $25.91 on Friday, July 21, 2017, a drop of 2.92% on unusually large volume of over 90 million shares. On the next following trading day, Monday, July 24, 2017, the share price decline continued as the market continued to digest this news, and GE shares dropped to close at $25.43 on July 24, 2017, on heavy volume of over 56 million shares, a two-day drop of $1.26 per share, or nearly 5%.

232. Analysts noted the importance of the surprising news that Industrial CFOA was being forecasted to come in at the low end of the $12 to $14 billion range. For example, RBC issued a report on July 23, 2017 stating, "[o]n [the] last earnings call [on July 21, 2017] . . . GE 'ripped the band-aid' by cutting its 2017 EPS and Industrial CFOA guidance ranges to their respective low ends" and "[i]mportantly, the company now expects full-year Industrial CFOA to come in at the low-end of its $12-$14 billion guidance range."

233. Analysts were similarly surprised about the adverse claims experience in the LTC book of business. For example, a J.P. Morgan analyst report dated July 24, 2017 noted that, although the magnitude of the LTC reserve issue had not been revealed, the mere existence of the issue presented a risk to GE Capital being able to sustain the dividends it had been "upstreaming" to its parent company, GE, which, in turn, presented a risk to GE's ability to continue to pay dividends to GE shareholders. The J.P. Morgan report states:

> [T]he comment [on the 2Q17 earnings call] that [GE] will be evaluating Insurance for losses is a stark reminder that GECS is not just GECAS. Indeed, GECAS is $40B of assets out of a total $153B. In fact, Insurance is almost the same size at ~$36B, with roughly breakeven earnings contribution, ***and now prone to "adverse claims" in long term care***, which according to our JPM Insurance analysts has in recent years been measured in "the billions" for others. This is a TBD, and we now

> see some risk to vertical earnings in 2H, ***as well as risk to potential for meaningful up streamed dividends in the years ahead***.

**C. October 20, 2017: financial results for 3Q 2017**

234. On October 20, 2017, before the market opened, GE filed an 8-K with the SEC attaching a "GE 3Q 2017 Earnings" summary. The summary reported GE's CFOA for the quarter (as discussed further below) and stated that although GE Capital had paid $4 billion in dividends to GE through September 30, 2017, GE was "deferring decision on additional dividends until Insurance reserve review [related to LTC insurance] is completed."

235. On October 20, 2017, before the market opened, GE held an earnings conference call to discuss its results for the third quarter ended September 30, 2017. On the call, Bornstein stated:

> Our reported CFOA was $500 million in the quarter. That represents GE cash flow . . . . Next on GE Capital, there you [do see] we did not receive a dividend in the quarter. As you know, we're in the process of performing an actuarial analysis of claims reserves in our insurance business. Until that review has been completed, ***we have deferred the decision to pay GE Capital dividends to GE***.
>
> Our industrial CFOA was $1.7 billion in the quarter, adjusted for $1.3 billion of US pension plan funding and deal taxes. This is down $1.2 billion from prior year. With BHGE on a dividend basis and excluding Oil and Gas CFOA, our Industrial CFOA was $2.1 billion.
>
> * * *
>
> Contract assets were a use of $800 million in the quarter. . . . $500 million is from our long-term service agreements due to better cost performance in parts life, primarily in Power and Transportation.

236. On the call, Miller further stated:

> On cash flow, we now expect Industrial cash flow for the year to be about $7 billion . . . . This is well below the $12 billion estimate we provided at second-quarter earnings, and it's principally driven by three businesses. Power is the biggest driver on lower volume, higher inventory, and the timing of payments on long-term equipment contracts. Oil and Gas is about $1 billion off; about half of that being driven by lower volume in Collections in the first half, and the rest driven by our

> methodology change to show them on the dividend basis for the second half of the year. And Renewables is also about $500 million off on lower-than-expected volume impacting inventory and progress collections.

237. On the call, Flannery added:

> As Jamie [Miller] mentioned, cash will be approximately $7 billion for the year. Power alone will be lower than expected by $3 billion on lower earnings and higher inventory. . . .
>
> We expect substantially higher cash generation in 2018 driven by lower structural headwinds, things like tax and restructuring charges; the rigorous cost-out plan; and a substantial improvement in working capital. That said, ***obviously, $7 billion of cash is significantly lower than guidance***, and this performance is simply not acceptable.

238. On the call, Bornstein further stated:

> GE Capital ended the quarter with $155 billion of assets, including $33 billion of liquidity, down $6 billion from the second quarter. As I mentioned on our last earnings call, ***we have recently observed elevated claims experience*** for a portion of the long-term care book at GE Capital's legacy insurance business, ***which represents $12 billion or roughly 50% of our insurance reserves.***
>
> As a result, we began a ***comprehensive review in the third quarter of premium deficiency assumptions*** that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. ***Until the review has been completed, we've deferred the decision to pay approximately $3 billion of additional GE Capital dividends***. Year to date, GE Capital has paid $4 billion of dividends to GE.

239. During the call, Flannery also announced that the Company had "identified $20-billion plus of assets that we will exit in the next 1 to 2 years."

240. In reaction to GE's disclosures regarding LTC insurance reserves and Industrial CFOA, which reflected the materialization of risks concealed and the material misstatements and omission alleged herein, there was an immediate price decline in GE's stock, which opened on the NYSE trading on October 20, 2017 down more than 5.6% from the closing price of $23.58 on the previous day, October 19, 2017. While the price rebounded temporarily by the close of

trading on Friday, October 20, 2017, by the close of the market on the next trading day (Monday, October 23, 2017)—after investors had sufficient time to absorb the impact of this news and after several analysts (including J.P. Morgan, Morgan Stanley and UBS AG) downgraded GE's stock in light of the disclosures—the stock closed at $22.32 on October 23, 2017, down $1.26, or 5.34%, from the close on Thursday, October 19, 2017 on extremely high volume of 187,340,900 shares traded. As the market continued to absorb this news, GE's stock price continued its slide over the next few trading days, falling to $21.89 on October 24, 2017, and then to $21.50 on October 25, 2017 and then to $21.32 on October 26, 2017. Thus, over the course of this five-day period while the market digested the information disclosed on October 20, 2017, GE's stock price sank from a close of $23.58 on October 19, 2017 to a close of $21.32 on October 26, 2017, a cumulative drop of $2.26, or almost 10%.

241. As discussed below, the changed views of analysts from the time the information was initially disclosed on October 20, 2017 to the next trading day (October 23, 2017) demonstrate that the market continued to digest the information after the initial disclosure on October 20, 2017.

242. For example, on October 20, 2017, when GE held its conference call, Morningstar opined that the GE's dividend was "at risk" based on the October 20, 2017 disclosures. But, by Monday, October 23, 2017, after further digesting the information disclosed on October 20, 2017, Morningstar then informed investors that the risk of a dividend cut was more likely. Specifically, in an analyst report on Friday, October 20, 2017, Morningstar wrote, "[w]e plan to cut our fair value estimate by as much as 10% following General Electric's third-quarter earnings report, which revealed deeper challenges in the power segment than we had anticipated." The report specifically pointed to GE "halv[ing] management's original 2017 target of $12 billion-$14 billion in industrial cash from operations," and further wrote:

> More concerning is the suspension of GE Capital dividends, ***pending actuarial analysis of claims reserves in a long-term care insurance business***. Absent these dividends to the parent, and with Flannery positioning 2018 as a trough or "reset" year, ***we think it would be irrational for GE to maintain its current dividend***. ***Flannery did not explicitly confirm a cut*** but hinted that GE would be managed for total shareholder return going forward.

243. Thus, as the title of the report stated, Morningstar was initially of the view that the "Dividend [Was] ***at Risk***." But, by the next trading day, Monday, October 23, 2017, Morningstar actually acted on its plan to lower estimates for GE by 10% (lowering its price target for the stock from $32 to $29) and stated:

> We're lowering our fair value estimate to $29 from $32 ***on weaker-than-expected industrial cash flow generation***. GE's dismal third quarter revealed both financial and behavioral factors that also lead us to believe ***the risk of a dividend cut has increased***. Originally, we had four conditions that caused us to believe GE would be able to maintain its $8 billion dividend. ***Two of those conditions broke down in the third quarter***. Management indicated that industrial cash from operations would reach only $7 billion in 2017, ***far short of the original $12 billion-$14 billion prior management targeted***. Subtracting capital expenditures from this new figure would leave only about $4 billion in industrial free cash flow, and that is before the $1.8 billion of pension contributions that GE is expected to make this year. Second, we had anticipated an additional $3 billion-$4 billion in GE Capital dividends to help bridge the gap if industrial free cash flow came in light. However, ***management revealed the suspension of GE Capital dividends pending review of reserves needed to support a long-term care insurance business***. In our view, these were the two most important conditions needed to sustain the current dividend.

244. An RBC analyst report dated October 23, 2017 offered the following explanation for why the stock rebounded on Friday, October 20, 2017, despite the negative news:

> New CEO John Flannery's much-anticipated inaugural earnings call set off a rollercoaster day for GE stock. We believe that his brutal honesty about prior mismanagement and commitment to rethinking the entire business model resonated well with investors. The turning point that sparked the stock rally from down -6% Friday morning, in our view, was during Q&A when management crisply explained how the ~$7 bil 2017 CFOA level was not the "new normal". . . .

> Biggest surprise: Despite guidance cuts, GE's stock ends the day up 1%. Given the magnitude of the guidance cuts, the urgent question we fielded on Oct-20 was *why the stock rallied from -6% at the open to up 1% at the close*. Our take is that this rally was driven by two factors: (1) The bridge of cash usage items that will not repeat in 2018, demonstrating how $7 bil is not the "new normal", eased some shock over the CFOA guidance cut. (2) John Flannery's brutal honesty about GE's prior failings, along with a heartfelt "falling on his sword" by outgoing CFO Jeff Bornstein. These factors helped investors conclude that a bottom could be at hand.

245. The RBC report then, like the October 23, 2017 Morningstar report, went on to state, "[w]e expect GE to cut its dividend ahead of the Nov-13 analyst meeting," and went on to: (i) discuss what was learned from the earnings call; (ii) stress both CFOA and LTC concerns; and (iii) actually *lower its price target* for GE's stock, stating:

> The deterioration of GE's cash generation and sustainability of its dividend remains one of the biggest topics of debate facing the company today. To address this, new CEO John Flannery was unequivocal about his focus and commitment to improving cash flows at the company. That said, ***GE was forced to once again cut its 2017 Industrial CFOA target, moving from ~$12 billion down to ~$7 billion***, implying a -40% decrease. In addition, the company had originally planned to orchestrate $6-$7 billion of total GE Capital (GECC) dividend back to the parent for the full-year. However, though it has only generated $4 billion YTD, ***management is deferring any decisions on additional GECC dividends until it completes an actuarial review of the claims reserves in its insurance business*** to gauge the level of cash outlays that may become necessary.

246. Another area of the report states:

> GE is currently in the midst of reviewing the adequacy of its reserves on its long-term care reinsurance business within GE Capital, which is expected to conclude in 4Q17. ***Given that this review may determine that roughly half of GE Capital's reserves are insufficiently funded and that additional contributions must be committed***, management has opted to defer any decision on transferring further dividends from GE Capital to the Industrial parent in 2H17. Year-to-date, the company has generated $4 billion of GE Capital dividends, vs. the prior target of $6-$7 billion for the year, ***which may no longer be feasible*** depending on the conclusion of the insurance reserve assessment.

247. In an October 23, 2017 analyst report, Deutsche Bank AG ("Deutsche Bank") similarly pointed to the surprising disclosures regarding GE's likely LTC charges in issuing a "sell" recommendation to investors, stating, *inter alia*:

> The fact that GE owes such a large bill for legacy insurance likely surprised a lot investors considering GE supposedly exited Genworth, ERC and GE's other insurance businesses many years ago. In fact, of GE Capital's [approximately] $155bn of assets at 3Q17, roughly $27bn are reportedly tied to insurance . . . Why is GE still taking charges for its discontinued operations . . . .

**D. November 13-14, 2017: investor update and Goldman Sachs conference**

248. On Monday, November 13, 2017, before the market opened, GE released to the market the long-awaited "GE Investor Update" from its CEO, Flannery. Flannery had been conducting a 100-days' long "deep dive" into all of GE's businesses and had earlier promised investors that he would update them on GE's plans for the future in November 2017, including an update on the LTC insurance issue.

249. In the written "GE Investor Update," GE announced that it was cutting its dividend by 50% from the then-current level of $0.96 per share to $0.48 per share. The "GE Investor Update" stated that this reduction meant that the all-important dividend yield was be reduced from approximately 4.7% to approximately 2.3%. The "GE Investor Update" further stated that there would be a "[p]otential 4Q [2017] insurance reserve adjustment," but did not specify the amount, and further disclosed that while GE Capital had paid GE $4 billion in dividends thus far through the year, the decision on whether GE Capital would pay any further dividends to GE in 2017 was "deferred" and that GE was "[n]ot planning for dividend from GE Capital in 2018."

250. This announcement was a highly significant event as the dividend cut was only the second dividend cut GE had made since the Great Depression (the other one was during the

financial crisis in 2008), and was attributable to GE's disappointing CFOA and forthcoming LTC reserve charge.

251. Beginning at 9 a.m. New York time, and continuing after the market had opened, GE held an "Investor Update" conference call with analysts and investors to discuss the written update further. During the call, CEO Flannery stated:

> You saw this morning that we announced the reduction in our dividend. It's in the context really of focusing on managing the company for total shareholder return. ***I'd just start by saying we understand this is an extremely painful action for our shareholders, our owners. We're reducing the dividend by 50% to $0.48 a share***. Not a decision we took lightly. It was after extreme deliberation and consideration what the alternatives were.
>
> * * *
>
> With respect to the dividend, again, I just want to reiterate, ***we understand how important the dividend is to our shareholders***, especially the people who use it for current income. We've gone through exhaustive analysis of this, but I want to start, first and foremost, with a full recognition of the gravity of this decision and the effect it has on many people. That said, the reduction of this dividend to $0.48 is a product, really, of where we are as a company right now. So we had a $0.96 dividend established. We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend, that we'd end up in 2018 with a payout ratio that was quite comparable to what you'd see from our peers. The reality is that hasn't unfolded that way. The cash profile has not unfolded that way, ***and we've been paying a dividend in excess of our free cash flow for a number of years now***.

252. GE then went on to discuss reasons why its dividend was being cut—Industrial CFOA shortfalls and the lack of an upstream dividend from GE Capital to GE for the remainder of 2017 and 2018 as a consequence of the LTC insurance issues. Defendant Flannery reiterated the Company's CFOA forecast reduction, in the following question and answer exchange during the call:

> **Unidentified Participant:**
>
> [S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe. Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the

> gate. . . .
> When did you make the decision? . . .
>
> **John L. Flannery—General Electric Company—Chairman & CEO:**
>
> So I think ***there's been major change in our cash flow forecast***. So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA. And the day I started, there was a guide to the low end of that range. . . .
>
> So we're now at a $7 billion number. . . . [F]undamentally, that ***dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow*** in the next couple of years. . . . ***So the single biggest delta, I think is obvious, which is what happened in the Power business***.

253. On the call the new head of GE Power, Russell Stokes, explained that LTSA "productivity" and LTSA income from negotiated upgrades, had been "offsetting" or masking lower transactional volume in the Power segment, noting:

> So what happened? The chart here we get into from 2014 to 2016, our gas equipment business margins were declining . . . Inside of the service business, we had been doing well around the upgrades for those AGPs I mentioned a moment ago. CSA [contractual service agreement] productivity have been doing really well. ***And it was offsetting, though, the fact that we were starting to see lower services transactional volume over the '14 to '16 time frame.*** . . .
>
> On culture. John talked about it, I don't really think it's much different, but for Power specifically, it's what I talked about. This idea of growth orientation tied to income, making sure that the teams have as much of an appreciation for how we generate cash. The inventory buildup that we've had right now, given some of our estimates over the market, is going, for me, is just not excusable and we're going to fix it. . . .
>
> We will have lower CSA or contractual asset gains. And I'd say really part of this is focusing the organization on actions that generate a cash return today.

254. On the call, regarding GE's review of its LTC insurance reserves, Miller updated investors as follows:

> One area, I'll just pause and talk about for a minute, is GE Capital. And as many of you know, ***we're in the middle of an ongoing reserve review at our insurance businesses there***. This process is ongoing. It involves multiple third parties and

> it's not done at this point. And I don't have a number for you today. We're on track to conclude that in December. ***And we mentioned to you before that we're not taking a second half [2017] GE Capital dividend of about $3 billion. And as we go through this process, at this point, I do expect the charge to be more than that***. But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.
>
> * * *
>
> Probably the last thing I would just mention on this page is that we're not planning a GE Capital dividend [to be paid to GE] for 2018.

255. On November 14, 2017, Miller appeared at a Goldman Sachs conference beginning at 9:30 a.m. New York time (*i.e.*, after the market had opened), during which one analyst noted that in "[y]esterday's presentation, GE Capital was noticeably absent in the discussion there."

256. Miller reiterated, "you saw that we cut the dividend yesterday by 50%" and provided further information. In response to an analyst's question, Miller further elaborated on the information provided in the November 13, 2017 presentation the day before, stating:

> And then the second piece to your question was really around the insurance review we have ongoing. Many of you may know, we're in the middle of a review of our insurance reserves. This is a book of largely reinsured long-term care businesses back from more than a decade ago. That review is ongoing, we're right in the middle of it. It involves multiple third parties. It's not done so we don't have any answers to it today. It's on track for completion in December. So when we know what that is, we'll announce it. We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year. At this point in the process, ***I'd tell you that I expect that charge to be more than that***, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point. But look, when we know and when we understand this better, we will announce it and be sure everybody knows.

257. The enormous 50% dividend slash was more than analysts had been anticipating. For example, after the October 20, 2017 disclosures (discussed above), in an October 23, 2017 analyst report, Morgan Stanley had forecasted a "higher probability of a dividend cut to [approximately] $0.70 . . . ." Thus, the unanticipated halving of the dividend to a substantially lower $0.48 per share, and the need for charges exceeding $3 billion for LTC reserves, caught

analysts and the market off guard and sent the stock price reeling. This news, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, caused GE's stock price to drop from a close of $20.49 on Friday, November 10, 2017 to close of $19.02 on Monday, November 13, 2017, a drop of over 7%, on heavy volume of over 261 million shares. The share price decline continued on the next trading day as the market continued to digest the shocking news about GE's massive dividend cut and need for larger-than-previously-disclosed LTC insurance reserves. On Tuesday, November 14, 2017, GE's stock fell an additional $1.12 per share, or 5.8%, to close at $17.90 on even heavier volume of 312,556,800 shares. The stunning news released by GE on November 13, 2017 and further discussed by GE at the November 14, 2017 Goldman Sachs conference resulted in a two-day share price free fall of more than 12.5%.

258. As analysts explained, the dividend cut was particularly distressing news to GE's "retail investors" who placed great emphasis on GE's attractive dividend yield. In a November 14, 2017 Deutsche Bank report, under the heading ***Negative surprises***, Deutsche Bank wrote, "[t]he dividend cut to 48 cents ***was steeper than we expected***." The Deutsche Bank report goes on to note that "retail investors," who own approximately 40% of GE's shares, were particularly apt to punish the stock because such investors had been heavily reliant on GE's (formerly) attractive dividend yield. The Deutsche Bank report states:

> Yesterday, GE's analyst meeting ***surprised*** on several fronts.
>
> **Steep dividend cut**
> For the third time in its history, GE cut its dividend. Only this time, the cut wasn't predominantly driven by macro forces as was the case in the past (ie, Great Depression, Great Recession) but instead was heavily attributable to circumstances that were created by GE itself—namely excessive earnings ramp/targets matched with a dividend payout ratio of 45-50%.
>
> The cut to 48 cents from 96 cents came in lower than consensus expectations of

> ~60 cents, in our opinion. . . .
>
> ***With >40% of GE's common equity owned by retail investors, we believe substantial near term selling pressure on GE could further ensue as retail investors who previously counted on the GE dividend look elsewhere***.

259. In a November 14, 2017 analyst report, Citigroup Global Markets, Inc. lowered its price target from $27 to $25 and wrote that "***[p]ower is a mess*** right now. GE Capital will likely take ***a big insurance charge***, and Cash/EPS could flat-line close to $1" and further that "the long term care reserve in GE Capital ***will be bigger than we thought***."

**E. January 16, 2018: GE's "Insurance Update"**

260. On Tuesday, January 16, 2018, before the market opened, GE issued a press release announcing the results of its reserve testing related to its LTC portfolio and disclosed the shocking news that it will take an "after tax GAAP charge of $6.2 billion for the fourth quarter of 2017" ($8.9 billion pre-tax) and that "GE Capital expects to make statutory reserve contributions of ~ $15 billion over seven years."

261. On January 16, 2018, before the market opened, GE also filed an 8-K with the SEC, which stated:

> On January 16, 2018, GE provided an update on the previously reported review of premium deficiency assumptions related to GE Capital's run-off insurance business (North American Life and Health ("NALH")). With the completion of that review, and of NALH's annual premium deficiency test, ***GE recorded an increase in future policy benefit reserves of $8.9 billion*** and $0.6 billion of related intangible asset write-off for the fourth quarter of 2017. ***This will result in a $6.2 billion charge*** ($7.5 billion upon remeasurement under tax reform) on an after-tax GAAP basis ***to GE's earnings in the fourth quarter of 2017***.
>
> As a regulated insurance business, NALH is subject to a statutory accounting framework for setting reserves that requires the modification of certain assumptions to reflect moderately adverse conditions and other differences from the reserve calculation under GAAP. Under that framework, we estimate that ***GE Capital will need to contribute approximately $15 billion of capital to NALH over the next seven years***. GE Capital plans to make a first capital contribution of approximately $3 billion in the first quarter of 2018 and expects to make further contributions of

> approximately $2 billion per year in each of the six following years, subject to ongoing monitoring by NALH's primary regulator, the Kansas Insurance Department. GE Capital plans to fund the capital contributions with its excess liquidity and other GE Capital portfolio actions and ***does not expect to make a common share dividend distribution to GE for the foreseeable future***.

262. On January 16, 2018, before the market opened, GE held an "Insurance Update Call" as a follow-up to the press release. During the call, Flannery stated:

> We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate. And you will see that reflected in our fourth quarter financials. GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion.
>
> Needless to say, at a time when we are moving forward as a company, I'm ***deeply disappointed at the magnitude of the charge*** in this legacy portfolio.
>
> * * *
>
> Clearly, in hindsight, we underappreciated the risk in this book.

263. In contrast to Defendants' repeated proclamations that GE had "exited" the insurance business and that "all of the insurance business is gone," Flannery acknowledged on January 16, 2018 that GE had only "exit[ed] ***the majority*** of our insurance businesses in the 2004 to 2006 timeframe." He also conceded that, notwithstanding GE's lack of disclosures to investors regarding its LTC liabilities, GE had been focused internally on its LTC portfolio throughout the relevant period. Flannery noted that executives "reviewed" GE's LTC exposure "[i]n 2015, as part of the GE Capital exit process" and further stated that GE's LTC book "has gone through a standard evaluation process and testing every year as is the standard in the industry."

264. In response to this disturbing news, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, GE's share price sank from a close of $18.76 on Friday, January 12, 2018 to $18.21 on Tuesday, January 16, 2018 (the next trading day), a drop of approximately 3% on heavy

trading volume of 205,657,000 shares. As investors continued to digest the news, the price drop continued the following trading day when on January 17, 2018, GE's stock fell to $17.35 from the January 16 close of $18.21, a drop of an additional 4.7% on heavy trading volume of 185,781,800 shares. The share price decline continued for the next two days, closing at $16.77 on January 18, 2018 and then at $16.26 on January 19, 2018. Thus, as the market continued to digest the news, GE's stock price declined over this four-day period from a close of $18.76 on Friday, January 12, 2018 to close at $16.26 on January 19, 2018, a cumulative drop of $2.50 per share or more than 13%.

265. Analysts were incredulous about the enormity of the LTC reserve charge. During the January 16 call, analyst Jeffrey Todd Sprague, Founder and Managing Partner at Vertical Research Partners, LLC, remarked that "[i]t is hard to imagine a $15 billion problem materialized in the course of a year, like there was not enough rigor behind this process."

266. Numerous analysts also remarked that the LTC reserve charge was greater than what the market had expected. In an analyst report dated January 16, 2018, entitled *Insurance woes hit GE hard*, Deutsche Bank stated its surprise regarding GE's enormous charge to earnings related to LTC insurance especially since LTC reserve issues had been revealed to the market by other companies with LTC exposure (but not by GE) at least as early as 2014:

> This morning, GE announced that it would take $6.2bn of 4Q17 after-tax charges to shore up reserves for GE Capital's long term care reinsurance book ($7.5bn at 21% US tax rate), or ***more than twice the original estimate last year of ~$3bn***, which we had presumed was a pretax number—this was not publicly specified. The charges come well after Genworth first flagged long term care issues in late 2014. The company also called out a considerable cash funding requirement of $15bn over the next 7 years. . . .
>
> Overall, the charges and scope of the problem are ***significantly worse than we had anticipated***.

267. In an analyst report dated January 16, 2018, entitled, *GE—Insurance Reserve Much Worse Than Anticipated; $15 Bil of Contributions Over 7 Years*, RBC wrote:

> Our view: Although we had been previously warned that Sector Perform-rated GE's insurance portfolio reserve charge would be substantial, ***the initial amount announced on Jan-16 was far more severe than the market had been anticipating***, and exceeded expectations in early November of a +$3 billion charge. Specifically, GE now expects to record a $6.2 billion after-tax GAAP initial charge in 4Q17 and confer over $15 billion of total statutory capital contributions (cash) over the next seven years based on a "comprehensive bottom- up rebuild" of all claim curves and assumptions.
>
> * * *
>
> Long-awaited insurance portfolio reserve charge was ***higher than expected***; $6.2 billion after-tax charge in 4Q17 and $15 billion of contributions over seven years. On Jan-16, GE finally announced the results of its comprehensive review of GE Capital's run-off insurance portfolio. Specifically, management sized the pre-tax GAAP charge at $9.5 billion (or $6.2 billion after-tax), to be booked in 4Q17, and estimates a total statutory capital contribution of $15 billion over the next seven years. Recall that GE had previously estimated that the charge would be over +$3 billion and that it would announce these results in Dec-2017; clearly, ***the severity of the reserve shortfall was more dire than anticipated*** Management stated that these new charges are based on a "comprehensive bottom-up rebuild" of all claim curves, projections, and assumptions, which ***suggests to us that the prior standards for the actuarial reviews had been inadequate***.

268. In an analyst report dated January 16, 2018, entitled *GE Capital Charge Problematic on Many Levels*, Cowen wrote:

> GE Capital's Woes A Problematic Development—GE announced a $6.2B after-tax charge ($9.5B pretax) related to its review of the insurance portfolio (i.e. GE North American Life & Health; "NALH") it divested over 10 years ago. ***The $6.2B is 2x+ larger than GE had originally guided*** GE Capital plans to make $15B
> of "statutory reserve contributions" (i.e., cash contributions) over the next seven years, with $3B to be paid in Q1:18 and $2B/year to be paid over 2019-2024.

269. The negative coverage continued the next day as analysts continued to digest the completely unanticipated news GE revealed the day before. On January 17, 2018, Deutsche Bank reemphasized the dire effect of the failure to properly reserve in the LTC business, stating:

> GE needs cash. Separating out Aviation and Healthcare (relatively robust cash generators) could strand substantial liabilities with the Power business that could face years of long term fundamental pressures. Power itself requires substantial cash to fund its downsizing and new product development. Moreover, ***GE Capital now requires cash to pay the $15bn of Insurance reserve funding (over 7 years), which would end up $9bn short once the $28bn of cash available pays off ~$25bn of run-off debt over the next 3 years (excluding the contribution from annual Capital earnings***, which may also shrink as EPS and the Industrial Finance books are meaningfully taken down).

270. Similarly, in a January 17, 2018 analyst report, J.P. Morgan analyst Tusa continued to digest the implications the January 16, 2018 disclosures would have for GE's future earnings and wrote, "[y]esterday's charge from GE was ***materially larger than expected***, and the implications of dealing with it are dilutive to earnings, FCF [free cash flow] and ultimately value." (emphasis in original). Tusa went on to note that the charge was so large that it implicates the financial strength of "the consolidated company now, and is not a ring fenced [GE Capital] issue."

271. In fact, in a January 16, 2018 article titled *GE Capital Drags Down its Parent and CEO*, reporters at The New York Times noted that Flannery himself admitted, "I share your ***surprise and disappointment*** of this coming out of a legacy business."

272. The market continued to digest this news on January 18, 2018. For example, a January 18, 2018 article in The Economist titled, *After a huge loss on old reinsurance contracts, GE contemplates a break-up*, stated, "[t]hat in the 12 years since [the Genworth and Swiss Re deals], the firm appears to have done little about this residual portfolio seems ***an odd omission***. ***The risk, after all, was well known.*** Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble."

### F. January 24, 2018: disclosure of 4Q 2017 financial results and SEC investigations into GE's LTC reserves and revenue recognition practices related to LTSAs

273. On January 24, 2018, before the market opened, GE issued a press release, filed with the SEC on an 8-K, announcing its 4Q 2017 results. The press release stated that GE suffered a net loss of $9.8 billion for 4Q 2017, which included a $6.2 billion after-tax charge to increase LTC insurance reserves and substantial profit shortfalls in its Power unit. The press release further stated:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions. . . . Power was down significantly and we expect market challenges to continue."

274. The press release further stated, "GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity. On a reported basis, the Verticals generated a loss of $(7.6) billion, ***which is down from last year driven by the effects of the charges in the Insurance business***" and that:

> GE announced last week that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), resulted in an ***after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017***, and GE Capital expects to make statutory reserve contributions of approximately ***$15 billion over 7 years***.

275. Also on January 24, 2018, during an earnings conference call held before the market opened, GE disclosed that it has "been ***notified by the SEC that they are investigating*** the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements."

276. In response to these disclosures regarding the SEC investigations, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, GE's stock price declined from a close of $16.89 on

January 23, 2018 to $16.44 on January 24, 2018, a 2.66% decrease on heavy volume of over 167 million shares. The share decline continued the next day as the price continued to drop to close at $16.18 on January 25, 2018, again on heavy volume of over 95 million shares. Thus, as the market continued to digest the news over this two-day period, GE's stock price declined from a close of $16.89 on January 23, 2018 to a close of $16.18 on January 25, 2018, a cumulative drop of $0.71 or more than 4%.

277. Analysts cited the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, in an RBC analyst report dated January 25, 2018, RBC lowered its price target for GE's stock and wrote that any positive developments in GE's financial results:

> [W]ere quickly made irrelevant when management unexpectedly disclosed during the earnings call that the SEC had opened two separate investigations: one into GE's insurance reserve charge and the other into its contract asset accounting practices. ***The stock reaction to this negative news was swift, reversing a +4% relief rally into a 2%-3% decline***. While it is difficult to handicap the risks associated with these SEC reviews in their early stages, this overhang will likely continue to dog GE over the near-term and present any bottom-fishing investors with a reason to stay on the sidelines. We are lowering our 2019 EPS by -4c and our price target to $17.
>
> **Biggest surprise: Discloses two separate SEC investigations**. GE's stock sell-off on Jan-24 was seemingly prompted by the unsettling revelation of two SEC investigations. Recall that it announced on Jan-16 that GE Capital's insurance reserves were found to be inadequate, requiring $15 bil of capital contributions over the next seven years. This development apparently elicited the interest of the SEC, which may be looking into how a liability of this magnitude had been permitted to languish unnoticed for so long. Separately, GE revealed that the SEC had opened an investigation into its contract asset accounting practices in late-2017.

278. Market commentators also pointed to the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, a January 25, 2018 CBS MarketWatch article entitled, *GE stock swings lower after disclosure of SEC investigation*, states:

> General Electric Co's stock was soaring after the company reported fourth-quarter results, then the industrial conglomerate's bombshell about a government accounting probe triggered a sharp pullback that erased all the gains.

* * *

> The stock . . . had traded up as much as 5.8% in premarket trade, after GE reported fourth-quarter results, and after the start of the post-earnings conference call.

* * *

> But after the SEC probe [was announced on the earnings call], the stock took a sharp dive. It tumbled 2.7% in active trade Wednesday, enough to pace the Dow Jones Industrial Average[] . . . decliners. Volume spike to 167 million shares, making the stock the most actively traded on major U.S. exchanges.

279. The declines in GE's stock following the revelations during the corrective disclosure period (April 21, 2017 through January 24, 2018) and the resulting losses suffered by Plaintiffs were proximately caused by the misstatements and omissions of material fact alleged herein.

**G. October 30, 2018: disclosure of $22 billion impairment loss primarily attributable to the Alstom acquisition and investigations by the SEC and DOJ relating to the impairment charge**

280. The declines in GE's stock following GE's disclosure that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition and the resulting losses suffered by Plaintiffs were proximately caused by the misstatements and omissions of material fact alleged herein.

281. On October 30, 2018 GE disclosed in its Form 10-Q for the third quarter of 2018 that it was taking an impairment loss of $22 billion primarily attributable to the Alstom acquisition.

> The value of these unrecognized intangible assets is driven by high customer retention rates in our Power business, our contractual backlog, the value of internally created technology, and the GE trade name. The combination of these unrecognized intangibles, adjustments to the carrying value of other assets and liabilities, and reduced reporting unit fair values calculated in step one, resulted in an implied fair value of goodwill substantially below the carrying value of goodwill for the Power Generation and Grid Solutions reporting units. Therefore, in the third

> quarter, we recorded our best estimate of a non-cash impairment loss of $21,973 million. The impairment loss included $827 million of goodwill recorded at Corporate associated with our Digital acquisitions that was previously allocated to our Power Generation and Grid Solutions reporting units. We recorded the estimated impairment losses in the caption "Goodwill impairment" in our consolidated Statement of Earnings (Loss). As a result of ongoing updates to our long-range forecast and the complexity of valuing intangible assets in the second step of the impairment test, the Company has not yet completed its analysis. We will recognize any differences to this estimate in the fourth quarter when we finalize the step two impairment test. After the impairment loss, there is no remaining goodwill associated with our Power Generation reporting unit and $1,653 million related to our Grid Solutions reporting unit at September 30, 2018.

282. This Form 10-Q also disclosed that the SEC and DOJ were investigating Alstom with respect to the impairment charge:

> Following our announcement on October 1, 2018 about the expected non-cash goodwill impairment charge related to GE's Power business, as discussed further in Note 8 to the consolidated financial statements, the SEC expanded the scope of its investigation to include that charge as well. We are providing documents and other information requested by the SEC staff, and we are cooperating with the ongoing investigation. Staff from the DOJ are also investigating these matters, and we are providing them with requested documents and information as well.

283. GE's stock price fell sharply on this announcement from a closing price of $11.16 on October 29, 2018 to close at $10.18 on October 30, 2018, on trading of almost 345 million shares.

## VI. Plaintiffs purchase GE stock in reliance on Defendants' materially false and misleading statements

284. Plaintiffs purchased GE common stock on the dates identified in Exhibit A for an aggregate price of more than approximately $120 million. *See* Exhibit A. Plaintiffs relied upon the misleading statements and/or omissions described in this Complaint when making the purchases identified in Exhibit A.

285. In accordance with Plaintiffs' due diligence process in the purchase of equity securities, Plaintiffs' investment advisors reviewed and relied upon GE's most recently available financial statements and SEC filings on Forms 10-K and 10-Q prior to purchase.

286. Plaintiffs' investment advisors further monitored GE's earnings releases and conference calls and relied upon statements made in such releases and conferences calls when making the purchases identified in Exhibit A.

287. In addition, Plaintiffs reviewed statements from GE employees and executives disseminated to the media concerning, among other things, Defendants' financials, revenues, profits and losses, GE's exit from the insurance business, methods for accounting in financial statements, financial controls, and related topics during the relevant period.

288. Plaintiffs would not have made the purchases identified in Exhibit A if Defendants had disclosed information that they had a duty to disclose. For example, Plaintiffs would not have purchased the GE Stock if they had known of: (i) GE's exposure to enormous and under-reserved-for LTC liabilities; (ii) GE's manipulation of LTSAs and contract assets to inflate its revenue; and (iii) acquisition of Alstom when GE knew the price it was paying was excessive and against the advice of its due diligence team, and would not lead to the future economic benefits it claimed based on the concessions it made for the transaction to close.

## VII. No safe harbor

289. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements,

there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

290. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized, and/or approved by Defendants who knew that those statements were false when made.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

291. Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.

292. Plaintiffs assert this Cause of Action pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants.

293. During the Relevant Period, Defendants disseminated or approved the false statements set forth above, which they knew were, or deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

294. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

d. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of GE common stock during the relevant period.

295. During the relevant period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of GE common stock to trade above its true value; and (iii) cause Plaintiffs to purchase or otherwise acquire GE common stock at artificially inflated prices that did not reflect the stock's true value during the relevant period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

296. While in possession of materially adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for GE common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

297. Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding GE's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

298. As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of GE common stock during the relevant period. Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of materially adverse information that was known to or recklessly disregarded by Defendants but not disclosed by them, Plaintiffs purchased or otherwise acquired GE common stock during the relevant period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of GE common stock substantially declined, causing losses to Plaintiffs. These declines and the preceding disclosures are set forth above in Section V.

299. At the time of the material misrepresentations and omissions alleged herein, Plaintiffs were not aware of their falsity and believed them to be true. Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GE common stock. Had Plaintiffs known the relevant truth regarding GE's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants,

Plaintiffs would not have purchased or otherwise acquired GE common stock at artificially-inflated prices, or at all.

300. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common stock during the relevant period.

**SECOND CAUSE OF ACTION**
**(Violation of Section 20(a) of the Exchange Act against Immelt and Bornstein)**

301. Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This claim is brought against Immelt and Bornstein pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

302. Prior to and during the relevant period, Immelt and Bornstein, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning GE, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

303. In their respective roles, Immelt and Bornstein had regular access to non-public information about GE's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of GE's corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

304. Immelt and Bornstein each was a controlling person of GE within the meaning of Section 20(a), as alleged herein. By virtue of their high-level positions, and their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the

statements filed by the Company with the SEC and disseminated to the investing public, Immelt and Bornstein each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiffs allege were materially false or misleading.

305. Immelt and Bornstein are each liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of GE common stock during the relevant period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) as set forth above in Sections II, III, and IV. The scheme: (i) deceived the investing public regarding GE's operations and the true value of GE's common stock; and (ii) caused Plaintiffs to purchase GE common stock at artificially inflated prices, which plummeted in value as the truth concerning the magnitude of GE's LTC exposure and the manipulation of costs and profitability of GE's LTSAs were revealed.

306. Immelt and Bornstein were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiffs allege were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be corrected. In particular, Immelt and Bornstein maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

307. As set forth above, Defendants violated Section 10(b) and Rule 10b-5, by their acts and omissions as alleged herein. By virtue of Immelt and Bornstein's status as controlling

persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, Immelt and Bornstein are liable pursuant to Section 20(a). As a direct and proximate result of Immelt and Bornstein's culpable conduct, Plaintiffs suffered damages in connection with their transactions in GE's common stock during the relevant period.

**THIRD CAUSE OF ACTION**
**(Rescission pursuant to O.R.C. § 1707.43)**

308. Plaintiffs reallege each allegation above as if fully set forth herein.

309. This claim is brought under Ohio Securities Act, O.R.C. § 1707.43, against Defendant GE.

310. GE violated O.R.C. § 1707.44(J) because Defendants made statements that inflated the value of GEs common stock that it knew, or should have known through the exercise of reasonable due diligence, were false and misleading in material respects.

311. Plaintiffs' purchases had a nexus to Ohio. All of the Plaintiffs have their principal places of business in Ohio and, as a result, suffered their losses in Ohio. Moreover, with the exception of purchases of shares included in the Touchstone Value Fund all of Plaintiffs purchases were made by an investment advisor located in Ohio. GE was aware that its false statements were disseminated into Ohio and were being relied upon by Ohio investors.

312. GE participated in, or aided, the sales to Plaintiffs. GE is the issuer of the securities purchased by Plaintiffs and caused them to be listed for sale on the New York Stock Exchange. GE issued false financial statements, Forms 10-K, Forms 10-Q and press releases that it knew, or should have known through the exercise of reasonable due diligence, were false or misleading and affected the value of GE's common stock. GE's officers similarly made false statements concerning facts that affected the value of GE's common stock attributable to GE that

GE knew, or should have known through the exercise of reasonable due diligence, were false or misleading.

313. Plaintiffs are entitled to void and rescind their purchase of GE common stock under O.R.C. § 1707.43 and recover the full amount of consideration paid for the common stock and all taxable court costs.

**FOURTH CAUSE OF ACTION**
**(Common law fraud)**

314. Plaintiffs reallege each allegation above as if fully set forth herein.

315. This claim is for common law fraud against Defendants.

316. The material misrepresentations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

317. Defendants knew their misrepresentations and omissions were false and misleading at the time they were made. Defendants made the false and misleading statements and omissions with the intent to defraud investors in GE, like Plaintiffs. Indeed, the Defendants made fraudulent misrepresentations and omissions directly to Plaintiffs through financial statements and earnings announcements, and through statements made by GE employees and executives disseminated to the media concerning, among other things, Defendants' financials, revenues, profits and losses, GE's exit from the insurance business, methods for accounting in financial statements, financial controls and related topics during the relevant period.

318. Plaintiffs justifiably relied on Defendants' false and misleading representations and omissions.

319. Had Plaintiffs known the relevant true facts regarding, among other things, GE's financial results, operations, business, and prospects, which were misrepresented and/or

concealed by Defendants, Plaintiffs would not have purchased or otherwise acquired GE common stock at artificially-inflated prices.

320. As a result of Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered damages according to proof. Defendants are liable to Plaintiffs for common law fraud.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

A. Compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

B. Extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

C. Costs and expenses incurred in this Action, including reasonable counsel fees and expert fees;

D. Prejudgment interest at the maximum legal rate;

E. Treble and punitive damages; and

F. Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 29, 2021

Respectfully submitted,

/s/ *Steven S. Fitzgerald*

William A. Maher
Steven S. Fitzgerald
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
wmaher@wmd-law.com
sfitzgerald@wmd-law.com
rhallinan@wmd-law.com

*Attorneys for Plaintiffs*