**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOUCHSTONE STRATEGIC TRUST, et al., | |
| Plaintiffs, | 19 Civ. 01876 (JMF) (GWG) |
| v. | [Rel. 17 Civ. 08457] |
| GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE MILLER, KEITH S. SHERIN, | <u>**ORAL ARGUMENT REQUESTED**</u> |
| Defendants. | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

Sean M. Berkowitz (*pro hac vice* forthcoming)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice* forthcoming)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

Sarah A. Tomkowiak (*pro hac vice* forthcoming)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

*Attorneys for Defendants*

May 10, 2021

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .......................................................................................................................3

    A.    The Parties ...................................................................................................3

    B.    Related Litigation And Prior Dismissals ...................................................3

    C.    This Lawsuit..................................................................................................6

ARGUMENT ...........................................................................................................................8

I.    THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM..........................................8

    A.    The Five-Year Statute Of Repose Bars Any New Claims Arising From Alleged Misstatements Or Omissions Made Prior To March 29, 2016.................9

    B.    The AC Is An Impermissible Puzzle Pleading .......................................9

    C.    Plaintiffs' LTC-Related Claims Should Be Dismissed..........................10

        1.    GE's LTC Reserves Are Not Actionable.................................10

        2.    Plaintiffs' Item 303 LTC Disclosure Claims Fail .....................12

        3.    GE's Internal Controls Statements Are Not Actionable ...........13

        4.    Plaintiffs' Remaining LTC-Related Claims Fail ......................13

    D.    Plaintiffs' LTSA-Related Claims Should Be Dismissed .......................14

        1.    Plaintiffs' Claims Based On Cost Adjustments Fail.................14

        2.    Plaintiffs' Claims Based On Factoring And Deferred Monetization Fail .....................................................................19

    E.    Plaintiffs' Alstom-Related Claims Should Be Dismissed .....................25

        1.    GE's Estimates And Calculations Of Goodwill Are Not Actionable ........25

        2.    Plaintiffs' Additional Alstom-Related Claims Fail.....................26

II.    THE AC FAILS TO PLEAD A "SCHEME LIABILITY" CLAIM.................................35

III.    THE AC FAILS TO PLEAD A SECTION 20(A) CLAIM..............................................36

IV.    THE AC FAILS TO PLEAD OHIO AND COMMON LAW FRAUD CLAIMS...........37

i

CONCLUSION................................................................................................................37

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020) ............................................................8, 17, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................................1

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018) ..............................................................................16

*Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A.*,
   2018 WL 1276847 (S.D.N.Y. Mar. 8, 2018) ....................................................................37

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................................8

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ......................................................................................33

*Brady v. Top Ships Inc.*,
   2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019) ..................................................................34

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ............................................................................................36

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..............................................................................16

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................................................32

*Escue v. Sequent, Inc.*,
   869 F. Supp. 2d 839 (S.D. Ohio 2012), *aff'd*, 568 F. App'x 357 (6th Cir. 2014) ..................37

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) ............................................................................................27

*First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*,
   52 F. Supp. 3d 625 (S.D.N.Y. 2014) ..............................................................................37

*Fogel v. Vega*,
  759 F. App'x 18 (2d Cir. 2018) ...........................................................................13

*Fries v. Northern Oil & Gas, Inc.*,
  285 F. Supp. 3d 706 (S.D.N.Y. 2018)...................................................................17

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)......................................................17

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*,
  796 F. App'x 31 (2d Cir. 2019) ............................................................................21

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................................13

*In re Allied Capital Corp. Sec. Litig.*,
  2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003).......................................................30

*In re AT&T/DirecTV Now Sec. Litig.*,
  480 F. Supp. 3d 507 (S.D.N.Y. 2020)...................................................................36

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)...................................................................15

*In re Barrick Gold Corp. Sec. Litig.*,
  341 F. Supp. 3d 358 (S.D.N.Y. 2018)...................................................................35

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)...................................................................24

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)...................................................................15

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................................13

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) .................................................................29

*In re Express Scripts Holding Co. Sec. Litig.*,
  2018 WL 2324065 (S.D.N.Y. May 22, 2018) .......................................................28

*In re Gen. Elec. Sec. Litig.*,
  2020 WL 2306434 (S.D.N.Y. May 7, 2020), *aff'd*, 2021 WL 357756 (2d Cir.
  Feb. 3, 2021) ................................................................................................ *passim*

*In re Gen. Elec. Sec. Litig.*,
  2021 WL 357756 (2d Cir. Feb. 3, 2021)..................................................................6

*In re GeoPharma, Inc. Sec. Litig.*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006).................................................................................19

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
    2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020) .......................................................................35

*In re Lehman Bros. Sec. & Erisa Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) .......................................................................21

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
    580 F. Supp. 2d 630 (S.D. Ohio 2008) ...............................................................................37

*In re Nokia OYJ (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)................................................................................31

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008).................................................................................9

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F.
    App'x 37 (2d Cir. 2018).....................................................................................................18

*In re Salomon Analyst Level 3 Litig.*,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005).................................................................................27

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................................13, 18, 24

*In re Sibanye Gold Ltd. Sec. Litig.*,
    2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020)...............................................................10, 29

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
    2016 WL 2757760 (S.D.N.Y. May 11, 2016) .....................................................................30

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...............................................................23, 35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................................................9

*Lucas v. Icahn*,
    616 F. App'x 448 (2d Cir. 2015) .......................................................................................17

*Lucescu v. Zafirovski*,
    2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018)......................................................................32

*Merck & Co., Inc. v. Reynolds*,
    559 U.S. 633 (2010)..........................................................................................................9

*Meyer v. Greene,*
    710 F.3d 1189 (11th Cir. 2013) ........................................................35

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.,*
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ........................................34

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,*
    575 U.S. 175 (2015) ............................................................... *passim*

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.,*
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................8, 12, 34

*Reilly v. U.S. Physical Therapy, Inc.,*
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ..........................................21

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ...................................................................33

*Schaffer v. Horizon Pharma PLC,*
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ........................................15, 21

*Shemian v. Research In Motion Ltd.,*
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) ..........17

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ............................................ *passim*

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
    2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) ....................................... *passim*

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.,*
    33 F. Supp. 3d 401 (S.D.N.Y. 2014) .............................................36, 37

*Steed Finance LDC v. Laser Advisers, Inc.,*
    258 F. Supp. 2d 272 (S.D.N.Y. 2003) ..................................................37

*Waters v. Gen. Elec. Co.,*
    2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010), *aff'd sub nom. GE Inv'rs v. Gen. Elec.
    Co.*, 447 F. App'x 229 (2d Cir. 2011) ................................................35

*Western & Southern Life Ins. Co. v. JPMorgan Chase Bank, N.A.,*
    54 F. Supp. 3d 888 (S.D. Ohio 2014) ..................................................37

## STATUTES & REGULATIONS

15 U.S.C. § 78u-4 ............................................................................8

28 U.S.C. § 1658(b) .......................................................................9, 13

17 C.F.R. § 229.303 .............................................................................................................32

17 C.F.R. § 240.10b-5 .........................................................................................................35

O.R.C. § 1707.44(J) .............................................................................................................37

## GLOSSARY OF TERMS USED

The following terms are used in this memorandum:

| | |
|---|---|
| AC | Amended Complaint (ECF No. 18), cited as "¶_" and attached as Exhibit 1 |
| 4AC | Fourth Amended Complaint (*AP7* Action, ECF No. 179) |
| 5AC | Fifth Amended Complaint (*AP7* Action, ECF No. 191) |
| Alstom | Alstom S.A. |
| AP7 | Sjunde AP-Fonden |
| *AP7* Action | *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17 Civ. 8457 (S.D.N.Y.) |
| CFOA | Cash from Operating Activities |
| Defendants | GE and the Individual Defendants |
| DOJ | U.S. Department of Justice |
| EBITDA | Earnings before interest, taxes, depreciation, and amortization |
| Exchange Act | Securities Exchange Act of 1934 |
| GAAP | Generally accepted accounting principles |
| GE or the Company | General Electric Company |
| Hot Seat | *Hot Seat: What I Learned Leading a Great American Company* |
| Individual Defendants | Jeffrey R. Immelt, Jeffrey S. Bornstein, and Keith S. Sherin[†] |
| Item 303 | 17 C.F.R. § 229.303 |
| Lights Out | *Lights Out: Pride, Delusion, and the Fall of General Electric* |
| LTC | Long-term care insurance |
| LTSA | Long-term service agreement |
| NALH | North American Life and Health, a subsidiary of GE Capital |

| Plaintiffs | Touchstone Strategic Trust, Touchstone Variable Series Trust, The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Western & Southern Financial Group, Inc., and Integrity Life Insurance Company |
| --- | --- |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| Rule 9(b) | Rule 9(b) of the Federal Rules of Civil Procedure |
| SAC | Second Amended Complaint (*TRS* Action, ECF No. 80) |
| SOX | Sarbanes-Oxley Act of 2002 |
| SEC | U.S. Securities and Exchange Commission |
| SEC Order | *In the Matter of General Electric Company*, Administrative Proceeding No. 3-20165, Order dated December 9, 2020 |
| TRS | Teachers' Retirement System of Oklahoma |
| *TRS* Action | *In re Gen. Elec. Sec. Litig.*, No. 19 Civ. 1013 (S.D.N.Y.) |
| *Trueblood* Action | *Trueblood v. Culp*, Index No. 655552/2018 (Sup. Ct. N.Y. Cty.) |

[†] Plaintiffs' inclusion of Jamie S. Miller in the AC's case caption is a typographical error, as the AC does not assert any claims against Ms. Miller.  *See* AC at 1 (asserting claims against GE and Messrs. Immelt, Bornstein, and Sherin); ¶¶ 29-32 (same).

## PRELIMINARY STATEMENT[1]

In this action, opt-out Plaintiffs (Ohio-based funds and insurers) attempt to re-litigate or repackage claims that were dismissed by this Court in the *AP7* Action, as well as claims that were dismissed by Judge Cote (affirmed by the Second Circuit) in the *TRS* Action.  *See In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434 (S.D.N.Y. May 7, 2020), *aff'd*, 2021 WL 357756 (2d Cir. Feb. 3, 2021) (hereinafter, "*TRS*").  To the extent Plaintiffs attempt to supplement those claims, they still do not come close to satisfying the applicable pleading standards.  Even as to the one narrow set of claims this Court upheld in the *AP7* Action—relating to factoring of LTSA receivables— Plaintiffs attempt to plead different theories than the one upheld by this Court, and their new allegations fail as well.  Accordingly, the AC should be dismissed in its entirety.

*First*, the five-year statute of repose bars multiple claims asserted for the first time in the AC, including those based on newly-challenged statements from GE's SEC filings in 2014 and 2015.

*Second*, in a futile attempt to change the results in the *AP7* and *TRS* Actions, the AC presents an improper "puzzle" pleading, often failing (in contravention of the PSLRA) to specify which portions of the approximately 150 statements referenced in lengthy block quotes are actually being challenged and why.

*Third*, Plaintiffs advance a host of recycled claims—already rejected by this Court in the *AP7* Action—related to GE's LTC liabilities and estimated LTC reserves.  The only new LTC allegations in the AC are sourced from the SEC Order, which this Court considered before

---

[1] Unless otherwise indicated herein, all internal citations and quotation marks are omitted, emphasis is added, and citations to "Ex. _" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith.  The Court may consider any documents or statements incorporated into the AC by reference, as well as disclosure documents filed with the SEC.  *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

dismissing the LTC claims in the 5AC and denying AP7 leave to amend, concluding that the Order did not "change [its] analysis" of those claims. The LTC claims should once again be dismissed.

*Fourth*, again futilely trying to piggyback on the SEC Order already considered by this Court, Plaintiffs assert a jumble of theories related to GE Power's LTSAs. Plaintiffs contend that GE engaged in "accounting gimmickry"—this time in connection with "cost adjustments"—but ignore that the SEC found no errors in GE's accounting. Plaintiffs do not and cannot dispute that GE disclosed the mechanics of LTSA accounting, and the impact of its cost adjustments on LTSA contract assets. Plaintiffs also assert Item 303 and misstatement claims based on GE's practice of selling or "factoring" LTSA receivables and its "related" practice of "deferred monetization," but there are fatal differences between Plaintiffs' new theories of liability and the factoring claims that survived in *AP7*. As pleaded, Plaintiffs have not stated a legally sufficient claim as to factoring or deferred monetization.

*Fifth*, Plaintiffs assert various claims related to GE's acquisition of Alstom in 2015. But many of those claims—those that relate to GE's reported goodwill balances and accounting—were considered and dismissed without leave to amend by Judge Cote in the *TRS* Action, and the plaintiffs there did not even attempt to appeal those rulings to the Second Circuit, which otherwise affirmed Judge Cote's decision. Plaintiffs' remaining Alstom claims are based on the wholly unsupported theory that GE's "enterprise value" for Alstom incorporated "economically irrational considerations." The AC does not plead any particularized facts to support this theory, and all of Plaintiffs' Alstom-related claims fail.

*Sixth*, Plaintiffs' undeveloped "scheme" liability claims fail under settled law.

*Seventh*, because Plaintiffs fail to state a claim under Section 10(b), or plead that any Defendant was a "culpable participant" in any fraud, their Section 20(a) claims fail as well.

*Finally*, Plaintiffs' tacked-on Ohio and common law fraud claims should be dismissed for

lack of supplemental jurisdiction, and fail for the same reasons that their Exchange Act claims fail.

The AC should be dismissed with prejudice.

## BACKGROUND

Defendants assume the Court's familiarity with the factual background of this action, as set forth in the Court's prior opinions in the related *AP7* Action.  *See* 417 F. Supp. 3d 379 (S.D.N.Y. 2019) (hereinafter, "*AP7 I*"); 2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) (hereinafter, "*AP7 II*"). Defendants also respectfully refer the Court to the factual background set forth in Judge Cote's opinion dismissing the *TRS* Action.  Rather than repeat that background, Defendants focus on the aspects of the prior related litigation relevant to this Motion, and the purportedly "new" allegations made by Plaintiffs here.

### A.    The Parties

GE is a global industrial company that serves customers in over 170 countries.  ¶¶ 29, 38, 40; *see also* Ex. 25, 2018 10-K, at 4.  In 2018, GE had eight primary business segments:  Aviation, Capital, Healthcare, Lighting, Oil & Gas, Power, Renewable Energy, and Transportation.  *See* ¶ 40; Ex. 25, 2018 10-K, at 4.  The Individual Defendants are former officers of GE or GE Capital.[2] ¶¶ 30-32.  Plaintiffs, a group of Ohio-based funds and insurance companies, assert individual claims against Defendants in connection with Plaintiffs' transactions in GE's stock from August 2014 to October 2018.  ¶¶ 23-28; ECF No. 18-1.

### B.    Related Litigation And Prior Dismissals

*AP7 Action*.  The first related putative class action was initiated in November 2017.  *See*

---

[2] Mr. Immelt served as GE's CEO from September 2001 to July 2017, and as Chairman of GE's Board from September 2001 to October 2017.  ¶ 30.  Mr. Bornstein served as GE's CFO from July 2013 to October 2017, and was a member of GE Capital's Board from 2006 to 2015.  ¶ 31.  Mr. Sherin served as GE's CFO from 1999 to July 2013, and as GE Capital's Chairman and CEO from July 2013 to September 2016.  ¶ 32.

ECF No. 4.  On October 25, 2019, lead plaintiff AP7 filed the 5AC, which abandoned its claims (asserted in the 4AC) that GE's LTC reserves, reported contract assets, and related LTSA metrics were false, focusing instead on alleged Item 303 violations related to LTC, customer utilization rates, LTSA modifications, cumulative catch-up adjustments, and factoring, as well as various alleged misstatements, 5AC ¶¶ 224-83, 406-37.  On December 18, 2019, Defendants filed a motion to dismiss the 5AC, ECF No. 196 (*AP7* Action), which was fully briefed as of February 28, 2020, *id.* ECF No. 200.

Prior to the Court's ruling on dismissal of the 5AC, on December 9, 2020, GE notified the Court that it had entered into a non-scienter settlement with the SEC, which resolved the SEC's investigation into GE.  *Id.* ECF No. 201; *e.g.*, ¶¶ 4, 275.  In connection with the settlement, the SEC issued an order containing its unadjudicated findings, which, as a condition to settlement, GE agreed neither to admit nor deny, and which, as the Order explicitly states, "are not binding on any other person or entity in this or any other proceeding." Ex. 28, SEC Order, at 1, 2 n.1.  The SEC Order made no allegation that any of GE's prior period financial statements were misstated, nor did it require corrections to or restatements of GE's previously reported financial statements.  *See generally id.*  The SEC Order also did not assert any alleged violations pursuant to Section 10(b) or SEC Rule 10(b)-5, instead asserting claims under provisions that require negligence only.  *Id.* ¶¶ 43-48.

In correspondence to the Court, AP7 claimed that the SEC's "findings confirm Plaintiffs' allegations that GE misled investors concerning GE Power and the GE LTC business," and "support their arguments in opposition to Defendants' motion to dismiss, which should be denied in its entirety."  ECF No. 202 (*AP7* Action), at 1, 4.  AP7 further asserted that "[a]t a minimum, to the extent the Court determines [the 5AC] is insufficient with respect to falsity or scienter, there is no credible argument that permitting Plaintiffs to amend their complaint would be futile here under

Fed. R. Civ. P. 15 (a)(2), particularly given the SEC's factual findings." *Id.* at 4.

On January 29, 2021, the Court held that the 5AC did not cure the deficiencies previously identified by the Court with respect to the 4AC, and again dismissed all LTC- and LTSA-related claims, except certain claims related to factoring. *AP7 II*, 2021 WL 311003, at *14. In denying leave to amend, the Court found that AP7 "ha[s] not given any indication that [it is] in possession of facts" that would cure its deficient claims, and that the SEC Order—which concerned "non-scienter-based violations of the Exchange Act, d[id] not change this analysis." *Id.* The Court further found that "[i]ndeed, in several respects, the [SEC] Settlement actually *undermines* Plaintiffs' allegations of scienter." *Id.* (emphasis in original).

*TRS Action*. A second related putative class action was filed in February 2019. In the SAC filed on August 30, 2019, lead plaintiff, TRS, asserted that starting in the fourth quarter of 2017, GE fraudulently hid from investors that its November 2015 acquisition of Alstom's Thermal, Renewables, and Grid businesses for $10.1 billion "had failed," and that the "truth" emerged when GE announced in October 2018 that it was "writing off $22 billion from its Power Segment ($15.8 billion in goodwill attributed to its Power Generation and Grid Solutions reporting units originally assigned from the Alstom acquisition)." SAC ¶¶ 199, 330. From that premise, TRS challenged (i) the goodwill balances reported for GE's Power segment, *e.g.*, *id.* ¶¶ 456-60, 466-69, 479, 487-90; (ii) statements regarding GE's GAAP-compliant goodwill testing and calculation, *e.g.*, *id.* ¶ 480; and (iii) GE's alleged failure to disclose adverse trends that would lead to "a major goodwill impairment," in violation of Item 303, *id.* ¶ 505.[3]

---

[3] Nominal plaintiffs in the *Trueblood* Action also focused on the "failed" Alstom deal, and alleged that 26 GE directors and officers breached their fiduciary duties by "enabling the Company's misrepresentation of GE Power's fair value, goodwill and lack of impairments." NYSCEF No. 1, ¶ 76. On July 3, 2019, Justice Masley dismissed the *Trueblood* Action without leave to amend, holding that plaintiffs failed to allege "that the goodwill impairment charge was tainted by fraud." NYSCEF No. 27, at 10-11.

On May 7, 2020, Judge Cote dismissed the *TRS* Action without leave to amend.  *See TRS*, 2020 WL 2306434, at *15.  Judge Cote held that the "SAC d[id] not adequately allege that GE's statements concerning goodwill were materially misleading or published with scienter."  *Id.* at *13.  Judge Cote found that TRS's "theory ultimately rests entirely on a disagreement about the exercise of judgment," and that TRS "failed to plead facts that would support a claim that the goodwill reported in the Class Period, which the plaintiffs acknowledge is a matter of opinion, was a false or misleading statement of opinion."  *Id.* at *14.  As for TRS's Item 303 claims, even though TRS had "argue[d] that Item 303 required GE to disclose the risk that its reduced cash flow was likely to lead to a major goodwill impairment," Judge Cote observed that GE's "SEC filings [had] adequately disclosed that risk."  *Id.* at *14 n.18.  Judge Cote also found that TRS failed to plead scienter.  *Id.* at *14-15.  TRS did not appeal dismissal of its Alstom/goodwill claims, and instead appealed only unrelated claims about a turbine blade defect.  The Second Circuit affirmed dismissal.  *In re Gen. Elec. Sec. Litig.*, 2021 WL 357756 (2d Cir. Feb. 3, 2021).

### C.    This Lawsuit

Plaintiffs filed their initial complaint in this action on February 27, 2019, ECF No. 1; disclosed that their claims overlapped with the claims asserted in the *AP7* and *TRS* Actions, ECF No. 4; and agreed to request deferral of dispositive motion practice pending a ruling on the motion to dismiss in *AP7*, ECF No. 11.  Following the Court's dismissal of the vast majority of the 5AC in *AP7* on January 29, 2021, Plaintiffs filed the AC on March 29, 2021.  ECF No. 18.

In the AC, Plaintiffs recycle myriad allegations this Court previously rejected in the *AP7* Action, and assert many of the same theories of liability.  Regarding LTC, apart from parroting allegations from the SEC Order, Plaintiffs raise virtually the same allegations and claims as AP7.  *See* ¶¶ 149-215.  Regarding GE Power's LTSAs, Plaintiffs rely heavily on the SEC Order; *Lights*

*Out*, a book by *Wall Street Journal* reporters Thomas Gryta and Ted Mann published in July 2020[4]; and an article by the *Lights Out* authors, which Plaintiffs combine with select (but not all) statements from *AP7* confidential witnesses "FE-7" and "FE-9"—statements that Plaintiffs do not claim themselves to have verified. *See* ¶ 77. Plaintiffs omit specific factoring-related allegations from the *AP7* Action on which the Court relied in sustaining certain claims in favor of allegations from the SEC Order. *Compare* ¶¶ 71-80, *with AP7 I*, 417 F. Supp. 3d at 409, 413.

Plaintiffs also repeat and re-allege claims and allegations already asserted—and rejected—in the *TRS* Action. Like TRS, Plaintiffs criticize GE's acquisition of Alstom in November 2015, *compare* ¶¶ 101-12, *with* SAC ¶¶ 57-63, adding only some unsubstantiated extracts from *Lights Out*. *Lights Out* does not cite any source (anonymous or otherwise) who claims that GE committed securities fraud. Plaintiffs also repeat TRS's claim that "Immelt and his close advisers" had "pushed forward" with the deal rather than "heeding [] concerns" raised by other "advisers and some of GE's directors," SAC ¶ 55—including concerns that GE had "made significant concessions that called into question the value of the [Alstom] acquisition" (such as divesting certain assets in response to regulators' concerns), *id.* ¶¶ 50-51. TRS did not directly "challenge GE's initial accounting for the goodwill from the Alstom acquisition," *TRS*, 2020 WL 2306434, at *3, like Plaintiffs do here. However, TRS did allege (unsuccessfully) that GE engaged in an "egregious accounting fraud" to hide that the Alstom deal "had failed." SAC ¶¶ 1, 199.

---

[4] *Lights Out* offers the authors' dramatized account of how "one of America's all-time great companies has now been reduced to a cautionary tale for our time." ¶¶ 4, 49. As the book notes, *Lights Out* primarily relies on anonymous sources, and of course was not intended to, and does not, meet PSLRA pleading standards. Ex. 26, *Lights Out*, Notes on Sourcing, at 327-28. And, since its publication, *Lights Out* has been the subject of criticism from those with actual first-hand knowledge of events discussed in the book, including Mr. Immelt, who, in February 2021, published a memoir entitled *Hot Seat*. ¶ 119; *e.g.*, Ex. 27, July 21, 2020 LinkedIn Post, *available at* https://www.linkedin.com/pulse/anonymity-license-rewrite-ges-history-alex-dimitrief/.

## ARGUMENT

## I.    THE AC FAILS TO PLEAD A SECTION 10(B) CLAIM

Plaintiffs' Section 10(b) claims are subject to the heightened pleading requirements of both Rule 9(b) and the PSLRA, in addition to the plausibility requirements under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The AC challenges over 150 statements or omissions related to LTC, LTSAs, and GE's Alstom acquisition as false or misleading.  *E.g.*, ¶¶ 83-88, 92-94, 113, 115-16, 123-24, 127-30, 132-35, 155, 157-63, 185-87, 193-96, 199, 206.  As this Court has explained, a statement or omission is misleading only when the "defendants' representations, taken together and in context, would have misled a reasonable investor."  *AP7 I*, 417 F. Supp. 3d at 390.  In addition, "with respect to each [alleged] act or omission," Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind" (or scienter).  15 U.S.C. § 78u-4(b)(2).  Like AP7, Plaintiffs here "do not attempt to demonstrate scienter by establishing that Defendants had the 'motive and opportunity' to commit fraud," and instead rely on a theory of recklessness.  *AP7 I*, 417 F. Supp. 3d at 398.[5]  To plead recklessness, Plaintiffs must allege facts that show "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Id.* at 391.

Here, Plaintiffs attempt to cite—without themselves talking with—some confidential witnesses from the *AP7* Action, but "courts have tended not to credit uncorroborated statements of [confidential witnesses] who are sourced secondhand—with whom plaintiffs' counsel have not themselves interacted."  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 2020 WL 4734989, at *11

---

[5] The AC does not allege any stock sales by any Defendant during the relevant period—a fact that "suggest[s] the absence of any nefarious motives."  *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

(S.D.N.Y. Aug. 14, 2020).    Further, "[c]onclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008).    Finally, "[w]hatever cognizance of secondhand allegations [in an SEC consent decree] courts may take at the pleading stage," a complaint that "*merely* recites others' allegations may [] be insufficient."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (emphasis in original).

The AC fails under these and other applicable standards.

### A.    The Five-Year Statute Of Repose Bars Any New Claims Arising From Alleged Misstatements Or Omissions Made Prior To March 29, 2016

The statute of repose bars claims asserted for the first time in the AC premised upon misstatements or omissions made prior to March 29, 2016, *i.e.*, five years before Plaintiffs filed the AC on March 29, 2021.  *See* 28 U.S.C. § 1658(b); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010).    The statute of repose runs from the date of each relevant misstatement or omission, and it is not subject to equitable tolling.  *AP7 I*, 417 F. Supp. 3d at 391.    "Nor may previously unasserted claims 'relate back' to the filing of an earlier complaint under Rule 15(c) if such claims are otherwise barred by the statute of repose."  *Id.*    As a result, Plaintiffs' claims premised on the alleged misstatements in paragraphs 84(a)-(d), 85(a)-(h), 88, 115-16, 123, 125, 127, and 130 of the AC, must all be dismissed as untimely.

### B.    The AC Is An Impermissible Puzzle Pleading

Many of Plaintiffs' approximately 150 alleged misstatements appear as long block quotes that leave Defendants (and the Court) to guess which parts are alleged to be false or misleading and why.  *E.g.*, ¶¶ 86-88, 93(a)-(b), 94(b)-(f), 113, 115-16, 123-24, 127-29, 132-33, 135, 185. This "puzzle" pleading fails to meet the PSLRA's requirement to "*specify* each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and claims

based on these statements should be dismissed for that reason alone. *AP7 I*, 417 F. Supp. 3d at 410 (emphasis in original); *see also In re Sibanye Gold Ltd. Sec. Litig.*, 2020 WL 6582326, at *13 (E.D.N.Y. Nov. 10, 2020) ("A complaint marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false[ ] fails to state a claim . . . .").

### C.    Plaintiffs' LTC-Related Claims Should Be Dismissed

Plaintiffs' LTC claims are fundamentally the same as those asserted (and twice dismissed) in the *AP7* Action.  What the AC adds—references to untested allegations from the SEC Order that GE has neither admitted nor denied, *e.g.*, ¶¶ 174-81—does nothing to salvage those deficient claims.  *See AP7 II*, 2021 WL 311003, at *14 (denying leave to amend following release of SEC Order, and finding that AP7 had "not given any indication that [it was] in possession of facts that would cure" the deficiencies of its claims).  Once again, the AC fails to state a claim premised upon any of (i) GE's LTC reserves; (ii) alleged LTC trends GE should have disclosed under Item 303; (iii) GE's SOX certifications; or (iv) the sundry other challenged LTC statements.

#### 1.    GE's LTC Reserves Are Not Actionable

Plaintiffs obliquely claim that "Defendants did not have a reasonable basis to conclude LTC reserves were adequate," ¶¶ 174-84, citing SEC allegations regarding various issues related to NALH's loss recognition testing processes in 2015 and 2016, ¶¶ 175-76, 178-79, and that unnamed "[e]xecutives at NALH and GE Capital" acknowledged "that NALH's continuing and expected losses posed a growing risk to GE's financial statements," ¶¶ 174, 185.  But Plaintiffs' allegations do not give this Court cause to revisit its dismissal of identical claims in *AP7*.  *See AP7 I*, 417 F. Supp. 3d at 392-404; *AP7 II*, 2021 WL 311003, at *7-10, *14.

GE's LTC reserves are indisputably opinion statements subject to the pleading standards set forth in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), and Plaintiffs fail to allege any specific facts showing that Defendants "did

not believe" that GE's LTC reserves were sufficient, *id.* at 193, or that GE's LTC reserves were misleading by omission, *AP7 I*, 417 F. Supp. 3d at 395, 397 (quoting *Omnicare*, 575 U.S. at 190). Nothing in the AC or the sources upon which Plaintiffs rely establishes that "GE failed to undertake a 'meaningful factual inquiry' into its reserves or that Defendants lacked 'any reasonable basis in fact' for their estimates.'" *AP7 I*, 417 F. Supp. 3d at 397. To the contrary, the SEC Order alleges that "each year NALH engaged in an impairment test, referred to by NALH as a 'loss recognition test' to evaluate whether the reserves GE held for future insurance claims were adequate," and each such year, "actuaries . . . evaluated actual claims experience, set current best estimate assumptions, used the best estimate assumptions to project out NALH's insurance liabilities, and compared those projections to the insurance reserves on NALH's financial statements." Ex. 28, SEC Order ¶ 24; *see also id.* ¶ 35 ("During 2017, NALH actuaries completed analyses which indicated that NALH might need to substantially increase its insurance reserves."). Moreover, the SEC did not claim that any of GE's financial statements were materially misstated or needed to be restated. *See generally id.*

Plaintiffs also do not (and cannot) plead any facts that give rise to the required "strong inference" of scienter. This Court has already rejected the confidential witness statements alleged by other plaintiffs, ¶¶ 183-84, and references to reserve increases taken by *other* LTC insurers, ¶¶ 165-73, upon which Plaintiffs rely. *AP7 I*, 417 F. Supp. 3d at 397 n.11, 398-99, 404 n.17; *AP7 II*, 2021 WL 311003, at *7-8. And this Court also already has disagreed that the SEC Order supports an inference of scienter, observing instead that it "actually *undermines*" scienter as to

LTC-related claims in "several respects." *AP7 II*, 2021 WL 311003, at *14 (citing SEC Order ¶ 41).[6]

2.    <u>Plaintiffs' Item 303 LTC Disclosure Claims Fail</u>

Like AP7, Plaintiffs allege that, in purported violation of Item 303, GE's quarterly and annual SEC filings from February 2014 through February 2017 failed to disclose allegedly known trends or uncertainties regarding GE's LTC claims experience, a "widening gap between its actual claims and expected claims," "increasing future liabilities, and growing insufficiency of its LTC reserves." ¶¶ 193-94. But this Court already considered and rejected the vast majority of allegations advanced in the AC—including the confidential witness statements Plaintiffs repackage from *AP7*, ¶¶ 183-84, actions of LTC underwriters and reinsurers *other than GE*, ¶¶ 168-73, and "systemic challenges in the LTC industry." *See AP7 I*, 417 F. Supp. 3d at 398-99; *AP7 II*, 2021 WL 311003, at *7-8.

Plaintiffs also fail to plead any inference of scienter for their LTC-related Item 303 claims. *Compare* ¶¶ 210-15, *with AP7 I*, 417 F. Supp. 3d at 398-400. As in *AP7*, the "alternative inference"—that "Defendants did not realize the brewing storm in their LTC portfolio," and "made disclosures and adjustments as they learned about the scale of the problem"—is "more compelling than the inference of fraud." *AP7 I*, 417 F. Supp. 3d at 399.[7]

---

[6] Likewise, the SEC Order's reference to a "flag[]" raised by "internal auditors" about NALH's 2016 roll-forward, ¶ 180, adds nothing to the scienter analysis, including because the SEC Order also alleges that "GE was not informed of GE Capital's and NALH's use of the roll-forward in 2016," Ex. 28, SEC Order ¶ 41.

[7] The absence of scienter is also "reinforced by the timing and number of disclosures that Defendants did make." *AP7 I*, 417 F. Supp. 3d at 399. An "incremental strategy" of taking successive write-downs during a class period "contradicts an inference of scienter." *Plumbers & Steamfitters*, 694 F. Supp. 2d at 302.

12

### 3.    GE's Internal Controls Statements Are Not Actionable

Invoking non-scienter based allegations in the SEC Order regarding "internal accounting" and "disclosure control" failures, Plaintiffs claim that Messrs. Immelt and Bornstein fraudulently certified that GE maintained adequate internal controls in quarterly and annual SEC filings from February 2014 to February 2017.[8]  *See* ¶¶ 197-208.  But certifications as to the adequacy of internal controls are opinion statements, which "contain an important qualification that the certifying officer's statements are true based on his or her knowledge."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021); *see also Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018).  Plaintiffs fail to provide any facts whatsoever to show that Messrs. Immelt and Bornstein knew at the time of the challenged certifications of any misrepresentations in GE's financial statements or any supposed accounting or internal control deficiencies.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (SOX certifications not actionable where allegations lacked factual support and plaintiffs failed to plead scienter).

### 4.    Plaintiffs' Remaining LTC-Related Claims Fail

To the extent there are any other claims to be divined from the balance of Plaintiffs' puzzle-pled LTC-related allegations, they constitute a half-hearted rehash of claims already dismissed by this Court, and should be dismissed once again.  *First*, Plaintiffs allege that, dating back to 2003,[9] various GE executives made false or misleading statements about GE's legacy run-off LTC insurance assets, and the reasons it did not sell those assets.  ¶¶ 152, 155-63.  But the Court twice

---

[8] Plaintiffs purport to base these claims on SOX Rules 302 and 404.  ¶¶ 204-06.  Those rules do not give rise to independent causes of action for private litigants, and Section 10(b) claims based on SOX certifications must satisfy all elements of a 10(b) claim (including scienter).  *See, e.g.*, *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *24-25 (S.D.N.Y. Apr. 2, 2020).

[9] Any claims premised on alleged misstatements or omissions before February 27, 2014, *see, e.g.*, ¶¶ 155, 157, 159-62, are barred by the statute of repose.  *See* 28 U.S.C. § 1658(b)(2); *AP-7 I*, 417 F. Supp. 3d at 391.

considered—and dismissed—claims premised on these exact statements.  *Compare, e.g.*, ¶¶ 161-63, *with AP7 I*, 417 F. Supp. 3d at 400-04 (dismissing claims based on statements about GE's exit from the insurance business and the impact of low interest rates on its potential sale of run-off insurance portfolios), *and AP7 II*, 2021 WL 311003, at *9-10 (same).  *Second*, Plaintiffs' identical challenges to early 2017 statements about the impact of low interest rates on the value of GE's run-off LTC assets, ¶¶ 186-87, fail for the same reason.  *AP7 I*, 417 F. Supp. 3d at 402-03 (dismissing claims based on same statements).

> ### D.    Plaintiffs' LTSA-Related Claims Should Be Dismissed

Plaintiffs' next set of claims concerns cost adjustments to, and the factoring and deferred monetization of, GE Power LTSAs.  ¶¶ 81-88, 92-94.  None passes muster.

> #### 1.    Plaintiffs' Claims Based On Cost Adjustments Fail

> ##### a.    *Plaintiffs' Item 303 Claim Based On Cost Adjustments Fails*

Like AP7, Plaintiffs assert Item 303 claims based on GE's LTSA margin estimates—this time focusing on "cost adjustments."  *Compare* ¶¶ 60, 83, *with AP7 I*, 417 F. Supp. 3d at 407-08 (dismissing Item 303 claim based on the purported "trend" of "eliminat[ing] the GE-sourced labor requirement in LTSAs, thereby raising the profit margin over the life of the contracts"); *see also AP7 II*, 2021 WL 311003, at *10 (same).  As a threshold matter, Plaintiffs' Item 303 claim based on cost adjustments fails because the AC does not identify (let alone plead with particularity) any undisclosed trend or uncertainty relating to cost adjustments.  Plaintiffs rely on allegations in the SEC Order, *see* ¶¶ 54, 57, 59-60, 64, 66-67, 91 (citing SEC Order ¶¶ 3-8, 19), but the SEC *declined* to bring any Item 303 claim based on a purported failure to disclose cost adjustments, and did not even allege that the adjustments constituted a trend or uncertainty under Item 303, *see* Ex. 28, SEC Order ¶¶ 15-16, 19.

In any event, Plaintiffs' claims that various "facts" should have been disclosed all fail.

Their first theory—that Defendants did not disclose in GE's Forms 10-Q in 2014, 2015, 2016, and 2017 and its Forms 10-K for 2014 through 2016 "that a substantial portion of [] reported LTSA revenue growth, and Power segment profit, was the result of adjusting cost estimates," ¶ 83—is a non-starter because that information was, in fact, disclosed. When GE reduced cost estimates and applied the updated LTSA profit margin to "costs incurred to date [to] make a new estimate of revenue earned to date," it "recognized as revenue and earnings" the "difference between the old and new estimates of revenue" through cumulative catch-up adjustments. Ex. 28, SEC Order ¶ 7; *see also* ¶ 60 (quoting portion of same). GE's 10-Ks not only described this practice, but also disclosed the portion of GE's earnings attributable to those adjustments. *See* Ex. 15, 2016 10-K, at 90 (explaining that GE "regularly revise[d]" its "estimates under" LTSAs, including due to "cost changes"; that "[r]evisions [could] affect a[n] [LTSA]'s total estimated profitability resulting in an adjustment of earnings"; and that revisions had "increased earnings by \$2.2 billion, \$1.4 billion and \$1.0 billion in 2016, 2015 and 2014, respectively"); *see also, e.g.*, Ex. 3, 2013 10-K, at 74, 103; Ex. 7, 2014 10-K, at 85-86; Ex. 10, 2015 10-K, at 87; Ex. 16, Q1 2017 10-Q, at 36, 44; Ex. 17, Q2 2017 10-Q, at 37, 45; Ex. 19, Q3 2017 10-Q, at 48; Ex. 18, Q3 2017 Call Tr., at 8. GE's comprehensive disclosures foreclose Plaintiffs' Item 303 claim.[10] *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at \*14 (S.D.N.Y. Jan. 18, 2018) (rejecting claim where company

---

[10] Nor can Plaintiffs state a claim based on GE's alleged failure to disclose that cost adjustments were "not sustainable" (which is not alleged with any particularity), ¶ 83: accurately reported revenue is not "rendered materially misleading by failing to disclose that such income was unsustainable." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006); *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (same). Plaintiffs also dubiously suggest that information regarding cost adjustments would have been "material" because GE was "pulling revenue forward," ¶ 83, but cumulative catch-up adjustments reflected past, not future, revenues. *See AP7 I*, 417 F. Supp. 3d at 412 n.24 (noting difference between cumulative catch-up accounting and "pulling profit forward"); Ex. 28, SEC Order ¶ 7 ("GE applied the new [LTSA profit] margin to costs *incurred to date* in order to make a new estimate of revenue *earned to date*.").

"explicitly identified" the supposedly undisclosed information).[11]

Plaintiffs' Item 303 cost adjustment claims fail for the additional reason that Plaintiffs plead no facts supporting a "strong inference" of scienter—much less "facts establishing that [Defendants] had actual knowledge of the purported trend," as Item 303 requires. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 810-11 (S.D.N.Y. 2018); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 n.90 (S.D.N.Y. 2018). Plaintiffs identify no confidential witnesses with information as to what any Defendants might have heard or seen about supposed trends. Instead, the AC relies on non-scienter based allegations from the SEC Order, and unsourced allegations from *Lights Out* and a *Wall Street Journal* article by the *Lights Out* authors.[12]

*First*, taking liberties with the SEC Order, Plaintiffs quote its text but make wholly unsupported additions in brackets: "Executives at GE Power informed GE management [*e.g.*, Immelt and Bornstein] that a significant portion of GE Power's segment profits was the result of reductions in cost estimates." ¶ 67 (quoting SEC Order ¶ 8) (alteration in AC). That allegation cannot support an inference of scienter; the SEC Order does not allege scienter as to anyone, nor does it identify Messrs. Immelt or Bornstein (or any other member of GE management) by name

---

[11] Similarly, Plaintiffs allege that GE "disregard[ed] actual utilization rates when projecting LTSA revenues," ¶ 69, but as this Court already twice explained, GE did not "disregard[]" anything: "downturns in customer utilization . . . were ultimately incorporated into Defendants' revenue models." *AP7 II*, 2021 WL 311003, at *11 (ellipsis in original).

[12] Plaintiffs also repeat various scienter allegations that this Court has rejected, including (i) based on the "dramatic" amount that LTSAs contributed to GE's contract assets, as well as the amount that cumulative catch-up adjustments impacted earnings, *compare* ¶ 96, *with* 4AC ¶¶ 311, 318, *and* 5AC ¶¶ 382, 388; (ii) that a subsequent change in accounting standards somehow rendered fraudulent GE's prior practice of recognizing revenue from cumulative catch-up adjustments, even though the new accounting standards were not yet in effect, *compare* ¶ 97, *with* 4AC ¶¶ 309-10, 312, 5AC ¶¶ 381, 383, *and AP7 I*, 417 F. Supp. 3d at 405; and (iii) that "GE, Immelt, and Bornstein were hyper-focused on GE Power and the impact of [ASC 606]," *compare* ¶ 98, *with* 4AC ¶ 319, *and* 5AC ¶ 370.

or identify who the referenced "executives" were.  *See generally* Ex. 28, SEC Order.  To support

an inference of recklessness, "confidential source allegations must show that individual defendants

actually possessed the knowledge highlighting the falsity of public statements."  *Hensley v. IEC*

*Elecs. Corp.*, 2014 WL 4473373, at *5 n.1 (S.D.N.Y. Sept. 11, 2014) (Furman, J.).  The SEC Order

provides no such allegations.  *See, e.g.*, *Fries v. Northern Oil & Gas, Inc.,* 285 F. Supp. 3d 706,

712, 722 (S.D.N.Y. 2018) (no recklessness where "SEC settlement . . . only implicated [defendant]

in negligent, not fraudulent, conduct"); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779,

at *4 n.3 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).[13]

    *Second*, citing *Lights Out* and the *Wall Street Journal* article, Plaintiffs allege that "GE

Power employees" told certain GE Power executives that "'[Defendants'] expectations about the

sales growth and profit they should be able to hit didn't reflect the dim reality of the market,'"

¶ 68 (quoting Ex. 24, Dec. 14, 2018 *WSJ* Article) (alteration in AC), and that the employees were

"told to nevertheless continue their 'aggressive' manipulation of LTSAs," *id.*  For one thing, the

AC again attempts to add in baseless allegations through brackets—neither the book nor article

specifically refers to any Defendant.  For another, *Lights Out* describes GE's LTSA accounting as

"aggressive," but "legal."  Ex. 26, *Lights Out*, at 247-49.  Regardless, the parroted allegations from

the book and the article do not come close to meeting PSLRA standards.  Nowhere do they identify

any of the "GE Power employees" who allegedly raised concerns by name (or even by title or

general responsibilities), making it impossible to assess the "likelihood that [these employees]

actually knew facts underlying [their] allegations."  *See Altimeo*, 2020 WL 4734989, at *14-15.

Nor does the book or article state with particularity any alleged communications from any

---

[13] In any event, GE disclosed that it reduced cost estimates under its LTSAs, as well as the portion of its earnings attributable to cumulative catch-up adjustments.  *E.g.*, Ex. 15, 2016 10-K, at 90; *see Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015) ("disclosure is flatly inconsistent with an intent to mislead").

Defendant to anyone at GE Power, nor allege that any concerns from GE Power were conveyed up the corporate ladder.  *See* Ex. 26, *Lights Out*, at 249-50; Ex. 24, Dec. 14, 2018 *WSJ* Article, at 8.

b.    *The Profit And Revenue Statements Are Not Actionable*

Like AP7, Plaintiffs challenge GE Power's reported service margins and operating profit for Q1 2016 and Q1 2017—this time claiming they concealed the "impact of contract adjustments."  *Compare* ¶¶ 85(i), 86, *with AP7 I*, 417 F. Supp. 3d at 404-06 (rejecting AP7's "attack" on "various revenue and profit projections reported by GE," including "reported profits for GE's Industrials group").  But Plaintiffs do not dispute the accuracy of the financial information GE reported, and a claim "cannot be premised upon a company's disclosure of accurate historical data."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403-04 (S.D.N.Y. 2016).  And once again, Plaintiffs ignore that GE disclosed the amounts of its cumulative catch-up adjustments and their resulting impact on GE's earnings—which is fatal to Plaintiffs' claims.  *E.g.*, Ex. 10, 2015 10-K, at 87; Ex. 12, Q1 2016 10-Q, at 46; Ex. 15, 2016 10-K, at 90; Ex. 16, Q1 2017 10-Q, at 36, 44; *see In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017) (dismissing claim where the company "disclos[ed] [] the very information [p]laintiffs contend [the company] omitted"), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018).

Plaintiffs' unfounded attacks on various other statements also fail.  Under Plaintiffs' own reasoning, Mr. Immelt was not misleading when he stated that improved profit margins stemmed from "benefits from our efforts in analytics," ¶ 85(i); the AC itself alleges that "research and innovation" resulted in cost adjustments that improved margins, *see* ¶ 62, and GE informed investors that "cost changes" could "affect a[n] [LTSA]'s total estimated profitability resulting in an adjustment of earnings," Ex. 10, 2015 10-K, at 87.  Nor did Mr. Bornstein misleadingly "portray[]" that "contract adjustments driven by better cost performance" created "a short term

18

timing issue" for cash in Q1 2017.  ¶ 86.  To the contrary, Mr. Bornstein stated that $100 million of lower-than-expected cash on contract assets was due to "services contract adjustments" that would "*come back over the remaining life of those contracts*," not "over the second to the fourth quarter," as Plaintiffs claim.  *Id.*  Plaintiffs cannot rewrite Mr. Bornstein's statement to support their claim.  *See In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 449 (S.D.N.Y. 2006). Plaintiffs also challenge an accurate October 20, 2017 statement by Mr. Bornstein regarding contract assets because he allegedly "failed to disclose the extent to which Power had *previously* relied on [] cost adjustments," ¶ 87—but once again, Plaintiffs ignore that GE had previously (and repeatedly) disclosed cumulative catch-up adjustments and their impact on earnings, *see supra*.

2.    Plaintiffs' Claims Based On Factoring And Deferred Monetization Fail

Although this Court allowed a subset of factoring claims to go forward in the *AP7* Action, Plaintiffs have chosen to plead their claims by stripping them of allegations that the Court relied on in allowing those claims to survive.  The genesis of these deviations is that unlike in the *AP7* Action, the majority of the allegations Plaintiffs use to support their factoring-related claims come from the SEC Order, as discussed below.

a.    *Plaintiffs' Item 303 Claim Based On Factoring And Deferred Monetization Of LTSA Receivables Fails*

Plaintiffs claim that Defendants violated Item 303 because they failed to disclose purported trends of "factoring, and related 'deferred monetization' practices" in GE's Forms 10-Q in 2016 and 2017 and its 2016 10-K.  ¶ 92.  The Court previously upheld AP7's claims concerning "GE's failure to disclose factoring in its Class Period financial statements from 2015 on . . . against GE and Bornstein."  *AP7 II*, 2021 WL 311003, at *14.  But Plaintiffs omit key allegations pled in *AP7* and alter others, choosing instead to rely on the non-scienter based SEC Order, which (i) acknowledged GE's historical practice of (and disclosures regarding) factoring of LTSA

receivables (due in one year or less) in Power, and (ii) focused on the "new practice" of deferred monetization of LTSA receivables (due up to five years out) in 2016 and 2017. *See* ¶ 74 (citing SEC Order ¶ 11); Ex. 28, SEC Order ¶ 17.

*First*, Plaintiffs omit the statement from FE-7 that was cited as an integral part to this Court's analysis in *AP7 I* permitting an Item 303 claim to proceed: FE-7's statement that, and explanation for why, "the existing number of LTSAs available to monetize was finite." 417 F. Supp. 3d at 409 ("Yet 'the existing number of LTSAs available to monetize was finite,' and due to slackening demand for new turbines (and thus new LTSAs), GE would not be able to continue factoring receivables indefinitely." (quoting 4AC ¶ 297)). Rather than verifying and incorporating that FE-7 statement, Plaintiffs allege in a conclusory manner that "[t]here was only a finite number of LTSAs that could be factored," and cite to the SEC Order. ¶ 76. But the Order does not say that. Moreover, the AC does not attempt to explain what is meant by "a finite number of LTSAs," or the extent and timing of any impact the allegedly "finite number of LTSAs" had on GE's ability to continue to engage in factoring (or deferred monetization). Plaintiffs also omit FE-7's general description of what selling LTSA receivables supposedly entailed, 5AC ¶¶ 395-97—likely because FE-7 alleged that the practice required invoices, whereas Plaintiffs inexplicably claim that GE sold "amounts that had not yet been invoiced," ¶ 93(a).

*Second*, Plaintiffs attempt to assert a claim based on the alleged non-disclosure of "factoring" LTSAs generally (as opposed to deferred monetization, specifically), but their claim is undermined by the SEC Order on which they rely. ¶ 92. As noted, the SEC Order averred that GE *did* "disclos[e] [] intercompany factoring in its quarterly and annual reports" (as those reports reflect). *See* ¶ 74; Ex. 28, SEC Order ¶¶ 11, 17; *see also* Ex. 12, Q1 2016 10-Q, at 44; Ex. 13, Q2 2016 10-Q, at 46; Ex. 14, Q3 2016 10-Q/A, at 47; Ex. 15, 2016 10-K, at 87; Ex. 16, Q1 2017 10-Q, at 42; Ex. 17, Q2 2017 10-Q, at 43; Ex. 19, Q3 2017 10-Q, at 46 (disclosing factoring and its

impact on GE's CFOA). As such, any attempt by Plaintiffs to cast their SEC-based claim as being about *all* factoring of Power LTSAs (which the business has done and disclosed for many years), as opposed to deferred monetization, should be rejected. *See, e.g.*, *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *14 n.18 (S.D.N.Y. July 23, 2018) (the Court need not accept allegations contradicted by the very sources Plaintiffs cite); *Schaffer*, 2018 WL 481883, at *14 (holding that an Item 303 claim cannot be based on a purported trend that was disclosed).

*Third*, as for the more limited supposed trend of "deferred monetization," Plaintiffs' Item 303 claim rests on selective allegations from the SEC Order, ¶¶ 72, 74-76, 78-79 (citing SEC Order ¶¶ 9, 11-14), and some (not all) statements from *AP7* confidential witnesses that Plaintiffs made no attempt to verify and thus should be afforded no weight. *See Altimeo*, 2020 WL 4734989, at *11-12, *15; *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("The unfairness of permitting a plaintiff in a separate action to rely blindly at the pleading stage primarily on confidential witness statements from another case to meet its pleading burden is patent."). In any event, the *AP7* allegations Plaintiffs did elect to include vaguely speak to "factoring" LTSAs more broadly, without distinguishing (as the SEC did) between factoring and deferred monetization of LTSAs. *See* ¶ 77(a)-(b).

*Fourth*, nothing in the SEC Order upon which Plaintiffs rely supports the required "strong inference" of scienter as to any Defendant—much less "actual knowledge" under Item 303—with respect to either the alleged trend of "factoring" or "deferred monetization." As to factoring LTSAs, GE's disclosures of factoring throughout the relevant period undermine any inference of fraudulent intent. *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *21 (S.D.N.Y. Feb. 26, 2019) ("[d]efendants' disclosures about the risk . . . are inconsistent with" a reckless state of mind), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019). As to deferred monetization, the non-scienter based allegations in the SEC Order do not salvage Plaintiffs' claims. Plaintiffs cite

to SEC Order ¶ 12 and assert that "Immelt and Bornstein knew of the deferred monetization practice when it was instituted." ¶ 76. But SEC Order ¶ 12 contains no allegations regarding Messrs. Immelt and Bornstein, *see id.*,[14] and nowhere "find[s]," as Plaintiffs claim, that Mr. Immelt or Mr. Bornstein "knew about the use of factoring to inflate Industrial [CFOA]," ¶¶ 76-77, much less that they knew that the practice had any material impact on GE's financials. Plaintiffs attempt to supplement the deficient allegations in the SEC Order with certain *AP7* confidential witness allegations that they did not themselves verify, which suffer from other deficiencies.[15]

*Finally*, Plaintiffs' factoring and deferred monetization claims suffer from yet another fatal deficiency: Plaintiffs have not advanced a viable loss causation theory. Plaintiffs vaguely claim that the "truth" regarding "Defendants' fraud" was "revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between April 21, 2017 and October 30, 2018," ¶ 219—and appear to assert that certain disclosures related in any way to Industrial CFOA during that period, ¶¶ 223-59, 273-79, somehow revealed a "scheme" to "manipulat[e] Industrial [CFOA] through the use of factoring including the 'deferred monetization' practices," ¶ 216. But, those disclosures did not reveal anything at all about GE's factoring or deferred monetization practices. Moreover, GE highlighted the practice of factoring

---

[14] If anything, the sentence—"GE's senior executives, and those at GE Power and GE Power Services not only agreed to engage in the practice, but expanded it in part to meet internal cash flow targets set by GE's leadership"—suggests that "GE's leadership" did *not* agree to engage in or expand deferred monetization. ¶ 76 (quoting SEC Order ¶ 12).

[15] Specifically, Plaintiffs copy FE-9's statements that "GE was factoring 'everything' in Renewable and his counterparts in Power were doing the same," and that "around June 2017," Mr. Bornstein "not[ed] that the Company was 'in too deep' to depart from the practice." ¶ 77(a). Plaintiffs do not themselves verify these statements, and in any event, the allegations do not fit Plaintiffs' SEC-based approach, as FE-9 does not specifically reference "deferred monetization." *Id.* Plaintiffs also misleadingly omit AP7's allegation that FE-9 spent part of his career in GE's Renewable Energy division and did not work in Power during the time period Plaintiffs claim GE was engaging in deferred monetization of Power receivables (2016 and part of 2017). *Compare id.*, *with* 5AC ¶¶ 68, 400.

LTSAs and its impact on CFOA well before the alleged "corrective disclosure period," ¶ 279, and GE provided a specific explanation of its deferred monetization practice (along with the amount of outstanding long-term financing receivables) as of Q1 2017, Ex. 16, Q1 2017 10-Q, at 43, and the impact of that practice on CFOA as of Q2 2017 (year to date and compared to the same prior period in 2016), Ex. 17, Q2 2017 10-Q, at 44; Ex. 19, Q3 2017 10-Q, at 47. Taken together, these facts preclude Plaintiffs' ability to establish loss causation for the majority of their Item 303 claims. *See Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (dismissing claim where alleged corrective disclosures "did not reveal any 'relevant truth' about the purported fraud").

> b.    *Statements "Concerning GE's Use Of Factoring And Its Deferred Monetization Practices" Are Not Actionable*

Plaintiffs' claims based on various affirmative statements regarding factoring or deferred monetization likewise fail. *First*, Plaintiffs attack as false or misleading, without any particularized facts in support, the Q1 2016 10-Q's statement that "GE sells customer receivables to GE Capital in part to fund the growth of [its] industrial businesses." ¶ 93(a). Plaintiffs' claim that the "deferred monetization practice" did not "fund the growth" of GE's industrial business because the practice "prevented *revenue* growth by pulling forward future revenues," *id.*, is also unsupported and contradicted by other allegations in the AC.[16]

*Second*, Plaintiffs also newly challenge various targets for, and reported amounts of, GE's Industrial CFOA, claiming that these figures "created the false impression that Industrial CFOA was commensurate with reported Power revenues." ¶ 94(b)-(f). But Plaintiffs do not even bother

---

[16] As Plaintiffs appear to acknowledge elsewhere, deferred monetization of LTSA receivables impacts cash collections, not revenue that already has been recognized. *See* ¶ 75 (alleging that deferred monetization "pulled forward future years' *cash* collections").

to specify what the referenced "reported Power revenues" were, let alone compare them to the Industrial CFOA figures.[17]  *See id.*  In any event, "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data" such as GE's Industrial CFOA, even where it was supposedly "inflated as a result of the alleged scheme."  *Sanofi*, 155 F. Supp. 3d at 403-04.

*Third*, like AP7, Plaintiffs here challenge the 2016 Form 10-K's statement that "[i]n order to manage credit exposure, GE sells current receivables to GE Capital and other third parties in part to fund the growth of our industrial businesses," ¶ 93(b), and newly add identical statements found in GE's 2017 Forms 10-Q, ¶ 93(c).  But unlike AP7, Plaintiffs do not advance the allegation that was integral to this Court's decision to permit AP7's challenge to proceed past a motion to dismiss—*i.e.*, that investors allegedly would have understood that managing credit exposure was factoring's "sole[]" purpose.  *See AP7 I*, 417 F. Supp. 3d at 413.  Instead, Plaintiffs allege that the statement was false or misleading because "deferred monetization" was implemented to "create the illusion" that cash was growing along with revenue.  ¶ 93(b)-(c).  But the statement in the 2016 10-K discusses short-term factoring of "current receivables," which does not, under Plaintiffs' theory, relate to deferred monetization.  Plaintiffs fail to explain how this true statement regarding factoring could have misled anyone about the impact of deferred monetization.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004).  As for the 2017 10-Qs, each specifically highlighted that GE engaged in "long-term financing arrangements with GE Capital," Ex. 16, Q1 2017 10-Q, at 43; Ex. 17, Q2 2017 10-Q, at 44; Ex. 19, Q3 2017 10-Q, at 47, which in no way "suggest[s] that GE was factoring only 'current receivables,'" as Plaintiffs claim, ¶ 93(c).

---

[17] In Q1 2016, for example, there could be no such "false impression":  "Industrial CFOA was $400 million, *down 60%*," ¶ 94(b), while Power's revenues were $5.204 billion, *up 13%*, Ex. 11, Q1 2016 Earnings Release, at 6.

E.    **Plaintiffs' Alstom-Related Claims Should Be Dismissed**

Plaintiffs' final recycled theory of fraud relates to GE's $10.1 billion acquisition of Alstom's Thermal, Renewables, and Grid businesses in November 2015.[18]  Specifically, Plaintiffs challenge: (i) GE's disclosure and accounting of its Alstom-related goodwill balances and impairment testing, *e.g.*, ¶¶ 125-30; and (ii) GE's and Mr. Immelt's statements regarding the reported enterprise value of the Alstom assets, the status of the transaction, and the subsequent goodwill impairment charge, *e.g.*, ¶¶ 113-24, 131-42.  Each of these claims fails.

1.    GE's Estimates And Calculations Of Goodwill Are Not Actionable

Like TRS, Plaintiffs challenge GE's reported goodwill balances and accounting disclosures related to the Alstom acquisition (albeit over an expanded period of time), *compare* ¶¶ 125-30, *with* SAC ¶¶ 456-63, 466-76, 479-90, but plead no additional facts to overcome Judge Cote's prior dismissal of claims premised upon those very same statements.  As Judge Cote recognized, "[g]oodwill balances are accounting estimates produced through an exercise of judgment," and "[b]ecause a wide range of goodwill values could be compliant with GAAP, the plaintiffs must identify particular facts supporting an inference that GE's accounting fell outside of that permissible range."  *TRS*, 2020 WL 2306434, at *14.  Rather than allege any new facts regarding GE's goodwill accounting (let alone any facts that would show GE's accounting fell outside of any permissible range under GAAP), Plaintiffs claim that GE's reported goodwill was "artificially inflated" because it was based on a "bogus enterprise value" of Alstom, *e.g.*, ¶¶ 127-28.  Even assuming that assertion could support a challenge to GE's goodwill disclosures (and it cannot, as discussed *infra*), Plaintiffs' allegations do not alter Judge Cote's holding that "previously known

_____

[18] On April 30, 2014, GE announced its binding offer to acquire these Alstom assets for $13.5 billion enterprise value.  ¶ 113; Ex. 4, Apr. 30, 2014 Press Release.  Adjusting for changes in deal structure, remedial price adjustments, net cash at close, and currency effects, GE paid approximately $10.1 billion in the acquisition.  Ex. 9, Nov. 2, 2015 Press Release.

trends may later reveal themselves to be of a different magnitude or importance than initially expected," *TRS*, 2020 WL 2306434, at *14, and a "disagreement about the exercise of judgment" does not establish that "goodwill balances were misleading as of the time they were stated," *id.*

Plaintiffs' goodwill-related claims also fail because they do not adequately allege scienter. Like TRS, Plaintiffs cite to no confidential witnesses, internal documents, or other information that go to any Defendant's knowledge of GE's goodwill accounting—and thus they fail to plead any facts showing "defendants knew facts or had access to information suggesting that their public statements were not accurate." *Id.* at *15. Also like TRS, Plaintiffs recite a "laundry list" of miscellaneous scienter allegations (*e.g.*, based upon the "magnitude" of the eventual impairment charge, ¶¶ 143-48); as Judge Cote held, "none [] support an inference that GE's goodwill accounting was reckless." *TRS*, 2020 WL 2306434, at *15.[19]

2.    Plaintiffs' Additional Alstom-Related Claims Fail

a.    *GE's Statements Regarding Alstom Are True And Inactionable Opinions*

Plaintiffs add a facially deficient claim that GE's and Mr. Immelt's statements that GE was acquiring Alstom at a $13.5 billion enterprise value were false or misleading because $13.5 billion "was not the fair value of the assets being acquired" and because Defendants knew or were reckless in not knowing that GE was "vastly overpaying." ¶ 113. As an initial matter, GE did not represent that $13.5 billion was the "fair value of the assets being acquired." Rather, GE merely disclosed

---

[19] Plaintiffs also challenge lengthy portions of GE's SEC filings related to a goodwill impairment charge it took in connection with its Power Conversion unit, *e.g.*, ¶¶ 132-33, claiming that the disclosures were false and misleading because they stated that the Power Conversion goodwill was impaired in light of "downturns in certain" of its "customer segments," *see* Ex. 19, Q3 2017 10-Q, at 85, when the "'primary factor' that led to the need for an impairment was that Alstom was acquired at a price that exceeded its fair value." *E.g.*, ¶ 133. But Plaintiffs allege no facts (and there are none) to support their claim: Alstom's goodwill was reported in the Grid Solutions division, not the Power Conversion unit. *See* Ex. 19, Q3 2017 10-Q, at 85 (noting that Grid Solutions reporting unit within Power was formed as a result of the Alstom acquisition).

its offer (and ultimately, purchase) price, which consisted of $13.5 billion "enterprise value" and $3.4 billion net cash.  *E.g.*, Ex. 4, Apr. 30, 2014 Press Release ("GE has submitted a binding offer to acquire the Thermal, Renewables ('Power') and Grid businesses of Alstom [] consisting of $13.5 billion (€9.9 billion) enterprise value and $3.4 billion (€2.5 billion) of net cash, totaling $16.9 billion (€12.35 billion).").  Plaintiffs do not allege particular facts showing that GE inaccurately calculated the enterprise value (typically, a calculation performed by adding a company's market capitalization and debt, then subtracting its cash and cash equivalents) of the assets acquired,[20] or dispute that GE accurately reported the price of the Alstom acquisition.

In any event, to the extent GE's statements implied anything about the "fair value" of the Alstom assets (a term that GE did not use), fair value is subject to "management's determination" and is "not [a] matter[] of objective fact."  *E.g.*, *TRS*, 2020 WL 2306434, at *13 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)).  As a result, statements regarding the value of the Alstom assets are opinions that must be analyzed under *Omnicare*.  *Id.*; *see also In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251 (S.D.N.Y. 2005) (rejecting "plaintiffs' characterization of valuation models as 'fact' rather than 'opinion'" because "financial valuation models depend so heavily on the discretionary choices of the modeler").  Plaintiffs' claims fail under those standards.  *Omnicare*, 575 U.S. at 184-86.

To start, Plaintiffs make no serious attempt to plead that any Defendant did not subjectively believe the Alstom assets had an enterprise value of $13.5 billion at any time between the April 2014 announcement of GE's offer and the November 2015 announcement that the deal had closed.  *Id.* at 193.  Plaintiffs claim that the enterprise value was "inflated by at least 50%," because GE took expected cost synergies into account, ¶ 110, but Plaintiffs offer no basis for their assertion

---

[20] "Enterprise Value," BLACK'S LAW DICTIONARY (11th ed. 2019).

that doing so resulted in an inflated valuation.  Nor do Plaintiffs allege that taking expected cost synergies into account was improper per se, or that any Defendant did not believe that the cost synergies included in the calculation would not be achieved, or that including cost synergies was an unusual or uncommon practice for GE.  *Id.*  Indeed, *Lights Out* reported that GE frequently considered "cost synergies" in its major acquisitions.  Ex. 26, *Lights Out*, at 196.

Plaintiffs also allege that GE's "deal team" and "bankers" believed GE should have "walked away" from the deal, but what Plaintiffs do not allege is that these views were shared by, or even expressed to, any Defendant.  *E.g.*, ¶¶ 124, 127, 129.  According to *Lights Out*, Mr. Immelt and other top executives did not recall anyone raising objections to the deal (let alone its price).  Ex. 26, *Lights Out*, at 195; *see In re Express Scripts Holding Co. Sec. Litig.*, 2018 WL 2324065, at *8-9 (S.D.N.Y. May 22, 2018) (no securities fraud claim where plaintiffs failed to allege that defendants "did not believe" that the accounting treatment was appropriate during the class period).  And although Plaintiffs point to Mr. Immelt's memoir, *Hot Seat*, to allege that Steve Bolze (head of GE Power) "increasingly elevated concerns to Immelt regarding 'Alstom's diminishing unit sales' and 'how the numbers weren't as good as they'd once been,'" ¶ 119 (quoting Ex. 29, *Hot Seat*, at 272-74), Plaintiffs omit that according to *Hot Seat*, when Mr. Immelt asked Mr. Bolze if he still wanted to go through with the deal despite his concerns, Mr. Bolze "always said yes."  Ex. 29, *Hot Seat*, at 273.

Nor do Plaintiffs identify any untrue embedded facts in GE's reported enterprise valuation of Alstom.  *Omnicare*, 575 U.S. at 176.  Plaintiffs quote GE's explanation that the purchase price represented "7.9 times pro-forma EBITDA," but do not assert that this was untrue.  *E.g.*, ¶ 113 (quoting Ex. 4, Apr. 30, 2014 Press Release).  Plaintiffs allege that GE omitted that more than 50% of Alstom's enterprise value was due to cost-cutting synergies, ¶ 110 (citing Ex. 26, *Lights Out*, at 195-96), but Mr. Bornstein disclosed that cost synergies had been incorporated therein, Ex. 5, Apr.

30, 2014 Call Tr., at 6 ("The valuation is built on modest revenue growth, conservative working capital assumptions, and cost synergies that we believe are highly achievable."),[21] and he had no duty to disclose the impact of those anticipated synergies on the valuation. *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 854 (S.D. Ohio 2016) (rejecting claims that reported enterprise valuations were misleading where defendant explained the general factors behind the calculation).

Plaintiffs are thus left with the theory that Defendants omitted three "particular (and material) facts going to the basis for" GE's opinions that rendered them misleading or incomplete. *Cf. Omnicare*, 575 U.S. at 194. *One*, Plaintiffs assert that GE omitted that the enterprise value was the amount GE needed to pay to ensure that Alstom's majority shareholder, Bouygues SA, received a satisfactory return on its investment. *E.g.*, ¶ 113. Setting aside that every purchase price inherently takes into account what the seller will accept, Plaintiffs have no support for their theory that GE backed into a valuation of Alstom "to appease Bouygues." *Id.* Plaintiffs cite to the secondhand view of an unnamed former "GE executive" who purportedly reported—after the fact—that GE's valuation of Alstom was "fixed based on Bouygues" and "artificial." ¶ 108; *see also* Ex. 26, *Lights Out*, at 196. Neither *Lights Out* nor Plaintiffs provide any detail regarding who the unnamed source is, when he worked for GE, whether he discussed the Alstom deal with Defendants, whether he was involved in calculating the valuation, or even whether he took part in any negotiations. Such vague allegations are entitled to no weight. *Sibanye Gold*, 2020 WL 6582326, at *17 ("Plaintiffs do not indicate that they have conducted their own investigation nor otherwise provided the court with sufficient information about the confidential source allegedly

---

[21] In that same conference call, John Flannery also noted that while the purchase price represented 7.9 time EBITDA, "*[a]djusting for synergies* we expect to realize in this transaction, the purchase price is 4.6 times EBITDA." Ex. 5, Apr. 30, 2014 Call Tr., at 3.

relied upon by the newspaper article.").  Nor does the AC offer any facts about whether or to what extent this "fixed" price exceeded any purported "fair value."  *See In re Allied Capital Corp. Sec. Litig.*, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (rejecting claims that fail to allege "what plaintiffs contend was the true valuation, or [] plead specific facts indicating that [the defendant's] values were incorrect").

*Two*, Plaintiffs claim that Alstom was "on the brink of bankruptcy or a bailout," ¶ 124, based on the inconsistent speculation of a "deal team" member.  According to Plaintiffs (citing to *Lights Out* and a *Wall Street Journal* article by the same authors), a confidential source (given the pseudonym "Adam Smith") helped develop a pitch to acquire Alstom in 2012, and subsequently speculated that Alstom had a "cash crunch" and its stock price would soon plummet, but—to Smith's chagrin—no such "significant decline" materialized.  ¶¶ 104-05.  While Smith apparently disagreed with the purchase price for a company that, in his view, "seemed to be headed for bankruptcy or a possible government bailout," ¶ 109, there is no allegation that Defendants shared this view (or even knew of it at the time).  *See* Ex. 26, *Lights Out*, at 232 (noting that Smith voiced concerns to his "peers and [direct] superiors" but "went no further").  A confidential witness's "personal view . . . simply is not enough to support a claim."  *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016).

*Three*, Plaintiffs allege that GE omitted that it "secretly agreed to adjust the acquisition price by hundreds of millions of dollars to pay" Alstom's criminal fine, even though the DOJ "insisted" that Alstom "pay the entire fine rather than obtain funds from GE to pay."  ¶ 122.  But as the *Wall Street Journal* article upon which Plaintiffs rely makes clear, "GE w[as]n't [] responsible for any part of [Alstom's] penalty under the terms of the settlement," and "[t]he potential cost of the fine was [already] included in GE's purchase price."  Ex. 6, Dec. 22, 2014 *WSJ* Article, at 3.  Nothing in the cited article implies that Alstom could not use the funds received

from GE in order to pay its fine.  In fact, publicly available information shows that Alstom could, and planned to do just that—without objection from the government, and pursuant to a court's grant of its request.  *E.g.*, Motion to Postpone Sentencing Date ¶ 4, *USA v. Alstom S.A.*, Case No. 3:14-cr-00246 (D. Conn. May 26, 2015), ECF No. 19 (unopposed request to continue sentencing because "Alstom is in the process of consummating a transaction in which it is selling virtually all of itself, and that transaction will facilitate the ability of Alstom to pay the fine without impairing its working capital.  And so we have asked . . . the Court to defer sentencing and entry of judgment until after that transaction has closed . . . .").  Plaintiffs' allegations are simply a fiction.

Plaintiffs also challenge factual statements regarding the status of the Alstom acquisition, but they fail to plead that any of these true statements were misleading.  Plaintiffs claim that accurate statements such as "all the major regulators" had "approved GE's purchase of Alstom with remedies" and that GE would "divest [several assets] to Ansaldo [Energia of Italy]" were misleading because the "concessions GE had agreed to made a bad deal much worse." ¶ 123.  But no reasonable investor would draw any inference about whether the deal was "good" or "bad" or "worse due to concessions" from these factual statements regarding the status of the deal.  Plaintiffs further claim that GE's November 2, 2015 statement that the "overall economics and strategic rationale remain the same as GE announced in April 2014" was misleading because GE had agreed to divestitures that "fundamentally altered" the value of Alstom to GE.  ¶ 124.  But GE explained why the divestitures did not change the overall economics of and strategic rationale behind the transaction, and Plaintiffs fail to explain how they "fundamentally altered" Alstom's value.  *See* Ex. 8, Oct. 16, 2015 Call Tr., at 3.  Because the challenged statements were true, they cannot support a claim.  *In re Nokia OYJ (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006) ("[I]t is well settled that a complaint alleging violations of the securities laws may not rely

upon statements that are true.").[22]

For these same reasons, Plaintiffs do not come close to establishing the required "strong inference" of scienter as to any of these challenged statements.[23]  Plaintiffs allege no motive for Defendants to commit fraud regarding the Alstom acquisition, other than allegations that Mr. Immelt wanted to "complete a bold transaction as part of GE's pivot away from GE Capital."  *See* ¶ 113.  But Mr. Immelt's desire to close a deal that he believed was a "strategic acquisition" that would "further [GE's] core industrial growth," Ex. 4, Apr. 30, 2014 Press Release, at 1-3; Ex. 9, Nov. 2, 2015 Press Release, at 1, is hardly evidence of a motive to commit fraud.  *See TRS*, 2020 WL 2306434, at *15 (that "certain Individual Defendants had been longtime supporters of the Alstom acquisition" does not support an inference of scienter); *see also ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Lucescu v. Zafirovski*, 2018 WL 1773134, at *8 (S.D.N.Y. Apr. 11, 2018) ("Action taken to maintain the appearance of corporate profitability, or of the success of an investment . . . does not entail concrete benefits sufficient to demonstrate motive").  Nor does the AC identify any facts supporting Plaintiffs' conclusion that Defendants knew or recklessly disregarded that GE was overpaying for Alstom.  To the contrary, *Hot Seat*, upon which Plaintiffs rely, acknowledges that the acquisition was reviewed 12 times by GE's Board, that it was also reviewed by many members of GE's 450-person audit staff, and that GE's independent auditor KPMG reviewed the terms of the acquisition

---

[22] Nor do Plaintiffs even attempt to allege that Mr. Immelt disbelieved his stated opinion that "[w]e're comfortable with this outcome" or omitted any material facts.  *See* ¶ 123.  Indeed, Plaintiffs' own cited sources state that Mr. Immelt "still" believes the deal "made all kinds of sense."  Ex. 29, *Hot Seat*, at 273.  Plaintiffs likewise fail to mount any challenge to Mr. Immelt's forward-looking statement that "we still expect to achieve $3 billion of synergies."  ¶ 123.

[23] Plaintiffs further claim that GE's failure to include all of the "omissions" discussed *supra* violated Item 303, ¶ 130, but they do not even attempt to explain how any of these alleged violations constituted a "known trend[] or uncertaint[y]" with an expected material impact on GE's net sales, income or revenue, as they must.  *See* 17 C.F.R. §§ 229.303(a)(1), (a)(3).

and reported no issues to GE's Audit Committee.  Ex. 29, *Hot Seat*, at 272-74.

At bottom, Plaintiffs' criticisms of GE's "valuation" of Alstom are merely hindsight allegations of corporate mismanagement that cannot sustain a securities fraud claim.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) ("Section 10(b) . . . does not reach mere 'instances of corporate mismanagement.'" (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977))).

        **b.**    *GE's Statements Regarding Its Goodwill Impairment Charge Are Not Actionable*

Last (as it relates to Alstom), Plaintiffs also newly challenge various disclosures regarding the goodwill impairment charge that GE took.  *E.g.*, ¶¶ 134, 141.  Each fails.

*First*, Plaintiffs claim that GE's October 1, 2018 disclosure regarding its impending goodwill charge was misleading because it omitted that the charge was "almost entirely due to the Alstom acquisition."  ¶ 134.  But GE announced that it expected to take a non-cash impairment charge representing "substantially all" of Power's goodwill balance of approximately $23 billion.  *Id.*; Ex. 20, Oct. 1, 2018 Press Release, at 1.  Necessarily, "substantially all" Power goodwill included goodwill related to Alstom.  *See, e.g.*, Ex. 21, Oct. 1, 2018 *Reuters* Article, at 2.  No one was misled.

*Second*, Plaintiffs claim that the October 30, 2018 announcement was false and misleading because "it suggested that the charge was the result of recent market disruptions," although GE allegedly was aware of challenging market conditions for "years."  ¶ 141.  But as GE disclosed, deterioration in the power market was more severe and sustained than anticipated.  Ex. 22, Q3 2018 10-Q, at 9; Ex. 23, Oct. 30, 2018 Call Tr., at 4 ("[W]ith respect to Power, the issues will persist longer and with deeper impact than we had initially expected . . . .").  Plaintiffs allege no particularized facts showing that any "known" challenges in the power market (which GE

disclosed) required GE to take a goodwill impairment sooner than it did.  *See TRS*, 2020 WL 2306434, at *14 ("the general downturn in power generation markets was widely known and disclosed in GE's SEC filings," and "[t]hose disclosures included discussion of the very issues on which the SAC relies in an attempt to suggest that the impairment should have been recorded earlier"); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) ("[N]othing more than disagreement with MDC's accounting judgments [regarding goodwill], [] cannot support a fraud claim.").

*Third*, the AC faults GE's October 30, 2018 disclosure for "not disclos[ing] the fact that the Alstom transaction was based on an artificial valuation of Alstom from the start." ¶ 140.  Aside from relying on improper circular reasoning, *see Brady v. Top Ships Inc.*, 2019 WL 3553999, at *8 (E.D.N.Y. Aug. 5, 2019), Plaintiffs' allegation that the October 30 statement was fraudulent is inconsistent with Plaintiffs' assertion that, on the same day, "there was no longer any artificial inflation in GE's stock price attributable to the fraud described herein." ¶ 219.

*Fourth*, Plaintiffs' claims regarding GE's goodwill write-down fail for the further reason that Plaintiffs have not adequately alleged scienter.  *See, e.g.*, *Plumbers & Steamfitters*, 694 F. Supp. 2d at 302.  The "alternative" non-fraudulent inference—that GE believed acquiring Alstom was in the Company's best interest and that it could capitalize on expected deal synergies, but did not anticipate the subsequent global power market decline—is more compelling than Plaintiffs' theory of fraud:  that Defendants knew from the outset that the biggest deal in GE's history (which Mr. Immelt hoped would cement his legacy) would be a "complete disaster," inevitably resulting in a large goodwill charge.  *See AP7 II*, 2021 WL 311003, at *12; *see also TRS*, 2020 WL 2306434, at *14-15.

*Finally*, Plaintiffs fail to adequately plead loss causation.  Plaintiffs allege that GE's $22 billion goodwill impairment charge and disclosure of expanded investigations by the SEC and

DOJ on October 30, 2018 revealed GE's "scheme" related to its "acquisition of Alstom," causing its stock price to drop from $11.16 to $10.18. ¶¶ 216-83. But Plaintiffs acknowledge that "[o]n ***October 1, 2018***, Defendants revealed that GE was required to reduce goodwill associated with the Alstom acquisition by approximately $22 billion," ¶ 144, after which GE's stock price ***rose*** from $10.86 to $11.63, a fact which is judicially noticeable. *See* Ex. 2, GE Historical Stock Price; *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 367 (S.D.N.Y. 2018); *see also Waters v. Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) (granting motion to dismiss and observing that "[t]he Court c[ould not] find, and Plaintiffs ha[d] not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud" (emphasis in original)), *aff'd sub nom. GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011). GE's additional disclosure on October 30, 2018 that the SEC and DOJ intended to investigate GE's goodwill accounting does not support loss causation. *See Janbay*, 2012 WL 1080306, at *15 ("The announcement of an SEC [] internal investigation is itself insufficient to plead loss causation."); *Meyer v. Greene*, 710 F.3d 1189, 1200-01 (11th Cir. 2013) (disclosure of investigation "is insufficient to constitute a corrective disclosure for purposes of § 10(b)").

## II.    THE AC FAILS TO PLEAD A "SCHEME LIABILITY" CLAIM

Plaintiffs appear to assert a "scheme liability" claim under subsections (a) and (c) of SEC Rule 10b-5, 17 C.F.R. § 240.10b-5(a), (c). *See* ¶ 294 (quoting Rule 10b-5). To state a claim for scheme liability, a "plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2020 WL 1676762, at *9 (E.D.N.Y. Apr. 6, 2020) ("A plaintiff bringing a claim pursuant to those subsections must plead with particularity the manipulative scheme itself."). "Scheme liability" claims are "aimed at 'inherently deceptive

conduct.'" *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 534 (S.D.N.Y. 2020). Though Plaintiffs use the word "scheme" 22 times in the AC, they do so without any effort to allege any "inherently deceptive conduct" beyond the alleged misstatements. Where, as here, Plaintiffs "attempt to bypass the elements" by simply "labeling the alleged misconduct a 'scheme' rather than a 'misstatement,'" their claims must be dismissed. *See id.* at 534-35.

## III.    THE AC FAILS TO PLEAD A SECTION 20(A) CLAIM

An actionable Section 20(a) claim requires a primary violation, control of the primary violator, and culpable participation in the controlled person's fraud. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Here, Plaintiffs fail to plead either Mr. Immelt's or Mr. Bornstein's liability under Section 20(a).[24] *First*, Plaintiffs' Section 20(a) claims all fail because the AC does not plead a single primary violation. *Second*, Plaintiffs fail to plead Mr. Immelt's or Mr. Bornstein's "culpable participation." The weight of authority in this Circuit requires Plaintiffs to plead "culpable participation" in any primary violation under Section 20(a), with the same particularity required to plead scienter. *See, e.g.*, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("Section 20(a) liability requires an 'individualized determination . . . of the defendant [control person's] particular culpability.'"). Accordingly, to plead culpable participation, Plaintiffs must plead particularized facts indicating that each of Mr. Immelt and Mr. Bornstein "knew or should have known that the primary violator [here, GE], over whom that person had control, was engaging in fraudulent conduct." *Id.* at 438-39 (dismissing Section 20(a) claim based on a "detailed allegation of involvement" because it did not "amount to an allegation of conscious misbehavior" sufficient to plead culpable participation). The AC contains no such allegations.

---

[24] Plaintiffs do not allege a Section 20(a) claim against Mr. Sherin. ¶ 301.

## IV.   THE AC FAILS TO PLEAD OHIO AND COMMON LAW FRAUD CLAIMS

Because Plaintiffs fail to state a violation of the Exchange Act, the Court should dismiss Plaintiffs' remaining state law claims for lack of supplemental jurisdiction. *See Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A.*, 2018 WL 1276847, at \*5 (S.D.N.Y. Mar. 8, 2018) (Furman, J.). In any event, because Plaintiffs fail to adequately allege any false or misleading statement, or that any Defendant acted with scienter, their Ohio Securities Act and New York common law fraud claims also fail.[25] *See* O.R.C. § 1707.44(J); *Western & Southern Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 910 (S.D. Ohio 2014) ("[Section] 1707.44(J) require[s] that a defendant act with an intent to mislead or deceive."); *Steed Finance LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 282 (S.D.N.Y. 2003) ("The elements of common law fraud in New York are 'essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b-5 . . . .'"); *Special Situations*, 33 F. Supp. 3d at 446 (same). In addition, to the extent any claims in the AC rely on purported omissions of or failures to disclose material facts, they cannot support a cause of action under the relevant provision of the Ohio Securities Act, which prohibits only false statements, *not* omissions. *See Escue v. Sequent, Inc.*, 869 F. Supp. 2d 839, 853 (S.D. Ohio 2012), *aff'd*, 568 F. App'x 357, 367 n.17 (6th Cir. 2014).

## <u>CONCLUSION</u>

The AC should be dismissed with prejudice.

---

[25] New York law is applicable to Plaintiffs' common law fraud claim because there is no "actual conflict" between the elements required to establish common law fraud under New York and Ohio law. *See First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 633-34 (S.D.N.Y. 2014). Even if Ohio law applied, the outcome would be the same. *E.g.*, *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, 580 F. Supp. 2d 630, 645-46 (S.D. Ohio 2008) (dismissing Ohio common law fraud claim for failure to plead that the defendant "knew or recklessly disregarded that its note ratings were not factually well-grounded").

Dated: New York, New York
       May 10, 2021

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Blake T. Denton
      Miles N. Ruthberg
      Blake T. Denton
      1271 Avenue of the Americas
      New York, New York 10020
      (212) 906-1200
      miles.ruthberg@lw.com
      blake.denton@lw.com

      Sean M. Berkowitz (*pro hac vice* forthcoming)
      330 North Wabash Avenue, Suite 2800
      Chicago, Illinois 60611
      (312) 876-7700
      sean.berkowitz@lw.com

      William J. Trach (*pro hac vice* forthcoming)
      200 Clarendon Street
      Boston, Massachusetts 02116
      (617) 948-6000
      william.trach@lw.com

      Sarah A. Tomkowiak (*pro hac vice* forthcoming)
      555 Eleventh Street NW
      Washington, D.C. 20004
      (202) 637-2200
      sarah.tomkowiak@lw.com

      *Attorneys for Defendants General Electric Company, Jeffrey R. Immelt, Jeffrey S. Bornstein, and Keith S. Sherin*